## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

---

BUILDING RESILIENT INFRASTRUCTURE
& DEVELOPING GREATER EQUITY, INC.,

     *Plaintiff*,

*v.*

                           Case No. _____

CONSUMER FINANCIAL PROTECTION
BUREAU *and* RUSSELL VOUGHT, *in his
official capacity as Acting Director,
Consumer Financial Protection
Bureau*,

     *Defendants*.

---

### COMPLAINT OF PLAINTIFF BUILDING RESILIENT INFRASTRUCTURE & DEVELOPING GREATER EQUITY, INC.

---

Plaintiff Building Resilient Infrastructure & Developing Greater Equity, Inc. ("Plaintiff" or "BRIDGE"), by its undersigned attorneys at Troutman Pepper Locke LLP, hereby provides its Complaint against Defendants the Consumer Financial Protection Bureau and Russell Vought, in his official capacity as Acting Director of the Consumer Financial Protection Bureau (collectively, "the CFPB"), as follows:

## NATURE OF THE ACTION

1.    Property Assessed Clean Energy ("PACE") financing is a government sponsored initiative that multiple States—including Florida—have adopted to offer homeowners the ability to finance certain energy efficient and weather-hardening home-improvement projects through a voluntary assessment on their regular property tax bill.

2.    PACE financing thus empowers States like Florida, through their state taxing power, to provide low- and middle-income property owners an affordable and equitable means to finance critical home-improvement projects that they may otherwise have to forgo—projects that are particularly crucial in natural-disaster prone States, such as Florida.

3.    Relatedly, PACE programs also provide States like Florida with another effective tool to pursue their sovereign objectives within their borders, such as water conservation, disaster readiness, storm hardening, infrastructure maintenance, and job creation.

4.    In 2018, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA" or "the Act"), which, in Section 307, directed the CFPB to prescribe particular regulations for PACE financing.

5.    Specifically, Section 307 ordered the CFPB to "prescribe regulations that carry out the purposes of" two identified sections of the Truth in Lending Act ("TILA"), related to determining a consumers' "ability to repay"

certain loans and an associated enforcement provision, while also "account[ing] for the unique nature of [PACE] financing" when issuing those regulations. 15 U.S.C. § 1639c(b)(3)(C).

6.    Despite Congress' specific and limited directive in Section 307, the CFPB promulgated the *Residential Property Assessed Clean Energy Financing (Regulation Z)* final rule ("Final PACE Rule"), 90 Fed. Reg. 2434 (Jan. 10, 2025), to apply essentially all of TILA's provisions to PACE financing transactions, as well as provisions of multiple other federal statutes—the Real Estate Settlement Procedures Act ("RESPA") and the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act")—that were not even mentioned in Section 307.

7.    As a result of the Final PACE Rule, PACE financing transactions must now, by March 1, 2026 (the Final Rule's effective date), for example, comply with all the burdensome front- and back-end consumer disclosure requirements that are applicable to residential mortgage loans under these statutes—which disclosure requirements, moreover, are unnecessary for PACE financing transactions.

8.    These consumer disclosures under TILA and RESPA will only create additional confusion for potential property owners interested in PACE financing.    This is especially true given that many state and local

- 3 -

municipalities have their own mandated consumer disclosures as it relates to PACE financing.

9.     Consequently, the Final PACE Rule will inflict extensive harm on BRIDGE, its members, and the PACE industry as a whole—Renew Financial Group, LLC ("Renew"), for example, estimates a 72% reduction in volume of funding, and Ygrene Energy Fund, Inc. ("Ygrene") estimate hundreds of thousands of dollars of expenses associated with implementation of and compliance with the Final PACE Rule both before and after its effective date.

10.     The CFPB's unlawful power grab over PACE financing with the Final PACE Rule will end PACE financing as a legally and commercially viable enterprise.

11.     The Final PACE Rule is unlawful in multiple respects.  First, the CFPB promulgated the Final PACE Rule "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), because the Final Pace Rule exceeded Congress' narrow instruction to adapt TILA's ability-to-repay requirements for residential mortgage loans to PACE financing transactions, while "account[ing] for the unique nature of [PACE] financing."  15 U.S.C. § 1639c(b)(3)(C).  Second, the Final PACE Rule violates the Tenth Amendment, including its anti-commandeering principle, and so is "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C.

§ 706(2)(B), because the Final PACE Rule interferes with the States' taxing authority and commandeers States to enforce the Federal Government's preferred regulatory program for PACE financing.  Third, the CFPB failed to observe rulemaking procedure required by law, 5 U.S.C. § 706(2)(C), because the CFPB did not submit the Final PACE Rule to the required Small Business Review Panel pursuant to the Regulatory Flexibility Act.  Finally, the Final PACE Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, 5 U.S.C. § 706(2)(D), because the CFPB relied upon the fatally flawed PACE Report as the justification for the Final Rule.

12.　　Plaintiff BRIDGE, a PACE trade organization, now brings this lawsuit to stop the enforcement of the flagrantly unlawful Final PACE Rule and Section 307, so as to ensure that this essential method of financing remains available in States like Florida.

## JURISDICTION AND VENUE

13.　　This action arises under the Constitution and the laws of the United States.  Specifically, this action raises federal questions under the Tenth Amendment to the Constitution; under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*; and under and TILA, as amended by the EGRRCPA, 15 U.S.C. § 1601 *et seq.*

14.　　Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

15.    Further, this Court has authority to issue the declaratory and injunctive relief sought under the APA, 5 U.S.C. §§ 701–06.

16.    Plaintiff has standing to bring this action because Plaintiff and its members are directly regulated under, and/or adversely affected by, the Final PACE Rule. *See* 90 Fed. Reg. 2434.

17.    BRIDGE is itself harmed because its mission is to promote, and advocate on behalf of, the residential PACE industry, as well as to support residential PACE companies to better support surrounding communities by providing PACE financing to create resilient homes and local infrastructure, but the Final PACE Rule will thwart that mission by destroying the PACE industry.

18.    Additionally, BRIDGE is harmed because its individual members are also harmed by the Final PACE Rule, as demonstrated below.

19.    For example, Renew estimates its total expected compliance costs before the Final PACE Rule's March 1, 2026 effective date to be $2,528,000 across legal, engineering, product, project management, and operations, and anticipates that it will lose close to 72% of its funding volume after the rule goes into effect," devastating its ability to do business.

20.    In January 2025 alone, Renew spent approximately $32,000 in legal fees to engage outside counsel for the purposes of implementing the Final

PACE Rule because Renew needs additional clarifications and legal guidance on certain aspects of the rule, given its complexity.

21.     And Renew anticipates it will incur an additional $448,000 in legal fees across the 14-month period from January 2025 to March 1, 2026 for the compliant implementation of the Final PACE Rule.

22.     Renew also expects to incur about $980,000 in additional headcount costs for the implementation of the Final PACE Rule, because Renew will need to devote additional internal technology and product resources to ensure that it can implement the Final PACE Rule from an operational and technological perspective, including by hiring four subject matter experts in the areas of technology and product management to work full time on the implementation at approximately $120 per hour.

23.     Further, Renew expects to incur another $1,100,000 to hire third-party consultants in areas such as engineering and product management to ensure the timely implementation of the Final PACE Rule.

24.     Renew will continue to incur significant compliance costs once the Final PACE Rule goes into effect, as it anticipates losing the majority of its funding volume.

25.    Similarly, Ygrene has shifted internal resources to assess the impact of the Final PACE Rule and develop a strategic plan for implementation and compliance.

26.    In addition to the strain on current resources, Ygrene has been required to supplement internal resources with outside legal and compliance counsel.

27.    Ygrene has to date spent just under $100,000 and anticipates spending an additional $500,000 over the next year to assist in both compliance and Final PACE Rule implementation.

28.    Ygrene's implementation of the Final PACE Rule will require the purchase of a new technology platform and corresponding internal resources to manage the platform.

29.    Ygrene employees have already dedicated more than 1,000 hours examining current systems for systemic enhancements and evaluating outside platforms as a potential option, and although a final selection has yet to be made, Ygrene projects the implementation cost and corresponding project management costs to be well over $500,000, in part due to limited third-party technology available in the market.

30.    Additionally, only mortgage platforms and providers incorporate compliance tolerance regulatory testing for TILA, RESPA, and ECOA, so

Ygrene anticipates the on-going outside technology expenditures will exceed $559,000 annually.

31.    In addition to the external costs associated with implementation, Ygrene will also need to increase its internal headcount by at least eight additional full-time employees that will be allocated to operations with a focus on underwriting, process and funding, compliance review and monitoring, and legal review and analysis, coupled with additional technology resources resulting in an additional expenditure of $880,000.

32.    Once the Final PACE Rule goes into effect on March 1, 2026, Ygrene will continue to incur significant on-going costs to comply with the Final PACE Rule's numerous and burdensome requirements.  And the Final PACE Rule will lead to a substantial decrease in Ygrene's business.

33.    Thus, the injuries-in-fact of Plaintiff and its members are directly traceable to the Final PACE Rule, and favorable judicial remedies against the enforcement of the Final PACE Rule—including declaratory and injunctive relief—would remedy these injuries-in-fact.

34.    Venue lies in this District under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this District.  Further, venue is also proper in this District

under 28 U.S.C. § 1391(e)(1) because Plaintiff is incorporated in the State of Florida, with its headquarters and principal place of business in this District.

## PARTIES

35.    Plaintiff BRIDGE is a trade organization organized under Section 501(c)(6) of the Internal Revenue Code of 1986 to promote, and advocate on behalf of, the residential PACE industry, as well as to support residential PACE companies to better support surrounding communities by providing PACE financing to create resilient homes and local infrastructure.

36.    Plaintiff is incorporated in the State of Florida, and its headquarters and principal place of business is in Florida, in this District, at 500 Knights Run Avenue, Unit 805, Tampa, Florida 33602.

37.    Defendant CFPB is an independent agency of the United States Government charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws, 12 U.S.C. § 5491(a), including, as relevant here, prescribing regulations to carry out the purposes of TILA, 15 U.S.C. § 1604(a).  The CFPB is located at 1700 G Street NW, Washington, D.C. 20552.

38.    Defendant Russell Vought is the Acting Director of the CFPB, an agency of the United States Government, located at 1700 G Street NW, Washington, D.C. 20552.  Defendant Russell Vought is sued in his official capacity as Acting Director of the CFPB.

## FACTUAL ALLEGATIONS

### I.    Legal Background

#### A.    The Truth In Lending Act And Regulation Z

39.    In 1968, Congress enacted the TILA, 15 U.S.C. § 1601 *et seq.*, Title I of the Consumer Credit Protection Act, Pub. L. 90-321 Stat. 146, requiring creditors "to disclose information [to consumers] relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004) (citing 15 U.S.C. §§ 631–1632, 1635, 1637–39), and to comply with certain other rules for "consumer credit transaction[s]," such as rules for lending requirements relating to residential mortgages, *id.*; *see* 15 U.S.C. § 1639c.

40.    TILA's requirements only apply to transactions where a creditor offers or extends credit to a consumer, *see* 12 C.F.R. § 1026.1(c); *see also* 15 U.S.C. § 1602(f), (i)—with "credit" defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," 15 U.S.C. § 1602(f), and "consumer" defined as a "natural person" to whom credit is extended, *id.* § 1602(i).

41.    As particularly relevant here, TILA imposes various obligations on a creditor who lends credit to a consumer in the form of "a residential mortgage loan"—defined, in relevant part, as "any consumer credit transaction that is secured by a mortgage . . . or other equivalent consensual security

interest on a dwelling or on residential real property that includes a dwelling." *Id.* § 1602(dd)(5).

42.    For example, TILA requires a creditor entering "a residential mortgage loan" to a consumer to ensure that "the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." *Id.* § 1639c(a).

43.    Further, creditors lending certain residential mortgage loans subject both to TILA and to RESPA must also provide required TILA disclosures to the consumer "not later than three business days after the creditor receives the consumer's written application, which shall be at least 7 business days before consummation of the transaction." *Id.* § 1638(b)(2)(A).

44.    A creditor's failure to comply with these TILA requirements (like other TILA requirements) can subject a lender to criminal penalties for noncompliance, as well as to civil liability.

45.    The CFPB is responsible for enforcing TILA and "prescrib[ing] regulations to carry out [TILA's] purposes." 15 U.S.C. § 1604(a).

46.    Those regulations are found within "Regulation Z," 12 C.F.R. § 1026, originally promulgated by the Federal Reserve Board.

47.    Finally, in addition to implementing TILA's requirements, Regulation Z also implements the requirements of certain related provisions of RESPA, 12 U.S.C. § 2601 *et seq.*, which sets forth additional disclosure requirements for mortgage loan transactions and "effect[s] certain changes in the settlement process for residential real estate" that are designed to give consumers "greater and more timely information on the nature and costs of the settlement process," 90 Fed. Reg. at 2442.

**B.    Congress Directs The CFPB To Prescribe Regulations That Carry Out The Purposes Of TILA's Ability-To-Repay Requirements With Respect To PACE Financing**

48.    In 2018, Congress amended TILA with the EGRRCPA. *See* 15 U.S.C. § 1601 *et seq*.

49.    As relevant here, Section 307 of EGRRCPA directed the CFPB to promulgate regulations to adapt TILA's ability-to-repay requirements for residential mortgage loans to PACE financing transactions, "which [regulations] shall account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C).

50.    Below, Plaintiff first describes PACE financing and then more particularly discusses Section 307.

**1.    PACE Financing**

51.    PACE financing is a method to finance certain clean-energy, natural-disaster-mitigation, and other critical infrastructure improvements to

the homes of consumers through voluntary property tax assessments, which method is authorized and regulated by state and local governments.

52.    States authorize PACE programs within their borders to pursue environmental and economic policy objectives, making it easier for consumers to make important improvements to their homes by installing solar panels, energy efficient windows, or improvements to withstand hurricanes and wildfires.

53.    In addition, each county and/or municipalities must proactively opt into the PACE program by entering into Interlocal Agreements with each PACE administrator.

54.    PACE is different in kind from traditional consumer credit transactions that a consumer could use to finance these kinds of home improvements, such as a mortgage, a home-equity line of credit, or credit-card transactions.

55.    PACE financing is only available where a state legislature or local government has expressly authorized it by statute or ordinance and only for those projects authorized by the State, as this method depends upon the States' power to issue property tax assessments.

56.     Further, the "creditor"—*i.e.*, the lender—in a PACE financing transaction is the local government entity which sponsors the state-authorized PACE program in its jurisdiction.  90 Fed. Reg. at 2449.

57.     PACE financing results in tax assessments imposed on the property, not the homeowner, meaning that "PACE assessments" are against the property, rather than a debt incurred by the homeowner.

58.     Thus, the obligation to pay back the PACE assessment through higher property taxes remains with the property even if the consumer sells the property and, for this same reason, PACE financing uses property-based underwriting rather than credit scores.

59.     Further, given that PACE financing is a method of financing through property tax assessments authorized by the State, States usually categorize PACE assessments as super priority liens with first lien position over pre-existing mortgage liens on the consumer's property.

60.     This makes PACE financing transactions attractive investment vehicles for capital markets, which usually leads to lower interest rates for consumers consummating these transactions.

61.     These salutary features are why, in 2016, then-President Obama announced that his Administration would carry out several "PACE initiatives" to expand access to PACE financing.  Press Release, Off. of the Press Sec'y,

*Fact Sheet: Obama Administration Announces Clean Energy Savings for All Americans Initiative* (July 19, 2016).[1]

62.    As President Obama explained, PACE transactions are "innovative financing mechanisms" that "unlock alternative sources of capital for low- and moderate- income Americans and veterans to scale up solar, promote energy and water efficiency retrofits, and create more resilient homes, leading to reduced energy bills, more empowered consumers, and cleaner communities." *Id.*

63.    And "low- and moderate-income communities" can use the money they "save on their energy bills" from making their homes more energy efficient "to pay back the cost over time through their property tax bill." *Id.*

64.    A PACE administrator—a private company authorized to assist a government entity in administering its PACE program—works with the consumer engaging in a PACE financing transaction to determine whether the consumer's proposed projects qualify for PACE and to vet PACE contractors to complete the project.

---

[1]    Available    at    https://obamawhitehouse.archives.gov/the-press-office/2016/07/19/fact-sheet-obama-administration-announces-clean-energy-savings-all (last visited May 24, 2025).

65.    Consumers pay no out-of-pocket "up-front cost" for PACE-financed projects; rather, the PACE administrator pays the contractor when the consumer certifies that the project is complete.

66.    Then, the PACE administrator records a lien on the consumer's property in favor of the PACE program's government-sponsor.

67.    The PACE assessment then appears as a line item on the homeowner's regular tax bill, and the homeowner makes payments over a designated term along with standard property taxes.

68.    Thus, PACE assessments "are collected 'in the same manner and at the same time as the general taxes of the city or county on real property.'" *In re Hero Loan Litig.*, No. EDCV 1602478-AB (KKx), 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017) (citation omitted).

69.    PACE financing gives homeowners—including vulnerable, low-income homeowners in natural-disaster-prone States—a reliable method of financing critical home-improvement projects without relying on credit cards, making a down payment, or incurring personal debt.

70.    Three States—Florida, California, and Missouri—currently have active PACE programs, although a total of 19 States plus the District of Columbia have enabling legislation for residential PACE financing programs. 90 Fed. Reg. at 2435.

71.    Florida passed PACE-enabling legislation in 2010, *see* Fla. Stat. § 163.08, and there are multiple active residential PACE programs currently operating in the State—including within this judicial district.

72.    Florida enabled PACE programs to further "the goals of the state's energy and hurricane mitigation policies," and, accordingly, PACE financing can only be used for qualifying projects that advance "[e]nergy conservation and efficiency," "[r]enewable energy improvement," and "wind resistance improvement." Fla. Stat. §§ 163.08(1)(b), 163.08(2)(b) (2012).

73.    Florida's PACE law is an exercise of Florida's taxing power, as it has authorized only municipalities to contract with property owners in the jurisdiction who apply to finance a qualifying improvement, which financing must be conducted by "levy[ing] non-ad valorem assessments" collected in the same manner as taxes levied against property located in the jurisdiction. *Id.* § 163.081(1); *see id.* § 163.081(2).

74.    Florida imposes numerous requirements to protect consumers and ensure the integrity of its PACE program. *See id.* § 163.081.

75.    Before a PACE administrator can enter into a PACE transaction with a consumer, it must provide the consumer with "a written financing estimate and disclosure" that includes fourteen statutorily enumerated disclosures; *id.* § 163.081(4); and the administrator must make thirteen

"findings based on a review of public records . . . and the property owner's statements, records, and credit report" to ensure that "[t]here are sufficient resources to complete the project," that the homeowner is current on all property-related debts and taxes, that the PACE tax assessment amount is fair and reasonable, and that the property is not subject to certain mortgages or liens, *id.* § 163.081(3).

76.    California's and Missouri's PACE programs are similar to Florida's PACE programs.  *See generally* Cal. Sts. & H. Code §§ 5898–99; Mo. Stat. §§ 67.2800–67.2840.

77.    California and Missouri authorized PACE financing for specific green-energy projects, natural-disaster-mitigation projects, or both.  *See* Cal. Sts. & High. Code §§ 5898.12(c), 5898.14, 5899(a)(1), 5899.3(a), 5899.4(a); Mo. Stat. §§ 67.2800, 67.2815.

78.    California and Missouri each passed these programs as an exercise of their state taxing power.  *See* Cal. Sts. & High. Code §§ 5898.20(c)(3), 5898.14, 5902(f); Cal. Fin. Code § 22018; Mo. Stat. §§ 67.2800, 67.2810.

79.    California and Missouri both included important consumer protections within their programs.  *See* Cal. Str. & H. Code §§ 5898.15–5898.17, 5898.23; Cal. Fin. Code §§ 22684(g), 22686, 22017, 22689; Cal. Code Regs. tit. 10, §§ 1620.02, 1620.11; Mo. Stat. §§ 67.2815, 67.2817–67.2820.

## 2. Section 307 Of EGRRCPA

80. Congress in Section 307 of EGRRCPA directed the CFPB to issue regulations applying specific portions of TILA's ability-to-pay requirements to PACE transactions.  15 U.S.C. § 1639c(b)(3)(C).

81. Section 307 contains three subparts.

82. First, Section 307 defines "the term 'Property Assessed Clean Energy [PACE] financing' [to] mean[ ] financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer."  *Id.* § 1639c(b)(3)(C)(i).

83. Second, Section 307 provides that the CFPB "shall prescribe regulations that carry out the purposes of subsection (a)"—that is, Section 1639c(a), which imposes TILA's ability-to-pay requirements for residential mortgage loans—"and apply section 1640 of this title [relating to the imposition of civil liability] with respect to violations under" the aforementioned Section 1639c(a).  *Id.* § 1639c(b)(3)(C)(ii).

84. Finally, Section 307 authorizes the CFPB to collect information and data that it deems necessary and requires the CFPB to "consult with State and local governments and bond-issuing authorities" when prescribing these regulations.  *Id.* § 1639c(b)(3)(C)(iii).

**C.    The CFPB Promulgates Its Final PACE Rule, Far Exceeding The Limited Regulations Congress Called For**

85.    On January 10, 2025, almost seven years after Congress enacted Section 307 of EGRRCPA, the CFPB promulgated its Final PACE Rule to regulate PACE financing transactions, which rule vastly exceeded Congress' limited grant of rulemaking authority to the CFPB under Section 307.

### 1.    The Key Features Of The Final PACE Rule

86.    The Final PACE Rule has several key features, as relevant here.

87.    *First*, and most significantly, the Final PACE Rule classifies "PACE transactions as credit under TILA," meaning that PACE transactions are now subject "generally to TILA," 90 Fed. Reg. at 2447–48.

88.    The Final PACE Rule achieves that result by changing a decades old exclusion from the definition of "credit" for all "[t]ax liens [and] tax assessments" so that now the exclusion would only apply to *involuntary* tax liens and assessments.  *See id*. at 2443.

89.    Thus, PACE transactions must comply with all TILA provisions not specifically exempted by the CFPB, including TILA's requirements relating to mortgage disclosures, appraisals, and "high cost mortgages."

90.    *Second,* by defining PACE transactions as residential "credit" under TILA, the CFPB logically had to, and did, also conclude that PACE transactions are mortgage "*loans*" under the SAFE Act.

- 21 -

91.    The SAFE Act requires states to fingerprint, test, and license any individual who takes applications or offers or negotiates the terms of mortgage "loans" (other than employees of banks)—so-called "mortgage loan originator[s]." *Id.* at 2495 (discussing the "Benefits and Costs of Loan Originator Provisions"); *see* 12 C.F.R. Part 1008 (implementing the SAFE Act's mandate that states license non-bank "mortgage loan originators").

92.    Requiring States to do that with PACE financing would fly in the face of both the Florida and California statutes, which are tailored to PACE transactions and already require registration of individuals performing certain PACE transaction tasks.

93.    *Third,* a PACE transaction also would qualify as a mortgage "loan" under RESPA, under the Final PACE Rule.

94.    This, combined with the finding that PACE transactions are "credit" under TILA, means that the local government sponsors—as the "creditors" in these transactions—would be obligated to provide consumers with "the TILA-RESPA integrated disclosure forms" applicable to mortgage loans, with limited exemptions.  90 Fed. Reg. at 2452–53.

95.    This requirement, too, would contravene state law, which already calls for disclosures that, unlike the TILA-RESPA forms, are specifically tailored to PACE transactions.

96.　　Disclosures mandated by these forms, as applied by the Final PACE Rule, include a "Loan Estimate" form required before entering a PACE transaction that itself includes, among other things: "a table itemizing each separate periodic payment or range of payments, among other information," *id.* at 2455; "the maximum amount payable for any fees or other amounts corresponding to the periodic payment for the PACE transaction that are not disclosed as part of the principal and interest disclosure," *id.*; and "information about taxes, insurance, and assessments," including "a statement that the PACE transaction, described in plain language as a 'PACE loan,' will be part of the property tax payment" and that "if the consumer has a pre-existing mortgage with an escrow account, the PACE loan will increase the consumer's escrow payment," *id.* at 2456; *see also id.* at 2455–59 (providing additional required disclosures).

97.　　PACE Administrators must also provide a second TILA-RESPA integrated disclosure form known as the "Closing Disclosure" which is "a final disclosure reflecting the actual terms of the transaction," *id.* at 2452, and must disclose, for example: "identifying information for the borrower, seller, and lender," including "the name of any PACE company involved in the transaction," *id.* at 2459; "the information in the projected payments table required on the Loan Estimate," including "the total periodic payment, as well

as an itemization of the periodic payment's constituent parts," *id.*; and information "related to the assumption disclosure" in the Loan Estimate form, *id.* at 2460; *see also id.* at 2459–61 (providing additional required disclosures).

98.    *Fourth*, and materially different from its other provisions, the Final PACE Rule applies "TILA's ability-to-repay requirements" to PACE transactions, with certain "adjustments" made by the CFPB. *Id.* at 2464.

99.    Under TILA's ability-to-repay requirements, as implemented by Regulation Z, a "creditor" must "make a reasonable and good faith determination of a consumer's ability to repay at or before consummation of a covered mortgage loan" based on the creditor's consideration of "eight factors." *Id.*

100.    The creditor must then "verify the information" that it "relies on in determining a consumer's repayment ability using reasonably reliable third-party records." *Id.*

101.    The ability-to-repay factors include the consumer's: "current or reasonably expected income or assets, other than the value of the dwelling, including any real property attached to the dwelling, that secures the loan"; "current employment status"; "monthly payment on the covered transaction"; "monthly payment on any simultaneous loan that the creditor knows or has reason to know will be made"; "monthly payment for mortgage-

related obligations"; "current debt obligations, alimony, and child support"; "monthly debt-to-income ratio or residual income"; and "credit history." 12 C.F.R. § 1026.43(c)(2)(i)–(viii).

102.    The Final PACE Rule applies this "existing ability-to-repay framework" under TILA and Regulation Z to PACE transactions. 90 Fed. Reg. at 2464–65.

103.    So, States and PACE administrators must spend additional money and resources to assess consumers in accordance with TILA mortgage requirements.

104.    Further, "in addition to the factors in § 1026.43(c)(2)(i) through (viii)," PACE administrators must consider under the ability-to-repay requirements "any monthly payments that the creditor knows or has reason to know the consumer will have to pay into an escrow account as a result of the PACE transaction that are in excess of the monthly payment amount considered under § 1026.43(c)(2)(viii)." *Id.* at 2467.

105.    The CFPB also provided "accompanying commentary" to guide the ability-to-repay determinations for PACE transactions. *Id.* at 2466.

106.    The CFPB clarified that the Final PACE Rule's ability-to-repay requirements apply to PACE companies that serve as authorized PACE administrators. *Id.* at 2473

107.   Last, the CFPB declined to allow PACE transactions to be defined as "qualified mortgage[s]" under TILA, meaning such transactions are not eligible "for a presumption of compliance with the ability-to-repay requirements." *Id.* at 2469.

108.   *Fifth, and finally*, the Final PACE Rule also applies "the TILA-RESPA waiting period" to PACE transactions. *Id.* at 2455.

109.   Under TILA-RESPA, any loan estimate incurs a seven-day waiting period before the consumer can consummate the loan.

110.   The Final PACE Rule shanghaied this requirement to set "a nationwide baseline waiting period for PACE transactions" of seven business days between the provision of a PACE financing estimate (provided within three business days of the application) and consummation of the transaction. *Id.*

### 2.    The CFPB's PACE Report, Relied Upon In The Final PACE Rule

111.   To justify these five key features of the Final PACE Rule, the CFPB relied on its own report entitled "Property Assessed Clean Energy Financing and Consumer Financial Outcomes: Data Point" ("PACE Report").

112.   The PACE Report purportedly "analyzes the impact of PACE transactions on consumer outcomes, with a particular focus on mortgage delinquency." *Id.* at 2440.

113. To conduct this analysis, the CFPB studied two groups of consumers: a control group (those who applied for PACE transactions, were approved, but did not proceed with the transactions), and a test group (those who applied, were approved, and did proceed with the transactions).

114. The CFPB limited the PACE Report analysis to data from between July 2014 and June 2020.

115. The PACE Report ultimately found only a 2.5 percentage point difference in consumer delinquency between the control and test groups over a two-year span following PACE transaction origination.

116. The PACE Report additionally shows that consumers who obtained a PACE assessment *performed better* than the report's control group of consumers who only applied for PACE financing and who also opened a (presumably) low-cost mortgage type account within a year of the PACE application.

117. The PACE Report was fundamentally flawed because it chose an improper control group, wrongly excluded certain consumers from its data, and artificially limited the time frame of the study to before States enacted significant reforms to their PACE programs in 2018 and later.

## II.    Factual Background

118. Plaintiff BRIDGE is a trade organization for companies operating in the residential PACE financing industry.

- 27 -

119.   Accordingly, BRIDGE's mission is to promote, and advocate on behalf of, the residential PACE industry, including by empowering residential PACE companies to better support surrounding communities through PACE financing.

120.   To achieve these purposes, BRIDGE is authorized to, among other things, file lawsuits on behalf of its members to protect their interests in PACE financing.

121.   Renew, and Ygrene are both members of BRIDGE, and operating in Florida, including in Hillsborough County.

122.   Renew provides affordable financing to consumers for renewable-energy and energy-efficiency projects—including PACE financing—to help move America towards a clean energy model.

123.   Renew was one of the first companies formed to help States pursue their clean-energy initiatives through PACE financing.

124.   Renew was founded in 2008 by a multidisciplinary team of experts in finance, technology, operations, and government policy, and manages PACE transactions in Florida and California.

125.   Renew currently has 38 full-time Florida employees and has enrolled over 5,156 Florida contractors as its third-party partners—nearly all

of which are small businesses—to provide PACE-financed home improvements.

126. In fiscal year 2024 alone, Renew facilitated $215,286,507.45 in PACE financing for critical home improvements projects in over 400 communities in Florida and California, creating and sustaining over 9,000 jobs in the process.

127. Renew administers PACE finance transactions to a large and diverse customer base in Florida and, specifically, Hillsborough County.

128. Almost 90% of Renew's PACE transactions occur in Florida where the company has facilitated PACE financing for approximately 1,617 customers.

129. Renew's customers are generally low-income families with an average weighted FICO score of 656 and over a third are also elderly.

130. These customers often do not have access to the full spectrum of credit options that are traditionally available to consumers.

131. However, many of Renew's customers maintain excellent credit scores and ability-to-repay as demonstrated by the high repayment success rate and low delinquency rate across all Renew PACE assets.

132. Indeed, the most recent data shows that the delinquency rate for Renew customers is only 1.487%.

133.   Renew has facilitated home improvement projects in clean energy, resiliency, storm hardening, and other critical categories in Florida.

134.   Namely, regarding projects Renew facilitated PACE financing for in the previous fiscal year, 41% of those projects were for roofing, 21% were for windows and storm hardening, 14% were for HVAC projects, 10% were for doors and hurricane hardening, 7% were for solar related improvements, and 3% were for energy and water efficiency projects.

135.   Renew adheres to all Florida legal requirements for PACE finance transactions, including the consumer-protection requirements, and has also voluntarily adopted additional consumer-protections measures as a matter of its business practice.

136.   For example, Renew prohibits financing on properties with a reverse mortgage or that were gifted to the homeowner by a nonprofit and considers a stringent list of factors when considering underwriting PACE assessments.

137.   Renew also prohibits financing terms that include negative amortization schedules, balloon payments, or prepayment penalties.

138.   Given these protections, Renew has been extremely successful in underwriting PACE financing transactions, experiencing a delinquency rate of approximately 1%.

139.  Ygrene, for its part, was founded in 2010 with a simple mission: remove barriers to financing energy-efficient home improvement projects in order to protect the environment and strengthen communities.

140.  Because financing energy-efficient projects is often unattainable for lower-income communities, Ygrene utilized PACE to help customers open the door by utilizing equity already built into their homes.

141.  Ygrene manages PACE transactions in Florida, and Tampa, and has over 47 employees and contracts with over 1,581 contractors in Florida to provide PACE-financed home improvements.

142.  Ygrene administers PACE finance transactions to a large and diverse customer base in Florida including in Hillsborough County.

143.  Ygrene has facilitated PACE financing for approximately 137,906 households.

144.  Approximately 49% of PACE financing arrangements are for clean-energy home improvement projects; approximately 53% are for disaster-mitigation projects; while 16% are for other necessary home improvements such as repairing damaged roofs or replacing a non-functioning air conditioner.

145.  Approximately 13% of Ygrene customers generally earn less than $60,000 annually, which is below the national median household income, and 51% earn less than $100,000 annually.

146.    In general, customers on average have a repayment success rate of 99%, while the current delinquency rate for Ygrene customers is only 4%.

147.    Since inception, over 62,000 Ygrene projects totaling $1.48 billion have been paid off in full.

148.    Like Renew, Ygrene adheres to all State legal requirements for PACE finance transactions, including the consumer-protection requirements, and has also voluntarily adopted additional consumer-protections measures as a matter of its business practice.

149.    Ygrene, like other PACE administrators, provides additional consumer protections beyond that of State regulation even though State regulation is sufficient.

150.    Given these protections, Ygrene Financial has been extremely successful in underwriting PACE financing transactions, experiencing extraordinarily low delinquency rates and zero foreclosures as of 2018.

151.    After the CFPB proposed what would become the Final PACE Rule, Renew, Ygrene, and others (including eight state attorneys general) submitted robust comments on that proposal to the CFPB—in addition to numerous other PACE administrators.  Plaintiff attaches these comments as Exhibits A–F to this Complaint.

152.   As Renew, Ygrene, and other PACE administrators explained in those comments, the CFPB's proposed rule was unlawful in numerous respects, including because it: (i) exceeded the CFPB's statutory authority under Section 307, including by erroneously defining PACE Financing as consumer credit under TILA; (ii) violated the Tenth Amendment through usurping State sovereign taxing authority; and (iii) violated the APA by arbitrarily and capriciously relying on the flawed PACE Report.

153.   Nevertheless, the CFPB finalized the proposed rule without remedying these numerous legal failings.

154.   Plaintiff now brings this Complaint against the CFPB challenging the lawfulness of the Final PACE Rule.

## CLAIMS FOR RELIEF

### COUNT I

### 5 U.S.C. § 706(2)(C)
### Violation Of The Administrative Procedure Act—The Final PACE Rule Exceeds The CFPB's Statutory Authority Under 15 U.S.C. § 1639c

155.   Plaintiff realleges all matters set forth above and incorporate them here by reference.

156.   Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

157.   "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," without "defer[ring] to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024); *see also id.* at 391–92.

158.   Further, in an APA challenge, a court must also consider whether the statute purporting to authorize the agency rule or action at issue is itself constitutional. *See West Virginia ex rel Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (citing *FEC v. Cruz*, 596 U.S. 289, 300 (2022)).  If the underlying statute is unconstitutional, then, necessarily, the rule is also invalid.  *See id.* at 1146–48.

159.   The Final PACE Rule violates Section 307 of the EGRRCPA in two separate respects.

160.   *First*, the Final PACE Rule exceeds Congress' grant of rule-making authority to the CFPB under Section 307 by applying essentially *all* of TILA and parts of RESPA and other federal consumer protection laws to PACE financing transactions.

161. Under Section 307's plain text, Congress intentionally and purposefully specified that the CFPB only had authority to apply just a single

conduct specific provision of TILA and an accompanying liability provision to PACE financing transactions.

162.    Section 307 directs the CFPB to "prescribe regulations that carry out the purposes of subsection (a) [of 15 U.S.C. § 1639c, within TILA] and apply section 1640 of this title with respect to violations under subsection (a) of this section with respect to [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii).

163.    Subsection (a), entitled "Ability to repay," prohibits creditors from making residential mortgage loans without first making "a reasonable and good faith determination" that "the consumer has a reasonable ability to repay the loan" and its associated fees according to the loan's terms. *Id.* § 1639c(a).

164.    Section 1640 of TILA, the Act's "Civil liability" provision, sets out the procedures a consumer must follow to seek a civil remedy against lenders for violations of TILA's ability-to-repay requirement. *See id.* § 1640.

165.    Given Section 307's unambiguous terms, the CFPB *only* had the authority to apply Sections 1639c(a) and 1640 to PACE financing transactions.

166.    The Final PACE Rule exceeds the CFPB's authority under Section 307 because it applies almost all of TILA, portions of RESPA, and other laws to PACE financing transactions, 90 Fed. Reg. at 2443, not just TILA's ability-to-repay subsection and its related civil-liability provision, *see* 15 U.S.C. § 1639c(b)(3)(C).

167.   For example, the Final PACE Rule applies the far-reaching "TILA-RESPA integrated disclosure[s]," 90 Fed. Reg. at 2442, 2452–53, 2459, and further defines PACE transactions as "residential mortgage loans" under the SAFE Act, which will require States to test and license individuals deemed to be "loan originators" of PACE transactions.

168.   Nothing in Section 307's text authorizes the CFPB to apply nearly all TILA provisions to PACE financing, and Congress included no language in Section 307 even mentioning RESPA or the SAFE Act—separate statutes from TILA—let alone empowering the CFPB to apply those Act's provisions to PACE financing.

169.   Applying these additional provisions to PACE financing impermissibly adds words to Section 307 and exceeds the CFPB's "statutory authority," rendering the Final PACE Rule unlawful.  *Loper Bright*, 603 U.S. at 412–13; *see* 5 U.S.C. § 706(2)(C).

170.   The CFPB achieved this illegal result by impermissibly changing the definition of "credit" under Regulation Z, which for 40 years had excluded all "tax liens and tax assessments," to exclude only *involuntary* assessments. 90 Fed. Reg. at 2447–48.

171.   This means that all *voluntary* tax assessments, including PACE transactions, are now "generally" subject "to TILA" and related RESPA and other requirements, unless specifically exempted by the CFPB. *Id.*

172.   The CFPB cannot avoid the clear command of Section 307 by amending a preexisting regulation to apply essentially the entirety of TILA and portions of RESPA to PACE financing transactions, as that is simply an indirect, bank-shot attempt to "add or subtract words" in Section 307. *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009)

173.   In any event, the CFPB's change to the definition of "credit" under the regulation is contrary to the plain meaning of "credit" under TILA, which does not cover PACE transactions.

174.   TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," and only applies when a "creditor" extends such debt to a "natural person."  15 U.S.C. § 1602(f)–(i).

175.   However, PACE assessments are obligations *imposed on the property, not the homeowner*, and they are collected in the same manner and at the same time as the general taxes of the city or county on real property, meaning that they are not a debt *incurred by the homeowner, the consumer or 'natural person'* to whom credit is extended.

176. Thus, PACE assessments cannot be a "credit transaction" within the meaning of TILA.

177. The CFPB itself had previously accepted this plain text definition of consumer "credit" before it promulgated the Final PACE Rule here. 12 C.F.R. § 1026.2, Supp. I, Cmt.(2)(a)(14)(1.ii).

178. *Second*, the Final PACE Rule also exceeds the CFPB's statutory authority under Section 307 by failing to "account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii).

179. PACE financing is unique in many fundamental ways.

180. PACE assessments are tax-assessments imposed by local governments on property, not debt obligations on homeowners.

181. Further, as the CFPB acknowledges, the "creditor" in a PACE financing transaction is the local government entity sponsoring the state-authorized PACE program in its jurisdiction. 90 Fed. Reg. at 2449.

182. PACE financing is also only available for projects selected by the State that that will advance the State's public-policy goals, such as energy conservation and natural-disaster preparedness.

183. And since PACE financing is only available for these limited projects, PACE transactions are typically much smaller in size when compared to regular mortgages.

184.  Finally, state- and local-government sponsors of PACE programs have already adopted measures to ensure that consumers understand PACE transactions, are able to pay the assessments, and are not subject to unscrupulous sales practices, while PACE administrators—including Plaintiff's members—also already voluntarily apply multiple underwriting practices designed to ensure consumers' ability-to-repay.

185.  The Final PACE Rule fails to account for the unique nature of PACE assessments, contrary to Section 307's express instruction, 15 U.S.C. § 1639c(b)(3)(C)(ii), meaning that the Final PACE Rule exceeds the CFPB's limited "statutory . . . authority" for this reason as well, 5 U.S.C. § 706(2)(C).

186.  The Final PACE Rule treats PACE financing transactions just like the purchase-money and refinance mortgage loans that are the primary objects of the TILA mortgage requirements, disregarding: PACE assessments' unique small size; the fact that they are tax assessment liens assessed by local governments against real property rather than a debt incurred by the homeowner; and that the creditor in these transactions is a governmental entity.

187.  Further, the Final PACE Rule does not adequately account for post-2018 underwriting practices and regulatory schemes unique to PACE financing that render the additional requirements under the Final PACE Rule

unnecessary to achieve "the purposes of subsection (a)," 15 U.S.C. § 1639c(b)(3)(C)(ii), which are to ensure that creditors do not give loans that consumers are unable to repay, *see id.* § 1639c(a).

188.   The CFPB wrongly claims in the Final PACE Rule that it did "account for the unique nature of PACE financing" because it applied "the existing statutory and regulatory regime governing residential mortgage loans" to PACE transactions with some minor "adjustments," 90 Fed. Reg. at 2465, referring to the limited exemptions for requirements related to escrow accounts and periodic statements, *see id.* at 2434.

189.   However, the CFPB clearly determined in the Final PACE Rule that applying "TILA's ability-to-repay regime"—along with the other TILA, RESPA, and SAFE Act requirements discussed above—"is appropriate for PACE loans ***notwithstanding certain characteristics of PACE financing or PACE programs discussed by commenters***." *Id.* at 2465 (emphasis added).

190.   Thus, the CFPB plainly disregarded the "unique nature" of PACE financing and instead chose to apply those regulatory requirements "broadly" to PACE transactions as if they were standard "consumer credit transactions" or "other types of mortgages." *Id.* at 2465–66.

191. For example, the CFPB expressly "decline[d] to exempt PACE transactions that are covered by State laws" that the CFPB admits already "have protections in place that may resemble TILA's ability-to-repay rules in some ways." *Id.* at 2465.

192. Because of this violation, this Court should hold the Final Rule unlawful and set it aside.

## COUNT II

### 5 U.S.C. § 706(2)(B)
### Violation Of The Administrative Procedure Act—The Final PACE Rule Is Contrary To Constitutional Right, Power, Privilege, Or Immunity Under U.S. Constitution Amendment X

193. Plaintiff realleges all matters set forth above and incorporate them here by reference.

194. Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

195. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

196. This constitutional text "confirms" that the Constitution grants Congress only "certain enumerated powers," while all unenumerated powers

are "reserved for the States" or to the People. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018).

197.   Thus, our Constitution enshrines a "system of 'dual sovereignty'" in which the States "retain[ ] 'a residuary and inviolable sovereignty,'" coexisting with the sovereignty of the federal government. *Printz v. United States*, 521 U.S. 898, 918–22 (1997) (citations omitted); s*ee Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("The States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.").

198.   As particularly relevant here, the Tenth Amendment protects "the taxation authority of state government" as a "central" attribute of "state sovereignty" upon which Congress may not tread, *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994)—a principle recognized both at the Founding and today.

199.   Prior to the ratification of the Constitution, each individual State held the power of direct taxation as "an essential function of government." *Lane Cnty. v. Oregon*, 74 U.S. (7 Wall.) 71, 76–77 (1868).

200.   So, beginning in colonial times, the taxing power "was exercised by the Colonies." *Id.*; s*ee New York v. United States*, 505 U.S. 144, 162–63 (1992).

201.   Then, "when the Colonies became State[s], both before and after the formation of the Confederation, [the taxing power] was exercised by the new governments." *Lane Cnty.*, 74 U.S. at 76–77.

202.   Indeed, "[u]nder the Articles of Confederation, the government of the United States was limited in the exercise of this power [to tax] to [issuing] requisitions upon the States, while the whole power of direct and indirect taxation . . . was acknowledged to bei[ ]ng exclusively to the States." *Id.* at 77; *accord Moore v. United States*, 602 U.S. 572, 581 (2024) ("After Independence in 1776 and under the Articles of Confederation in effect from 1781 to 1789, the Federal Government relied primarily on contributions from the States for revenue.").

203.   After the States ratified the Constitution, the States did not cede their core, sovereign taxing power to the federal government. *Lane Cnty.*, 74 U.S. at 76–77.

204.   Rather, after the Constitution, "[i]n respect . . . to property, business, and persons, within their respective limits, [the States'] power of taxation remained and remains entire" just as before the Constitution. *Id.* (also identifying certain limited restraints on the State's taxing power, such as the power "to tax exports, or imports," in the Constitution).

205.   Of course, the Constitution did "greatly change[ ] th[e] condition of things" with respect to taxation by also giving Congress "the power to tax, both directly and indirectly," unlike the Articles of Confederation.  *Id.*

206.   But Congress' taxing power with respect "to property, business, and persons" is "*a concurrent power*" with the States.  *Id.* (emphasis added).

207.   Thus, "nothing in the Constitution [ ] contemplates or authorizes any direct abridgement of this power by national legislation."  *Id.*  It is as "complete in the State as the like power, within the limits of the Constitution, is complete in Congress."  *Id.*; *see also Union Pac. R.R. Co. v. Peniston*, 85 U.S. (18 Wall.) 5, 29–31 (1873).

208.   Writing as Publius, Alexander Hamilton articulated the States' and the federal government's concurrent power over taxation as a key feature of the Constitution.

209.   As Hamilton explained, under the Constitution, "the power of imposing taxes on all articles other than exports and imports . . . is manifestly a *concurrent and coequal authority* in the United States and in the individual States," as "[t]here is plainly no expression in the granting clause which makes that power *exclusive* in the Union."  *The Federalist* No. 32, at 201 (Alexander Hamilton) (Jacob E. Cooke ed., 1967) (first emphasis added).

210.   Accordingly, "under the plan of the Convention, [the States] retain that authority in *the most absolute and unqualified sense*."  *Id.* at 199 (emphasis added).

211.   Therefore, "an attempt on the part of the national Government to abridge [the States] in the exercise of [their taxing authority] would be a violent assumption of power, unwarranted by any article or clause of its constitution." *Id.* at 199.

212.   The early Supreme Court, in cases like *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819), and *Gibbons v. Ogden,* 22 U.S. (9 Wheat) 1 (1824), understood the Constitution in the same way.

213.   In those canonical cases, the Court explained that, under the Constitution, "the power of taxation is indispensable to [the States'] existence" and "is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities at the same time"—both the States and the federal government.  *Gibbons*, 22 U.S. at 199.

214.   So, the Constitution adopted "a principle which leaves the power of taxing the people and property of a state unimpaired" and "which leaves to a state the command of all its resources," *McCulloch*, 17 U.S. at 430, as "the power of taxing the people and their property[ ] is essential to the very

existence of government," *id.* at 428; *accord Lane Cnty.*, 74 U.S. at 76 ("[T]o the existence of the States . . . the power of taxation is indispensable.").

215.    The Constitution does "not interfere with the power of the States to tax for the support of their own governments; nor [was] the exercise of that power by the States an exercise of any portion of the power that is granted to the United States." *Gibbons*, 22 U.S. at 199.

216.    Likewise, "[t]here is no analogy, then, between the power of taxation and the power of regulating commerce." *Id.* at 200.

217.    The Supreme Court's more modern cases carry forward this same Founding Era understanding of the States' taxing power.

218.    Thus, the more modern Supreme Court has reaffirmed that "the taxation authority of state government" is "an authority . . . recognized as central to state sovereignty." *Dep't of Revenue of Or.*, 510 U.S. at 345; *Printz*, 521 U.S. at 918–19 (citing *Lane Cnty.*, 74 U.S. at 76).

219.    The more modern Supreme Court has held that "[t]he power to tax 'is an incident of sovereignty, and is co-extensive with that to which it is an incident.'" *Curry v. McCanless*, 307 U.S. 357, 366 (1939) (citation omitted).

220.    And the more modern Supreme Court has stated that "[a]ll subjects over which the sovereign power of a State extends, are objects of

taxation." *Int'l Harvester Co. v. Wis. Dep't of Tax'n*, 322 U.S. 435, 444–45 (1944) (citations omitted).

221.    Consequently, "the taxing power of a State . . . may be exercised to an *unlimited extent* upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the State, except so far as it has been surrendered to the Federal government, either expressly or by necessary implication." *Peniston*, 85 U.S. at 29 (emphasis added); *accord The Federalist* No. 32, *supra*, at 199 (identifying this as an "authority in the most absolute and unqualified sense").

222.    With respect to the power of taxation of "property, business, and persons, within their respective limits," the States have the "discretion" regarding "[t]he extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised." *Lane Cnty.*, 74 U.S. at 77.

223.    "That discretion is restrained *only* by the will of the people expressed in the State constitutions or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government," including because "[t]here is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation." *Id.* (emphasis added).

224.   Congress may not "[ ]impair[ ]" the State's "power of taxing the people and property of [the] state," nor may the "judicial department" ask "what degree of taxation is [a] legitimate use, and what degree may amo[u]nt to [an] abuse of the power." *McCulloch*, 17 U.S. at 430.

225.   Apart from the States' sovereign power of taxation, the Tenth Amendment also enshrines an "anticommandeering principle" as an essential attribute of state sovereignty.  *Murphy*, 584 U.S. at 471.

226.   This principle confirms that "Congress [has no] power to issue direct orders to the governments of the States," given that such a power is "conspicuously absent from the list of powers given to Congress" in the Constitution.  *Id.*

227.   "While Congress has substantial powers to govern the Nation directly . . . the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."  *New York*, 505 U.S. at 162–63.

228.   In all, "[t]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925.

229.  And "[t]his rule applies . . . not only to state officers with policymaking responsibility but also to those assigned more mundane tasks," whether at the "state [or] local" level.  *Murphy*, 584 U.S. at 473.

230.  The Final PACE Rule and Section 307, the purported statutory authority for the Final PACE Rule, violate the Tenth Amendment by infringing upon the States' taxing authority and commandeering States to enforce the federal government's preferred regulatory program for PACE financing.

231.  PACE financing is an exercise of a State's taxing authority "[i]n respect . . . to property, business, and persons" which "remains entire[ly]" with the States.  *Lane Cnty.*, 74 U.S.

232.  PACE financing transactions deal directly with "the subjects upon which" States determine to exercise their taxing power and "the mode in which" they choose to do so.  *Id*.

233.  That is, the States impose and collect these tax assessments exactly like they would for any other property tax assessment, as a tax assessment lien on property that does not constitute a personal debt owed by a consumer, which must be collected in the same manner and at the same time as the general taxes.

234.  Indeed, Section 307 itself recognizes that PACE financing is a product of state taxing authority, as it defines PACE financing as "financing to

cover the costs of home improvements *that results in a tax assessment* on the real property of the consumer." 15 U.S.C. § 1639c(b)(3)(C)(i) (emphasis added); *see also, e.g.*, Fla. Stat. §§ 163.081(1)(e), 197.3632(8)(a).

235.   The Final PACE Rule and Section 307 seek to "direct[ly] abridg[e]" *Lane Cnty.*, 74 U.S. at 77, and "[ ]impair," *McCulloch*, 17 U.S. at 430, the States' sovereign taxing power by prohibiting States from imposing "tax liens and tax assessments," 90 Fed. Reg. at 2447, that the States otherwise would impose as part of their PACE financing programs.

236.   For example, the Final PACE Rule and Section 307 would purport to transform state "tax liens and tax assessments [upon residential property itself] that are voluntary" into debt that is owed personally by consumers and thus "subject generally to TILA." 90 Fed. Reg. at 2447; *see id.* at 2434, 2443.

237.   Additionally, States will have to provide federally-mandated disclosures on top of existing State disclosures.

238.   Further, the Final PACE Rule and Section 307 will heavily penalize PACE programs' local government sponsors (as the "creditors") for failure to ensure that "the consumer has a reasonable ability to repay the [PACE tax assessment]," 15 U.S.C. § 1639c(a)(1), or provide mandatory TILA, RESPA, and SAFE disclosures to the consumer, even though Florida has not ceded its tax power to the Federal government.

239.   These requirements also lead to a *federal* directive that certain *State* citizens may not participate in State PACE financing programs because the *State* citizens fail to meet *federal* ability-to-pay standards, entailing that the *State* is barred from exercising its *state* taxing authority as to those citizens and their properties.

240.   Congress does not have the power to abridge or impair the States' exercise of their taxing authority by prohibiting the States from authorizing PACE financing transactions unless certain Federal requirements are met, as Section 307 and the Final PACE Rule purport to do.

241.   The States have "discretion" regarding "[t]he extent to which [State taxing authority] shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised," for "property, business, and persons, within their respective limits," *Lane Cnty.*, 74 U.S. at 77.

242.   "There is nothing in the Constitution which contemplates or authorizes *any* direct abridgment of this power by national legislation," such as by Section 307 and the Final PACE Rule.  *Id.* (emphasis added).

243.   "[T]he taxing power of a State," such as its power over PACE tax assessments, "may be exercised to an *unlimited extent* upon all property, trades, business, and avocations existing or carried on within the territorial boundaries of the State." *Peniston*, 85 U.S. at 29 (emphasis added); *accord The*

*Federalist* No. 32, *supra*, at 199 (identifying this as an "authority in the most absolute and unqualified sense").

244.  PACE financing is clearly an exercise of State taxing authority, and so Congress may not "[ ]impair[ ]" the State's "power of taxing the people and property of [the] state," through PACE assessments, nor may the "judicial department" ask "what degree of taxation is [a] legitimate use, and what degree may amount to [an] abuse of power." *McCulloch*, 17 U.S. at 430.

245.  For similar reasons, Section 307 and the Final PACE Rule also violate the Tenth Amendment's anticommandeering principle, as they "compel the States to implement, by legislation or executive action, [a] federal regulatory program[ ]," for PACE financing transactions.  *Printz*, 521 U.S. at 925.

246.  The Final Pace Rule and Section 307 impose TILA and Regulation Z obligations and liability on "creditors," "which the CFPB understands is typically the government sponsor in a PACE transaction," not the private PACE companies.  90 Fed. Reg. at 2449.

247.  Thus, for example, state officials must provide integrated TILA-RESPA disclosures to the consumer "not later than three business days after the creditor receives the consumer's written application, which shall be at least 7 business days before consummation of the transaction," 15 U.S.C.

§ 1638(b)(2)(A); 90 Fed. Reg. at 2502 (listing contents of disclosures); must deny potentially-otherwise eligible PACE applications based off TILA ability-to-repay requirements, 90 Fed. Reg. at 2463, 2503; and fingerprint, test, and license individuals who take offers or negotiate PACE transactions, *id*. at 2495.

248. Consequently, the Final PACE Rule and Section 307 directly "compel the States to implement . . . [a] federal regulatory program[ ]," *Printz*, 521 U.S. at 925, as the local government sponsor is the "creditor."

249. Finally, even if the Constitution did allow for some regulation of state taxing authority by Congress at the margins, the Final PACE Rule would still violate the Tenth Amendment.

250. The Final PACE Rule goes well beyond the regulation called for by Section 307 and would significantly burden and ultimately destroy PACE financing transactions.

251. So, even under an interpretation of the Tenth Amendment that left Congress some marginal power to check States' exercise of their taxing authority, the Final PACE Rule would be unconstitutional.

252. Because of this violation, this Court should hold the Final Rule unlawful and set it aside.

## COUNT III

### 5 U.S.C. § 706(2)(D)
### Violation of The Administrative Procedure Act—The CFPB Promulgated the Final PACE Rule Without Observance Of Procedure Required By Law Under 5 U.S.C. § 609

253.  Plaintiff realleges all matters set forth above and incorporate them here by reference.

254.  Under the APA, a court must "hold unlawful and set aside agency action" that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

255.  Under the Regulatory Flexibility Act, prior to promulgating a rule that "will have a significant economic impact on a substantial number of small entities," the CFPB must "assure that small entities have been given an opportunity to participate in the rulemaking," including by convening a Small Business Review Panel to review agency materials related to the proposed rule, "collect advice and recommendations" from "small entity representative[s]," and submit a report to the agency.  5 U.S.C. § 609(a)–(b).

256.  For purposes of the Regulatory Flexibility Act, a private entity is a "small" entity if it averages less than $47 million in annual receipts over the past five years, and a government entity is a "small" entity if its jurisdiction has a population of less than 50,000.  *See* 13 C.F.R. § 121.201; 5 U.S.C. § 601(3)–(6).

257.  Here, the CFPB failed to submit the Final PACE Rule to the required Small Business Review Panel, and that failure of the CFPB to observe required rulemaking procedures requires the Court to vacate the Final PACE Rule.

258.  The Regulatory Flexibility Act required the CFPB to convene a Small Business Review Panel before promulgating the Final PACE Rule because it will significantly impact thousands of small government entities in PACE-enabled States, thousands of small PACE contractors, and *all* PACE companies engaged in residential PACE programs.

259.  For the 2,000 small government entities in PACE-enabled States, the Final PACE Rule threatens to eliminate a potential revenue stream, force them to bear significant costs that could have been ameliorated through qualifying improvements financed through PACE, and eliminate a program designed specifically to further their public interests.

260.  Thousands of small contractors are enrolled in PACE programs in Florida, California, and Missouri, most of which have less than 50 employees and will be negatively affected by the Final PACE Rule.

261.  The PACE companies that stand to be devastated by the Final PACE Rule also include small entities.

262.  The Final PACE Rule clearly will have a significant impact on a substantial number of small entities, which is why the Small Business Administration's Office of Advocacy submitted a comment during the rulemaking process explain that convening a Small Business Review Panel was required.

263.  The CFPB's explanations in the Final PACE Rule itself for not submitting the rule to the Small Business Review Panel are all wrong.

264.  The CFPB determined that the Final PACE Rule "would not have a [significant impact on a substantial number of small entities]," based on its conclusion that "it does not appear likely that" any of the four "currently active private PACE companies averaged less than $47 million in annual receipts over the past five years" and the one "local government entity that directly originates PACE transactions has population greater than 50,000."  90 Fed. Reg. at 2498–99.

265.  But the CFPB is incorrect that none of the PACE administrators and government sponsors qualify as small entities.

266.  For example, the CFPB itself admits that there are "2,000 small government entities" in Florida, California, and Missouri currently authorized to administer residential PACE programs, *id*. at 2500, and does not dispute that there are over 2,500 contractors currently enrolled in the programs offered

by Plaintiff Renew in Florida and California alone—nearly all of which are small businesses.

267.  The CFPB also reasoned that there were too few PACE companies, government entities sponsoring PACE programs, and home improvement contactors marketing and helping originate PACE financing to constitute a "substantial number" when compared to "small entities in any of the industries [PACE companies] could reasonably be classified in," "small government entities," and "small home improvement contractor[s]" "nationwide," respectively. *Id.* at 2499–50.

268.  However, the CFPB only reached that conclusion by using the incorrect denominator, comparing the number of affected PACE companies, governments, and contractors to small companies, governments, and contractors *nationwide* rather than small companies in the PACE financing industry, small government entities only in the three states where residential PACE financing was available, and home improvement contractors who participate in PACE financing who must undergo rigorous review prior to participation.

269.  Accordingly, the CFPB has no justification not submitting the Final Rule to the Small Business Review Panel.

270.   Because of this violation, this Court should hold the Final Rule unlawful and set it aside.

## COUNT IV

### 5 U.S.C. § 706(2)(A)
### Violation Of The Administrative Procedure Act—The Final PACE Rule Is Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law

271.   Plaintiff realleges all matters set forth above and incorporate them here by reference.

272.   Under the APA, a court must set aside any agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706.

273.   Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*, 463 U.S. 29, 43 (1983) ("*State Farm*").

274.  The APA's arbitrary-and-capricious-review standard requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action," *id*. at 43; *see also FCC v. Fox Television Stations,*

*Inc.*, 556 U.S. 502, 513 (2009), or fails to "reasonably consider[ ] the relevant issues," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

275.    The Final PACE Rule is arbitrary and capricious because the CFPB relied upon the fatally flawed PACE Report as the justification for the Final PACE Rule.

276.    In promulgating the Final PACE Rule, the CFPB relied exclusively on the PACE Report to provide the "data-based support" for the Rule.

277.    The PACE Report found that PACE financing for consumers who applied for a PACE transaction between July 2014 and June 2020 resulted in a 2.5 percentage points mortgage delinquency rate difference over a two-year span following the PACE transaction's origination.

278.    The PACE Report suggests that PACE consumers in the two year period before obtaining PACE financing had a 7.1% mortgage delinquency rate, so a 2.5 percentage point increase is a 35% increase over two years.

279.    The CFPB justifies the Final PACE Rule on these findings.

280.    However, the CFPB's reliance on the PACE Report for the Final PACE Rule was arbitrary and capricious, given the numerous and fatal flaws in that report.

281. The PACE Report is significantly outdated because "lending practices and State law have evolved since the origination of the PACE loans reflected in the PACE Report." 90 Fed. Reg. at 2451.

282. The PACE reforms that California enacted in 2018 produced beneficial results for consumers, which the CFPB itself recognized as very effective at reducing the negative impacts on PACE Homeowners' credit health.

283. However, the PACE Report's dataset only included PACE homeowners who originated a PACE assessment between July 2016 and June 2020—meaning nearly two-thirds of the homeowners the CFPB analyzed had their PACE assessment originated before the far-reaching PACE reforms.

284. The PACE Report's underlying data did not distinguish PACE homeowners between the relevant, post-reform period—which showed much better results—and the previous, less regulated period.

285. Consequently, the CFPB failed to use "relevant data" and did not "articulate a satisfactory explanation for its action." *State Farm*, 463 U.S. at 43.

286. It is impossible to "reasonably consider[ ] the relevant issues," *Prometheus Radio Project*, 592 U.S. at 423, using data derived from an inapplicable period.

287.   The PACE Report also uses an improper control group to conclude that PACE consumers are exploited by PACE financing programs.

288.   The PACE Report compares two groups of consumers: a control group (those who applied for PACE transactions, were approved, but did not proceed with the transactions), and a test group (those who applied, were approved, and did proceed with the transactions).

289.   The PACE Report's choice of a control group is flawed for several reasons.

290.   To begin, PACE applicants who ultimately forego entering a PACE financing transaction are either denied or they self-select to not obtain PACE financing, and the CFPB never assesses the groups' similarities on important metrics.

291.   Further, prior research shows that several characteristics of borrowers and their loans, including loan-to-value ratio of the underlying mortgage, unemployment, income stability over time, variability of mortgage payments, negative equity in property, and income verification procedures used by lenders affect the frequency of mortgage delinquencies, but the CFPB does not bother identifying the differences between the control and test groups.

292.   The PACE Report's failure to account for these variables suggests that any individual variable could cause the 2.5% difference between the control and test groups.

293.   This skewing of the control group shows that the PACE Report relied on "[ir]relevant data" that provides no "satisfactory explanation for [the CFPB's] action," *State Farm*, 463 U.S. at 43, rendering the Final PACE Rule arbitrary and capricious.

294.   The PACE Report omits 22% of PACE applicants from its control group because it could not find their credit histories, meaning that *almost a quarter* of the relevant dataset—likely those who were denied financing—were not included in the study, inflating the approval rates to a level that the CFPB finds problematic.

295.   Finally, the PACE Report's own data shows that consumers who obtained a PACE assessment *performed better* than a "demonstration" control group of consumers in the Application-only group who also opened a (presumably) low-cost mortgage type account within a year of the PACE application.

296.   Taken together, the CFPB's reliance on the PACE Report's flawed analysis demonstrates that the CFPB's did not "examine the relevant data," did not "articulate a satisfactory explanation" for its failure to do so, and so did

not engage in "reasoned decisionmaking," *State Farm*, 463 U.S. at 43, 52, or "reasonably consider[ ] the relevant issues," *Prometheus Radio Project*, 592 U.S. at 423.

297.   Finally, the PACE Report found only a small difference of 2.5 percentage points in mortgage delinquencies between the control and test groups, suggesting—even under the PACE Report's flawed methodology—that there is *at most* only a negligible difference in delinquency rates between those who did and those who did not obtain PACE financing.

298.   Nowhere does the PACE Report identify that this delinquency rate resulted from PACE debt rather than other sources, and those in the control group likely did not choose PACE financing because they determined they could not afford to.

299.   Such a small (potential) difference, standing alone, is insufficient to justify such a burdensome rule that will limit access to financing for critical home improvement projects, and likely results from the flaws of the PACE Report.

300.   Indeed, this small number shrinks *even more* when the PACE Report uses data from after the April 2018 California PACE reforms.

301.   The CFPB's reliance on the PACE Report does not constitute a "reasoned" "consideration of the relevant factors." *Hewitt v. Comm'r of IRS*, 21

F.4th 1336, 1342 (11th Cir. 2021) (citations omitted); *see Prometheus Radio Project*, 592 U.S. at 423.

302.   Because of this violation, this Court should hold the Final Rule unlawful and set it aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

(a.)   Issue a declaratory judgment that the CFPB unlawfully promulgated the Final PACE Rule:

    (i.)   In excess of its statutory authority within the meaning of 5 U.S.C. § 706(2)(C);

    (ii.)   Contrary to the constitutional right under 5 U.S.C. § 706(2)(B);

    (iii.)   Without observance of procedure required by law under 5 U.S.C. § 706(2)(D); and/or

    (iv.)   Arbitrarily, capriciously, in an abuse of discretion, or otherwise not in accordance with the law within the meaning of 5 U.S.C. § 706(2)(A);

(b.)   Issue a declaratory judgment that the Final PACE Rule and Section 307 of EGRRCPA, 15 U.S.C. § 1639c(b)(3)(C), are unconstitutional under the Tenth Amendment to the Constitution as a violation of States'

sovereign taxing authority and as a violation of the anti-commandeering principle;

(c.)    Hold unlawful and set aside or vacate the Final PACE Rule under 5 U.S.C. § 706(2);

(d.)    Issue preliminary- and permanent-injunctive relief against Defendants and in favor of Plaintiff, prohibiting the CFPB, its officers, employees, and agents from applying or enforcing the Final PACE Rule, including during the pendency of this lawsuit;

(e.)    Award Plaintiff its costs and reasonable attorney's fees as appropriate; and,

(f.)    Award all such other relief as the Court may deem proper.

Dated: May 28, 2025.

Respectfully submitted,

MISHA TSEYTLIN*
KEVIN M. LEROY*
TROUTMAN PEPPER LOCKE LLP
111 South Wacker Dr., Suite 4100
Chicago, Illinois 60606
(608) 999-1240 (MT)
(312) 759-1938 (KL)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

CARSON A. COX*
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point, Suite 1500

*/s/ John S. Gibbs III*
JOHN S. GIBBS III
*Counsel of Record*
Florida Bar No. 91102
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street N.E., Suite 3000
Atlanta, Georgia 30308
Phone: (404) 885-3000
Email: evan.gibbs@troutman.com

ALEXANDER J. HILL*
TROUTMAN PEPPER LOCKE LLP

Richmond, Virginia 23219
(804) 697-1338
carson.cox@troutman.com

600 Peachtree Street N.E., Suite
3000
Atlanta, Georgia 30308
(404) 885-2763
alex.hill@troutman.com

*pro hac vice motions forthcoming*

*Attorneys for Plaintiff Building
Resilient Infrastructure &
Developing Greater Equity, Inc.*