# EXHIBIT E



July 26, 2023


Rohit Chopra, Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552

**Re: Comments/RIN 3170-AA84, Proposed Rule Regarding Residential Property Assessed Clean Energy (Regulation Z)**

Dear Director Chopra:

FortiFi Financial, Inc., formerly Energy Efficient Equity, Inc. ("E3"), (collectively, "FortiFi") appreciates the opportunity to submit this public comment letter in response to the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Notice of Proposed Rulemaking (the "NPRM" or "proposed rule") on Residential Property Assessed Clean Energy ("PACE") Financing. FortiFi is a PACE program administrator as that term is defined by California Financial Code § 22018 and California Streets and Highways Code § 5902(f). FortiFi has been a PACE program administrator in California since 2016, and in Florida since 2019.

## I.  Executive Summary

PACE is a property tax assessment program enacted and regulated by State and local jurisdictions to advance state environmental and economic interests through energy efficiency, water conservation, and natural disaster hardening improvements to residential properties.

While the consumer protections outlined in the proposed rule may have been appropriate a decade ago at the infancy of PACE, the statutory and regulatory PACE regimes enacted by the States and local governments, which the proposed rule would likely preempt or unnecessarily and inconsistently supplement, are more effective and provide greater consumer protections than those proposed by the Bureau. Relying on outdated anecdotes, flawed empirical data and research methodology, and a defective cost-benefit analysis, the Bureau has badly mischaracterized the current state of PACE financing and



ignored the Congressional directive to "consider the unique nature" of PACE.   The proposed rule could potentially eliminate the availability of PACE financing for many consumers, thereby significantly undermining State environmental and economic interests, without providing any meaningful benefit to consumers.  In short, the proposed rule does far more harm than good.

As described herein, the CFPB's report entitled Property Assessed Clean Energy Financing and Consumer Financial Outcomes: Data Point (hereinafter "Data Point"),[1] upon which the Bureau relies exclusively for empirical support, is inherently flawed.  First, the Data Point misrepresents the credit record data.[2]   In its request for program administrator data, the CFPB's electronic data submission format only allowed for program administrators to submit information for a single property owner (applicant) per assessment.   This collection method disregards that approximately fifty percent of properties with PACE assessments have multiple property owners, and therefore, multiple PACE applicants.[3]   As a result, the conclusions derived from roughly half the consumer data pool are flawed.  Second, the Bureau represents that it requested data for consumers who applied for PACE between July 2014 and June 2020.[4]  This is incorrect. The Bureau requested and received data through December 31, 2019.[5]  This error has significant bearing on the data analysis as it reduces by six months the period described as "Post-April 2018," which is far more instructive of conditions in the current market.[6] Given these data deficiencies alone, the reliability of the Data Point is dubious.

---

[1] *See* Siobhan McAlister & Ryan Sandler, *Property Assessed Clean Energy Financing and Consumer Financial Outcomes: Data Point, CFPB* (May 2023) (available at https://files.consumerfinance.gov/f/documents/cfpb_pace-rulemaking-report_2023-04.pdf).

[2] The Data Point incorrectly states that "[t]he four PACE companies each provided the CFPB's contractor with the names and addresses associated with each PACE application."  Data Point at 10.

[3] *See* Cal. Sts. & High. Code § 5902(g) (defining "property owner" as "all property owners of record on the property subject to the PACE assessment.").

[4] Data Point at 8.

[5] Data Point, Appendix C.

[6] The data requested by the CFPB through December 31, 2019, was submitted by the PACE program administrators in May 2022.  The Bureau references phantom data through June 2020 throughout the Data Point.  See Data Point at 7, 8, 9, 13, 16, 22, 45, and 59.  The Bureau had the opportunity but declined to request more current data.



Apart from the data deficiencies, the analysis and methodology suffer from several significant shortcomings.  For example, comparison of a group of consumers who financed PACE assessments to those who were approved for PACE financing but did not utilize it to draw conclusions about financial outcomes is comparing apples to oranges.  An additional expense will predictably impact a homeowner's overall economic profile, but forgoing qualifying improvements may have adverse impacts on the long-term value of a property, the ability to obtain or expense of homeowner's insurance, or the property's ability to withstand extreme weather events that are not captured in the data.  Accordingly, to ensure an apples-to-apples comparison, the Bureau's analysis should have compared those who received PACE assessments with those PACE applicants who utilized other home improvement financing alternatives—information that could have been gleaned from the credit report data the Bureau obtained and on which it otherwise relied.  Similarly, in what can only be described as a guess, the Bureau asserts that property owners who refinanced properties with PACE assessments might have done so because they misunderstood the PACE transaction.[7]  This baseless speculation ignores a much more obvious reason—during the relevant timer period, homeowners were able to take advantage of unprecedentedly low mortgage rates to refinance existing debt.[8]

Inexplicably, the proposed rule does not evaluate the effectiveness of the PACE statutes, regulations, and local ordinances, including PACE—specific disclosures, adopted by State and local jurisdictions.  The States have adopted effective measures to ensure that consumers understand and are able to repay their assessments.  Indeed, the PACE data published by California's Department of Financial Protection and Innovation ("DFPI"), California's PACE regulator, for 2019 through 2021, demonstrates, among other things, that the number of property foreclosures with PACE assessments is practically non-existent, and the number of unresolved PACE consumer complaints (including complaints against the home improvement contractor) as of year-end 2021 was two.[9]  We urge the

---

[7] *See* Residential Property Assessed Clean Energy Financing (Regulation Z), 88 Fed. Reg. 30388, 30421 (May 11, 2023) (hereinafter "Proposal").

[8] See CFPB, *CFPB Annual Report of 2021 Mortgage Market Activity Reveals an End to the Refinancing Boom and an Increase in Home Purchase Loans* (Sept. 19, 2022) (available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-annual-report-2021-mortgage-market-activity-end-to-refinancing-boom).

[9] *See* California Department of Financial Protection and Innovation, *Annual Report of Operation of Finance Lenders, Brokers, and PACE Administrators Licensed Under the California Licensing Law*, 41,



CFPB to consider whether the PACE statutes and regulations, and the consumer protections the industry has voluntarily elected to adopt, effectively address the aged anecdotal concerns referenced in the proposed rule.

Apart from its analytical flaws, the proposed rule fails to even consider—let alone accommodate—the States' sovereign interests guaranteed by the Tenth Amendment to the U.S. Constitution.  Under well-settled Constitutional law, the CFPB cannot commandeer the States' exercise of their sovereign authority to impose local property taxes.  The proposed rule, which is contrary to this principle, would be invalid under the U.S. Constitution.  The CFPB has an obligation to conform any rule to the U.S. Constitution, an obligation that trumps any statutory directive and certainly any misguided policy preferences.  In short, it can and should defer to the States' regulation of PACE financing both because the Constitution requires such deference, and because the States have already accomplished the goals of Section 307 of the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA").

The CFPB's proposal to interpret the Truth in Lending Act ("TILA") term "consumer credit" as including PACE financing and other State tax assessments characterized as "voluntary" would be unlawful.  PACE assessments are not and cannot be deemed "consumer credit" or "residential mortgage loans" under any reasonable construction of TILA, and the Bureau's proposal to do so is contrary to clearly expressed Congressional intent.  Section 307 of the EGRRCPA would be unnecessary if, as the Bureau suggests, PACE assessments had always been subject to the rules applicable to residential mortgage loans.  Congress's narrow directive to the Bureau to "carry out the purposes" of one specific provision of TILA is not a license to apply every other provision of TILA; indeed, it quite obviously implies the opposite.

The Bureau's proposal to apply TILA to "voluntary tax assessments" is also bad policy.  The statutory provisions and rules that the Bureau would force upon PACE assessments (and any other "voluntary" property tax assessments) were designed for residential mortgage loans.  They were not intended to apply to PACE assessments and are clearly inferior to State and local laws and ordinances that were, unlike TILA and Regulation Z, specifically designed to protect the interests of homeowners considering PACE financing,

---

46-7 (Aug. 2022) (available at https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/08/2021-CFL-Aggregated-Annual-Report.pdf) (hereinafter "DFPI Annual Report").



while not undermining the policy goals of PACE.  Further, the CFPB's casual decision to intrude upon States' sovereign taxing authority would raise a host of constitutional and practical complications that the Bureau appears not to have considered let alone addressed.

The Bureau similarly errs in its proposal to rewrite sections 129C and 130 of TILA to impose direct liability on PACE administrators like FortiFi.  Congress has made clear that liability under TILA extends only to "creditors," except in the handful of instances where Congress has expressly extended liability to other types of entities.  Congress has not authorized the CFPB to countermand its clear directives, and the CFPB's assertion of this authority cannot withstand serious scrutiny.

Finally, the Bureau has not followed applicable procedural requirements under the Consumer Financial Protection Act, the Small Business Regulatory Enforcement Fairness Act, and the National Environmental Policy Act.  Its cost-benefit analysis is fatally flawed in that it both wildly underestimates the costs of the proposed rule, omitting costs that are both knowable and quantifiable, and overestimates the benefits.  Although finding no correlation between the effect of PACE and census tract demographics for age,[10] race, and ethnicity,[11] including black and Hispanic homeowners, the Bureau fails to address the economic equity costs to these communities if PACE financing is unavailable for critical home improvements.  Likewise, its certification that the proposed rule would not have a significant economic impact on a substantial number of small entities "circumvents the requirements of the [SBREFA]," and relies on an improperly narrow view of the likely impacts of the rule, which even the Bureau concedes will impact thousands of small home improvement contractors.[12]    Finally, the Bureau's proposed rule unlawfully fails to consider the environmental impacts of a rule that even it assumes would severely restrict the availability PACE financing, a type of financing created expressly by States to address severe and worsening environmental risks in their respective jurisdictions.

---

[10] Data Point at 16 ("PACE consumers had an average age of 55, similar to the general population of consumers in California and Florida with credit records and a mortgage.").

[11] Data Point at 38 ("We find largely similar effects of PACE for all categories of census tract race and ethnicity.").

[12] *See* Comment of U.S. Small Business Administration Office of Advocacy (July 24, 2023).



Simply put, the proposed rule is irredeemable. The Bureau should withdraw the proposed rule and develop an alternative that is (1) based on the well-regulated PACE market that actually exists right now, (2) consistent, if possible, with Constitutional limitations on the Federal government's authority to regulate state taxing authority, (3) consistent with TILA, and (4) based on an adequate consideration of costs and benefits, including the impact on small entities and the impact on the environment.

## II. The "Unique Nature" of PACE Assessments

At the outset, it is important to understand that PACE assessments are fundamentally different than mortgage transactions or other consumer credit transactions. State governments have authorized PACE programs to allow homeowners in certain jurisdictions to finance specified types of improvements to their homes in order to advance critical state interests in environmental sustainability and to address increasingly extreme weather events.[13] Homeowners could (in theory but often not in reality) finance these improvements with traditional consumer credit products, such as home equity lines of credit, credit cards, or second mortgages. This superficial similarity should not, however, obscure the fundamental differences between PACE financing and traditional consumer credit. To name just a few: PACE assessments can *only* be imposed by governmental entities; PACE financings are *only* available to serve important state interests; state legislatures determined that PACE financing is *necessary* to serve these interests; and PACE assessments, unlike consumer credit transactions, do not constitute a personal debt of the homeowner.

The proposal fails to appreciate the implications of these key differences between PACE assessments and traditional consumer credit transactions and therefore has failed to abide by Congress's directive to consider the "unique nature" of PACE financing when carrying out the rulemaking directive.[14]

---

[13] State governments have also authorized Commercial PACE programs, designed to allow owners of commercial property the ability to finance the up-front cost of energy or other eligible improvements on a property and then pay back the assessment over time. *See* U.S. Department of Energy, *Property Assessed Clean Energy Programs* (available at https://www.energy.gov/scep/slsc/property-assessed-clean-energy-programs) (last visited July 26, 2023).

[14] Comment of Members of Congress from Florida, Jared Moskowitz, Byron Donalds, Maria Elvira Salazar, Michael Waltz, Darren Soto, John H Rutherford, Bill Posey, and Anna Paulina Luna (July 12,



*a.  PACE transactions, by their very nature, can only be imposed by state or local governments.*

In California, only "the legislative body of any public agency" can authorize PACE transactions.[15]  Depending on the particular purpose of the financing, a "public agency" can be "a city, county, city and county, municipal utility district, community services district, sanitary district, sanitation district or water district, irrigation district, or public utility district that owns and operates an electric distribution system."[16]  Only an "authorized public agency official" can enter into agreements with homeowners for PACE assessments.[17]

Likewise, in Florida, only a "local government may levy non-ad valorem assessments to fund qualifying improvements."[18]  A "local government" is a "county, a municipality, a dependent special district [(i.e., a unit of a local government created for a special purpose)]" or a "separate legal entity" created pursuant to Florida's Interlocal Cooperation Act.[19]

Any individual or entity that can contract can become a "creditor" under TILA.  By contrast, PACE financing is an exercise of sovereign authority that, unlike consumer credit, can only be offered by states or local governmental entities.  This fundamental feature of PACE financing has significant implications for the rulemaking, as discussed further below.

*b.  PACE transactions are only available to advance important public policies of the State.*

PACE is not "general purpose" financing, available to be used for any household purpose.  Rather, PACE assessments are available only to serve specific state interests.  For

---

2023) ("Instead of considering the unique nature of PACE financing, the Proposed Rule simply determined PACE financing is to be treated as a mortgage loan.").

[15] Cal. Sts. & High. Code §§ 5898.14(3); 5898.20; 5899.

[16] Cal. Sts. & High. Code §§ 5898.20(c)(3); 5899(b)(1).

[17] Cal. Sts. & High. Code §§ 5898.21; 5899(f).

[18] Fla. Stat. Ann. § 163.08(3).  Local governments may also "enter into a partnership with one or more local governments for the purpose of providing and financing qualifying improvements."  Fla. Stat. Ann. § 163.08(5).

[19] *See* Fla. Stat. Ann. § 163.08(2)(a) (citing Fla. Stat. Ann. §§ 189.012 and 163.01(7)).



example, in California, PACE assessments may be used to finance the installation of home improvements that will: (1) promote "renewable energy sources or energy efficiency improvements," (2) "improve water efficiency,"[20] (3) "address seismic safety needs,"[21] (4) "finance the installation of electric vehicle charging infrastructure" in order to "address the issue of global climate change,"[22] and (5) "promote the installation of wildfire safety improvements."[23]  PACE assessments cannot be imposed, and indeed no work that will be funded through a PACE program can commence, before a determination has been made that improvements serve one of these purposes.[24]

Similarly, in Florida, PACE exists to advance "the goals of the state's energy and hurricane mitigation policies."[25]  The Florida legislature determined that "the financing of qualifying improvements through the execution of financing agreements and the related imposition of voluntary assessments are reasonable and necessary to serve and achieve a compelling state interest and are necessary for the prosperity and welfare of the state and its property owners and inhabitants."[26]  Accordingly, PACE assessments can only be used to finance home improvements that advance "[e]nergy conservation and efficiency," "[r]enewable energy improvement," and "wind resistance improvement."[27]

By contrast, consumer credit subject to TILA is available to borrowers for use for all "personal, family, or household purposes."[28]  Consumer credit is not required to, and likely rarely does, serve any sovereign interest of the States, a significant distinction that further contributes to the "unique nature" of PACE financing.

---

[20] Cal. Sts. & High. Code § 5898.12(c).

[21] Cal. Sts. & High. Code § 5899(a)(1).

[22] Cal. Sts. & High. Code § 5899.3(a).

[23] Cal. Sts. & High. Code § 5899.4(a)(4).

[24] Cal. Fin. Code § 22684(g).

[25] Fla. Stat. Ann. § 163.08(1)(b).

[26] Fla. Stat. Ann. § 163.08(1)(b), (c).

[27] Fla. Stat. Ann. § 163.08(2)(b).

[28] 15 U.S.C. § 1602(i).



    *c. State Legislatures determined that PACE programs were necessary to advance
these State interests.*

PACE financing serves a need that the traditional consumer credit market does not
adequately address.  In authorizing residential PACE programs, the California state
legislature was explicit: "The upfront cost of making residential . . . real property" more
energy and water efficient, more seismically safe, and more resistant to wildfires
"prevents many property owners from making those improvements.  To make those
improvements more affordable and to promote the installation of those improvements, it
is *necessary* to authorize an alternative procedure for authorizing assessments to finance
the cost" of these improvements.[29]

Similarly, the Florida legislature stated that properties that are not using "energy
conservation strategies" or "protected from wind damage by wind resistance qualifying
improvements" "contribute to the burden affecting all improved property," and that the
"installation and operation of qualifying improvements not only benefit the affected
properties for which the improvements are made, but also assist in fulfilling the goal of
the state's energy and hurricane mitigation policies."[30]  In short, PACE assessments
provide benefits to all citizens and to the State generally.  The Florida legislature found
that authorizing such assessments was "*necessary*" to achieve these positive benefits.[31]

Comments submitted in response to the Bureau's 2019 ANPR provide further support for
the proposition that PACE assessments provide financing that the consumer credit
market does not provide.[32]  In addition, comments already submitted in response to the
NPRM, suggest that adoption of the proposed rule would likely devastate the industry and
make PACE financing unavailable for consumers who have no other source of

---

[29] Cal. Sts. & High. Code §§ 5898.14(a)(2); § 5899(a)(2); 5899.4(a)(2) (emphasis added); *see also id.* at
§ 5899.3(a)(3) (same for electric vehicle charging infrastructure).

[30] Fla. Stat. Ann. § 163.08(1)(b).

[31] *Id.* § 163.08(1)(c) (emphasis added).

[32] *See, e.g.,* Comment of Los Angeles Business Council (Apr. 26, 2019) ("PACE provides access to
affordable and fixed rate capital for these critical public purposes, in some cases where other financing
sources (unsecured credit, HELOCs) are unavailable."); Comment of Natural Resources Defense Council
(May 6, 2019) ("The key feature of residential PACE financing is that homeowners pay for these
improvements with payments made through their property taxes, which results in access to affordable
and fixed rate capital in some cases where other financing sources are unavailable.").



financing.[33]  The obvious import is that the elimination or significant reduction of PACE financing will result in fewer qualifying home improvements, to the detriment of States' critical public policy interests.

>   d.  *PACE assessments are not personal debts, but property tax assessments "indistinguishable" from property tax assessments used to pay for other important public works.*

PACE assessments are not personal debts of homeowners, but "constitute a lien against the lots and parcels of land on which they are made, until they are paid."[34]  They are collected "in the same manner and at the same time as the general taxes of the city or country on real property."[35]   As a Florida court recently held: PACE "assessments imposed pursuant to [Fla. Stat. Ann. § 163.08] are *indistinguishable from and fully equivalent to* all other non-ad valorem assessments providing for the payment of costs of capital projects, improvements, and/or essential services (e.g., infrastructure and services related to roads, stormwater, water, sewer, garbage removal/disposal, etc.) which benefit property or relieve a burden created by property in furtherance of a public purpose."[36]

Similarly, the U.S. Department of Energy explains that "[a] PACE assessment is a debt of the property, meaning the debt is tied to the property as opposed to the property

---

[33] *See, e.g,* Comment of Shingles Solution Technology (July 9, 2023); Comment of Pro-Form Roofing (July 12, 2023); Comment of Infinity Windows (July 21, 2023); Comment of Lock Tight Windows, Doors, and Roofing (July 24, 2023); Comment of Members of Congress from Florida, Jared Moskowitz, Byron Donalds, Maria Elvira Salazar, Michael Waltz, Darren Soto, John H Rutherford, Bill Posey, and Anna Paulina Luna (July 12, 2023) (proposed rule "if finalized, will have a negative financial impact on Floridians by reducing their access to affordable financing for disaster hardening at a time when other financing options, such as credit cards and cash-out refinances, are among their least affordable in years.").

[34] Cal. Sts. & High. Code § 5898.30; *see also* Fla. Stat. §§ 163.08(4), 197.3632.

[35] Cal. Sts. & High. Code § 5898.30; *see generally In re Watkins*, 620 B.R. 377, 379-380 (Bankr. M.D. Fla. 2020) (describing process for the collection of unpaid non-ad valorem tax assessments in Florida).

[36] *See Florida PACE Funding Agency v. State of Florida*, No. 2022-CA-1562 (Fla. Cir. Ct. Oct. 6, 2022) (available at https://floridapace.gov/wp-content/uploads/2022/12/CERTIFIED-COPY-OF-FINAL-JUDGMENT-FROM-LEON-COUNTY-compressed.pdf); *see also Florida Development Finance Corp. v. State*, No. 2014-CA-000548, 2014 WL 12544504 (Fla. Cir. Ct. July 18, 2014) (same).



owner(s)."[37]   This structure "can address a key disincentive to investing in energy improvements because many property owners are hesitant to make property improvements if they think they may not stay in the property long enough for the resulting savings to cover the upfront costs."[38]   In contrast to mortgages, PACE assessments do not accelerate upon default, and therefore homeowners are able to avoid any foreclosure by paying the past due assessment payments.[39]

## III. State and Local Governments Have Already Adopted Appropriate Consumer Protections Based on Local Circumstances

Although the proposed rule makes passing reference to some, but certainly not all, of the consumer protections that State and local governments have adopted, it fails to appreciate the significance of these consumer protections for this rulemaking.  The States and local governments that have authorized PACE have already adopted measures to ensure that consumers understand PACE transactions, are able to pay the assessments, and are not subject to unscrupulous sales practices.  As explained in detail below, fitting and effective regulation of PACE does not require recharacterization of PACE as credit or mortgage credit.  Such recharacterization is required only to facilitate the Bureau's regulatory overreach.  The CFPB can—and should—defer to the States' and local governments' judgments regarding the appropriate regulation of their sovereign taxing authority.

   *a. States and local governments have created disclosure regimes specifically tailored to ensure that homeowners understand PACE transactions.*

(1) California's disclosure regime for PACE

In California, the state legislature has created a comprehensive set of disclosures that program administrators, like FortiFi, must provide to homeowners during the application process.

---

[37] *See* U.S. Department of Energy, *Property Assessed Clean Energy Programs* (available at
https://www.energy.gov/scep/slsc/property-assessed-clean-energy-programs (last visited July 25, 2023).
[38] *Id.*
[39] *See, e.g.,* Fla. Stat. Ann. § 197.472; Cal. Sts. & High. Code § 8800; Cal. Rev. & Tax. Code § 4101 *et seq.*



The California disclosures include a Financing Estimate and Disclosure which must be presented to each property owner in a substantially similar format to that in Cal. Sts. & High. Code § 5898.17 setting forth:

- a customer service toll-free phone number and email of the program administrator;

- notice that the program administrator must respond to any consumer complaints, questions about financing obligations or contractual rights under the terms of the assessment contract within 24 hours or one business day;

- the total product costs of the home improvement, including labor and installation;

- a description of the product (e.g., Energy Star Windows)

- a detailed accounting of financing costs, including application fees and costs, prepaid interest, other costs;

- the term of the assessment;

- the APR, simple interest rate, and estimated annual administrative fees separately listed and summed to provide a total annual payment;

- a disclosure for consumers that pay their property taxes through an impound account that the mortgage servicer may apportion the amount and add it to the homeowners' monthly payment;

- a sum of the total amount that homeowners will pay over the life of the financing;

- other costs, including an appraisal fee (if any), bond related costs (if any), annual administrative fees, estimated closing costs, credit reporting fees, and recording fees;

- disclosure of the total financing and closing costs;

- estimate of cash to close (if any);

- whether there is a prepayment penalty;



- information specifically designed to allow homeowners to compare other financing options, including the amount of principal homeowners' will have paid over the term of the financing, the total amount of interest homeowners' will have paid over the term of the financing, amount of financing and other costs, homeowners will have paid over the term of the financing, and the grand total that the homeowner should expect to pay over the entire term of the financing (i.e., assuming no prepayment), the APR (again), and the total interest paid over the full term of the financing as a percentage of the amount financed;

- a disclosure informing homeowners that they "may be required to pay off the remaining balance of th[e] obligation by the mortgage lender refinancing [the] home," and that if they sell their home during the term of the financing "the buyer or their mortgage lender may require [the homeowners] to pay off the balance of th[e] obligation as a condition of sale."  Each property owner is required to initial this disclosure;

- a disclosure informing homeowners that their "payments will be added to [their] property tax bill."  That "[w]hether [the homeowners] pay [their] property taxes through [their] mortgage payment, using an impound account, or if [they] pay them directly to the tax collector, [they] will need to save an estimated $_____ for [their] first tax installment. If [they] pay [their] taxes through an impound account [they] should notify [their] mortgage lender, so that [their] monthly mortgage payment can be adjusted by [their] mortgage lender to cover [their] increased property tax bill." Each property owner is required to initial this disclosure;

- an instruction to homeowners to "[c]onsult [their] tax adviser regarding tax credits, credits and deductions, tax deductibility, and other tax benefits available," and warning them that "[m]aking an appropriate application for the benefit is [their] responsibility." Each property owner is required to initial this disclosure;

- a warning that if their "property tax payment is late, the amount due will be subject to a 10% penalty, late fees, and 1.5% per month interest penalty as established by state law, and [their] property may be subject to foreclosure." Each property owner is required to initial this disclosure;



- disclosure of the homeowners' three day right to cancel the transaction (five days for senior citizens), and instruction on how to exercise that right by mail or email; and

- an acknowledgment of receipt that informs consumers that receipt of the disclosure is "NOT a contract" and does not obligate them to accept the financing. Each property owner is required to sign and date this disclosure.[40]

Before a homeowner executes a PACE assessment contract in California, the program administrator must orally confirm that the homeowners have received a copy of the contract, the Financing Estimate and Disclosure described above, and the separate notice of right to cancel required by Cal. Sts. & High. Code § 5898.16, all of which must be provided in hard copy upon request.[41]

In addition to these written disclosures,[42] the program administrator must also provide to the homeowner oral confirmation of the key terms of the transaction, after ensuring that the homeowner has any other person they would like on the call and after determining the homeowner's preferred language.[43]  During the phone call, which must be recorded and must be performed by a human being (*i.e.*, cannot be prerecorded),[44] the program administrator must:

- encourage the homeowners to "review the assessment contract and financing estimate and disclosure form with all other owners of the property;"

- confirm the efficiency improvements that the PACE assessment will finance;

---

[40] *See generally* Cal. Sts. & High. Code § 5898.17; *see also* Sample California Finance Agreement, attached as Exhibit A, at FED-1 to FED-6.

[41] Cal. Sts. & High. Code § 5913(a)(1)(A); *see also* Cal. Code Regs. tit. 10, § 1620.06(a)-(d) (detailed regulations implementing these requirements).

[42] Cal. Sts. & High. Code § 5913(c).

[43] Cal. Sts. & High. Code § 5913(a)(1)(B), (a)(2)(A).  Notably, if the program administrator cannot provide the oral disclosures in a language of the homeowner's choosing, the transaction cannot proceed.  Cal. Sts. & High. Code § 5913(d).  In addition, if the homeowner selects a language other than English for the oral conversation, then the program administrator must provide a copy of the assessment contract and the written disclosures in that other language *before* the contract is executed.  Cal. Sts. & High. Code § 5913(e).

[44] Cal. Sts. & High. Code § 5913(b)(1), (2).



- confirm that the homeowner understands the "total estimated annual costs the property owner will have to pay under the assessment contract, including applicable fees;"

- confirm the "total estimated average monthly amount of funds the property owner would have to save in order to pay the annual costs under the PACE assessment, including applicable fees;"

- explain "[t]hat the county annual secured property tax bill, which will include the installment of the PACE lien, will be mailed by the county tax collector no later than November 1 each year, and that if the lien is recorded after the fiscal year closes but before the bill is mailed, the first installment may not appear on the county tax bill until the following year;"

- confirm "the term of the assessment contract;"

- explain that the "payments on the assessment contract will be made through an additional annual assessment on the property and paid either directly to the county tax collector's office as part of the total annual secured property tax bill, or through the property owner's mortgage impound account, and that if the property owner pays taxes through an impound account, the property owner should notify the property owner's mortgage lender to discuss adjusting the monthly mortgage payment by the estimated monthly cost of the PACE assessment;"

- ensure the homeowners understand that "the property will be subject to a lien during the term of the assessment contract and that the obligations under the assessment contract may be required to be paid in full before the property owner sells or refinances the property;"

- confirm "[t]hat the property owner has disclosed whether the property has received or is seeking additional PACE assessments and has disclosed all other PACE assessments or special taxes that are or about to be placed on the property, if known to and understood by the property owner;"

- explain "[t]hat any potential utility savings are not guaranteed, and will not reduce the assessment payments or total assessment amount;"



- explain "[t]hat the program administrator and contractor do not provide tax advice, and that the property owner should seek professional tax advice if the property owner has questions regarding tax credits, tax deductibility, or of other tax impacts on the PACE assessment or assessment contract;"

- explain "[t]hat if that property tax payment is delinquent within the fiscal year, the county tax collector will assess a 10-percent penalty and may assess related costs, as required by state law. A delinquent payment also subjects the property to foreclosure. If the delinquent payment continues past June 30 of a given year and defaults, the county tax collector will assess penalties at the rate of 1 ½ percent per month (18 percent per year), and the property will continue to be subject to foreclosure and may become subject to the county tax collector's right to sell the property at auction;"

- confirm "[t]hat the property owner has a three-business (or five-business) day right to cancel the assessment contract . . . , and that canceling the assessment contract may also cancel the home improvement contract;"

- confirm "[t]hat it is the responsibility of the property owner to contact the property owner's home insurance provider to determine whether the efficiency improvement to be financed by the PACE assessment is covered by the property owner's insurance plan;" and

- ensure that the property owner knows "[t]hat the property owner may repay an amount owed pursuant to an assessment contract before the date that amount is due under the contract without early repayment penalty."[45]

Recordings of these conversations must be maintained for at least five years.[46]

---

[45] Cal. Sts. & High. Code § 5913(a)(2)(B)-(P); *see also* Cal. Code Regs. tit. 10, § 1620.06(e) (providing additional requirements regarding the confirmation call).

[46] *Id.* § 5913(b)(3); *see also* Cal. Code Regs. tit. 10, § 1620.07 (imposing obligations on PACE program administrators to retain relevant records, including "[o]ral confirmation of key terms records.").



(2) Florida's disclosure regime for PACE

In Florida, the State legislature has made clear that PACE assessments are "[s]ubject to local government ordinance or resolution," including the form and content of disclosures.[47] Several of the largest jurisdictions that authorize PACE transactions have enacted ordinances to ensure PACE transactions are adequately disclosed.  For example, in Broward County any local government must provide a separate written disclosure containing:

- a full legal description of the property that will become subject to the PACE assessment;

- the total amount of debt created, including interest;

- the maximum annual PACE assessment;

- that the PACE assessment will appear on the property owner's bill;

- that there is no discount for paying the PACE assessment early;

- "[t]hat the PACE assessment will be collected in the same manner as real estate taxes, that failure to pay the PACE assessment may cause a tax certificate to be issued against the property, and that failure to pay may result in the loss of property subject to the PACE assessment, including homestead property, in the same manner as failure to pay property taxes;" and

- "[t]hat the property improvements and PACE assessment may or may not affect the overall value of the property."[48]

---

[47] Fla. Stat. Ann. § 163.08(4).

[48] Broward County Code of Ordinances § 20-14(b) (available at
https://library.municode.com/fl/broward_county/codes/code_of_ordinances?nodeId=PTIICOOR_CH20LIBURE_ARTIINGE_S20-14DIREFLPRASCLENPRPA) (last visited July 26, 2023).



These disclosures must be signed and dated by the homeowner and must be recorded along with the financing agreement itself.[49]  Local governments must also conduct a "disclosure interview," which must provide—

> confirmation of the property owner's understanding of the individual Broward PACE Program "Notice" provisions, including the total amount of the PACE debt, amount of the annual PACE assessment, the total number of years of the annual PACE assessment, mandatory collection via property taxes for which the property owner is responsible, the potential impacts on escrow fees for those property owners with a mortgage on the subject property, the absence of government relief, and the ability to cancel the agreement within three (3) business days after the property owner signs the Financing Agreement.[50]

The interview must be recorded and made available to the property owner upon request.[51]

Similarly, in Palm Beach County, the local ordinance mandates that property owners receive a disclosure form which sets forth the nature of the transaction, the cost of the PACE assessment, including both interest and fees expressed both as an APR and as a dollar figure, and the assessed value of the property relative to the PACE assessment and any existing mortgage.[52]   The disclosure also contains answers to important questions about the PACE assessment, including how PACE assessments are repaid, rights with respect to home improvement contractors, consequences for non-payment,

---

[49] *Id.* at § 20-14(c), (d).
[50] Broward County Admin. Code § 22.177(c)(4) (available at https://library.municode.com/fl/broward_county/codes/administrative_code?nodeId=CH22OTOPPOFIADSE_PTXXVIIIBRCOPRASCLENPAPRPO_22.177ADPAPRREREPR) (last visited July 26, 2023).
[51] *Id.*
[52] Palm Beach County Code of Ordinances § 17-506(a) (available at https://library.municode.com/fl/palm_beach_county/codes/code_of_ordinances?nodeId=PABECOCO_CH17LITAMIBURE_ARTXVIIPRASCLENPAPR_S17-506DIRE) (last visited July 26, 2023).



the potential effect of a PACE assessment on the ability to refinance the mortgage or sell the home, and the property owner's right of cancellation.[53]

Miami-Dade County has similarly enacted an ordinance establishing tailored disclosures of key terms and considerations for homeowners in its boundaries that are considering using PACE assessments to finance qualifying improvements.[54]  Several of the other large counties and municipalities in Florida that have authorized PACE have adopted similar disclosures to ensure homeowners understand the terms, conditions, and risks of using PACE assessments to finance qualifying home improvements.[55]

Beyond the requirements of counties or local jurisdictions, FortiFi and other program administrator members of PACENation have voluntarily agreed to a set of consumer protection principles that include "know-before-you-owe" disclosures specifically tailored to PACE, as well as a "confirmed terms phone call," similar to the confirmation of terms call required in California.[56]

---

[53] *See id.*; *see also Palm Beach County PACE Consumer Disclosure Notice* (available at https://www.pbctax.com/wp-content/uploads/2022/02/PBC-Consumer-Disclosure-Notice.pdf) (last visited July 26, 2023).

[54] *See* Miami-Dade Code of Ordinances § 2-2083 (available at https://library.municode.com/fl/miami-_dade_county/codes/code_of_ordinances?nodeId=PTIIICOOR_CH2AD_ARTCXXXVIIIVOENEFREENCO_S2-2083AGTE) (last visited July  26, 2023).

[55] *See, e.g.,* Sarasota County Code or Ordinances §§ 38-326(7), (8), 38-331 (available at https://library.municode.com/fl/sarasota_county/codes/code_of_ordinances?nodeId=PTIIICOOR_CH38CODE_ARTXIVPRASCLENPAPR_S38-326PAPRST) (last visited July 26, 2023); West Palm Beach Code of Ordinances § 34-144(b) (available at https://library.municode.com/fl/west_palm_beach/codes/code_of_ordinances?nodeId=PTIICOOR_CH34EN_ARTVIPRASCLENPRPA_S34-140DE); Monroe County Code of Ordinances § 12-176 (available at https://library.municode.com/fl/monroe_county/codes/code_of_ordinances?nodeId=CH12ENNAREPR_ARTVIIPRASCLENPAPR) (last visited July 26, 2023).

[56] *See* Residential Property Assessed Clean Energy (R-PACE) State and Local Consumer Protection Principles ¶¶ 8-9 (available at https://www.pacenation.org/wp-content/uploads/2021/11/PACENation-R-PACE-Consumer-Protection-Policy-Principles-ADOPTED-October-21.2021.pdf) (hereinafter "PACENation Consumer Protection Principles").



b.  *State legislatures and local governments have already imposed requirements,*
    *tailored to the "unique nature" of PACE assessments, to make a reasonable*
    *determination that homeowners have the ability to repay PACE assessments.*

(1) The California ability to pay regulatory regime

When it authorized PACE financing, the California legislature restricted access to
homeowners who met a strict set of criteria.  These criteria are related to the amount of
overall debt, including mortgage related debt, secured by the property relative to the
property's value, the property owner's historical performance with respect to payment of
property-based debt and property tax, and other evidence of consumer's inability to
manage their finances (*e.g.*, bankruptcy).  By limiting the availability of PACE financing to
those homeowners who have already demonstrated an ability to manage local property
tax assessments and the likely much larger mortgage payments, these criteria effectively
limit the availability of PACE assessments to those homeowners who can afford them.
Indeed, given the DFPI's foreclosure data from 2019 though 2021, reporting there have
only been seven property foreclosures with PACE assessments,[57] these criteria have
proven to be incredibly effective indicators of whether a property owner has the ability to
pay the PACE assessment.  Specifically, under Financial Code § 22684, a program
administrator cannot execute an assessment contract until the following criteria are
satisfied:

- All property taxes for the property that will be subject to the assessment contract
  are current. The program administrator shall ask a property owner whether there
  has been no more than one late payment of property taxes on the property for the
  previous three years or since the current owner acquired the property, whichever
  period is shorter.

- The property that will be subject to the assessment contract has no recorded and
  outstanding liens of certain types in excess of one thousand dollars ($1,000).

---

[57] DFPI Annual Report, p. 46–47, Tables 32-34.  Five of these foreclosure actions occurred in 2019 and
involved PACE assessments imposed in 2016 and 2017.  The other two occurred in 2021 and involved
PACE assessments imposed in 2019 and 2021 on multimillion dollar homes in Venice Beach.  *Id.*  This is
nothing like the foreclosure crisis that prompted the creation of the CFPB and the enactment of the ability-
to-repay provisions applicable to most mortgage loans, nor is it consistent with the anecdotes reported to
the Bureau by consumer advocates.  The proposed rule is silent as to its choice to ignore the DFPI data.



- The property that will be subject to the assessment contract has no notices of default currently recorded that have not been rescinded.

- The property owner has not been a party to any bankruptcy proceedings within the last four years, except that the property owner may have been party to a bankruptcy proceeding that was discharged or dismissed between two and four years before the application date and the property owner has had no payments more than 30 days past due on any mortgage debt or nonmortgage debt, excluding medical debt, during the 12 months immediately preceding the application date.

- The property owner is current on all mortgage debt on the subject property and has no more than one late payment during the six months immediately preceding the application date and if the late payment did not exceed 30 days past due.

- The financing is for less than 15 percent of the value of the property, up to the first seven hundred thousand dollars ($700,000) inclusive of the existing assessments, and is for less than 10 percent of the remaining value of the property above seven hundred thousand dollars ($700,000).

- The total PACE assessments and the mortgage-related debt on the property subject to the PACE assessment will not exceed 97 percent of the market value of the property as established by the valuation required by Financial Code Section 22685.

- The term of the assessment contract shall not exceed the estimated useful life of the measure to which the greatest portion of funds disbursed under the assessment contract is attributable. The program administrator shall determine useful life for purposes of this subdivision based upon credible third-party standards or certification criteria that have been established by appropriate government agencies or nationally recognized standards and testing organizations.

- The program administrator shall verify the existence of recorded PACE assessments and shall ask if the property owner has authorized additional PACE assessments on the same subject property that have not yet been recorded.

- The program administrator must use commercially reasonable and available methods to verify the above criteria.



Additionally, property owners are not permitted to obtain a PACE assessment if the assessment would result in annual property taxes and assessments that exceed 5 percent of the property's estimated value.[58]

As of April 2018, California "program administrators," including FortiFi, are required to make "a reasonable good faith determination that the property owner has a reasonable *ability to pay* the annual payment obligations for the PACE assessment" before executing an assessment contract or allowing a home improvement contract to be executed or for work to commence.[59]    This determination must be made after consideration of the property owner's monthly income, housing expense, and debt obligations (generally verified through reliable third-party records) and must allow the program administrator to determine that the property owner's income is sufficient to pay the PACE assessment, existing mortgage obligations, existing debts, and household living expenses.[60]    The program administrator must consider:

- The property owner's monthly income and housing expense (including all mortgage principal and interest payments, insurance, existing property taxes, mortgage guaranty insurance, and any other preexisting fees and assessments on the property);[61]

- The property owner's monthly debt obligations, including secured and unsecured debt, alimony, and child support.[62]

Notably, program administrators are prohibited from basing any employee's compensation on making a positive determination of a property owner's ability to pay a PACE assessment.[63]

The Bureau provides no reliable evidence that these existing requirements, which are not premised on recharacterizing PACE as consumer credit, do not adequately ensure that consumers who cannot pay a PACE assessment are prevented from assessment

---

[58] Cal. Sts. & High. Code § 5898.16(a)(1).
[59] Cal. Fin. Code § 22686 (emphasis added).
[60] Cal. Fin. Code § 22687.
[61] Cal. Fin. Code § 22687(a)(1), (2); Cal. Code Regs. tit. 10, § 1620.22.
[62] Cal. Fin. Code § 22687(a)(4), (c).
[63] Cal. Code Regs. tit. 10, § 1620.21(b).



approval, nor does it provide any evidence—or even a reasoned argument—for why TILA's regime would be superior or more effective than the existing California regime.[64]

### (2) The Florida ability to pay regulatory regime

The Florida legislature considered the unique nature of PACE and adopted its own requirements to address homeowners' ability to pay the PACE assessment. As is the case in California, Florida has established a number of criteria, reflecting the homeowners' demonstrated ability to satisfy property-based financial obligations, that must be satisfied before a property owner can enter into a financing agreement for a PACE assessment in the State. Specifically, before entering into a financing agreement, the local government must ensure that:

- All property taxes and other assessments levied on the same bill as the property taxes are current and have not been delinquent for three years or since the property owner purchased the property.[65]

- The property is free from certain liens, including but not limited to construction liens.

- There are no notices of default or other evidence of property-based debt delinquency that have been recorded in the prior three years or since the property owner has owned the property.[66]

- The property owner is current on all mortgage debt.[67]

Additionally, the assessment may not exceed 20 percent of the just value of the property.[68] The Bureau's Data Point suggests that Florida's property-based criteria have been successful in ensuring that homeowners have an ability to pay the assessment. Indeed, the Data Point suggests that PACE assessments' effect on the incidence of

---

[64] *See* Data Point at 4.
[65] Fla. Stat. Ann. § 163.08(9).
[66] *Id.*
[67] *Id.*
[68] Fla. Stat. Ann. § 163.08(12)(a).



mortgage delinquency has always been lower in Florida than in California, even after California's 2018 reforms.[69]

In Florida, the statutory requirements have been supplemented by requirements imposed by local governments, tailored to the needs and conditions of their respective communities.  For example, in Broward County, in addition to these requirements, before imposing a PACE assessment on a homeowner whose gross annual income exceeds 120% of the county average, a local government must ensure one of the following:

- "that the total amount of any annual property taxes and assessments do not exceed five percent (5%) of the property's fair market value, determined at the time financing is approved, and ensure that the total amount of annual PACE assessments do not exceed four percent (4%) of the total annual gross income of the property owner in the prior calendar or fiscal year, based upon an affidavit or attestation by the property owner of the owner's total annual gross income;"

- "that each prior mortgage or financing instrument holder has consented to any proposed Financing Agreement and PACE Assessment, or that the prior mortgage or financing instrument holder or loan servicer has consented to escrow sufficient funds to ensure payment of the annual assessment with each year's tax bill;" or

- "that the total cost of the Financing Agreement or PACE Assessment is equal to or less than the projected savings to the property owner based upon the projected energy savings in a written statement from a Certified Energy Auditor, certified by the Association of Energy Engineers, the Residential Energy Services Network, or the Building Performance Institute, or the projected insurance savings in a written statement from the property owner's insurer."[70]

Homeowners whose annual income is less than or equal to 120% of the average median income of Broward County residents can only obtain PACE financing if total annual property taxes, including PACE assessments, does not exceed 5% of the fair market

---

[69] Data Point at 47.

[70] Broward County Admin. Code § 22.177(a) (available at https://library.municode.com/fl/broward_county/codes/administrative_code?nodeId=CH22OTOPPOFIADSE_PTXXVIIIBRCOPRASCLENPAPRPO_22.175DE) (last visited July 26, 2023).



value of the home, and the annual PACE assessments does not exceed 4% of the property owner's gross annual income.[71]

In addition, a local government in Broward Country must "conduct appropriate due diligence to ensure that contractor prices for services, materials, and products fall within market pricing norms" before extending financing pursuant to a PACE assessment.[72]

Palm Beach County requires PACE administrators and local governments that extend PACE financing to comply with existing criteria of the Fla. Stat. Ann. § 163.08 (including any amendments thereto), and to ensure:

- that the PACE assessments does not exceed 20% of the assessed value of the property (unless consented to by any mortgage holder);

- that all property taxes and other assessments have been paid and not been delinquent for the past three years;

- that the property is free from certain liens, including construction liens;

- that there are no notices of default on property-based debt in the past three years (or for as long as the applicant has owned the property);

- that all mortgage debt on the property is current;

- that all mortgage-related debt on the property does not exceed 90% of the fair market value of the property (as determined by a reputable valuation service);

- that all mortgage-related debt plus the PACE assessment does not exceed the fair market value of the property;

- that the property owner is not currently in bankruptcy proceedings; and

- that the total estimated payment amount for the PACE assessment does not exceed 10% of the property owner's annual household income determined using

---

[71] Broward County Admin. Code § 22.177(b).
[72] Broward Country Admin. Code § 22.176(e).



sufficient and credible documentation, for example using adjusted gross income from a recent tax return.[73]

Other counties and localities in Florida have imposed their own tailored ability-to-pay requirements designed to protect consumers from taking out PACE assessments that they cannot afford.[74]

    *c. States have already created licensing and registration requirements for home improvement contractors that offer PACE financings.*

        (1) California's statutory regime for home improvement contractors who offer PACE financing

Effective January 1, 2019, California created a comprehensive statutory framework for the enrollment, training and monitoring of licensed home improvement contractors and their employees, licensed home improvement solicitors, that offer PACE financing to homeowners as a financing alternative (*i.e.*, "PACE solicitors"[75] and "PACE solicitor agents"[76]).  A program administrator may only "enroll" a PACE solicitor after conducting extensive due diligence,[77] and must require PACE solicitors to agree to abide by extensive consumer protection requirements as a condition of enrollment.[78]  The program administrator is required to provide the DFPI with a list of its enrolled PACE solicitors, updated daily, that includes detailed information.[79]  The DFPI posts a list of enrolled PACE solicitors and PACE solicitor agents, as well as a list of those who have been prohibited from soliciting PACE assessments on its website.[80]

---

[73] Palm Beach County Code of Ordinances § 17-507(a)(1).

[74] *See, e.g.,* Sarasota County Code of Ordinances § 38-326(b); Monroe County Code of Ordinances § 12-177(a)(1).

[75] Cal. Fin. Code § 22017(a); Cal. Code Regs. tit. 10, § 1620.02(f).

[76] Cal. Fin. Code § 22017(b); Cal. Code Regs. tit. 10, § 1620.02(g).

[77] Cal. Fin. Code § 22680; Cal. Code Regs. tit. 10, §§ 1620.11(c); 1620.13 (setting forth extensive grounds for denying enrollment of a PACE solicitor); 1620.16 (setting forth grounds for cancelling the enrollment of a PACE solicitor or PACE solicitor agent).

[78] Cal. Fin. Code § 22689; Cal. Code Regs. tit. 10, § 1620.11(b).

[79] Cal. Fin. Code § 22682; Cal. Code Regs. tit. 10, § 1620.11(d).

[80] Cal. Fin. Code § 22690.5; *see also* DFPI, Enrolled PACE Solicitors Search (available at https://dfpi.ca.gov/pace-program-administrators/pace-solicitor-search/).



Program administrators must also conduct background checks on PACE solicitor agents and ensure that such individuals receive training regarding their legal obligations when offering PACE financing.[81]  Program administrators must monitor PACE solicitors and their agents for compliance with applicable law and take steps to audit their compliance with applicable law, including licensure requirements.[82]

The Bureau provides no reliable evidence, or even addresses whether, these existing requirements, which impose consumer protections while not subverting PACE's public policy purpose, do not adequately ensure the home improvement contractors involved with PACE receive appropriate training, enrollment and monitoring, nor does it provide any evidence—or even a reasoned argument—for why TILA's regime would be superior or more effective than California's existing statutory requirements.  As discussed below, even if home improvement contractors could become licensed "mortgage loan originators," which, under California and Florida law they cannot, such licensure would provide contractors with no PACE related training.  If the Bureau is genuinely interested in protecting consumers, it would abandon its proposal to require roofers and plumbers to become licensed mortgage loan originators.

(2) Florida's licensing regime for home improvement contractors

In Florida, work that will be financed by a PACE assessment can only be undertaken by a contractor who is certified or registered under Florida's comprehensive licensing scheme.[83]  This includes, but is not limited to, compliance with all bonding, insurance, and workers' compensation insurance requirements.  Florida contractors are regulated by the Department of Business and Professional Regulation.[84]

Counties that have authorized PACE programs have imposed additional requirements on contractors who seek to offer PACE assessments as a form of financing.  For example, Sarasota County requires local governments within its boundaries to establish a "Code of Conduct" that establishes obligations of contractors, including accurate representations

---

[81] Cal. Code Regs. tit. 10, § 1620.12; *see also* Cal. Fin. Code § 22681 (training requirements); Cal. Code Regs. tit. 10, § 1620.17 (imposing additional requirements for training PACE solicitor agents).
[82] Cal. Code Regs. tit. 10, §§ 1620.14; 1620.15.
[83] Fla. Stat. Ann. § 163.08(11); *see also* Fla. Stat. Ann. 489.101 *et seq.*
[84] *See* Florida Department of Business & Professional Regulation, *Construction Industry*  (available at http://www.myfloridalicense.com/DBPR/construction-industry/) (last visited July 20, 2023).



of PACE and consumer protections, training, and removal of contractors who fail to abide by applicable requirements or fail to resolve consumer complaints.[85]  Palm Beach County requires contractors to obtain a license, agree to comply with marketing guidelines and program requirements, and agree to resolve consumer complaints on a timely basis.[86] Counties have also established consumer protections regarding the advertisement of PACE financing, the price that contractors can charge for qualifying improvements, and the quality of the materials that must be used when projects are financed using PACE assessments.[87]

In addition, PACE administrators have voluntarily undertaken obligations to ensure that home improvement contractors treat homeowners appropriately, including: (1) ensuring that home improvement contractors do not charge more for projects financed through PACE, (2) conducting appropriate background checks, (3) requiring that contractors abide by all program policies and fair advertising and marketing practices, (4) providing appropriate training for contractors, and (5) monitoring contractors and terminating the enrollment of contractors who do not abide by program requirements or otherwise act unscrupulously.[88]  FortiFi's written agreements with contractors who participate in the PACE program include the above requirements.  Further, PACE administrators do not disburse the PACE financing proceeds to the participating contractor until the property owner has confirmed the project is complete to her satisfaction, thus eliminating common home improvement consumer complaints—failure to start or complete a job and failure to have the required licensing.  Finally, unlike other home improvement financing companies, program administrators also committed to attempting to help resolve homeowner complaints related to contractor workmanship issues.[89]

In sum, State and local governments, with the active cooperation and support of industry participants, have already created licensing, registration, training, and monitoring regimes

---

[85] Sarasota County Code of Ordinances § 38-326(14).

[86] Palm Beach County Code § 17-507(9)(a).

[87] *See, e.g.,* Sarasota County Code of Ordinances § 38-326(3), (5); Broward County Code of Ordinances § 22.176(e), (f); Palm Beach County Code of Ordinances § 17-507(9)(b).

[88] PACENation Consumer Protection Principles ¶¶ 5, 13.

[89] *Id.* at ¶¶ 14, 15.



for home improvement contractors that are tailored to the "unique nature" of PACE financing.

## IV. Prevailing Industry Practices Provide Further Consumer Protections

*a. FortiFi, itself, takes multiple steps over and beyond what is legally required to ensure homeowners understand the terms of the PACE financing, including the effect on monthly escrow payments.*

Unfortunately, the Bureau has made little effort to acquaint itself with the PACE industry's current process for communicating with property owners and approving, funding, and recording PACE assessments.  For example, the proposed rule appears to be based on a perception that the home improvement contractor is involved in communications regarding PACE financing throughout the approval process.[90]  This is incorrect.  Once an application is submitted, the numerous communications regarding the terms of the PACE financing are exclusively between the program administrator and the homeowner(s).

The property owner can submit an application directly to FortiFi through its website or at the time the project is agreed to with the home improvement contractor.  In California, when executing the application, the property owner affirmatively verifies that:

- All property taxes are current and there has been no more than one late payment of property taxes on the property for the previous three years or since the property owner acquired the property, whichever is shorter.

- The property is free of certain liens in excess of one thousand dollars ($1,000.00).

- The property has no notices of default currently recorded that have not been rescinded.

---

[90]  The proposed rule states that "contractors may also deliver disclosures relating to the PACE transaction and obtain the customer's signature on the financing agreement."  Proposal at 30389.  This statement demonstrates a profound misunderstanding of the PACE financing processes.  Disclosures and the financing agreement are delivered directly by the program administrator to the property owner. The home improvement contractor has no involvement with the delivery of the finance agreement to the property owner.



- The property owner has not been a party to any bankruptcy proceeding within the last four years, excepting a bankruptcy proceeding that was discharged or dismissed between two and four years before the Application date and have had no payments more than 30 days past due on any mortgage debt or nonmortgage debt, excluding medical debt, during the 12 months immediately preceding the application date.

- The property owner is current on all mortgage debt on the property and has had no more than one late payment during the six months immediately preceding the application date and the payment did not exceed 30 days past due.

- The property is not subject to a reverse mortgage.

By separate execution, the property owner affirmatively verifies that:

- The property owner understands that the financing provided by the PACE program will be repayable through an assessment levied against the property.

- The property owner understands that an assessment lien will be recorded by the PACE program against the property in the office of the County Recorder upon completion of the project described in the Assessment Contract.

- The property owner understands that the property tax bill (which includes the property owner's assessment) for the property will increase by the amount of the assessment installment payments as specified in the Assessment Contract.

- The property owner understands that the assessment lien will be senior to all existing and future private liens against the property, including mortgages, deeds of trust and other security instruments.

By separate execution, the property owner also affirmatively verifies that:

- That the information provided in the application is true and correct as of the application date.

- The property owner has access to the Program Handbook.



- The property owner is applying to participate in the PACE program, has the authority, without the consent of any third party, to execute and deliver the application, the Assessment Contract, and the various other documents and instruments referenced herein.

Upon receipt of the application, FortiFi independently verifies through third party records the property owner's payment of mortgage and property taxes, an absence of liens, default and reverse mortgage on the property, and that the property owner has not been a party to a bankruptcy proceeding within the statutory period. FortiFi reviews the PACE lien registry to determine if there are any other PACE assessments on the property.[91] FortiFi also confirms that the contractor and contractor's agent are enrolled with FortiFi and reconfirms that the Contractor State License Board ("CSLB") contractor and home improvement solicitor ("HIS") licenses are active. FortiFi reviews the home improvement contract to verify the project meets applicable PACE product eligibility and pricing guidelines.

Upon verification of the above items, FortiFi emails a "read only" version of the financing documents, in English or Spanish translation at the property owner's request, including the above-described statutorily required disclosures, additional disclosures, and the Assessment Contract (collectively, "Finance Agreement") to the property owner's email

---

[91] In August 2019, program administrators FortiFi, HomeRun Financing, formerly PACE Funding Group, LLC, Renovate America, Inc., Ygrene Energy Fund California LLC, and subsequently Renew Financial, entered into a Master Services Agreement with provider Spring Labs to create and maintain a PACE lien registry. Since February 2021, the PACE program administrators have utilized the PACE lien registry of PACE applications and assessments to ensure each program administrator is aware of which properties have a PACE application in process or previously funded PACE assessment. The lien registry is designed, developed, and maintained by Spring Labs, an independent third party, who has developed a cryptographically secure, private, controlled and permissioned API and Datastore. When queried by the program administrators, the lien registry provides a response that tells program administrators if another program administrator (while maintaining anonymity) already has an application or assessment at the property. Program administrators utilize the lien registry at the most critical points of the transaction (signed assessment contract, notice to proceed, funded, and cancelled) to prevent any potential lien stacking, simultaneous applications, or fraud.



address.[92]  The contractor does not receive the Finance Agreement or present it to the property owner.

In addition to the statutory disclosure advising the property owner to notify their lender of the increase to the escrow payment for the assessment payment,[93] Exhibit D to the Assessment Contract states:

> IF YOUR LENDER REQUIRES AN IMPOUND FOR YOUR PROPERTY TAXES IT IS YOUR REPONSIBILITY TO NOTIFY THEM OF THE ANNUAL ASSESSMENT PAYMENT SO THEY CAN ADJUST YOUR IMPOUND AMOUNT.[94]

After emailing the "read only" version of the Finance Agreement, a FortiFi customer service representative ("CSR") contacts the property owner(s) to conduct the statutorily mandated confirmation of terms call.[95]  In accordance with California regulations, a program administrator cannot confirm the property owner understands the terms of the assessment unless the property owner can respond without the assistance of the contractor.[96]  California regulations also require the CSR to confirm that the property owner has access to the internet and agrees to accept the Finance Agreement at the email address listed on the application.  In accordance with California regulations, FortiFi uses technology to detect newly created email addresses.  If FortiFi determines the email address was created during solicitation for the PACE financing, FortiFi will not proceed reviewing the application.  The CSR advises the property owner to print, read, and save a physical copy of the Finance Agreement.  FortiFi verifies the identity of the property owner through biometric based automated identification.  Assuming the identification of the property owner can be verified, the CSR proceeds with the recorded confirmation of terms call in Spanish or English at the property owner's request.  As described above, during the confirmation of terms call, among many other things, the property owner is advised of the terms of the PACE financing including the interest rate, term, estimated

---

[92] *See* Sample California Finance Agreement, *supra* n. 40. California PACE regulations require program administrators to obtain consent to enter into the assessment contract electronically through a separate written document.

[93] Cal. Sts. & High. Code § 5898.17.

[94] *See* Sample California Finance Agreement, *supra* n. 40, at D-2.

[95] Cal. Sts. & High. Code § 5913.

[96] Cal. Code Regs. tit. 10, § 1620.06 (e)(2).



annual assessment payment, estimated monthly amount to of funds the property owner needs to save to pay the annual assessment, and that the assessment will be paid through property taxes.  During the call, the property owner is specifically advised to notify their lender to discuss adjusting their mortgage payment if they escrow property tax payments.  The property owner is also asked if they have applied for any other PACE financing.  The CSR also advises the property owner of the monthly income amount FortiFi will be required to verify through third-party income records.

Following the confirmation of terms call, FortiFi sends an executable Finance Agreement to all property owners for execution.  FortiFi also confirms that the property, project and property owner meet all statutory, regulatory and internal requirements, including the review of third-party documentation and credit reports to make a good faith determination the property owner has the reasonable ability to pay the annual assessment payment based on the requirements of Financial Code §§ 22686 and 22687.  After all these conditions have cleared, FortiFi issues a Notice to Proceed to the property owner and the contractor.

When the contractor notifies FortiFi that the project is complete, FortiFi re-confirms that the contractor's CSLB license and the contractor agent's HIS license are active.  FortiFi also re-verifies that the property and the property owner meet all eligibility requirements. If all conditions clear, FortiFi emails the Completion Certificate to the contractor and property owners' email address.  The Completion Certificate lists the improvements installed and project cost.  By executing the Completion Certificate, the property owner and the contractor confirm that the project is complete.  The Completion Certificate is not required by statute or regulation.  It is a consumer protection implemented by FortiFi to confirm, in writing, that the property owner agrees that the project is complete.  FortiFi will not disburse PACE financing proceeds to the contractor unless and until the Completion Certificate is executed by the contractor and the property owner.

Upon receipt of the Completion Certificate, FortiFi contacts the property owner to conduct a recorded "settlement call" with the property owner.  The settlement call is not required by statute or regulation.  It is a consumer protection implemented by FortiFi in April 2018 to confirm that the property owner executed the Completion Certificate and receive verbal confirmation that the property owner is satisfied with the project and the project is complete.  During the settlement call, the CSR reiterates the terms of the PACE financing



and asks the property owner if their property taxes are paid through escrow. If the property owner answers affirmatively, the CSR advises the property owner to contact the mortgage company as soon as possible to discuss increasing the escrow amount to prepare for an increase in property taxes. FortiFi will not disburse PACE financing proceeds to the contractor unless and until the settlement call is completed. After the settlement call is completed, at FortiFi's direction and expense, a third-party inspector visits the property to confirm that the PACE eligible products were installed. The third-party inspection is not required by statute or regulation. It is a consumer protection implemented by FortiFi to confirm that PACE improvements were installed and eliminate fraud.

After FortiFi conducts the settlement call, FortiFi records the assessment with the applicable county. After the assessment is recorded, FortiFi emails a Final Cost and Payment Summary to the property owner(s). The Final Cost and Summary specifically advises: "If you make your property tax payments via an impound escrow account, please tell your mortgage lender that your annual tax amount will increase by [$XXX] starting in the 20XX tax year." The Final Cost and Payment Summary is not required by statute or regulation. It is a consumer protection implemented by FortiFi to help ensure that the property owner understands the terms of the PACE financing and to remind property owners with impound accounts to advise their lender to increase the escrow payment.

Finally, sixty (60) days before the property tax bill is sent for the first two assessment payments, FortiFi sends a notice to the property owner reminding them of the upcoming assessment payment. This notice includes a reminder to the property owner to notify their lender to increase the impound amount if property taxes are paid through escrow. The notice is not required by statute or regulation. It is a consumer protection agreed to by program administrator members of PACE Nation to help property owners prepare to make their first PACE assessment payment.

For Florida, the process is substantially similar. When executing the application, the property owner affirmatively verifies that the property owner and the property meet the statutory requirements for PACE eligibility, *i.e.*, property taxes are current and have not been delinquent for preceding three years, the property is free of certain types of liens, no notices of default on the property, and the property owner is current on all mortgage debt on the property. The property owner also verifies by execution that she understands



that the PACE financing will result in a tax assessment on the property which is repaid in the same manner as property taxes.  Upon receipt of an application, FortiFi confirms the active license status of the contractor, reviews the PACE lien registry, reviews the property tax, lien and default status, confirms the property is not subject to a reverse mortgage and reviews the home improvement contract.

Additionally, Florida statutorily requires property owners to notify holders or loan servicers of any existing mortgage encumbering the property of the property owner's intent to enter into the financing agreement together with the maximum principal amount to be financed and the maximum annual assessment necessary to repay that amount.[97]  To ensure mortgage lenders receive the required notice with accurate information, FortiFi sends the notice ("Lender Notice") to the lender.[98]  In addition to the statutorily required information, the Lender Notice also provides information about the PACE program and the assessment including the statement, "[a] mortgagee has the right to adjust the monthly contribution amount to a tax and insurance escrow into which the Property Owner/Mortgage presently contributes to account for the new assessment and the annual assessment payment."

After FortiFi confirms the property and property owner meet the eligibility requirements, FortiFi emails the Financing Agreement directly to the property owner and conducts a confirmation of terms call (substantially similar to the California confirmation of terms call).[99]  After the contractor has advised that the project is complete, as in California, FortiFi emails a copy of the Completion Certificate to the property owner's email address.[100]  After the property owner executes the Completion Certificate, FortiFi conducts a recorded settlement call with the property owner and sends a third-party inspector to inspect the property to confirm the qualifying improvements have been installed.  The Completion Certificate, settlement call, and third-party inspection are not required by Florida's PACE statute.  These consumer protections have been in place at FortiFi since 2019.  Based on its experience, FortiFi believes that these self-implemented consumer protections have significantly addressed the risk of contractor fraud and are exponentially more effective than any aspect of the proposed rule.  Given the CFPB's

---

[97] Fla. Stat. Ann. § 163.08(13).

[98] *See* Sample Florida Notice to Lender, attached as Exhibit B.

[99] *See* Sample Florida Finance Agreement, attached as Exhibit C.

[100] *See* Sample Florida Completion Certificate, attached as Exhibit D.



finding that in Florida, the probability of experiencing a 60-day mortgage delinquency after a PACE assessment has been originated increased less than two percent during the entire timeframe analyzed,[101] FortiFi posits that Florida legislation and program administrator's consumer protections have proven to be extremely successful.

The above-described processes demonstrate that FortiFi does not delegate communications regarding PACE financing processes or terms to contractors. Once an application is submitted by the property owner(s) to FortiFi, there are multiple direct communications between the property owner(s) and FortiFi which provide full and complete PACE financing information to property owners, and multiple opportunities for property owners to ask questions about the financing. Further, there are no commensurate consumer protection processes associated with any other home improvement financing alternative, including residential mortgage loans.

Although the Bureau requested and received written materials associated with PACE transactions in response to its March 4, 2019 ANPR, it did not renew its request in the intervening four years. In connection with the proposed rule, it does not appear the Bureau reviewed any PACE disclosure, finance agreement, program handbook, confirmation of terms call script, settlement call script or contractor participation agreement currently used by any program administrator. The Bureau's decision to rely on stale anecdotes and turn a blind eye to the information consumers receive before and after entering into a PACE assessment is mystifying.

For example, the proposed rule states that the Bureau has heard "anecdotally" from consumer advocates that "PACE consumers are often surprised by and unprepared for a large [escrow account] spike" and "information provided by PACE programs regarding the relationship between PACE financing and escrow accounts is insufficient to prepare consumers for the payment shock."[102] The anecdotes and the Bureau's concern ignore the multiple communications property owners receive specifically advising them to notify their lender to increase their impound account amount:

---

[101] Data Point at Figure 14.
[102] Proposal at 30411.



(1) in the statutory disclosures with a requirement that the property owner(s) initial this specific disclosure;

(2) in the California Assessment Contract, Exhibit D, which the property owners execute to verify Exhibit D was read;

(3) during the recorded confirmation of terms call conducted before the Assessment Contract is executed;

(4) during the recorded settlement call conducted when the project is complete;

(5) in the Final Cost and Payment Summary;

(6) in the reminder notice of assessment payment sent to all property owners 60 days in advance of the first two property tax payments that include the PACE assessment;

(7) in the PACE Program Handbooks for California and Florida which are available on the FortiFi website; and

(8) in Florida, in a written notice sent to the lender of the property owner's intent to enter into a PACE assessment.

These specific repeated directives to property owners (and in Florida notice directly to the lender) to advise their lender to increase their impound account amount to adjust for payment of the PACE assessment provide more consumer protection from any purported "escrow payment shock" than any aspect of the proposed rule. If the Bureau is going to ground the proposed rule on anecdotes, it should at least consider the information actually provided to property owners.

    *b. The States, local governments, and the PACE industry have successfully reacted to contractor fraud.*

FortiFi acknowledges that from 2016 to 2018, before the 2018 California PACE Reforms were enacted and the industry protections described above were adopted, certain California bad actor contractors took advantage of PACE financing, resulting in harm to



property owners and program administrators.  These contractor scams typically fell into three categories.

First, contractors misrepresented to property owners that PACE was a free government program.  Property owners agreed to the project, the improvements were installed on the property and the contractor received disbursement of the PACE financing proceeds. When the property owner and the program administrator became aware of the misrepresentation—typically when the property owner received the property tax bill—the contractor was gone.

Second, contractors impersonated property owners and contractors by setting up fake telephone numbers, email accounts and business records.  The contractors forged the property owners' signatures on assessment contracts and completion certificates, received disbursement of the PACE financing proceeds and had disappeared by the time the property owner's tax bill arrived.

Finally, the most common scam involved contractor and property owner collusion.  Often, the contractor and property owner agreed to an alternative dwelling unit ("ADU") project. ADUs are not eligible PACE improvements and, therefore, cannot be financed using PACE.  The contractor and property owner would misrepresent the project to the PACE administrator and that the project had been completed.   In reliance on these misrepresentations, the program administrator disbursed the PACE financing proceeds to the contractor.  Instead of the building the agreed upon ADU, the contractor absconded with the money and the property owner was left with an assessment on the property and no ADU or a partial ADU.  The contractor was able to perpetrate this fraud by colluding with the property owner to thwart the internal and statutory consumer protections program administrators had in place, including confirmation of terms call, completion certificate, and photographic confirmation of the installation.

The Bureau appears unaware of the significant financial toll the historical contractor (and property owner) fraud has exacted on PACE program administrators.  FortiFi, and presumably the other program administrators, has incurred tremendous financial losses releasing assessments and refunding assessment payments due to contractor fraud. Further, contractor fraud negatively impacts the ability to securitize PACE assessments, and investors have demanded that such issues be addressed.  Finally, the state and local



governments that authorize PACE programs have a strong interest in ensuring the integrity of their programs.

In response to these concerns, the California legislature, Florida jurisdictions, DFPI, FortiFi, and the other program administrators have effectively responded to contractor fraud.[103]  For FortiFi, the most impactful consumer protections to address contractor fraud have been the internal policy implementation of third-party inspections and settlement calls.  Third-party inspections allow FortiFi to ferret out the ADU and identity theft scams where no improvements are installed on the property.  Third-party inspections are completed before PACE financing proceeds are disbursed to the contractor.  Settlement calls provide FortiFi the opportunity to speak directly with the property owner to confirm the project was completed to their satisfaction and reconfirm the terms of the PACE financing.  For identity theft, FortiFi utilizes third party vendors to identify newly created email addresses and untraceable (burner phone) phones.  These consumer protections, in conjunction with the statutory, regulatory, and local jurisdiction requirements have transformed PACE into the safest form of home improvement financing.

## V.  The Proposed Rule Is Based on Flawed Data Collection and a Biased Analysis of the Market

### a.  *The proposed rule is based on the analysis of a market that no longer exists.*

The proposed rule is based largely, if not entirely, on anecdotes included in submissions to the Bureau's March 2019 Advanced Notice of Proposed Rulemaking, and the Data Point, which was published on the same day of the proposed rule,[104] and which analyzes data from December 31, 2019 and earlier.  While federal rulemakings are not always based on "real-time" data about the markets they regulate, the failure to analyze the

---

[103] Since the PACE program became subject to DFPI enforcement on January 1, 2019, the DFPI has brought enforcement actions against only four contractors, a clear indication PACE contractor fraud has been significantly curtailed.

[104] FortiFi agrees with the position expressed by a group of consumer advocate organizations in January 2020 that the staff of the CFPB should have "delay[ed] any proposed rule until the staff have had the opportunity to examine the data, share those findings, and formulate proposals based on both the data and the public's response to the data."  *See* https://www.nclc.org/wp-content/uploads/2022/08/ltr-to-cfpb-tila-to-pace-jan2020.pdf.



market that has existed in the past three-and-a-half years is a fatal flaw for this rulemaking because the market has changed dramatically.

> (1) The "consumer protection issues" relied upon by the proposed rule do not reflect current market realities

To begin, the rule errs by basing critical policy judgments on the stale anecdotes of consumer advocates and unidentified "others" that the Bureau must concede may not be true and, even if true, may not be representative of the market for PACE assessments (even as it existed before the spring of 2019). For example, the Bureau declined to modify the verification requirements of the ability-to-repay provisions of 12 C.F.R. § 1026.43(c) based on "consumer protection issues observed by advocates and others."[105]  Likewise, the cost-benefit analysis suggests that applying TILA's loan originator provisions to home improvement contractors may help address "consumer protection issues identified in the comments responding to the ANPR."[106]  The Bureau does not identify with any specificity what these "consumer protection issues" are, nor does it provide any basis to conclude that these unspecified consumer protection issues still exist, notwithstanding recent state and local legislative reforms and voluntary industry reforms that the Bureau elsewhere concedes had a dramatic impact on the market.[107]

In fact, the evidence suggests that recent state legislative reforms and industry efforts to address fraud and other concerns are addressing the "consumer protection issues identified in the comments responding to the ANPR."[108]  For example, the Bureau notes that it has received "over 50 complaints related to PACE financing" since 2015.[109]  As an initial matter, this is a *de minimis* number of complaints, in both absolute and relative terms. By way of comparison, the CFPB received 50,800 credit card complaints, 29,100

---

[105] Proposal at 30408.

[106] Proposal at 30427.

[107] *See* Data Point at 47.

[108] The Data Point finds that after the effective date of the 2018 California PACE Reforms, "PACE loans only increased mortgage delinquency for California PACE borrowers by 1.4 percentage points, a 64 percent reduction." Data Point at 46, Figure 14.

[109] Proposal at 30390.



mortgage complaints, and 7,200 personal loan complaints *in 2022 alone*.[110]   More significantly, the CFPB does not explain why unverified complaints received in 2015-2018, are relevant to a rule proposed in 2023.   For example, although FortiFi has administered approximately 12,500 PACE assessments since January 1, 2019, it has received only one lone complaint from the CFPB during that period, *and that complaint was related to an entirely different company and mistakenly forwarded to FortiFi.*

Similarly, the proposal notes that "[c]onsumers in California are also able to submit complaints to their State PACE regulator and submitted 385 complaints between 2019 and 2021."[111]  To begin with, 385 complaints represent approximately .0033% of the over 118 thousand estimated enrolled PACE assessment portfolio through December 31, 2021.[112]  More significantly, the number of complaints has decreased significantly.  There were only 69 property owner complaints in all of 2021, and only 2 of those remained unresolved at the end of that year.[113]

Finally, while comments to the ANPR provided a number of anecdotes regarding problematic practices in the PACE market,[114] these undated and unverified anecdotes do not account for the significant subsequent reforms—adopted both by government and industry—specifically designed to address these types of concerns.   Simply put, the picture the proposed rule paints is based on cherry-picked anecdotes from a time before the entire market was transformed by regulatory and industry reforms.  The Bureau must account for these reforms and base its policy on the experience of homeowners in the market that currently exists.

---

[110] *See* Consumer Financial Protection Bureau, *Consumer Response Annual Report*, at 28, 38, 57 (March 2023) (available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_2022-consumer-response-annual-report_2023-03.pdf).

[111] Proposal at 30390.

[112] *See* DFPI Annual Report at 43; CAEATFA PACE Loss Reserve Program Enrollment Activity (available at https://www.treasurer.ca.gov/caeatfa/pace/activity.pdf) (last visited July 26, 2023).

[113] DFPI Annual Report at 41.

[114] *See* Appendix to Comment Submitted by the National Consumer Law Center (May 7, 2019).



(2) The Bureau should not base any empirical analysis on pre-reform
    assessments

Likewise, the Data Point analyzes the effect of PACE financing transactions that were consummated in the three years ending December 31, 2019 (not June 2020, as the Data Point incorrectly asserts).[115]  The Data Point acknowledges the improvement in consumer outcomes in both California and Florida after April 2018,[116] but it does not separately analyze time periods after the full slate of California reforms became effective,[117] nor does it account at all for the impact of the adoption of county and local ordinances in Florida, or the current practices of PACE administrators even when not bound by state or local law.[118]

Worse yet, even though the Data Point clearly suggests that consumer outcomes post April 2018 markedly improved and ascribes this improvement to legislation that has only been strengthened in the intervening years, the proposal still inexplicably relies on analysis applicable to the *pre-2018 period* studied by the report.[119]  Even if one were to ignore the myriad flaws in the Data Report (discussed below), it simply defies common sense to base policy decisions on a market that *your own analysis* suggests does not exist anymore, while declining to request or consider current market data.

Since the purpose of the Data Point is ultimately to inform the CFPB and the public about the impact of PACE financing in order to guide future policy considerations, any reliance on historic data from a decade ago is misleading.  Given that the CFPB itself found the post-April 2018 effects of PACE financing on consumer outcomes were markedly different

---

[115] See Data Point at 8, Appendix C.

[116] *See* Data Point at 47.

[117] *See, e.g.,* Cal. Fin. Code §§ 22680-2263 (regulating PACE solicitors and solicitor agents) (operative Jan. 1, 2019).

[118] *See supra* sections III, IV.

[119] *Compare* Proposal at 30413 ("Available data that show the broader effect that PACE transactions have on consumer' finances further highlight affordability risks inherent in PACE financing . . . For consumers with a pre-existing non-PACE mortgage, getting a PACE transaction increased the probability of a 60-day delinquency on their non-PACE mortgage by 2.5 percentage points over a two-year period.") *with* Data Point at 47 (suggesting an effect on delinquency that is half of that figure).



from pre-April 2018 outcomes, the CFPB's inclusion of pre-April 2018 data to support its conclusions results in biased conclusions.

    *b.  The CFPB's data collection was flawed.*

From a data collection standpoint, in addition to its failure to request and analyze current relevant data, the Bureau erred in several other respects. First, the electronic data submission format provided by the CFPB to the program administrators only requested and allowed for the inclusion of one hashed unique identifier (property owner) to the Application Data and Assessment Data tables.[120]  As a result, for each application and recorded assessment there was only one associated hashed unique identifier.  During the data request time period, 43% of applications submitted to FortiFi had more than one property owner (consumer) and 50% of the assessments recorded by FortiFi have more than one property owner, and for both groups up to five property owners.[121]  As a result, the credit outcomes in roughly half of all cases is woefully incomplete and flawed.  This error impacts almost every conclusion in the Data Point.  For example, in FortiFi's experience, where there are multiple property owners, it is common for the mortgage to be held by only one of the property owners and common for co-property owners to have significantly dissimilar credit information. The Data Point does not acknowledge or consider these market realities.

Second, as discussed, *infra*, the "Post 2018" time period of the data collection is six months shorter than reported in the Data Point, further diluting the relevance of the data.

Third, the CFPB's data request also contains ambiguous field descriptions.  For example, for the Application Data table, the CFPB requested the program administrators identify the date the application was approved.  As demonstrated, *infra*, PACE applications go through a series of approval conditions and the "approval date" could occur at a number of points in the process, i.e., the date the financing agreement is executed, the date the contractor and property owner receive the notice to proceed, etc.    It is FortiFi's

---

[120] Data Point at Appendix C. The CFPB explicitly specified that the first column of Application and Assessment Data be a unique identifier for the application.  This unique identifier only allowed for the inclusion of a single consumer (property owner).

[121]  It is FortiFi's understanding that the other program administrators have substantially similar percentages of assessments with multiple property owners.



understanding that the program administrators interpreted this date in an inconsistent manner. The Bureau also assumes, incorrectly, that if an application is "approved," and there is not a corresponding recorded assessment, it necessarily means the property owner chose not to proceed with PACE financing. There are a number of additional circumstances that can account for an approved application not resulting in a recorded assessment, i.e., the project is not completed, the contractor or property owner do not execute the Completion Certificate, the third-party inspection does not verify the PACE eligible products were installed, the home improvement contractor's license is suspended mid-project, and the property owner exercises her right to cancel the PACE financing, etc. Given the numerous data collection flaws, FortiFi believes it is in the public's best interest for the CFPB to conduct data analysis on current corrected data taking into consideration PACE assessment processes.

### c. The CFPB's data analysis is defective and biased.

From an empirical standpoint, the CFPB has acknowledged, including during a recent meeting with PACE administrators, that the proposed rule's empirical findings are based exclusively on the Bureau's Data Point.[122] In addition to the fact, discussed above, that the Data Point bases its conclusions on stale data not representative of the market that currently exists (or has existed for the past several years), it suffers from other critical flaws that make its analysis inherently untrustworthy.

First, the Data Point compares consumers who obtained a PACE assessment to those who were approved for a PACE assessment, but no corresponding assessment was recorded. It finds that those who obtained a PACE assessment were, on average, more likely to experience negative credit outcomes, including mortgage delinquency. The

---

[122] The Bureau has a process by which major research studies, such as the Data Point, are subject to peer review by its Academic Research Council. See Jason Brown, *Bureau adopts new procedures for external peer review of important research,* CFPB (Aug. 28, 2020) (available at https://www.consumerfinance.gov/about-us/blog/bureau-adopts-new-procedures-external-peer-review-research/). The Bureau did not wait for the conclusion of that process before publishing a proposed rule based largely on the conclusions of the Data Point. This is unfortunate, as it is possible that process may have led to the identification and correction of many of the flaws in the Report. To the extent the Bureau pursues such a review post-proposal, the integrity of the process would necessitate that the reviewers be furnished with all relevant public comments concerning both the Data Point's assumptions and methodology.



problem, however, is that the comparison of these two groups does not result in instructive analysis or findings.   One set had an obligation to pay back, over time, a PACE assessment that averaged $25,000, while the other set had no such obligation.  From an empirical perspective, it should have been entirely expected that an additional expense of approximately $2,700 per year would have had an impact on a homeowner's other credit performance.   Indeed, it is self-evident that this would be true for any type of additional financial obligation of that magnitude.   Simply put, if consumer's expenses increase, it will necessarily negatively impact credit outcomes.   This outcome is not specific to PACE but applies to any increase in debt.

Accordingly, to accurately estimate the extent to which PACE assessments impact credit outcomes, the Data Point should have analyzed the outcomes of those who obtained a PACE assessment to finance their home improvement versus homeowners that used other sources of financing for commensurate debt amounts, including sources that are subject to ability-to-repay regulatory requirements such as second mortgages or credit cards.[123]   The Data Report fails to make this obvious comparison and therefore fails to demonstrate anything other than, at most, the well-understood phenomenon that increasing expenses increases a consumer's credit risk.

The CFPB provides no explanation for its decision to ignore delinquency rates for HELOCs, unsecured loans and credit cards in examining the effect of PACE loans on mortgage delinquencies.  A second control group of consumers with similar credit score distributions who obtained financing for home improvements averaging $25,000 during the same time periods in California and Florida would have allowed for an apples-to-apples comparison of consumers who applied for credit, were accepted, and took on the financing obligations, one through PACE, and a separate control group through other non-PACE financing options. The results would have provided meaningful information as to the impact of PACE financing in comparison to other alternatives. FortiFi suspects the Bureau was aware of the results of a comparison of delinquency rate data for these comparable financing alternatives and chose an inferior control group to provide a means to an end.

Second, instead of comparing outcomes of property owners who used PACE financing for home improvements to property owners who used alternative financing for home

---

[123] 12 CFR 1026.43; 1026.51.



improvements with comparable principle amounts and terms, the Data Point asserts that "PACE loans have interest rates that are substantially higher than normal rates for mortgages or home equity loans."[124]  This conclusion misses the mark as it compares the mean PACE interest rate (7.6%) to mortgage interest rates (3.5%).  Comparison of a residential mortgage, which in California in 2022 averaged $397,791,[125] to the average assessment amount, $25,000,[126] without additional analysis, is not an apt comparison.  The fact that a consumer could receive lower interest rates financing an amount fifteen times the assessment amount is not a particularly enlightening comparison.  Additionally, the data analysis is based on mortgage interest rates that existed between July 2014 and June 2020, a time of historically low interest rates in the mortgage market caused, in no small part, by significant government intervention.[127]  But, as anyone who has tried to finance the purchase of a home recently or (perhaps) perused the CFPB's own website would know, mortgage rates are no longer at historic lows.[128]

Buried in the proposed rule is a purported interest rate comparison which demonstrates the bias in the CFPB's analysis.  The CFPB compares the estimated PACE mean *APR* for 2014 to 2019 to the *interest rates* for comparable home improvement financing alternatives.[129]  First, the CFPB concedes the mean PACE APR of 8.5 percent compares favorably to credit card interest rates of 13 and 17 percent during the period studied by the PACE Report.[130]  The CFPB also appears to concede the mean PACE APR compares favorably to the average 10 percent interest rates for personal loans.[131]  The CFPB then unfavorably compares the PACE 8.5 percent APR to the 2019 HELOC median interest rate of 5.34 percent.[132]  Presumably the CFPB is aware APR always yield a higher

---

[124] Data Point at 4.

[125] *See* Chris Horymski, *Total Mortgage Debt Increases to $11.2 Trillion in 2022*, Experian (Mar. 27, 2023) (available at https://www.experian.com/blogs/ask-experian/how-much-americans-owe-on-their-mortgages-in-every-state/).

[126] Data Point at 12.

[127] Data Point at 13.

[128] *See* CFPB, *Mortgage financing options in a higher interest rate environment* (Dec. 21, 2022) (available at https://www.consumerfinance.gov/about-us/blog/mortgage-financing-options-in-a-higher-interest-rate-environment/).

[129] Proposed Rule at 30423, fn. 283.

[130] *Id.*

[131] *Id.*

[132] *Id.*



number than interest rates, and that median interest rates were lower in 2019 than in the preceding five years.  In framing the comparison in this manner, the CFPB ensures PACE will always appear relatively more expensive.

Thus, the Bureau provides no evidence to substantiate its claim that PACE financing is more expensive than other available, comparable forms of financing.  Our experience—and common sense—suggest precisely the opposite.[133]  FortiFi expected that the CFPB would compare PACE to other home improvement financing alternatives with similar interest rate structures over similar time periods. Its failure to do so is inexplicable.

Mortgage loans and home equity loans are not point of sale products and, in any event, they now have APRs that are broadly comparable to PACE financing with similar terms, and likely higher (or unavailable) for homeowners with damaged credit.  The proposed rule states "[c]onsumers have a number of financing options for home improvement projects such as home equity lines of credit, personal loans and credit cards."[134]  **FortiFi agrees and strongly encourages the Bureau to analyze these financing alternatives in comparison to PACE with respect to terms, expense, availability to Black, Hispanic and elderly consumers, State regulation and consumer complaints.**

Third, the Data Point reveals the Bureau's inherent bias in drawing the conclusion that data suggesting that "a little more than 13 percent of PACE borrowers received multiple PACE loans," many within a few months, is evidence of "problematic sales practices."[135] This statement betrays a complete lack of research and understanding of the market for PACE home improvement projects and the structure of PACE financing.  It is common for a PACE project to consist of multiple qualifying improvements that are completed on separate schedules and therefore financed separately.  Home improvement contractors cannot receive the proceeds of PACE financing until the property owner certifies that the installation of the qualifying improvement is complete to their satisfaction.  A homeowner in Florida concerned about the ability of their home to withstand the next hurricane, or to

---

[133] *See* U.S. Department of Energy, *Property Assessed Clean Energy Programs* (available at https://www.energy.gov/scep/slsc/property-assessed-clean-energy-programs) (last visited July 26, 2023) (listing as an advantage of PACE financing that it "[c]an lead to low interest rates because of the high security of loan repayments attached to the property tax bill.").

[134] Data Point at 35.

[135] Data Point at 4; *see also id.* at 23-24.



receive a discount in their insurance premiums, may wish to install hurricane windows and replace a roof. Hurricane windows are typically made to order and can have an installation date months after the installation of a roof. Further, these projects may be undertaken by different contractors who do not want their payment to be contingent on the other contractor's completion of its project, or even the same contractor who cannot afford a delay in payment for the first project while the second project is still being completed.

From an analysis perspective, the Data Point does not attempt to analyze whether the consumers who received more than one PACE loan had worse credit outcomes than those who only had a single PACE loan, nor does it provide any evidence to support its allegation of "loan splitting." The Bureau's analysis also ignores that since 2019, program administrators confirm, on recorded calls, whether property owners have applied for or received any other PACE financing on the property and program administrators' participation in the PACE lien registry.[136]  Again, instead of relying on stale anecdotes, a more thorough understanding of the program administrators' processes and consumer protections would have benefited the Bureau's analysis. Further, as suggested by public comment letters submitted to the Bureau, it would have been instructional and informative for the Bureau to have consulted with home improvement contractors who participate in the PACE program to gain an understanding of how they interact with the property owners and how project completion is impacted by PACE financing.

Fourth, the Data Point states that PACE loans cause an increase in negative credit outcomes, but the Bureau fails to consider the effect on other credit during the first year following recordation of the PACE assessment, during which time homeowners either (1) began making assessment payments through increased monthly escrow payments, or (2) benefited from lower utility or insurance premium payments before they were required to make assessment payments. If the later, this increased cash flow would likely have a positive impact on the homeowner's other credit outcomes. With either scenario, the Bureau's methodology, to ignore the first twelve months following recordation of the assessment, renders the Data Point defective.[137]  The Data Point also fails to consider the increased home value post installation of the eligible improvement and the increased equity in the property given the property owner's decision to finance the eligible

---

[136] *See supra* n. 91.

[137] Data Point at 30, Figure 8(b).



improvement through PACE financing.  The Bureau's simplistic analysis fails to consider
the unique nature of PACE and demonstrates an implicit bias in its analysis.

Fifth, the Data Point mistakes correlation with causation.  For example, it states that
homeowners without a mortgage saw greater increases in credit card balance and
surmises that homeowners "without a mortgage are responding to the cost of PACE by
relying on credit cards."[138]  But this hypothesis fails to consider other possible reasons for
increased balances that would not be evenly distributed between the two groups
compared.  For example, it could well be that homeowners who financed qualifying home
improvements through PACE could not finance other aspects of a home renovation
through PACE (because they were not eligible for PACE financing) and relied on credit
cards to do so.   To the extent the application-only group is comprised of many
homeowners who did not undertake any home improvement, they would not have
incurred this additional debt.  This example also exposes the consequences of the flawed
data collection.  While the Data Point concludes that 30% of property owners with PACE
assessments have no mortgage, FortiFi believes this percentage is grossly inflated due
to poor data.  It is FortiFi's understanding that the accurate percentage, for all PACE
assessments, is 8-10%.   The error in the Bureau's conclusion stems from its data
collection request which omitted joint property owners, such that the conclusions derived
from half the consumer data pool are flawed.  It also stems from the Bureau's decision to
ground its analysis on stale anti-PACE anecdotes as opposed to using this opportunity to
understand the realities of the PACE market.

Finally, the Data Point's analysis is flawed because it fails to account for the fact that
multiple individuals, each with his or her own credit profile, could be responsible for
payment of a PACE assessment.  The CFPB's contractor matched a single consumer
associated with a PACE loan to a single credit file, and then deidentified the matched file
before submitting to the Bureau.[139]  The Bureau then analyzed this consumer's credit
performance over time.  But the failure to analyze the credit history of any individual
responsible for payment of the resulting PACE assessment, including for example
spouses who are joint owners of the property, necessarily skews the data.  Simply put,
the Bureau's analysis cannot reliably estimate the *actual* impact of PACE assessments

---

[138] Data Point at 41.

[139] *See* Data Point, Appendix C at 5.



on credit outcomes for responsible homeowners because (in addition to all of the other issues) so many homeowners are not represented in the data.

    d. *Preliminary analysis of more recent data suggests that PACE assessments do not negatively impact homeowners' other credit outcomes.*

As discussed above, the Bureau should not base policy judgments on analysis of assessments consummated prior to significant legal and practical reforms that the Bureau itself concedes have resulted in markedly different outcomes.[140]  Indeed, the Bureau's own research suggests that the impact of PACE on mortgage delinquency are statistically different than zero,[141] which is actually less than expected given the Bureau's failure to ensure that the comparator group had used a different financial product (or cash) to complete a qualifying home improvement.

To determine whether the post-April 2018 trend has been sustained in assessments made since January 1, 2020, FortiFi and other PACE administrators provided to Experian the same data they had previously provided to the CFPB, but included data for the period from January 1, 2020 through December 31, 2022.  Experian appended this data to credit bureau data.  Experian confirmed that the data collection process mirrored the process performed by Experian to collect data for the Bureau.

Although our analysis is preliminary,[142] it appears that data for more recent years confirms that PACE assessments have no discernible impact on other credit outcomes, even when applying the same apples-to-oranges comparison that the Bureau applied in the Data Point.  For example, average credit scores (likely the best indicator of financial health) of homeowners who received a PACE assessment declined by only a point or two in earlier periods and in more recent periods have actually increased relative to homeowners who

---

[140] Data Point at 47, Figure 14.

[141] *Id.*

[142] The Bureau declined program administrators' request to extend the comment period, which has prevented submission of a final analysis.  *See* PACENation Request for Extension of Comment Period (May 16, 2023) ("Given that the CFPB based its analysis on data through December 31, 2019, and the CFPB's analysis of post-2018 data shows a marked improvement in outcomes for property owners in California and Florida, the undersigned [program administrators, including FortiFi,] require additional time to gather and analyze data for the more current and relevant period, January 1, 2020 to December 31, 2022.").



were approved for but did not receive a PACE assessment.  Our preliminary analysis also confirms the intuition that the Data Point's exclusion from the analysis of credit data from the first year after recordation of the PACE assessment results in inflated harms.  Although this analysis is preliminary, it supports the need for the Bureau to conduct a new analysis of empirical information that relies on more recent data and addresses the issues described above.

## VI. Congress Cannot Regulate State Authority to Impose Local Property Taxes

If adopted, the proposed rule would implement Congress's directive in section 307 of the EGRRCPA in a way that would invade state sovereignty in violation of the Constitution, including the 10th Amendment's guarantee that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively."[143]  Section 307 does not require this result.  Indeed, Congress's directive to the CFPB to consider the "unique nature" of PACE financing is a clear indication that Congress intended the Bureau to develop a rule that would accommodate the feature of PACE financing that makes it truly "unique"—the fact that PACE financing is an exercise of sovereign state taxing authority.

As described in detail above, State and local governments have adopted significant consumer protections designed to ensure that homeowners have the ability to pay PACE assessments.  These state and local protections already fulfill the purposes of section 307 of the EGRRCPA.  The CFPB has ample authority to defer to state and local governments' own judgments regarding the appropriate balance between their critical interests in the environmental sustainability of their housing stock and consumer protections.[144]  Any other course of action would be unconstitutional.

PACE financing is not a loan, but a non-ad valorem tax assessment substantively identical to tax assessments that state and local governments have long used to finance public projects.  As both the founding fathers and the Supreme Court have long recognized, "the power of taxation is indispensable" to States' existence, and with respect to "property. . . within their respective limits, their power of taxation remained and remains

---

[143] U.S. Const. amend. X.

[144] See, e.g., 15 U.S.C. §§ 1603(5); 1604(f).



entire."[145]  As Alexander Hamilton put it in the Federalist Papers, "a law for abrogating or preventing the collection of a tax laid by the authority of the State, (unless upon imports and exports), would not be the supreme law of the land, but a usurpation of power not granted by the Constitution."[146]  The Supreme Court has been equally clear:

> The extent to which [the State power of taxation] shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the States commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the State constitutions or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government. There is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation.[147]

The Supreme Court has never overruled its decision in *Lane*, and none of the exceptions to this general rule are present here.

First, the Constitution itself expressed a definite limit on States' taxing authority by providing that:

> No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.[148]

---

[145] *Lane Cnty. v. State of Oregon*, 74 U.S. 71, 76-78 (1868).

[146] The Federalist No. 33 (Jan. 2, 1788) (available at https://founders.archives.gov/documents/Hamilton/01-04-02-0190).

[147] *Lane*, 74 U.S. at 76-78.

[148] U.S. Const. art. I, § 10, cl. 2.



Of course, this clause has no application to PACE assessments.  In addition, as the CFPB has observed in a similar context, that "specific restriction confirms that the Constitution otherwise leaves" State authority to impose local property taxes undisturbed.[149]

Second, this is not a case in which State and local taxing authority is being used "to burden or embarrass the operations of the national government."[150]  By authorizing PACE assessments, States are using their tax authority to impose assessments on the real property of homeowners in their territory in order to advance their critical public policy interests.  They are not using this authority to "retard, impede, burden, or in any manner control, the operations of the . . . [national] government."[151]  Indeed, the opposite is true.  The Federal government, operating through the CFPB, is proposing to violate the long-established constitutional "principle which leaves the power of taxing the people and property of a state unimpaired."[152]

Finally, this is not "a case in which Congress has subjected a State to the same legislation applicable to private parties."[153]  Congress may have the authority to subject States to federal legislation when they are engaged in conduct identical to a private party.  But the States have not authorized local governments to make mortgage loans or engage in any other conduct that private parties admittedly subject to Congressional authority are able to engage in—nor does the Bureau's attempted recharacterization of PACE assessments as residential mortgage loans in contradiction of State law make it so.  Rather, they have authorized local governments to impose non-ad valorem property taxes, sovereign

---

[149] *See* Brief for Petitioners at 11, *Consumer Financial Protection Bureau v. Comm. Fin. Serv. Assoc. of Am., Ltd.*, No. 22-448 (May 8, 2023) (available at https://www.supremecourt.gov/DocketPDF/22/22-448/266373/20230508190055738_22-448tsUnitedStates.pdf).

[150] *Lane*, 74 U.S. at 77.

[151] *M'Culloch v. Maryland*, 17 U.S. 316, 436 (1819).  Notably, even while striking down Maryland's tax of national banks, Chief Justice Marshall acknowledged the State's authority to impose a tax "on the real property of the bank, in common with the other real property within the state."  *Id.*

[152] *Id.* at 430.

[153] *New York v. United States*, 505 U.S. 144, 160 (1992); *Cf. Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 554 (1985) ("[The San Antonio Metropolitan Transit Authority] faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet.").



conduct that only states can carry out. As Congress acknowledged, PACE assessments are "unique" because only "state and local governments" can impose them.[154]

Since no established exception applies, the question then becomes, can the Federal government commandeer States' exercise of sovereign authority to impose local property taxes to serve the Federal government's policy goals, at the expense of the States' policy goals? It clearly cannot. As the Supreme Court has recently recognized, whatever the breadth of Congress's authority under the Commerce Clause, it lacks "the power to issue orders directly to the States."[155] Indeed, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."[156] "The anticommandeering doctrine simply represents the recognition of this limit on congressional authority."[157]

The anticommandeering doctrine is not some arcane jurisprudential invention but a fundamental guarantee of the system of dual sovereignty that has existed throughout the nation's history. In this respect—

> It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority. It is no more compatible with this independence and autonomy that their officers be 'dragooned' into administering federal law, than it would be compatible with the independence and autonomy of the United States that its officers be impressed into service for the execution of state laws.[158]

Competing federal interests are not relevant. "[W]here, as here, it is the whole *object* of the law to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, [any] 'balancing' analysis is inappropriate. It is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect."[159] The Federal government is one of "enumerated powers." Because the

---

[154] 15 U.S.C. § 1639c(b)(3)(C).

[155] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (cleaned up).

[156] *New York*, 505 U.S. at 162.

[157] *Murphy*, 138 S. Ct. at 1476.

[158] *Printz v. United States*, 521 U.S. 898, 928 (1997) (cleaned up).

[159] *Id.* at 932.



Constitution did not confer on Congress the authority to commandeer states' local taxing authority, that "legislative power is reserved for the States, as the Tenth Amendment confirms."[160]

Of course, adherence to this fundamental feature of our federal government does not mean that State citizens in general, or homeowners who choose to finance qualifying improvements through PACE assessments specifically, are left unprotected.  As Chief Justice Marshall explained over two hundred years ago—

> [T]he power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it.  The only security against the abuse of this power, is found in the structure of the government itself.  In imposing a tax, the legislature acts upon its constituents.  This is, in general, a sufficient security against erroneous and oppressive taxation.[161]

The reforms adopted by the State and local governments who offer PACE financing prove the prescience of this observation and the genius of our governmental structure.  As recounted above, State and local governments have already adopted protections to ensure that homeowners understand the nature of PACE assessments and do not agree to assessments that will impose unmanageable financial burdens.  In short, the constitutional design is working as intended.  States have responded to their constituents to adopt their own limitations on the exercise of their sovereign taxing authority.  The Federal government cannot interfere with that authority, and there is no cause to.

That the Bureau has been directed to "prescribe regulations" to carry out the ability-to-repay purposes of section 129C(a) of TILA does not mean that constitutional conflict is inevitable.  The Bureau has also been provided authority, of equal dignity to this statutory directive, to exempt any class of "[t]ransactions for which the Bureau, by rule, determines that coverage under [TILA] is not necessary."[162]  Congress has also recognized that states may provide for protections that are, as is the case here, "substantially similar" to

---

[160] *Murphy*, 138 S. Ct. at 1476.

[161] *M'Culloch*, 17 U.S. at 428.

[162] 15 U.S.C. § 1603(5); *see also* 15 U.S.C. § 1604(f) (providing further exemption authority).



those provided under TILA and authorized the Bureau to exempt transactions subject to these state protections from the TILA's coverage.[163]  The Bureau can and should exercise that authority here.  The only alternative is a rule that will be invalid as contrary to the U.S. Constitution.

## VII.    PACE Assessments Are Not "Consumer Credit"

The Bureau's proposal to characterize PACE transactions as extensions of "consumer credit"—thereby imposing upon PACE a host of rules designed for mortgage transactions—suffers from several fatal flaws.  First, for the reasons discussed above, the proposal, which is not responsive to any Congressional directive, is unconstitutional.  Second, the term "consumer credit" cannot reasonably be interpreted as including PACE assessments.   The proposed rule, therefore, would exceed the Bureau's rulemaking authority.  Finally, even aside from the proposal's inconsistency with both the Constitution and TILA, the proposal is simply bad policy—there is no sound reason to treat PACE assessments like consumer credit transactions, especially given the active regulation of PACE by state and local governments that makes the Bureau's ill-considered proposal unnecessary.

### a.  It is not reasonable to interpret TILA as applying to PACE assessments.

The Truth in Lending Act regulates "consumer credit."[164]   TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."[165]   It also provides that the term "consumer" when used in "reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a *natural person*, and the money, property, or services which are the subject of the transaction *are primarily for personal, family, or household purposes.*"[166]   As both the CFPB and the Federal Reserve Board have long understood, when Congress

---

[163] 15 U.S.C. § 1633.

[164] *See* 15 U.S.C. § 1601(a); *see also* 15 U.S.C. § 1602(g) (defining a "creditor" as one who "regularly extends . . . consumer credit"); 1602(dd)(5) (defining the term "residential mortgage loan" as a "consumer credit transaction" secured by a mortgage).

[165] 15 U.S.C. § 1602(f) (emphasis added).

[166] 15 U.S.C. § 1602(i) (emphasis added).



does not define terms, it intends for those terms to be understood by reference to otherwise applicable state or common law.[167]

For nearly four decades, the official staff commentary to Regulation Z's definition of "credit" has explained that the term "credit" excludes "[t]ax liens, tax assessments, court judgments, and court approvals of reaffirmation of debts in bankruptcy. However, third-party financing of such obligations (for example a bank loan obtained to pay off a tax lien) is credit for purposes of the regulation."[168] The CFPB now proposes to amend this official interpretation to provide that the definition of credit excludes only "involuntary" tax liens and "involuntary" tax assessments.[169] The effect, according to the CFPB, would be to "clarify that PACE transactions are credit under TILA and Regulation Z."[170]

Although the CFPB has broad rulemaking authority under TILA, its proposal to recharacterize state and local tax assessments as extensions of consumer credit clearly exceeds this authority and, therefore, should not be adopted by the Bureau. State and local tax assessments are not "consumer credit transactions" for at least four reasons: (1) PACE assessments do not constitute debt incurred by a "natural person," but are liens on real property; (2) PACE assessments are not issued "primarily for personal, family, or household purposes," but are issued with the overriding purpose to advance critical state environmental and economic interests; (3) numerous provisions in TILA, including the 2018 amendments made by the EGRRCPA that specifically relate to PACE assessments, demonstrate that Congress did not regard exercises of state taxing authority as the issuance of consumer credit; (4) the canon of constitutional avoidance dispels any remaining doubt that "consumer credit" does not include tax assessments.

(1) PACE assessments do not constitute debt incurred by a "natural person," but are liens on real property

First, PACE assessments are not transactions pursuant to which local tax authorities grant a "natural person" the right to "incur a debt and defer its payment."[171] In California, PACE assessments do not constitute a "debt" of any natural person, but "constitute a lien

---

[167] 12 CFR 1026.2(b)(3); *see also Billings v. Propel Fin. Servs., L.L.C.,* 821 F.3d 608, 610 (5th Cir. 2016).

[168] 12 CFR pt. 1026, Comment 1026.2(a)(14)-1.ii.

[169] *See* Proposal at 30396-98.

[170] *Id.* at 30396.

[171] 15 U.S.C. § 1602(f), (i).



against the lots and parcels of land on which they are made."[172]  As one district court observed, "PACE assessments are obligations imposed on the property, not the homeowner, and they are collected 'in the same manner and at the same time as the general taxes of the city or county on real property.'"[173]  "Under California law, a tax assessment lien on property does not constitute a personal debt owed by a consumer," and therefore "PACE assessments cannot be a credit transaction" or a "residential mortgage loan" under TILA.[174]  Significantly, the district court recognized that this statutory basis for rejecting the application of TILA to California PACE assessments is "[i]ndependently dispositive" of the issue, even before considering "the official staff interpretation" that the CFPB proposes to amend.[175]  Finally, lest there be any doubt, the California legislature has explicitly provided that the laws it has enacted for purposes of regulating PACE assessments do "not apply to a finance lender, mortgage loan originator, or broker licensee" unless they are separately engaged in PACE financing, making clear that PACE assessments are not considered mortgage loans under state law.[176]

Similarly, under Florida law, "repayment obligations" for PACE assessments "are tied to the properties and not to the individuals, and repayment is collected through voluntary special non-ad valorem assessments placed on the property."[177]  PACE assessments are collected using the same "uniform method" for collection of non-ad valorem assessments.[178]  Indeed, PACE assessments "are *indistinguishable from and fully equivalent to* all other non-ad valorem assessments providing for the payment of costs of capital projects, improvements, and/or essential services (e.g., infrastructure and services related to roads, stormwater, water, sewer, garbage removal/disposal, etc.) which benefit property or relieve a burden created by property in furtherance of a public

---

[172] Cal. Sts. & High. Code § 5898.30.

[173] *In re Hero Loan Litig.*, No. CV 16-08943-AB (KKX), 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017) (quoting Cal. Sts. & High. Code §§ 5898.12, 5898.30).

[174] *Id.* (citing *Huntington Beach v. Super. Ct.*, 78 Cal.App.3d 333, 340 (1978)).

[175] *Id.*

[176] Cal. Fin. Code § 22694.

[177] *Fla. Bankers Ass'n v. Fla. Dev. Fin. Corp.*, 176 So. 3d 1258, 1262 (Fla. 2015).

[178] *Id.* at 1264 (quoting Fla. Stat. Ann. § 197.3632).



purpose."[179]  Thus PACE assessments are no different than ordinary real property "tax obligations, which are not 'debts' subject to TILA."[180]

A homeowner who voluntary agrees to the imposition of a PACE assessment does not thereby become "indebted" to the local taxing authority; if the homeowner sold the house the day after the transaction was consummated, that "natural person" would never owe a penny.  Accordingly, PACE assessments do not involve the right of a "natural person" to "incur debt and defer its payment."  The Bureau's proposal to treat PACE financing as "consumer credit" founders on this point alone.

> **(2) PACE assessments are not issued "primarily for personal, family, or household purposes"**

Second, PACE assessments are not "consumer credit" because they are not issued "primarily for personal, family, or household purposes."[181]  Rather, the primary purpose of PACE assessments—indeed, the only reason PACE programs exist—is to advance each respective *State's* critical public policy interests.  This is not mere conjecture.  State legislatures have been pellucidly clear.

The California legislature created PACE programs to finance "*public improvements*,"[182] specifically (1) those that would advance the state's "energy and water conservation efforts," which the legislature deemed necessary "to address the issue of global climate change,"[183] (2) those that would "address seismic safety needs throughout this state,"[184] (3) those that would advance the state's goal "to increase electric vehicle usage" in order to "address the issue of global climate change,"[185] and (4) those public improvements

---

[179] *See* Final Judgment at 16, *Florida PACE Funding Agency v. State of Florida*, No. 2022-CA-1562 (Fla. Cir. Ct. Oct. 6, 2022) (available at https://floridapace.gov/wp-content/uploads/2022/12/CERTIFIED-COPY-OF-FINAL-JUDGMENT-FROM-LEON-COUNTY-compressed.pdf); *see also Florida Development Finance Corp. v. State*, No. 2014-CA-000548, 2014 WL 12544504 (Fla. Cir. Ct. July 18, 2014) (same).

[180] *Billings*, 821 F.3d at 613.

[181] 15 U.S.C. § 1602(i); *see also* 12 CFR 1026.2(12) ("Consumer credit means credit offered or extended to a consumer primarily for personal, family, or household purposes.").

[182] Cal. Sts. & High. Code § 5898.12(a)(emphasis added); *see also id.* at § 5898.20(a)(1).

[183] *Id.* § 5898.14(a)(1).

[184] *Id.* § 5899(a)(1).

[185] *Id.* § 5899.3(a)(2).



intended to make homes and businesses "more resistant to wildfire."[186]  The legislature has specifically found that PACE assessments pursuant to these programs advance a "public purpose."[187]  In fact, a local government is not permitted to finance these public improvements unless it makes a finding that doing so "is in the public interest."[188]

Likewise, the Florida legislature has declared that it is the state's public policy to "promote energy conservation, energy security, and the reduction of greenhouse gases,"[189] and has expressly determined that PACE assessments used to finance energy conservation improvements and wind resistance improvements to real property advance "the goals of the state's energy and hurricane mitigation policies" and serve "a compelling state interest."[190]

The Bureau must defer to State legislatures' expressed declaration of the purpose of their legislation,[191] particularly where, as here, a steady stream of evidence supports the States' strong interest in promoting an environmentally sustainable housing stock that can help combat global warming and withstand droughts, wildfires, earthquakes, hurricanes, and other natural disasters that severely impact the housing stock and the economies of both California and Florida.[192]

---

[186] *Id.* § 5899.4(a)(1).

[187] *Id.* §§ 5899(a)(3); 5899.4(a)(3).

[188] *Id.* § 5898.20(a)(2), (b).

[189] Fla. Stat. Ann. § 163.08(1)(a).

[190] *Id.* § 163.08(b).

[191] *See, e.g., Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1145 (11th Cir. 2022) (discussing the "great deference owed to [state] legislatures" when exercising traditional authorities); *McCreary Cnty., Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 864 (2005) (observing, even in the context of the Fourteenth Amendment, that "a legislature's stated reasons will generally get deference" provided they are not a "sham.").

[192] *See, e.g.,* https://newsroom.statefarm.com/state-farm-general-insurance-company-california-new-business-update/ (State Farm Insurance announces decision to cease accepting new applications for property insurance due, in part, to "rapidly growing catastrophe exposure."); https://abc7news.com/farmers-insurance-state-farm-allstate-home-wildfire/13335307/ (reporting that both Allstate and Farmers had stopped issuing new home owner policies in California); https://www.cnn.com/2023/06/01/business/florida-homeowner-insurance-rates/index.html (detailing the crisis in the Florida home insurance market).



Because the primary purpose of PACE Assessments is to advance State public policy interests, they necessarily are not "primarily for personal, family, or household purposes."[193]  Indeed, Congress has made clear that a transaction can have only one "primary purpose" by exempting from TILA "[c]redit transactions involving extensions of credit *primarily* for business, commercial, or agricultural purposes."[194]  In this respect, Regulation Z makes clear that "[t]here is no precise test" for "what constitutes the primary purpose" of a transaction,[195] but acknowledges that if the primary purpose of an extension of credit is for business, it is not subject to Regulation Z even if it also serves household purposes.[196]  Thus, while PACE assessments may undoubtedly serve the "personal, family, or household purposes" of homeowners when those purposes align with State interests, their "primary" purpose is to advance state environmental and economic policies.  Accordingly, even if PACE assessments were "credit" (and they are not), they would not be "consumer credit."

> **(3) Other provisions of TILA demonstrate Congress's understanding that tax assessments are not credit**

The CFPB's proposed interpretation of TILA violates the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."[197]  To begin with the most obvious example, Congress's 2018 amendment to TILA instructing the CFPB to issue rules carry out the ability-to-repay purposes of 15 U.S.C. § 1639c(a) "with respect to Property Assessed Clean Energy financing" would have been completely unnecessary if, as the Bureau now suggests, a PACE assessment was properly construed as "consumer credit" and therefore a "residential mortgage loan" already subject to 15 U.S.C. § 1639c(a).  Further, Congress's direction to the CFPB to "account for the unique nature" of PACE financing is a clear indication that Congress understood that PACE financing was not consumer credit, but something different: "a tax assessment

---

[193] 15 U.S.C. § 1602(i); *see also* 12 CFR 1026.2(12) ("Consumer credit means credit offered or extended to a consumer primarily for personal, family, or household purposes.").

[194] 15 U.S.C. § 1603(1).

[195] 12 CFR pt. 1026, Official Comment 2(a)(12).

[196] *Id.*, Official Comment 3(a).

[197] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (cleaned up).



on the real property of the consumer."[198]  Simply put, had Congress intended for PACE assessments to be treated like residential mortgage loans for purposes of TILA, it would have said so.  That Congress instead specifically directed the CFPB to subject PACE assessments to a *single* substantive provision in one section of TILA is a clear indication that it did *not* intend to subject PACE assessments to the countless other provisions regulating consumer credit that are spread throughout the Consumer Credit Protection Act.[199]

Although not specifically directed to PACE assessments, numerous other provisions of TILA make clear that Congress considered state tax assessments to be different in kind from extensions of credit.  For example, TILA's ability-to-repay provision assumes that the principal payments on any "residential mortgage loan" are distinct from consumer's monthly obligations for "applicable taxes, insurance (including mortgage guarantee insurance), and assessments."[200]  Disclosure provisions mandated by TILA likewise draw distinctions between "the payment of principal and interest" and the payment of "applicable taxes, insurance, and assessments."[201]  In fact, Congress has enacted a provision for the establishment of escrow accounts that is entirely premised on the distinction between payments pursuant to "a consumer credit transaction secured by a first lien on the principal dwelling" and "the payment of property taxes."[202]  Finally, perhaps the best evidence that the CFPB's proposal to categorize PACE assessments as "consumer credit" is the regulatory equivalent of jamming a square peg through a round hole is the significant (and yet still inadequate) revisions the CFPB is forced to propose

---

[198] 15 U.S.C. § 1639c(b)(3)(C).

[199] *See, e.g., Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1037 (2019) (observing that Congress's decision to subject those who enforce security interests to a single provision of the Fair Debt Collection Practices Act presents "a serious, indeed insurmountable, obstacle to subjecting [such entities] to the main coverage of the Act."); *see also* Brief of Amicus Curiae United States at 15, *Obduskey v. McCarthy & Holthus LLP*, No. 17-1307 (Nov. 14, 2018) (S. Ct.) (observing that, if those enforcing security interests were already generally subject to the FDCPA's general provisions, Congress would not have needed to subject such entities to a single specific provision of the FDCPA) (available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/bcfp_amicus_obduskey-v-mcCarthy-holthus-llp_2018-11.pdf).

[200] 15 U.S.C. § 1639c(a).

[201] 15 U.S.C. § 1638(a)(16).

[202] 15 U.S.C. § 1639d.



to the disclosure regime governing residential mortgage transactions.[203]  It is telling, for example, that notwithstanding the Bureau's proposal to recharacterize PACE assessments as "consumer credit" when they are originated, it simultaneously requires that "payments for pre-existing PACE transactions are [to be] considered property taxes" for purposes of the ability-to-repay rule.[204]  In short, Congress has consistently treated property tax assessments, including PACE assessments, as completely distinct from consumer credit transactions.  The Bureau's proposal to erase this distinction is contrary to clear expressions of congressional intent reflected in TILA.

(4) Congress would not have intended to violate the Constitution

For the reasons explained in detail above, by subjecting State property tax assessments to TILA (including both disclosure regimes and substantive limitations), the proposed revision to TILA's official commentary would, if adopted, interfere with States' sovereign tax authority in a manner that fundamentally conflicts with "the structural framework of dual sovereignty" enshrined in the Constitution.[205]  The text of TILA alone demonstrates that Congress did not intend for tax assessments—even those characterized as "voluntary"—to be considered "consumer credit transactions" generally subject to TILA. Any remaining doubt, however, is resolved through application of the canon of constitutional avoidance.  This interpretive canon rests on the reasonable assumption that Congress does not intend to transgress the limits of the Constitution and, therefore, requires that statutes be construed, if possible, "to avoid not only the conclusion that they are unconstitutional, but also grave doubts upon that score."[206]  At a minimum, the Bureau's proposal to interpret TILA as applying to States' exercise of their sovereign taxing authority raises "grave constitutional doubts."   As the last fifty years have demonstrated, the term "consumer credit" can quite easily be construed as <u>not</u> including

---

[203] *See, e.g.,* Proposal at 30400 (proposing to exempt PACE transactions from requirements in the good faith estimate regarding disclosure of escrow account payment field because "PACE transactions are typically part of the property tax payment," and using a disclosure intended for residential mortgage loans "could cause confusion.").

[204] Proposal at 30440.

[205] *Printz*, 521 U.S. at 932.

[206] *United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1622 (2021) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) ("This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations.") (quoting *Rust v. Sullivan*, 500 U.S. 173, 191 (1991)).



state tax assessments. The Bureau should abandon its proposal to violate both the Constitution and the text of TILA and continue to abide by that longstanding and sensible interpretation currently codified in the commentary to Regulation Z.

> b. *The Bureau's proposed change to its commentary would have detrimental impacts on local governments and homeowners and is unnecessary.*

Even if the Bureau had the authority to interpret the term "consumer credit" as encompassing PACE assessments, there are not good reasons to do so. To begin, the Bureau's arguments in support of its proposed interpretation, which are focused on the dubious distinction between "voluntary" and "involuntary" tax assessments, are not persuasive or workable. In addition, even with respect to PACE, there are no sound reasons to impose TILA's regulatory regime designed for mortgage transactions on PACE transactions, given both their "unique nature" and the State and local government regulations that are, unlike TILA's mortgage regulations, designed for PACE.

> (1) The proposed distinction between voluntary and involuntary tax assessments is both unsound and unworkable

The Bureau's proposal to amend its longstanding commentary interpreting the scope of credit as not applying to "tax liens" or "tax assessments" rests entirely on its view that, while "PACE transactions have been treated as assessments under State law, are collected through local property tax systems, and are secured by liens treated similarly to property tax liens," they should be treated like consumer credit because they "arise through voluntary contractual agreement[s]."[207]

The voluntary nature of a typical PACE assessment is not an adequate ground to ignore its more fundamental characteristics that distinguish it from consumer credit. As the Bureau acknowledges, PACE assessments are a type of "property tax."[208] They can only be imposed by governmental entities to advance "important public policy purposes as mandated by state law."[209] They are "repaid through the property tax system along with the consumer's other property tax payment obligations."[210] And, they are "tied to the

---

[207] Proposal at 30396.

[208] *Id.* at 30388.

[209] *Id.* at 30397.

[210] *Id. at* 30389.



property, not the property owner."[211]  These characteristics of PACE assessments—and not their voluntary nature—should govern whether they can properly be interpreted as "consumer credit transactions" (they cannot).

In addition to its legal and logical infirmities, the Bureau's proposed distinction between "voluntary" and "involuntary" taxes is practically unworkable.  It would call into question countless exercises of state and local taxing authority that have never been regarded as consumer credit.  For example, section 26580 of the California Public Resources Code, which was enacted over fifty years ago, permits geologic hazard abatement districts to impose special assessments in order to "[a]cquire, construct, operate, manage, or maintain improvements on public or private lands . . . *with the consent of the owner*. . . ."[212]  More broadly, the California Constitution provides that "Cities, Counties, and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district."[213]  If a homeowner votes in favor of the special tax and receives a benefit, has the homeowner entered into a consumer credit transaction?  Likewise, in Illinois, the state legislature has authorized homeowners to the relevant municipality or county for the creation of a special service area, which if adopted would result in the imposition of additional tax assessment on homeowners within the area to fund some public benefit.[214]  But 51% of the voters and homeowners can prevent the imposition of the tax by submitting an objection petition.[215]  If a homeowner fails to object, has the homeowner entered into a voluntary consumer credit transaction?  Likewise, if a property owner opts to change use of a property, for example, from agricultural use to purely residential use notwithstanding marked increase in property taxes, how would that not be voluntary?

Simply put, public work projects undertaken by local governments across the country are based, in one form or another, on the consent of at least some portion of the impacted homeowners.  These exercises of sovereign State taxation authority have never been regarded as extensions of credit, even if the assessment is consented to by the

---

[211] *Id.*

[212] Cal Pub. Res. § 26580(a); *see also* Cal. Pub. Res. § 26587 (authorizing such districts to levy assessments on property that is benefited by such improvements).

[213] Cal. Const. art. XIII A, § 4.

[214] 35 Ill. Comp. Stat. Ann. 200/27-20.

[215] 35 Ill. Comp. Stat. Ann. 200/27-55.



homeowner, is for a set amount of time, is determined by the amount of benefit it provides to the relevant property and includes an interest component.  Like PACE assessments, these special assessments serve the public's interest, but will also often increase the value of the assessed property.  As with PACE assessments, payment of a special assessment is secured by a lien on the affected property and collected through the local tax system.[216]  Adoption of the proposed change to the commentary will limit the revenue options for every State and municipality in the nation and raise countless questions regarding work-a-day functioning of State and local governments and spawn needless litigation.

The Bureau's proposal breezes by this issue without any suggestion that it has, as the law requires, meaningfully consulted with "State and local authorities" about the possible ramifications of its proposal on "voluntary" tax assessments other than PACE assessments.[217]  Indeed, the National League of Cities and National Association of Counties have already commented on the proposal's "far reaching ramifications, which [the] CFPB does not examine in the proposed rule," and requested an extension of the comment period (a request the CFPB ignored).[218]  The failure of the Bureau to provide meaningful notice to the public, including governmental entities, regarding the potential implications of its proposed revision to the commentary is yet another reason why it should abandon its proposal to extend the definition of "consumer credit transactions" to tax assessments, even those that could be characterized as "voluntary."

---

[216] See Massachusetts Department of Revenue, Division of Local Services, *Betterment and Special Assessments* (Feb. 2021) (available at
https://archives.lib.state.ma.us/bitstream/handle/2452/838067/ocn425958307-2021-01.pdf?sequence=1);
South Dakota Municipal League, *Guide to Special Assessments* (available at
https://dor.sd.gov/media/xjzforb4/sdml_guide_to_special_assessments.pdf); League of Minnesota Cities,
*Special Assessment Toolkit* (available at https://www.lmc.org/wp-content/uploads/documents/Special-Assessment-Toolkit.pdf).
[217] 15 U.S.C. § 1639c(b)(3)(C)(ii)(II); *see* Proposal at 30394.
[218] *See* National League of Cities and National Association of Counties Request for Extension of
Comment Period for Proposed Rule on Residential Property Assessed Clean Energy Financing
(Regulation Z) (June 21, 2023).



> (2) Consumers would not benefit from TILA's right of rescission, but it would be burdensome for States and confusing for consumers

The Bureau suggests that the right of rescission "could benefit borrowers," even though it acknowledges that homeowners "in California already have a three-day right to cancel under state law."  In fact, California's right of rescission is more protective of homeowners as it provides senior citizens (*i.e.*, those over the age of 65) with a five-day right of rescission.  Similarly, Florida law also provides for a three day right to cancel, which is prominently disclosed to consumers.[219]  Finally, as the Bureau acknowledges, even in states where such a right is not guaranteed, PACE administrators, including FortiFi, have voluntarily agreed to provide a three day right to cancel the transaction without any financial penalty.[220]  As a result, TILA's right of rescission will be, at best unnecessary, possibly less protective of consumers, and likely confusing for borrowers who already have rescission rights (and receive disclosures regarding these rights) under applicable State law (including contract law).  Accordingly, while the Bureau is correct to state that TILA's rescission right will "provide few benefits," it will impose unnecessary costs.  Even if the Bureau were to adopt its revision to the commentary, it should exempt PACE assessments from TILA's right of rescission.

> (3) TILA'S mortgage disclosures, even with the proposed modifications, are inferior to State-mandated disclosures

The Bureau has proposed to require state and local governments to provide to homeowners contemplating a voluntary PACE assessment the disclosures the Bureau created, after years of development and consumer testing, for *mortgage* transactions.  As the Bureau implicitly recognizes, these disclosures are a poor fit for PACE transactions, which are fundamentally different than mortgage transactions in multiple respects.  The result is a set of disclosures that, even if revised as the Bureau proposed, will include numerous requirements that will only confuse homeowners.  For example:

---

[219] *See* Fla. Stat. Ann. § 520.72; *see also* Sarasota County Code of Ordinance § 38-326(a)(7)(dd) (requiring disclosure of right); Broward County Code of Ordinance § 22.177(c)(4) (same); Palm Beach County Code of Ordinances § 17-506(a)(11)(same); FortiFi Florida PACE Program Handbook, at 19 (May 2022) (available at https://www.fortifi.com/assets/documents/fortifi-program-handbook-fl-20220516.pdf).
[220] *See* PACENation Consumer Protection Principles ¶ 12.



- Section 1026.37(a)(9) would require disclosure in the loan estimate of the purpose of the loan, which could be "purchase," "refinance" of existing obligation, or financing of initial "construction" of a dwelling.  If none of these apply (which would be the case for PACE transactions), the purpose must be listed as "home equity loan," which is a different kind of product and would likely confuse consumers.

- Section 1026.37(a)(11) would require the loan estimate to disclose the "loan type," which may be either "conventional" (i.e., those insured by a Federal or State government agency), "FHA," "VA, or "Other" for other "federally-insured or guaranteed loans."  The model form lists these types of loans, but that would likely be confusing to a consumer, as none of these are applicable to PACE transactions.

- Section 1026.37(a)(13) would require disclosure in the loan estimate of whether there has been a "rate lock," which is not a feature of PACE financing.

- Section 1026.37(c)(2)(ii) would require disclosure in the loan estimate of the "maximum amount payable for mortgage insurance premiums" corresponding to the principal and interest payment.  A line for "Mortgage Insurance" is included in the model form, but mortgage insurance is not a feature of PACE transactions.

- Section 1026.37(f) would require itemization in the loan estimate of closing costs, including "services you cannot shop for" and "services you can shop for."  This section does not apply to PACE transactions and will be left blank.

- Section 1026.37(g)(1) would require itemization in the loan estimate of other closing costs, including "taxes and other government fees," which could be confusing for consumers given that the entire transaction is a tax and any other fees charged in the context of the transaction could be considered "government fees."

- Section 1026.37(g)(2) would require, under the header "prepaids," itemization of "homeowners insurance premium," "mortgage insurance premium," and "prepaid interest," none of which are applicable to PACE transactions.  On the fourth line of this table, the model form lists "property taxes," which is potentially confusing



given that a PACE assessment is a type of property tax.   Although these amounts can be left blank, the labels themselves will likely be confusing.

- Section 1026.37(g)(3) would require detail regarding the "initial escrow payment at closing," which doesn't make sense given that PACE transactions do not result in any initial escrow payments.

The closing disclosure, even with modifications the Bureau has proposed, is a similarly poor fit for PACE transactions and is also likely to confuse borrowers.  For example, like the loan estimate, the closing disclosure would require disclosure of (1) the "purpose" of the loan (*i.e.*, purchase, refinance, construction, or home equity loan);   (2) the loan type ("conventional," "FHA," "VA," or other); (3) the amount of mortgage insurance; (4) settlement services borrower did or did not shop for; (5) prepaid costs for homeowners insurance, mortgage insurance, and property taxes; (6) initial escrow payments at closing; and (7) a statement that "[i]f you borrow more than this property is worth, the interest on the loan amount above this property's fair market value is not deductible from your federal income taxes."[221]

The Bureau blithely asserts that these "disclosure requirements would likely benefit consumers by increasing their understanding of the terms of the PACE transaction…."[222] But, unlike the multiple rounds of consumer testing that the Bureau conducted before adopting these disclosures for mortgage transactions,[223] the Bureau has apparently conducted no testing of these disclosures to determine whether they are helpful to consumers or, as is almost certainly the case, hopelessly confusing.

Still worse, the discussion of the benefits and costs of imposing these ill-fitting disclosures on PACE transactions fails to even mention that State and local governments have already mandated extensive disclosures, created specifically to explain to consumers the "unique nature" of PACE assessments in their locality.  As detailed above (see *supra* section III.a.1), California has adopted a comprehensive disclosure regime, tailored to PACE transactions in that state, which provides information relevant to homeowners

---

[221] *See generally* 12 CFR 1026.38.

[222] Proposal at 30426.

[223] *See* CFPB, *Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth in Lending Act (Regulation Z) Rule Assessment*, at p. 36 (Oct. 2020) (available at https://files.consumerfinance.gov/f/documents/cfpb_trid-rule-assessment_report.pdf).



contemplating PACE transactions that the Bureau's proposed model form does not provide but omits the irrelevant (and likely confusing) information that the Bureau's form does provide.[224]  California law also requires oral confirmation of the key terms of the agreement, which FortiFi regards as a highly effective means of ensuring consumers understand the transaction.[225]  Of course, the oral disclosure provisions only make sense if they follow the provision of California's written disclosures, and the proposal strongly suggests that the current State disclosures will no longer be provided.[226]

Likewise, local governments in Florida have mandated disclosures tailored to their localities,[227] and at least two large counties have mandated an oral confirmation interview similar to California's.[228]   Finally, even where the law does not require it, PACE administrators have committed to providing PACE financing disclosures and conducting a confirmed terms phone call "as a compliment to written disclosures."[229]

In an apparent attempt to conjure some benefit to substituting the TILA disclosure regime for the tailored disclosure regimes of States and localities, the Bureau asserts that the TILA disclosures "may prompt consumers with a pre-existing non-PACE mortgage to inform their mortgage servicer of the PACE transaction," which "in turn, could prompt the servicer to conduct an escrow analysis to account for the PACE payment sooner than it otherwise would have."[230]   But this supposed benefit completely ignores the fact that Florida law already requires—

> **the property owner [to] provide to the holders or loan servicers of any existing mortgages encumbering or otherwise secured by the property a notice of the owner's intent to enter into a financing agreement together with the maximum principal amount to be**

---

[224] *See generally* Cal. Sts. & High. Code § 5898.17.

[225] Cal. Sts. & High. Code § 5913.

[226] *See* Proposal at 30426.

[227] *See supra* section III.a.2.

[228] Broward County Admin. Code § 22.177(c)(4); Palm Beach County Code § 17-506(a)(17).

[229] *See* PACENation Consumer Protection Principles ¶¶ 8-9.

[230] Proposal at 30426.



> **financed and the maximum annual assessment necessary to repay that amount**.[231]

Although the proposed rule acknowledges the existence of this statutory requirement, it fails to explain why it is not adequate—indeed, superior—to the disclosure that it proposes to mandate.  Indeed, to the extent this requirement does not result in mortgage servicers appropriately adjusting mortgage escrow payments, the fault would appear to lay with mortgage servicers.  The Bureau's proposed disclosure is at best unnecessary and probably harmful, as it would likely preempt Florida's law.

Likewise, the discussion of this supposed benefit ignores the fact that California law already mandates a disclosure provision that specifically addresses this issue:

> Your payments will be added to your property tax bill. Whether you pay your property taxes through your mortgage payment, using an impound account, or if you pay them directly to the tax collector, you will need to save an estimated $_____ for your first tax installment. **If you pay your taxes through an impound account you should notify your mortgage lender, so that your monthly mortgage payment can be adjusted by your mortgage lender to cover your increased property tax bill**.[232]

California law also specifically requires program administrators, like FortiFi, to confirm with consumers in a recorded conversation—

> That payments on the assessment contract will be made through an additional annual assessment on the property and paid either directly to the county tax collector's office as part of the total annual secured property tax bill, or through the property owner's mortgage impound account, and that if the property owner pays taxes through an impound account, **the property owner should notify the property owner's mortgage lender**

---

[231] Fla. Stat. Ann. § 163.08(13); *see also* Sarasota County Code of Ordinances § 38-326(a)(13) ("The PACE Local Government shall obtain from the property owner a verified copy or other proof of lender notification of intent to enter into the Financing Agreement, consistent with Section 163.08(13), Florida Statutes.").

[232] Cal. Sts. & High. Code § 5898.17(b) (emphasis added).



**to discuss adjusting the monthly mortgage payment by the
estimated monthly cost of the PACE assessment**.[233]

Accordingly, the proposed TILA forms will not advance the benefit of ensuring that
homeowners and, by extension, mortgage servicers will be timely informed of the
PACE assessment, as that benefit is already conferred by relevant state law.  In
any event, and perhaps more fundamentally, the Bureau's discussion of "payment
shock" ignores the fact that consumers with escrow accounts will always owe less
in any single payment than they would if they did not pay property taxes through
an escrow account.  The Bureau's adoption of consumer advocates'
unsubstantiated concern that consumers with escrow accounts are less likely to
anticipate upcoming payments than those without escrow accounts ignores the
reality, described at length above, that California consumers are informed
*repeatedly* both in writing and orally of their obligation to repay PACE
assessments, including through escrow payments.[234]

Finally, the Bureau understates the costs to local governments who will be
responsible, either directly or through program administrators, to provide the TILA
disclosures.  The Bureau acknowledges that program administrators will
"experience one-time adjustment costs related to" switching to the TILA
disclosures, and that they may also "face additional cost of gathering information"
that would be required to be disclosed that is not currently disclosed.  But the
Bureau fails to acknowledge that the proposed rule would require the provision of
*two* sets of disclosures (the loan estimate and the closing disclosure), which will
impose additional costs.  Because the information provided in the two forms is
largely the same, and because, unlike with mortgage transactions, there are
typically not settlement services that homeowners could shop for between the
provision of the loan estimate and the closing disclosure, the requirement to
provide two disclosures is an unjustified cost, which will likely be passed on to
consumers in one form or another, and yet another demonstration of why PACE
assessments should not be treated like mortgage transactions.

---

[233] Cal. Sts. & High. Code § 5913(a)(2)(H) (emphasis added).

[234] *See supra* section IV.a.



In sum, as with the right of recission, if the Bureau proceeds to finalize its flawed proposal to apply TILA's mortgage provisions to PACE, it should defer to the superior State and local disclosure regimes that already exist and exempt PACE transactions from TILA's disclosure requirements.

> (4) The seven-day waiting period is unlawful and would significantly diminish the availability of PACE financing

The Bureau proposes to impose a seven-business-day waiting period between the provision of the loan estimate (provided within three days of the application) and consummation of the loan.[235]   To begin with, the proposal does not explain why the Bureau is authorized to impose this requirement on PACE transactions.  TILA requires the seven-day waiting period for consumer credit secured by a dwelling, but only if that extension of credit is also subject to the Real Estate Settlement Procedures Act (RESPA).[236]  Of course, PACE assessments are not "federally related mortgage loan[s]" subject to RESPA.[237]  Thus, even if PACE transactions were consumer credit (they are not), the Bureau would lack the authority to impose the seven-day waiting period on the transactions.

Aside from its legal infirmities, the proposal to apply a seven-business-day waiting period on PACE transactions is bad policy, as it would significantly impact the availability of PACE financing without any corresponding benefit.  The single paragraph that discusses the benefits and costs of the seven-business-day waiting period acknowledges that PACE transactions are typically point-of-sale transactions and that "this speed of origination is necessary to compete with unsecured financing options."[238]   The proposal also acknowledges the possibility that "the seven-day waiting period would lead to a further reduction in PACE transaction volume due to reduced contractor participation if

---

[235] *See* Proposal at 30426; *see also* 12 CFR 1026.19(e)(1)(iii)(B).

[236] 15 U.S.C. § 1638(b)(2)(A) ("[I]n the case of any extension of credit that is secured by the dwelling of a consumer, *which is also subject to the Real Estate Settlement Procedures Act*, good faith estimates of the disclosures required under subsection (a) shall be made in accordance with regulations of the Bureau under section 1631(c) of this title and shall be delivered or placed in the mail not later than three business days after the creditor receives the consumer's written application, which shall be at least 7 business days before consummation of the transaction.").

[237] *See* 12 U.S.C. § 2602(1)(B)(iv).

[238] Proposal at 30426.



contractors preferred to offer only credit options that do not have such a waiting period."[239] The Bureau states that because states have not imposed similar waiting requirements, it lacks "data to indicate how large this effect might be."[240]

Although FortiFi cannot offer data to quantify the effect, we estimate that the seven-day waiting requirement would severely undermine PACE as a competitive financing product. Home improvement contractors are often able to offer homeowners other options to finance qualifying improvements and are unlikely to wait over a week before getting financing in place and getting to work.  Further, even if contractors were willing to absorb the delay, homeowners may be unwilling, quite reasonably, to delay a qualifying improvement, *e.g.*, to repair a damaged roof or replace a non-functioning air conditioner. The result is that PACE simply will not be offered, even if it provides superior terms and consumer protections, which will almost always be the case, particularly for consumers with fewer financing options.  Thus, the proposed seven-business-day waiting period would impose significant costs on consumers, in the form of reduced access to credit, higher cost credit, and fewer consumer protections.[241]

These costs are not justified by any countervailing benefit.  Indeed, the discussion of the costs and benefits of the seven-business-day waiting period in the proposal's section 1022 analysis does not identify a single benefit.[242]  In the preamble's earlier discussion of the waiting period requirement, the Bureau asserts that the "timing requirements are important to borrowers," but it does not provide any basis for this assertion.  The CFPB's citation to its 2013 rulemaking adopting the TILA-RESPA integrated disclosures is not a persuasive basis to extend the requirement to PACE assessments.   Mortgage transactions are far larger, on average, than PACE assessments and require borrowers to expend significant funds on settlement services that are not required in PACE

---

[239] *Id.*

[240] *Id.*

[241] Significantly, state and local jurisdictions have imposed requirements and restrictions on qualifying improvements performed by home improvement contractors that are not applicable to home improvements financed through other means.  *See, e.g.,* Cal. Code Regs. tit. 10, § 1620.10; Broward County Code of Ordinances § 22.176 (regulating the materials, pricing, and performance of qualifying improvements); Sarasota County Code of Ordinances § 38-326 (same).

[242] Proposal at 30426.



transactions.  Further, to repeat, the seven-business-day waiting period was mandated by Congress for certain mortgage transactions, but not for PACE assessments.

> (5) The licensing regime for mortgage originators should not apply to home improvement contractors

The proposal suggests that one of the likely impacts of the change to the commentary will be to subject home improvement contractors and PACE administrators to the provisions of TILA and Regulation Z that regulate loan originators, as well as the provisions of other laws, in particular the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (SAFE Act), that impose "registration requirements."[243]  The Bureau acknowledges that this would impose costs—which it does not have the data to quantify—on individual contractors and related companies if they were to comply with these provisions, and could also cause contractors to "exit the PACE market," which would impose costs on both contractors and consumers.[244]

Although it may not have the data to quantify the cost on individual contractors to seek licensure as mortgage loan originators, the Bureau does have access to, yet did not consider, the cost of mortgage loan originator licensure requirements in California and Florida, or the likelihood that home improvement contractor would have the option to obtain such a license.[245]  In California, which has a separate extensive statutory framework for contractors to enroll as PACE solicitors or PACE solicitor agents,[246] an applicant for a mortgage loan originator license must submit the Nationwide Mortgage Licensing System and Registry ("NMLS") form along with fingerprint images to the

---

[243] Proposal at 30425 (citing 12 CFR 1026.36); id. at 142 (citing 12 CFR 1026.36(f)).

[244] Proposal at 30426.

[245] See Cal. Fin. Code §§ 22105.1, 22109.1-22109.6, 22112; Fla. Stat. Ann. § 494.00312; DFPI Mortgage Loan Originator License New Application Checklist (Individual) (available at https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/CA-DFPI-MLO-New-Application-Checklist.pdf); Florida Mortgage Loan Originator License (available at https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/FL-MLO-New-App-Checklist.pdf); MO Mortgage Loan Originator License New Application Checklist (Individual)(available at https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/MO-MLO-New-Application-Checklist.pdf).

[246] The Bureau appears not to consider how confusing it will be to contractors to determine if licensure as loan originators is in addition to or in lieu of enrollment as PACE solicitors, as the California statute and regulations clearly differentiate the two.



NMLS.[247]  Additionally, the DFPI requires mortgage loan originator applicants to, among other things, complete 20 hours of pre-licensure education and pay $381.25 in applicant fees.[248]

Critically, California Financial Code section 22109.1 requires the DFPI commissioner to deny an application for a mortgage loan originator unless the commissioner finds that "the applicant is employed by, and subject to the supervision of, a finance lender or broker that has obtained a license from the commissioner pursuant to this division."  It is safe to say that virtually no California home improvement contractor will satisfy this requirement, effectively ending the availability of PACE financing in California.

To obtain licensure as a mortgage loan originator in Florida, an applicant must complete 20 hours of pre-licensure education, have completed high-school or its equivalent,[249] submit to a background check, pass the National and State components of the NMLS test for mortgage loan originators, and pay $300.25 in application and other fees.[250]  Further, similar to the California statute, in Florida, "an individual may not act as a loan originator unless he or she is an employee of, or an independent contractor for, a mortgage broker or a mortgage lender . . . ."[251]

These mortgage loan originator requirements render the proposal unworkable as it pertains to home improvement contractors.  As such, the Bureau grossly understates the likelihood that home improvement contractors will "exit the PACE market" if the Bureau finalizes its proposal to characterize PACE assessments as "consumer credit" and home improvement contractors as "loan originators."  As described above, home improvement contractors that offer PACE financing are already subject to state licensing and other

---

[247] Cal. Fin. Code § 22105.1.

[248] See CA-DFPI Mortgage Loan Originator New Applicant Checklist (Individual) (available at https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/CA-DFPI-MLO-New-Application-Checklist.pdf).

[249] As many home improvement contractors in Florida are immigrants, this may be an insurmountable obstacle.

[250] See NMLS New Application, Florida Mortgage Loan Originator License (available at https://mortgage.nationwidelicensingsystem.org/slr/publishedstatedocuments/fl-mlo-new-app-checklist.pdf); see also Fla. Stat. Ann. § 494.00312.

[251] See Fla. Stat. Ann. § 494.00331.



requirements that apply to all home improvement contractors,[252] and are subject to additional requirements imposed by state and local governments specifically in relation to their role in PACE transactions.[253]  We expect that layering on the significant additional and inconsistent obligations under TILA and the SAFE Act, including, for example, education and testing requirements related to mortgage lending,[254] will cause all home improvement contractors to exit the market.[255]

The proposal suggests that these reforms may benefit consumers by addressing "consumer protection issues identified in the comments responding to the ANPR . . . related to conduct by home improvement contractors,"[256] but the proposal fails to explain why state requirements designed to address those same issues, many of which became effective after the comment period of the ANPR closed,[257] have failed to sufficiently address these issues.  In fact, as discussed above, in 2021, the number of unresolved complaints relating to contractors submitted to the DFPI decreased to two, which suggests that program administrators' and State and local governments' efforts to address home improvement contractors' conduct has been and will continue to be effective, and that federal licensing and registration requirements are not necessary.

> (6) HOEPA and higher-priced mortgage provisions make little sense when applied to PACE

The Home Ownership and Equity Protection Act of 1994 (HOEPA) established certain additional protections for "high-cost mortgages," which are defined as those with APRs that exceed the "average prime offer rate" by more than 6.5 percentage points for a first-lien transaction, or in which the transaction's total points and fees exceed certain

---

[252] *See, e.g.,* Fla. Stat. Ann. § 489.101 et seq.

[253] *See supra* section II.c.

[254] *See, e.g.,* 12 CFR 1008.105(d), (e).

[255] The Proposal is not clear regarding whether the licensing and registration requirements applicable to mortgage loan originators would displace or supplement state requirements.

[256] Proposal at 30427.

[257] *Compare* Advance Notice of Proposed Rulemaking on Residential Property Assessed Clean Energy Financing, 84 Fed. Reg. 8479 (Mar. 8, 2019) (60 day comment period) *with* Cal. Code Regs. tit. 10, § 1620.11-17 (operative October 1, 2021); Palm Beach County Code of Ordinances § 17-507 (effective November 15, 2022).



thresholds, or that permit certain prepayment penalties.[258]  Based on data it analyzed, the Bureau estimates that over 35% of PACE transactions could be subject to rules implementing HOEPA,[259] though it surmises that PACE administrators will avoid PACE transactions that would trigger HOEPA's thresholds.[260]  As the Bureau acknowledges, either of these outcomes would impose costs on PACE administrators and could reduce access to credit.[261]

In fact, local governments would have no choice but to avoid HOEPA's requirements because compliance is likely not even possible.  For example, HOEPA and Regulation Z generally *prohibit* payment of loan proceeds directly to a home improvement contractor, which is standard practice in most PACE programs.[262]  Likewise, they prohibit making a high-cost mortgage "unless the creditor receives written certification that the consumer has obtained counseling on the advisability of the mortgage from a counselor that is approved to provide such counseling by the Secretary of the U.S. Department of Housing and Urban Development or, if permitted by the Secretary, by a State housing finance authority."[263]  But the Secretary of HUD has not approved any housing counselor to provide counseling on PACE, nor permitted State housing finance authorities to provide such counseling.[264]  In short, HOEPA was not intended to apply to PACE assessments, and the application of HOPEA rules would operate as a price cap, further reducing access to credit.

Similarly, the application of rules regarding higher-priced mortgages to PACE transactions would, as the Bureau acknowledges, impose significant costs on program administrators (and the local governments for whom they administer PACE programs), as well as on consumers, both in terms of increased costs and reduced access to

---

[258] 12 CFR 1026.32(a)(1).  The terms "points and fees" and "prepayment penalty" are defined, in relevant part, in 12 CFR 1026.32(b)(1) and (6), respectively.

[259] *See* Data Point at 15-16.

[260] Proposal at 30427.  The Bureau also speculates that PACE administrators will reduce fees in order to avoid triggering HOEPA thresholds, but it provides no evidence to suggest that doing so economically is possible, particularly in light of the increased origination costs the proposed rule would impose.

[261] Proposal at 30427.

[262] 15 U.S.C. § 1639(i); 12 CFR 1026.34(a)(1).

[263] 12 CFR 1026.34(a)(5)(i); see also 15 U.S.C. § 1639(u)(1).

[264] *See, e.g.,* 24 CFR 214.103(k) (knowledge criteria for HUD approved housing counselors).



credit.[265]  The Bureau's analysis suggests that almost all PACE assessments would be subject to rules related to higher-priced mortgages.[266]  While the Bureau has sensibly exempted PACE assessments from the requirement to establish escrow accounts,[267] it has not proposed to exempt PACE assessments from the requirement to obtain a written appraisal, a requirement the Bureau suggests will apply to approximately 25% of PACE transactions.[268]

Applying this requirement to PACE assessments makes little sense.  As the Bureau states, PACE transactions rely on automated value models (AVMs) to assess fair market value.  The Bureau has provided no evidence that AVMs relied upon fail to adequately assess the property value for purposes of PACE transactions, or that there is any benefit that justifies the cost and delay associated with obtaining a written appraisal.  Accordingly, if the Bureau does not abandon its proposal to extend TILA's mortgage regulations to PACE assessments, it should exempt PACE assessments from the regulatory requirements that apply to high-cost and higher-priced mortgage loans.

## VIII.  Even Assuming Congress Can Constitutionally Subject State Taxing Authority to a Federal Ability-To-Repay Requirement, The Bureau Erred In Implementing That Directive

### a.  *The purposes of section 129c(a)'s ability-to-repay requirement are served by existing State laws.*

Congress's directive to the CFPB in section 307 of the EGRRCPA was a narrow one: the Bureau was asked to prescribe regulations that would "carry out the purposes" of TILA's ability-to-repay provisions, but to do so in light of the "unique nature" of PACE financing. The purpose of the ability-to-repay provisions were set forth in Section 1402 of the Dodd-Frank Act, codified at 15 U.S.C. § 1639b(a).  Congress found that "economic stabilization would be enhanced by the protection, limitation, and regulation of the terms of residential mortgage credit and the practices related to such credit, *while ensuring that responsible,*

---

[265] Proposal at 30427.

[266] According to the Data Point, approximately 97% of California PACE transactions it examined and over 96% of Florida transactions would exceed the threshold for "higher-priced" mortgages.  *See* Data Point at 15-16.

[267] *See* proposed 12 CFR 1026.35(b)(2)(i)(E).

[268] Proposal at 30427.



*affordable mortgage credit remains available to consumers.*"[269]    Thus, Congress's
purpose was to preserve consumers' access to beneficial funding sources, while ensuring
that consumers receive such funding "on terms that reasonably reflect their ability to
repay."[270]

The proposed rule takes this narrow charge and uses it to impose an ability-to-repay
regime that is significantly more onerous than the ability-to-repay regime applicable to
mortgages, as it eliminates the regulatory safe harbors for "qualified mortgages" that the
vast majority of mortgage transactions have utilized since the Bureau's original ability-to-
repay rule went into effect.[271]  As a result, local governments will be required to comply
with ability-to-repay requirements, and assume litigation risk, that applies to only a very
small portion of the mortgage market.  The Bureau proposes this differential treatment
notwithstanding the fact that mortgages are typically orders of magnitude larger than
PACE assessments, with correspondingly larger monthly payments.

The ability-to-repay regime applicable only to non-qualified mortgages is not appropriate
for PACE assessments, which have an average size of approximately $25,000 (less than
10% of the average mortgage), are fully amortizing over the lifetime of the qualifying
improvement, have fixed interest, and do not accelerate upon default.  This is not a case,
as it was with mortgages, where "loose underwriting practices" caused a global financial
crisis.[272]  Indeed, the Bureau does not even have reliable evidence to support the notion
that homeowners are currently taking out PACE assessments that they do not have an
ability to pay.[273]

---

[269] 15 U.S.C. § 1639b(a)(1); *see also* 12 U.S.C. § 5511(a) (directing the Bureau to implement Federal
consumer financial law in a manner that will ensure consumers have access to markets for consumer
financial products and services).

[270] 15 U.S.C. § 1639b(a)(2).

[271] *See, e.g.,* Consumer Financial Protection Bureau, *Ability-to-Repay and Qualified Mortgage Rule
Assessment Report*, at 196-97 (Jan. 2019) ("The adoption of the ATR/QM rule in 2014 does not seem to
have led to the development of a private market for non-QM loans, as 94 percent of loans securitized
during this time were QM.")

[272] *See* 78 Fed. Reg. 6408 (Jan. 30, 2013).

[273] Data Point at 45 ("We do not have sufficient income information for consumers who received PACE
loans to definitively say whether making eligibility determinations based on income reduces the negative
impact of PACE.").



In fact, the evidence proves the opposite.  The California DFPI reports that in 2021 only 0.41% of PACE assessments made since the inception of PACE were in default, and that there were only seven foreclosure actions in the past three years, including homes worth $4.4 and $2.4 million—home values that suggest that the PACE assessment was likely not a contributing factor to the default.[274]  For comparison, the DFPI reports that in California, mortgage lenders completed 3,016 foreclosures in 2021, an increase of 25.8% from the 2,397 foreclosures in 2020.[275]

Nor is there any evidence to suggest that PACE assessments are leading homeowners to default on other obligations.  In 2014, the  California legislature created the California PACE Loan Loss Reserve Fund, to be administered by the California Alternative Energy and Advanced Transportation Financing Authority ("CAEATFA").[276]  Finding that "actions by federally chartered home loan entities have frustrated efforts to accelerate the implementation of the PACE financing program,"[277] CAEATFA was directed to "develop and administer a PACE risk mitigation program for PACE financing to increase its acceptance in the marketplace and protect against the risk of default and foreclosure."[278]

In response to this directive, CAEATFA created the $10 million Fund to make first mortgage lenders whole for direct losses as a result of a PACE lien in a foreclosure or forced sale.[279]  These losses include: "[l]osses resulting from the first mortgage lender's payment of any PACE assessment paid while in possession of the property[, including] penalties and interest where they have accrued through no fault of the first mortgage lender," and "[i]n any forced sale for unpaid taxes or special assessments, losses incurred by the first mortgage lender resulting from PACE assessments being paid before the

---

[274] *See* California Department of Financial Protection and Innovation, *Annual Report of Operation of Finance Lenders, Brokers, and PACE Administrators Licensed Under the California Licensing Law*, at 36, 40 (Aug. 2022) (available at https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/08/2021-CFL-Aggregated-Annual-Report.pdf).

[275] *See* California Department of Financial Protection and Innovation, *Annual Report of Activity Under the California Residential Mortgage Lending Act*, at 1, 8 (July 2022) (available at https://dfpi.ca.gov/wp-content/uploads/sites/337/2022/07/DFPI_AnnualReport_CRMLA-2021.pdf).

[276] *See* California State Treasurer, *Property Assessed Clean Energy (PACE) Loan Reserve Program* (available at https://www.treasurer.ca.gov/caeatfa/pace/index.asp).

[277] Cal. Pub. Res. Code § 26050.5.

[278] Cal. Pub. Res. Code § 26060(b).

[279] *Id.*



outstanding balance."[280]   Significantly, the California State Treasurer observed in response to a Federal Housing Finance Agency Request for Input, there were *zero* claims on the Fund from its creation in 2014 through March of 2020, results that "speak for themselves."[281]  In response to a more recent public records request for the entire history of claims made to the Loan Loss Reserve Fund, the Executive Office of the California State Treasurer responded that as of June 26, 2023, there have been two claims, one submitted on April 21, 2020 for $6,307.36, and another submitted on April 21, 2020 for $5,277.95.  Both claims were paid in full to the first mortgage lender.  This history of CAEATFA Loan Loss Reserve claims is clear evidence that PACE assessments do not contribute to default on mortgages.

Likewise, there is no evidence that PACE assessments are contributing to mortgage delinquency in Florida: as data on the Bureau's own website shows, 90-day mortgage delinquencies are at historic lows in Florida, and equivalent to the national rate.[282]  Indeed, the Bureau's own (flawed) Data Point states that PACE had an even smaller effect on mortgage delinquency rates in Florida after 2018, than in California.[283]

As discussed at length above, the Bureau's proposal relies on stale and misinterpreted data from a time period before significant State and local reforms were fully in effect, and unattributed, undated, and unverified assertions from consumer advocates.[284]

In short, the Bureau's proposal is an overreaction to a problem that does not exist.  In combination with the rest of the rule, its likely impact would be <u>not</u> to ensure that PACE assessments are available and affordable, but to severely reduce the availability of PACE financing and force consumers to rely on less regulated and more expensive products to finance home improvements, such as unsecured credit.  Worse, it would likely preempt—forever—the "tailored laws and protections" that state and local governments have already put into place, could put into place in the future, and could adjust over time, to

---

[280] Cal. Code Regs. tit. 4, § 10083.

[281] *See* Letter from California State Treasurer Fiona Ma to FHFA re: PACE Request for Input, Notice No. 2020-N-1, attached as Exhibit E.

[282] *See, e.g.,* Consumer Financial Protection Bureau, Mortgages 90 or More Days Delinquent (available at https://www.consumerfinance.gov/data-research/mortgage-performance-trends/mortgages-90-or-more-days-delinquent/) (last visited July 26, 2023).

[283] Data Point at 47.

[284] Proposal at 30408.



address concerns that homeowners are taking on too great a financial burden when agreeing to PACE assessments.  As Director Chopra has recognized, "Washington does not do markets any favors when it . . . seeks to preempt strong consumer protections enacted by" State governments.[285]

### b.  The Bureau should exempt PACE assessments subject to State law requirements that "carry out the purposes" of TILA § 129C(a).

One of the motivations for the Dodd-Frank Act's ability-to-repay provisions was the perception that State efforts to regulate mortgage lenders had been stymied by federal preemption.[286]  That has not been the case with respect to PACE assessments, which (consistent with the U.S. Constitution) have to date been subject exclusively to State regulation.  Indeed, as discussed at length above, State and local governments have already enacted laws that ensure homeowners will be able to pay the assessment, while ensuring that this valuable form of financing remains available to advance critical State interests in environmentally sustainable housing.[287]  Such laws "carry out the purposes" of TILA § 129C(a).

TILA authorizes the Bureau to defer to these state judgments, and avoid the constitutional conflict discussed above, by exempting PACE assessments that are subject to these State and local laws from TILA's ability-to-repay provisions.  Simply put, imposing a federal ability-to-repay regime that will likely preempt state and local laws "is not necessary to carry out the purposes of [TILA]."[288]  Federal laws are necessarily less

---

[285] Director Chopra Remarks – December NAAG Meeting (Dec. 7, 2021).

[286] *See, e.g.,* S. Rep. No. 111-276, at 11 ("This financial crisis was precipitated by the proliferation of poorly underwritten mortgages with abusive terms, followed by a broad fall in housing prices as those mortgages went into default and led to increasing foreclosures."); *id.* at 16-17 (discussing federal preemption of state anti-predatory lending laws leading up to the financial crisis); *see also* Director Chopra Remarks – December NAAG Meeting (Dec. 7, 2021) (expressing the view that "preemption allowed for an explosion of subprime mortgages in states with strong mortgage protections for consumers").

[287] *See supra* section III.b.

[288] 15 U.S.C. § 1603(5); *see also* 15 U.S.C. § 1604(f)(1) (authorizing the Bureau to exempt from TILA any class of transactions for which coverage "does not provide a meaningful benefit to consumers"); 15 U.S.C. § 1633 ("The Bureau shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that under the law of that State that class of



tailored to local conditions and less responsive to the impacted citizenry than State and local regulation. Furthermore, given the painfully slow rulemaking process, the CFPB is far less able to react to changes in local conditions that may warrant revisiting these rules, even if it was inclined to. By contrast, State and local governments can respond quickly to changing circumstances—for example increasingly extreme weather events that require new air conditioners, storm windows, or wildfire resistance measures or the absence of alternative financing sources in their jurisdiction—to adjust regulations to ensure that PACE financing is available to those consumers who need it and can afford it.

While exempting state regulated PACE financing from TILA altogether would preclude TILA claims for failure to comply with the state ability-to-repay regimes, it would not affect State enforcement,[289] nor would it affect existing rights to enforce Federal or State prohibitions on unfair or deceptive conduct.

    *c.*   *If the Bureau does not exempt PACE assessments that comply with State law requirements, it should create a category of "Qualified Mortgages" for such PACE assessments.*

If the Bureau declines to exempt State regulated PACE assessments from TILA's ability-to-repay obligation, it should, at a minimum, create a "qualified mortgage" safe harbor for PACE assessments that comply with State and local ability-to-repay requirements. A conclusive presumption that PACE assessments that satisfy State requirements satisfy the ability-to-repay requirements of 15 U.S.C. § 1639c(a) is consistent with similar presumptions that the Bureau has adopted for residential mortgage transactions, including presumptions for loans that qualify under standards determined by other Federal agencies,[290] and loans that qualify for purchase by the Government Sponsored Enterprises (GSE) operating under the conservatorship of the Federal Housing Finance Agency.[291]

---

transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement.").

[289] *See, e.g.,* Cal. Fin. Code § 22700 *et seq.*; Palm Beach County Code of Ordinances § 17-508; Sarasota County Code of Ordinances § 38-333.

[290] 12 CFR 1026.43(e)(4).

[291] 12 CFR 1026.43(e)(4) (2014); *see also* 78 Fed. Reg. 6408, 6587 (Jan. 30, 2013).



The Bureau could impose broad guardrails that these laws must satisfy in order to ensure that they can fairly be characterized as "carrying out the purposes" of 15 U.S.C. § 1639c(a), as it did with respect to mortgages that qualified under the "GSE patch."[292]  For example, the CFPB could ensure that appropriate property based underwriting requirements are satisfied, such as:

- no delinquency on property tax or other assessments in the past three years (or since the property was purchased);

- no existing reverse mortgages;

- homeowners are current on all mortgage debt, and not in forbearance;

- there are no existing liens on the property;

- the PACE assessment does not exceed 20% of the fair market value of the property (which can be determined through an automated valuation model that satisfies the forthcoming interagency rule on such models);

- the combined mortgage debt and PACE assessment does not exceed the market value;

- there is no evidence of recorded property-based delinquency in the past three years; and

- the term of the financing agreement does not exceed the useful life of the home improvement being installed, as determined by reputable third party sources.

As with loans made under the GSE patch, the Bureau could prohibit PACE assessments that are negatively amortizing, result in a balloon payment, or impose prepayment penalties.  Finally, the Bureau could also require a good faith determination of homeowners' ability to pay the PACE assessment based on the household income of the homeowners, as confirmed by homeowner attestation and other reputable information.[293]

---

[292] *See, e.g.,* 12 CFR § 1026.43(e)(2)(i)-(iii) (2014).
[293] PACENation Consumer Protection Principles ¶ 2.



Such minimum requirements are broadly consistent with existing State requirements and industry practices and would provide a reasonable Federal floor to ensure that homeowners have an ability to pay the PACE assessment, thereby carrying out the purposes of 15 U.S.C. § 1639c(a), while leaving to the States the discretion to impose (or not impose) additional requirements.

The Bureau has no valid basis to refuse to provide a regulatory safe harbor for PACE assessments.  As Congress recognized when it enacted TILA § 129C and numerous other provisions in the enumerated consumer laws, regulatory safe harbors both facilitate compliance and avoid the litigation and other unnecessary costs associated with uncertain compliance obligations.[294]  Indeed, Director Chopra has expressed a preference for "simple, easy to understand" rules and a desire to avoid rules that simply "increase[] compliance costs."[295]  Such unnecessary costs will have predictably negative impacts on the availability of PACE financing, just as they have with respect to the availability of non-QM mortgage loans.[296]  This is contrary to TILA § 129C(a)'s express purposes.[297]

The Bureau's basis for preliminarily determining that a regulatory safe harbor is inappropriate with respect to PACE is based on its flawed Data Point (discussed above), and the mistaken notion that "creditors originating PACE transactions may possess a uniquely strong disincentive to adequately consider" homeowners' ability to pay PACE assessments.[298]  In fact, the local governments who the Bureau would deem the "creditors" in a typical PACE assessment have a uniquely *strong* incentive to ensure that homeowners in their jurisdiction are not saddled with unaffordable PACE assessments, just as they have a uniquely strong incentive to ensure that homeowners are not saddled with unaffordable property taxes in general.  PACE assessments run with the property—

---

[294] *See* 15 U.S.C. § 1639c(b); *see also* 15 U.S.C. §§ 1640(f); 1691e(e); 1692k(e).

[295] *See* Rohit Chopra, *Rethinking the Approach to Regulations* (June 17, 2022).

[296] *See, e.g.,* Consumer Financial Protection Bureau, *Ability-to-Repay and Qualified Mortgage Rule Assessment Report*, at p. 116 (2019) ("The impact of the Rule on access to credit for non-QM borrowers derives primarily from the fact that, relative to the pre-Rule period, such originations carry an extra risk (actual or perceived) and impose extra costs for the lender, collectively referred to as "'ATR risk'[, which consist, in part, of the] risk of litigation by private parties asserting that the lender failed to assess ATR [and the] costs of complying with documentation and verification requirements of the Rule. . . .").

[297] 15 U.S.C. §§ 1639b(a); 1639c(b)(3)(B)(i).

[298] Proposal at 30413.



not the individual homeowner—and therefore local governments have a strong incentive to ensure that qualifying improvements financed by PACE assessments increase, rather than decrease, the value of property in their jurisdiction, and the economic well-being of their citizenry.   In this respect, a PACE assessment is no different from special assessments that have been used to finance sewers, sidewalks, schools, and other public improvements under State law for over three hundred years.

Further, even if it were true that the local governments providing PACE assessments do not bear significant *credit* risk, this does not in any manner differentiate them from the vast majority of mortgage originators who originate loans based on the regulatory criteria for "qualified mortgages" and investor criteria and immediately sell them to the secondary market.  Simply put, the only thing "unique" about those who extend PACE financing is that they are public officials who can be removed by their voters for failing to responsibly administer PACE programs.

Assuming the Bureau can constitutionally regulate PACE assessments at all, the Bureau has ample authority to provide a regulatory safe harbor that will facilitate compliance and avoid unnecessary costs.[299]  Its failure to do so lacks any reasonable justification.  It acknowledges that the failure to provide a safe harbor will adversely impact the availability of PACE financing but suggests—without evidence and contrary to the manifest views of State legislatures where PACE assessments have been authorized—that "many affected consumers will retain access to other forms of mortgage and non-mortgage credit that could serve the purpose of PACE-authorizing statutes, such as energy efficiency improvements."[300]   This optimism is contrary to the express findings of State legislatures,[301] and the Bureau later admits that it did not actually analyze whether consumers unable to obtain PACE financing for qualifying improvements will be able to find superior forms of financing.[302]  In short, if the Bureau finalizes a rule applying TILA §

---

[299] 15 U.S.C. §§ 1639c(b)(3)(C)(ii); 1604(a); 1640(f).

[300] Proposal at 30415.

[301] *See supra* section II.c.

[302] *See* Proposal at 30423 (referring to Part IX.D of the preamble), 129 ("Although the Bureau expects the volume of PACE transactions in Florida and other States would decline if the proposed rule were finalized, it does not have data that would indicate how much of this decline would be a cost to consumers who miss out on a transaction that they would prefer to engage in, and how much is a benefit to consumers who had no interest in participating in a PACE transaction once they understood its true nature or would not have been able to afford the PACE transaction.").



129C(a) to PACE assessments, it can and should adopt a reasonable regulatory safe harbor to ensure that homeowners who can afford PACE assessments can obtain them.

## IX. The Bureau Lacks the Authority to Subject PACE Administrators to Sections 129C and 130 of TILA

Although Congress directed the Bureau to apply section 130 of TILA to violations of its rule promulgated pursuant to section 307 of the EGRRCPA, it did not thereby authorize the Bureau to rewrite that section of TILA.  The Bureau's proposal to do so exceeds its statutory authority and should be abandoned.

Section 130 of TILA establishes a private right of action for violation of the statute by "creditors" and only by "creditors."[303]   When TILA was enacted, the term "creditor" included those who "arrange for the extension of" credit.[304]  The ambiguity over who might qualify as a creditor (and therefore be subject to TILA's civil liability provisions) proved to be a major problem during the first decade of the statute's existence.[305]  As a result, in 1980, Congress amended TILA specifically to remove the clause that extended civil liability to those who "arrange for the extension of consumer credit."[306]  It amended the statute again in 1982 to eliminate a sentence that had included, in the definition of "creditor," those who arranged credit for non-creditors.[307]   Congress intended these amendments "to eliminate confusion in 'multiple creditor' situations'" by making crystal clear that only the "creditor"—*i.e.*, "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness"—would be held liable under TILA.[308]  As one court put it, "[o]f all of the possible participants in

---

[303] 15 U.S.C. § 1640.  Assignees of creditors can be liable in certain limited circumstances.  15 U.S.C. § 1641.

[304] *See Truth in Lending Act*, Pub. L. No. 90-321, § 103(f) (1968).

[305] *See generally* S. Rep. 96-73, at 10, 1980 U.S.C.C.A.N. 280, 287 (Apr. 24, 1979) ("This section simplifies the definition of 'creditor' by specifying that it applies to a person who regularly extends credit and is the person to whom the debt is initially payable on its face.  This will eliminate confusion under the current act as to the responsibilities of assignees and 'arrangers of credit.'  The revision was recommended by the Federal Reserve Board.").

[306] *Truth in Lending Simplification and Reform Act*, Pub. L. No. 96-221, § 602(1).

[307] *See* Act October 15, 1982, Pub. L. No. 97-320, § 702(a) (1982).

[308] S. Rep. 97-536, 43, 1982 U.S.C.C.A.N. 3054, 3097 (1982); *see also Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 460 (5th Cir. 1999) (explaining that Congress sought to simplify the definition of creditor in



selling credit services and arranging for and closing consumer credit transactions, Congress has chosen to make TILA's disclosure obligations and related duties applicable only to creditors."[309]

Notwithstanding this very clear expression of Congressional intent, the CFPB now suggests that it can simply amend the statute to "substitute[e] 'PACE company' for 'creditor' each place such term appears."[310]  But only Congress can amend its own statutes,[311] and section 307 of the EGRRCPA is not, as the Bureau boldly presumes,[312] authorization to rewrite TILA's civil liability provisions.

Assuming for the moment that Congress could regulate PACE transactions at all (*but see supra* section VI), its direction to "apply Section 130 to violations" of the ability-to-repay rules does not require or even contemplate that the CFPB can undo Congress's deliberate choices to limit civil liability to TILA "creditors."  Rather, the straightforward interpretation of this provision is to make "creditors" who fail to comply with the ability-to-repay provisions liable under section 130.  In the proposal, the CFPB points out that "PACE creditors are generally government entities" and that Congress has separately made clear that "that no civil or criminal penalties may be imposed under TILA upon any State or political subdivision thereof, or any agency of any State or political subdivision."[313]  True, but this is just a feature of the "unique nature" of PACE transactions;[314] it does not authorize the Bureau to change the fundamental nature of TILA's regulatory regime.

Had Congress wanted to extend civil liability beyond "creditors," it could have amended Section 130 of TILA.  Perhaps more likely, it could have amended the definition of "creditor" in section 103(g) to specify the liability of PACE administrators, as it has

---

TILA, in part, due to the Supreme Court's decision in *Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 157-58 (1981) holding that multiple entities could be the "creditor" for a single transaction).

[309] *Robey-Harcourt v. Bencorp Fin. Co.*, 212 F. Supp. 2d 1332, 1333 (W.D. Okla. 2002), *aff'd*, 326 F.3d 1140 (10th Cir. 2003) (emphasis added).

[310] *See* Proposed § 1026.43(i)(3); Proposal at 30431.

[311] *See* U.S. Const. art. I; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

[312] Proposal at 30412-17.

[313] Proposal at 30416 (citing 15 U.S.C. § 1612(b)).

[314] 15 U.S.C. § 1639c(b)(3)(C)(ii).



previously done with respect to "card issuers" and "private educational lenders."[315]  It did neither of these things.  Or Congress could have amended section 129C itself to make clear that for purposes of applying section 130's civil liability provisions for violations of the ability-to-repay provisions, the term "PACE administrator" should be substituted for the term "creditor" each place that it appears in that section.  There is also clear precedent for this method of extending the civil liability beyond "creditors," as Congress had done precisely this for "mortgage originators" just a few years earlier:

> For purposes of providing a cause of action for any failure by a mortgage originator, other than a creditor, to comply with any requirement imposed under [15 U.S.C. § 1639b] and any regulation prescribed under this section, section 1640 of this title shall be applied with respect to any such failure by substituting "mortgage originator" for "creditor" each place such term appears in each such []section.[316]

Congress did none of these things, which is the clearest indication that—unlike mortgage originators, card issuers, or private education lenders—it did not intend for PACE administrators to be subject to civil liability.

In short, the proposal takes a straightforward and easily understood directive and infers an additional (and significant) grant of rulemaking authority that the text cannot bear.  This is error.  As the Supreme Court has repeatedly instructed, "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."[317]  The CFPB should abandon its proposal to exceed the rulemaking authority Congress has delegated to it.

The CFPB's proposal to apply the substantive ability-to-repay provisions of section 129C (15 U.S.C. § 1639c) to PACE administrators suffers from the same basic flaw.  When

---

[315] 15 U.S.C. § 1602(g).

[316] *See Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010*, Pub. L. No. 111-203, Title XIV § 1404 (codified at 15 U.S.C. § 1639b(d)).  Notably, although it chose to extend civil liability to mortgage originators, it also limited that liability.  15 U.S.C. § 1639c(d)(2).

[317] *Whitman v. Am. Trucking Ass'ns*, Inc., 531 U.S. 457, 468 (2001); *see also Sackett v. Envtl. Prot. Agency*, 143 S. Ct. 1322, 1340 (2023) ("We have often remarked that Congress does not 'hide elephants in mouseholes' by 'alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'") (citing *Whitman*, 531 U.S. at 468).



Congress has sought to impose legal obligations on entities other than "creditors," it has done so expressly.  For example, section 129B of TILA provides that "each mortgage originator shall" be licensed and disclose its NMLS ID on loan documents, and that "no mortgage originator shall receive . . . compensation that varies based on the terms of [a mortgage loan] (other than the amount of the principal)."[318]  Likewise, in section 140 of TILA, Congress imposed clear directives on "private educational lenders."[319]  Finally, Congress has imposed numerous obligations on "card issuers," in direct terms.[320]  Notably, Congress itself comprehensively defined the terms "mortgage originator,"[321] "private educational lender,"[322] and "card issuer,"[323] and has made express allowance for the civil liability of each type of entity.[324]

In sum, given this clear precedent, Congress's direction to the Bureau in section 307 of the EGRRCPA to "prescribe regulations that carry out the purposes of [15 U.S.C. § 1639c(a)] and apply [15 U.S.C. § 1640] with respect to violations" committed in the context of PACE financings cannot reasonably be construed as an invitation to extend liability beyond the entity that actually provides the financing.  In addition, its direction to "account for the unique nature of [PACE] financing" when promulgating rules is an obvious reference to the fact that PACE assessments are fundamentally different from consumer credit because they are tax assessments levied by the "State and local governments" the Bureau was required to consult when developing the rule.  That PACE administrators can be "substantially involved" in PACE financing is not "unique," but a common feature of consumer credit transactions.  EGRRCPA's amendment to TILA, therefore, provides no basis for interpreting Congress's limited grant of rulemaking authority as a warrant to rewrite the statute.

---

[318] 15 U.S.C. § 1639b(b)(1), (c)(1).

[319] 15 U.S.C. § 1650(b) ("A private educational lender may not, directly or indirectly,...."), (c) ("A private educational lender may not...."), (e) ("It shall be unlawful for any private educational lender....").

[320] *See, e.g.,* 15 U.S.C. §§ 1666g; 1665e.

[321] 15 U.S.C. § 1602(dd)(2).

[322] 15 U.S.C. § 1650(a)(7).

[323] 15 U.S.C. § 1602(o).

[324] 15 U.S.C. §§ 1602(g); 1639b(d).



## X.  The Bureau Did Not Follow Applicable Procedural Requirements

*a. The Bureau's cost-benefit analysis understates costs and overstates benefits of the proposed rule.*

Pursuant to section 1022 of the Consumer Financial Protection Act, the Bureau has provided a preliminary analysis of the benefits, costs, and impacts of the proposed rule. Unfortunately, this preliminary analysis grossly understates the costs of the proposed rule and overstates the benefits.

With respect to costs, the Bureau estimates that the rule would cut the number of PACE applications in half,[325] but this understates the impact of the proposed rule overall. The imposition of mortgage rules on PACE financing is almost certain to cause home improvement contractors to decline to provide PACE financing. For one, it is not clear that home improvement contractors would even be able to register as loan originators under California or Florida law,[326] and it is unlikely that they would be willing to abide by the requirements of these laws even if they could.[327] The seven-business-day waiting period is also likely to cause home improvement contractors to stop offering PACE financing in favor of more expensive financing options, such as personal loans. Given the significant consumer protections PACE program administrators employ to confirm the licensure, train, and monitor home improvement contractors, a decrease in PACE financing will likely have a tremendous detrimental impact on consumers.[328] No other home improvement financing option has similar contractor related consumer protections. For example, FortiFi doubts any unsecured lender will assist property owners to resolve with a contractor a leaking roof issue two years after installation. Further, the increased

---

[325] Proposal at 30422.

[326] *See supra* section VII.b.5.

[327] *See supra* n. 33.

[328] The California Department of Consumer Affairs' 2019-2020 Annual Report states that during fiscal year 2019-2020, the Contractors State License Bureau received 17,141 consumer complaints. *See* https://www.dca.ca.gov/publications/2020_annrpt.pdf. The Consumer Sentinel Network, Data Book 2020, which the FTC relies on for consumer fraud report data, reports that from 2018 to 2020, the number of consumer fraud reports in the Home Repair subcategory increased from 5,583 (0.18% of the total) to 30,337 (0.64% of the total). *See* Federal Trade Commission, *Consumer Sentinel Network, Data Book 2020*, at 87 (Feb. 2021) (available at https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2020/csn_annual_data_book_2020.pdf).



litigation risk and other costs imposed on PACE programs may cause local government sponsors to exit the program.  The Bureau bases its analysis on the experience of California following its reforms, but those reforms are more flexible and sensible than those proposed by the CFPB.

The shift from PACE financing to other forms of financing will harm consumers, who will likely have to rely on more expensive forms of financing that lack the protections applicable to PACE financing described above.  The current (fixed) interest rate for PACE financing in both Florida and California is 9.9%.  By contrast, current rates on credit cards are now averaging over 22%,[329] rates on much shorter duration personal loans are over 11%,[330] and the average (variable) rate on a home equity line of credit is currently 8.58%.[331]  Unlike with PACE financing, where APRs are "tightly bunched,"[332] rates for borrowers with damaged credit are likely far higher than these reported averages.  PACE financing also provides consumers with a financing option that does not require an upfront, often unaffordable, down payment.  As both the California and Florida legislatures found, requirements for large upfront payments often prevent consumers from pursuing qualifying improvements, to the detriment of both the State's public policy interests and the homeowners' interests.[333]  The result is that the Bureau's proposed rule will force homeowners, particularly economically vulnerable homeowners, to use products that are more expensive or forgo qualifying improvements altogether.[334]  Dispelling the media

---

[329] *See* Fed. Rsrv. Econ. Data, Fed. Rsrv. Bank of St. Louis, *Commercial Bank Interests Rate on Credit Card Plans, Accounts Assessed Interest* (July 19, 2023) (available at https://fred.stlouisfed.org/series/TERMCBCCINTNS).

[330] *See* Fed. Rsrv. Econ. Data, Fed. Rsrv. Bank of St. Louis, *Finance Rate on Personal Loans at Commercial banks, 24 Month Loan* (July 19, 2023) (available at https://fred.stlouisfed.org/series/TERMCBPER24NS).  Rates on personal loans with terms comparable to PACE financing are likely much higher.

[331] *See* Bankrate.com, *National HELOC Interest Rate Trends* (available at https://www.bankrate.com/home-equity/heloc-rates/?zipCode=02143#average-heloc) (last visited July 26, 2023).

[332] Proposal at 30418.

[333] *See supra* section II.c.

[334] Notably, while the Bureau hypothesizes that the availability of a credit file for consumers suggests that they may have other financing options, it did not actually analyze whether that financing would be available for those who could no longer obtain PACE financing on terms that were superior to PACE. Further, it acknowledges that a quarter of the homeowners who have obtained PACE financing in the three years it studied did not have a credit file.  *See* Proposal at 30423.



stories and consumer advocate complaints that PACE assessments have disproportionately negative outcomes for elderly and Black and Hispanic homeowners, the Bureau found no correlation between the effect of PACE and census tract demographics for age, race and ethnicity, including Black and Hispanic homeowners.[335] Given this finding, and the accurate interest rate data for comparable home improvement financing options, it is incumbent on the Bureau to address the economic equity costs to those communities if PACE financing is unavailable due to its proposal.

The cost to homeowners who would be forced to forego qualifying improvements to their homes should also have been quantified by the Bureau. Not only would homeowners lose out on the significant cost savings for utility bills, they would also pay higher insurance premiums (or become uninsurable) and suffer more economic loss from extreme weather events. Although the Bureau acknowledges that local government stakeholders in Florida advised that Floridians needed PACE financing to complete hurricane hardening home improvements to obtain or retain homeowners insurance and avoid forced placed insurance at higher premiums,[336] the impact of this critical fact is not considered in the Bureau's analysis.[337] The Bureau's analysis ignores the fact that for many homeowners, the investment in the eligible improvement is not an optional purchase.[338] Floridians view PACE as a critical financing option to ensure their homes are insurable within the State and their families are protected. An inability to finance hurricane hardening home improvements increases premiums and negatively impacts all Florida homeowners and all state taxpayers when homes are no longer privately insurable and become the State's responsibility. A study of PACE's impact in Florida estimates that, through November 2019, it saved homeowners approximately $1.3 billion in insurance premiums, and avoided over $1.2 billion in costs associated with natural

---

[335] Data Point at 16, 37-38.

[336] Proposal at 30423 n. 286.

[337] The Bureau also acknowledges that the data demonstrates that "roofs and disaster hardening are the most common type of project for PACE transactions in Florida." *Id.* at 30425.

[338] In Florida, to stem the tide of cancelled homeowner's policies, legislation was passed in 2022 prohibiting insurers from refusing to issue or renew a homeowner's policy insuring a residential structure with a roof less than 15 years old solely because of the age of the roof. *See* Fla. Stat. Ann. § 627.7011(5)(b). However, for homeowners with roofs over 15 years old or damaged by a hurricane, financing a roof may be a necessity, not a choice.



disasters (principally hurricanes).[339]    Similarly, a 2019 study of PACE's impact in California suggests that PACE has reduced disaster losses and insurance premiums by hundreds of millions of dollars.[340]   The proposal makes passing reference to these benefits, but fails to acknowledge that they are quantifiable (as would the costs of reduction in PACE financing) and immediately discounts them, again based on unverified "comments from consumer advocacy groups" citing instances in which homeowners allegedly "received smaller energy savings than was advertised to them."[341]

The Bureau similarly fails to recognize that foregone improvements will reduce the value of the real property.  A new roof or a new air conditioning unit can not only save on utility bills, or avoid disaster-related costs, it increases the value of most homeowners' most significant asset.  While an investment in a home will rarely be reflected in two or three subsequent years of credit data (and may even have a negative impact), it will ultimately inure to the long-term benefit of homeowners, many of whom are likely to rely on the value of this asset to fund retirement or other significant expenses.

Finally, as discussed in greater detail below, the proposal does not discuss the significant environmental benefits to both homeowners and the population generally—all of whom are "consumers"—resulting from the availability of PACE financing.  Given the extreme weather conditions in California and Florida, in addition to saving homes during catastrophic weather events such as hurricanes, heatwaves, wildfires, earthquakes, the installation of PACE eligible improvements can save the lives of property owners.[342]  As discussed above, PACE exists to advance the environmental goals of the sponsoring

---

[339] *See* Z. Oliphant, MS, T. Culhane, Ph.D,  and P. Haldar, Ph.D., MBA, *Public Impacts of Florida's Property Assessed Clean Energy (PACE) Program* (University of South Florida 2020) (available at https://www.usf.edu/pcgs/documents/pace.pdf).

[340] *See generally* Adam Rose and Dan Wei, *Impacts of the Property Assessed Clean Energy (PACE) Program on the Economies of California and Florida*, at 15 (Mar. 6, 2019) (available at http://www.schwarzeneggerinstitute.com/images/files/SI_White_Paper%20PACE_Economic_Impacts_FINAL_3_6_19.pdf).

[341] Proposal at 30423.

[342] See Los Angeles Times, *The L.A. Times investigation into extreme heat's deadly toll* (Oct. 7, 2021) (available at https://www.latimes.com/environment/story/2021-10-07/la-times-investigation-extreme-heat) (investigating the unequal distribution of cooling infrastructure in California).



State governments; by its very nature, it results in positive externalities.[343]  The Bureau's discussion of costs and benefits does not even mention these benefits, or the costs of a proposed rule that will significantly diminish them.

In contrast to its cursory and deficient analysis of the potential costs of the proposed rule, the Bureau tries valiantly—though ultimately unsuccessfully—to identify benefits to the rule.  Much of its claimed benefits are based on the flawed analysis of the Data Point. For the reasons described at length above, that report does not provide a reliable basis to conclude that mortgage delinquencies increase because of unaffordable PACE assessments, and therefore does not demonstrate that imposition of the rule will reduce late fees charged by mortgage servicers.   Similarly, while it is indisputable that "foreclosure is extremely costly" there is no evidence that PACE assessments have led to a significant number of foreclosures.  As noted in the DFPI Annual Report, there were only seven reported foreclosures of California homes with PACE assessments in the years 2019 to 2021, and there is no basis to conclude that those foreclosures were caused by a PACE assessment that the homeowner could not afford, as opposed to some other cause (such as illness, lost employment, divorce, etc.).[344]  Further, direct evidence from the California's CAEATFA PACE Reserve Fund suggests that PACE assessments do not result in foreclosure,[345] contrary to the CFPB's speculation otherwise.[346]

Finally, the Bureau speculates, without a shred of empirical evidence, that consumers who refinanced or prepaid their assessments, did so, even in part, because they did not understand the PACE transaction.  The fact that the Bureau arbitrarily assigned a 10% likelihood of early repayments to consumer confusion so that it could concoct a $4.4 million benefit demonstrates, again, an inherent bias in the proposed rule.  This baseless speculation ignores a fact the Bureau is well aware of — during the relevant time period, homeowners took advantage of unprecedentedly low mortgage rates to refinance existing

---

[343] *See, e.g.,* Fla. Stat. Ann. § 163.08(1)(b) ("[T]he installation and operation of qualifying improvements not only benefit the affected properties for which the improvements are made, but also assist in fulfilling the goals of the state's energy and hurricane mitigation policies.").

[344] DFPI Annual Report at 46.

[345] *See* Letter from California State Treasurer Fiona Ma to FHFA re: PACE Request for Input, Notice No. 2020-N-1, *supra* n. 281.

[346] Proposal at 30420.



debt.[347]   If consumers paid off PACE transactions early, particularly in 2020 as the Bureau's data suggests, it is because mortgage rates were at historic lows, fueling a refinance boom, not because consumers did not understand the transaction.[348]   Further, as described at length above, existing California law and industry practices are far superior to the Bureau's proposed rule for ensuring consumer understanding of PACE transactions.   The proposed rule's ATR provisions and its disclosure provisions will not advance consumer understanding or affordability.

b.  *The Bureau was required to convene a Small Business Review Panel before issuing the proposed rule.*

Under the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), the Bureau must convene and chair a Small Business Review Panel if it is considering a proposed rule that would have a significant economic impact on a substantial number of small entities ("SISNOSE").[349]   The Bureau's certification that this proposed rule would not have a SISNOSE is fundamentally flawed.

First, the Bureau assumes that the proposed rule would not have a SISNOSE on small governmental entities because "only about 11.6 percent of small government entities" nationwide are in states with active PACE programs.[350]   The Bureau reasons that 2,000 small government entities is not a substantial number (relative to the total number of small government entities nationwide), and that even for those entities the impact on revenue will not be significant.   This analysis seriously underestimates both the number of small government entities potentially affected and the economic impact.   First, while residential PACE is currently active in only three states it has been authorized in many more.   The Bureau should consider the impact on local governments who would likely have adopted PACE programs, but for the Bureau's rule.   Further, even aside from PACE, the proposed change to the commentary has potentially far broader impacts on local government

---

[347] See *CFPB Annual Report of 2021 Mortgage Market Activity Reveals an End to the Refinancing Boom and an Increase in Home Purchase Loans* (Sept. 19, 2022) (available at https://www.consumerfinance.gov/about-us/newsroom/cfpb-annual-report-2021-mortgage-market-activity-end-to-refinancing-boom).

[348] The DFPI Annual Report reveals that there was a single (unverified) complaint relating to the advertisement of PACE in 2021.

[349] 5 U.S.C. § 609(b).

[350] Proposal at 30429.



entities.[351]  As the National League of Cities and National Association of Counties have already commented, the proposed change to TILA's commentary "will have broad implications for local governments."[352]

The Bureau suggests that the economic impact will not be significant because elimination of PACE would not significantly impact local government revenues.[353]  This too narrowly construes the economic impact of the proposed rule.  For those local entities that sponsor PACE programs, elimination of the program due to the rule will not merely eliminate a potential revenue stream, it would eliminate a program designed specifically to encourage homeowners to invest in home improvements that serve public interests.  The proposed rule's detrimental impact on these public interests—in water and energy conservation, hurricane hardening, seismic strengthening, and wildfire resistance—will have a significant adverse economic effect, focused on the communities in which PACE is authorized (but will be effectively eliminated by the proposed rule), but extending to other communities in surrounding areas.[354]  This detrimental environmental impact would result in adverse economic impacts on small governmental entities, who will bear significant costs in the wake of natural disasters, costs that could have been ameliorated through qualifying improvements financed through PACE.

The proposed rule would also eliminate the secondary benefits of PACE financings, including increased revenue and employment for home improvement contractors and others involved in the production and installation of qualifying home improvements.[355]  Finally, the change in commentary could have economic impacts beyond residential PACE programs and impose significant costs on local government entities that impose special assessments, with the consent of homeowners, to advance myriad public projects.

---

[351] *See supra* section VII.b.1.

[352] *See* Joint Comment of National League of Cities and National Association of Counties (June 21, 2023).

[353] Proposal at 30429.

[354] *See generally* Adam Rose and Dan Wei, *Impacts of the Property Assessed Clean Energy (PACE) Program on the Economies of California and Florida* (Mar. 6, 2019) (available at http://schwarzenegger.usc.edu/institute-in-action/article/impacts-of-the-property-assessed-clean-energy-program-on-the-economies-of-c).

[355] *Id.*



The single paragraph of the preamble that discusses the proposed rule's potential impact on home improvement contractors is similarly flawed. The Bureau reasons that, even if all home improvement contractors that currently offer PACE experienced a significant economic impact, the number of impacted contractors relevant to the number across the country "would be less than three percent of all relevant small entities, and so not a substantial number."[356] But SBREFA does not ask agencies to consider whether the number of small entities impacted by a rule is "substantial" relevant to an arbitrary denominator, but whether the rule would impact "a substantial number of small entities."[357] As the Small Business Administration's Office of Advocacy ("SBA") stated, "by relying on all home improvement contractors, the CFPB has used the incorrect denominator to determine whether the rulemaking will impact a substantial number of small entities. Instead of using the 233,000 small home improvement contractors as the universe of potentially regulated small entities, the CFPB should have used the number of small home improvement contractors that participate in the PACE program."[358] In this respect, several thousand small home improvement contractors, as well as countless other small entities that will be indirectly impacted by the proposed rule, is a "substantial number."

In short, the certification that the proposed rule will not result in a SISNOSE relies upon an arbitrarily narrow articulation of the impact of the rule, and undermines the purposes of SBREFA, which is to ensure that the Bureau is informed of the impacts of its rules on small entities. FortiFi agrees with the SBA's conclusion that "[t]he CFPB circumvented the requirements of the [SBREFA] by not providing an adequate factual basis to support its certification."[359] The Bureau's failure to abide by the requirements of SBREFA is yet another reason why the proposed rule must be withdrawn.

    *c. The Bureau did not comply with the National Environmental Policy Act.*

The National Environmental Policy Act ("NEPA") requires all federal agencies to include a detailed draft environmental impact statement ("EIS") in any proposed rule that, if

---

[356] Proposal at 30429.

[357] 5 U.S.C. § 609(a).

[358] Comment from U.S. Small Business Administration Office of Advocacy (July 24, 2023).

[359] *Id.*



adopted, would significantly impact the human environment.[360]   The proposed rule will have significant adverse effects on the availability of PACE financing, which will, in turn, have a significant adverse impact on the human environment.  State legislatures have authorized PACE programs in order to advance the States' public interest in water and energy conservation, clean energy, seismic strengthening, hurricane hardening, and wildfire resistance.[361]   And PACE financing has, to date, significantly advanced these interests.[362]   For example, the California State Treasurer's website displays enrolled PACE administrators' estimates regarding the environmental impact of PACE funded improvements through June 30, 2020, which demonstrates the hundreds of millions of kWH saved, the hundreds of millions of kWH generated, the millions of metric tons of $CO_2$ saved, the millions of therms saved, and the hundreds of millions of gallons of water conserved in California due to PACE financing.[363]   Likewise, a study of PACE's environmental impacts in Florida estimated that, through November 2019, PACE funded qualifying improvements had saved 960 million kWh of electricity (the equivalent of powering over 78,000 homes for a year), saved 480 thousand cubic feet of natural gas, prevented over 500 thousand metric tons of greenhouse gas (the equivalent of removing 114,000 passenger vehicles for a year), and resulted in the installation of 14 megawatts of solar capacity.[364]

As the Natural Resources Defense Council (NRDC) stated in response to the ANPR, the home improvements financed through PACE programs are "important both to curbing global warming pollution and lowering consumer energy bills."[365]   NRDC suggested that

---

[360] 42 U.S.C. § 4332(c); 4336a(c); 40 CFR 1502.5(d).

[361] *See supra* section II.c.

[362] *See, e.g.,* PACENation, *A PACE Enabled World*, at 13-14 (2021) (estimating that residential PACE financing has already reduced energy consumption by 25 billion kWh and carbon consumption by 7 million metric tons, and estimating that the potential impact could be orders of magnitude larger) (available at https://paceenabledworld.pacenation.org/PACENation_Databook_2021.pdf).

[363] California State Treasurer, *Property Assessed Clean Energy (PACE) Loss Reserve Program* (available at https://www.treasurer.ca.gov/caeatfa/pace/activity.asp).

[364] *See* Z. Oliphant, MS, T. Culhane, Ph.D,  and P. Haldar, Ph.D., MBA, *Public Impacts of Florida's Property Assessed Clean Energy (PACE) Program* (University of South Florida 2020) (available at https://www.usf.edu/pcgs/documents/pace.pdf).

[365] *See* Natural Resources Defense Council, *Comment in Response to Advance Notice of Proposed Rulemaking on Residential Property Assessed Clean Energy Financing; Docket No. CFPB - 2019-0011* (March 2019).



"[t]o limit and avoid the worst impacts of climate change, we need to *encourage* states and localities to use financing tools such as PACE to accelerate the deployment of energy efficiency and renewable energy."   Unfortunately, the Bureau has proposed to do the opposite.

The elimination or significant reduction of residential PACE financing that would occur if the rule is adopted would have significant and "reasonably foreseeable environmental effects."[366]   NEPA requires the Bureau to assess these impacts, after consultation with other agencies that have expertise on these issues, so that it can consider alternatives that will be less damaging to the environment.[367]   The Bureau failed to comply with the NEPA, indeed it failed to address the environmental impacts of its proposal at all.  It must withdraw its proposal, draft an EIS (after appropriate consultation), and publish a draft EIS that accompanies any new proposed rule.

## XI. Conclusion

For the foregoing reasons, FortiFi respectfully requests that the Bureau withdraw the proposed rule and reconsider its approach to implementing Section 307 of the EGRRCPA after an adequate consideration of (1) PACE financing as it is currently regulated and administered, (2) constitutional and statutory limitations on the Bureau's authority, and (3) the costs and benefits of any new proposal, including specifically to small entities and the environment.  The Bureau should also conduct a new, updated analysis of the impacts of PACE financing on homeowners, using appropriate data and methodology, and with a full consideration of the costs and benefits.

Sincerely,

Christopher A. Nard
Chief Executive Officer
FortiFi, Inc.

---

[366] 42 U.S.C. § 4332(c).

[367] *Id.*

# EXHIBIT A



# FortiFi

| | |
|---|---|
| Phone | 1 858 345 2000 |
| Email | info@fortifi.com |
| Address | 200 Spectrum Center Drive Suite 1470 Irvine, CA 92618 |
| | www.fortifi.com |

e3_fin_docs 0A87B2BA v1 r1

# FortiFi Financial

## Smart Financing for a sustainable future

Thank you for choosing FortiFi Financial ("FORTIFI"), the smart choice for financing your home improvements.

The CSCDA PACE (Property Assessed Clean Energy) program is an innovative public-private partnership, designed to improve communities by providing low cost financing for energy efficiency, water conservation and seismic improvements. The process is simple: work with the contractor you have selected to determine which improvements you want, FORTIFI provides the financing and you make payments as part of your property taxes over the useful life of the improvements. Payment for your improvements will be made directly to the contractor after you advise FORTIFI that the improvements are complete.

## Instructions

1. Sign Financing Documents
2. Install Improvements
3. Sign Completion Certificate
4. Enjoy Your Improvements
5. Tell Your Friends!

## Contents

Financing Estimate and Disclosure

Additional Information Regarding Your Financing

Contact List

Assessment Contract

Exhibit A: Property Information, Contact Information, List of Documents

Exhibit B: Project Definition

Exhibit C: Addendum to Assessment Contract

Exhibit D: Federal Housing Financing Agency Acknowledgement

Exhibit E: Right to Cancel

# Financing Estimate and Disclosure

Notice to Property Owner: Existing law requires that a printed paper copy of this document be provided to you before reviewing and signing, unless you opt out, in writing, to that printed copy by signing a printed paper document. If you opt out of receiving a printed paper copy of this disclosure, an electronic copy will be provided to you. The financing arrangement described below will result in an assessment against your property which will be collected along with your property taxes and will result in a lien on your property. You should read and review the terms carefully, and if necessary, consult with a tax professional or attorney. This financing is a contractual assessment and not a loan. As such, references to "simple interest," "principal," "annual percentage rate (APR)," are for illustrative purposes only and should not be construed as a description of a loan.

We advise you to print, read and save a physical and digital copy of these documents. You may request a printed copy of the Assessment Contract or the Financing Estimate and Disclosure at any time by calling FortiFi's customer service at the number below.

## Customer Service Toll-Free telephone number and email:

In the event you have a consumer complaint, questions about your financing obligations related to the contractual assessment or your contractual rights under the terms of this contract, you can contact either this toll-free telephone number or email address provided below and receive a response within 24 hours or one business day.

Toll-Free telephone number: 1 (844) 622 5533

Customer service email address:

compliance@fortifi.com

Address:        200 Spectrum Center Drive Suite 1470

                Irvine, CA 92618

## Property and Application Information

| | |
|---|---|
| Owners | ██████████████████████ |
| Address | ██████████████████████ |
| APN | ██████████ |
| Transaction # | █████████████ |
| Application Date | 01/29/2022 |
| Pre-NTP Expiration Date | 07/28/2022 |
| Estimated Recording Date | 01/29/2022 |
| Estimated First Payment Date | 11/01/2022 |

## Products and Costs

| | |
|---|---|
| Product Costs<br>(Including labor and installation) | $30,744.26 |
| Description | 1.  Energy Star Window<br>NFRC & Energy Star certified window |

## Financing Costs

| | |
|---|---|
| Application fees and costs | $0.00 |
| Estimated Capitalized Interest | $1,010.34 |
| Pre-paid Interest (Points) | $0.00 |
| Other Costs<br>(See Other Costs below) | $2,225.90 |
| Total Amount Financed | $34,220.50 |
| Term | 25 years |
| Annual Percentage Rate (APR) | 5.85% |
| Simple Interest Rate | 4.99% |
| Estimated Annual Administrative Fees | $95.00/year |
| Estimated Annual Payment Amount*<br>(Estimated Annual Principal, Interest, and Administrative Fees) | $2,520.60 |

*Note: If your property taxes are paid through an impound account, your mortgage lender may apportion the amount and add it to your monthly payment.

| | |
|---|---|
| Total Amount Paid Over Life of Financing<br>(The total amount you will have paid over the life of the financing after you make all payments including principal, interest, costs, and fees) | $63,014.76 |

## Other Costs

| | |
|---|---|
| Appraisal Fees | $0.00 |
| Bond Related Costs<br>(Deposit for debt servicing on related bond) | $0.00 |
| Estimated Closing Costs<br>(For origination and program administration) | $2,225.90 |
| Credit Reporting Fees | $0.00 |
| Recording Fees<br>(Fee paid to your County to record and process your Assessment) | $240.00 |
| Total Other Costs | $2,465.90 |

## Total Financing Costs and Closing Costs

Total Financing Costs and Closing Costs                    $63,014.76
(Product costs, Financing and Other costs)

Estimated Cash (out of pocket) to close                    $0.00

## Other Terms

Prepayment Fee                    ☐ Yes    ☒ No

## Additional Information About These Financing Comparisons

(Use this information to compare to other financing options)

Estimates over the term of the financing.

Principal you will have paid off                    $30,744.26

Amount of interest you have paid                    $27,429.60

Amount of financing and other costs                    $4,840.90

Total you will have paid                    $63,014.76

Annual Percentage Rate (APR)                    5.85%

Total Interest Paid                    43.57%
(as a percentage of all the payments you have made)

## Other Important Considerations

Sale or Refinancing



I understand that I may be required to pay off the remaining balance of this obligation by the mortgage lender refinancing my home. If I sell my home, the buyer or their mortgage Lender may require me to pay off the balance of this obligation as a condition of sale.

## Monthly Mortgage Payments

Your payments will be added to your property tax bill. Whether you pay your property taxes through your mortgage payment, using an impound account, or if you pay them directly to the tax collector, you will need to save an estimated $1,260.30 for your first tax installment. If you pay your taxes through an impound account you should notify your mortgage lender, so that your monthly mortgage payment can be adjusted by your mortgage lender to cover your increased property tax bill.



## Tax Benefits

Consult your tax adviser regarding tax credits, credits and deductions, tax deductibility, and other tax benefits available. Making an appropriate application for the benefit is your responsibility.



## Statutory Penalties

If your property tax payment is late, the Amount due will be subject to a 10% penalty, late fees, and 1.5% per month interest penalty as established by state law, and your property may be subject to foreclosure.

## Right to Cancel

If you are under the age of 65, you, the property owner, may cancel the contract at any time on or before midnight on the third business day after the date of the transaction to enter into the agreement without any penalty or obligation.

If you are 65 years old or older, you, the property owner, may cancel the contract at any time on or before midnight on the fifth business day after the date of the transaction to enter into the agreement without any penalty or obligation.

To cancel this transaction, you may mail or deliver a signed and dated copy of the contract with notice of cancellation to:

FortiFi Financial, Inc.
200 Spectrum Center Drive Suite 1470
Irvine, CA 92618

You may also cancel the contract by sending notification of cancellation by email to the following email address:
underwriting@fortifi.com.



## Confirmation of Receipt

This confirms the receipt of the information in this form. You do not have to accept this
financing just because you acknowledge that you have received or signed this form, and it is
NOT a contract.

Identity verification code            8BCB9D70          Date          1/29/2022

Identity verification code            78BB52D5          Date          1/29/2022

# Additional Information Regarding Your Financing

## Understanding what can change at Settlement

The Financing Estimate and Disclosure Statement above estimates your settlement charges based on an Assessment Recording date on or before June 30, 2022. If your Assessment is recorded on or before June 30, 2022 your first payment will be included on your November 2022 property tax bill. IF YOUR ASSESSMENT IS RECORDED AFTER JUNE 30, 2022, YOUR FIRST PAYMENT WILL BE INCLUDED ON YOUR NOVEMBER 2023 PROPERTY TAX BILL. IN ADDITION, THE AMOUNT OF CAPITALIZED INTEREST YOU OWE WILL INCREASE AND YOUR ANNUAL PAYMENT WILL ALSO INCREASE. ACTUAL AMOUNTS WILL BE CALCULATED BASED ON THE ACTUAL RECORDING DATE OF YOUR ASSESSMENT AND WILL BE LISTED IN THE FINAL COST AND PAYMENT SUMMARY.

Items that Cannot Increase at settlement

- Interest Rate
- Amount Financed
- Recording Fee
- Reserve Deposit

Items that Can Increase at settlement

- Closing Costs
- Capitalized Interest

## What you should know before hiring a contractor

By law, anyone in California who contracts for or bids on a construction project valued at $500 or more (combined labor and material costs) must be licensed by the Contractors State License Board (CSLB). To qualify for a license, a contractor must verify four years of journey-level experience in the trade, pass both a trade and license law and business examination, and post a license bond. Since 2005, all new contractors have been required to pass a criminal background check. Contractors are required to put their CSLB license number in all advertisements. Ask to see the contractor's plastic pocket license and photo identification.

## Construction Project Checklist

- Check the contractor license number at www.cslb.ca.gov to make sure it is current and in good standing
- Ask to see the contractor's pocket license and a current photo ID
- Ask for a list of current contact information (telephone number and business address) for the contractor, subcontractors, and suppliers
- Find out from your local building department whether your project needs a building permit and confirm that your contractor will obtain all necessary permits
- Get at least three contractor bids and references, and check out, in person, each prospective contractor's recent similar projects
- Ask whether your contractor carries general liability insurance for employees in case accidental damage occurs during the project, and workers' compensation insurance for employees

- Make sure all project materials and expectations are spelled out and signed in a written contract, including clean-up, debris removal, and site security
- Ask your contractor if he or she understands your project expectations
- Schedule and document each phase of your project and the corresponding payment schedule. Do not let payments get ahead of the work
- Pay no more than 10% down or $1,000, whichever is less. There is an exception to this rule for contractors who have filed a blanket performance and payment bond with CSLB's Registrar. This information is noted on the contractor's license detail page on CSLB's website
- Avoid paying in cash
- Keep all of your project documents, including payments and photographs, in a job file
- Try researching your contractor's name online for additional reviews

## Questions

If you have questions about the financing terms or costs on this form, contact FortiFi Financial at:

| | |
|---|---|
| Phone | 1 844 622 5533 |
| Fax | 1 844 622 5533 |
| Email | info@fortifi.com |
| Address | 200 Spectrum Center Drive Suite 1470 |
| | Irvine, CA 92618 |
| | www.fortifi.com |

# Contact List

Below is a list of contacts you can reach out to with questions regarding your PACE Financing.

## FortiFi Financial Inc. Contact Information

| | |
|---|---|
| Phone | (844) 622-5533 |
| Fax | (844) 622-5533 |
| Email | info@fortifi.com |
| Address | 200 Spectrum Center Drive Suite 1470 Irvine, CA 92618 |
| | www.fortifi.com |

## Contractor Contact Information

| | |
|---|---|
| Representative | ████████████ |
| Phone | ██████████ |
| Email | ████████████████ |

## Department of Financial Protection and Innovation Contact Information

| | |
|---|---|
| Email | ask.dfpi@dfpi.ca.gov |
| Website | www.dfpi.ca.gov |
| Consumer Services Toll Free Number | (866) 275-2677 |

████████████

# Assessment Contract

## CALIFORNIA STATEWIDE COMMUNITIES DEVELOPMENT AUTHORITY OPEN PACE PROGRAM

THIS ASSESSMENT CONTRACT (this "Contract"), dated as of Jan. 29, 2022, is by and between the California Statewide Communities Development Authority (the "Authority"), and the record owners, ███████ ████████████████████ (the "Property Owner") of the fee interest in the real property described on Exhibit A (the "Property").

## RECITALS

WHEREAS, the Authority is a joint exercise of powers authority, the members of which include numerous cities and counties in the State of California;

WHEREAS, the Authority has established the California Statewide Communities Development Authority Open PACE Program (the "Program") to allow the financing or refinancing of certain distributed generation renewable energy sources, energy efficiency improvements, water conservation improvements, seismic strengthening improvements, electric vehicle charging infrastructure and such other work, infrastructure or improvements as may be authorized by law from time to time that are permanently fixed to real property (the "Authorized Improvements") through the levy of contractual assessments pursuant to Chapter 29 of Part 3 of Division 7 of the California Streets & Highways Code ("Chapter 29") and the issuance of improvement bonds under the Improvement Bond Act of 1915 (California Streets and Highways Code Section 8500 and following) (the "1915 Act") upon the security of the unpaid contractual assessments;

WHEREAS, Chapter 29 provides that assessments may be levied under the provisions thereof only with the free and willing consent of the owner of each lot or parcel on which an assessment is levied at the time the assessment is levied pursuant to a contract between the property owner and the public agency;

WHEREAS, the Authority has conducted the proceedings required by Chapter 29 with respect to the territory within the boundaries of the City or County identified in Exhibit A (the "Participating Entity");

WHEREAS, the Authority has appointed FortiFi Financial, Inc., as a program administrator (together with any successors thereto, the "Program Administrator") for the Program as it pertains to this Contract;

WHEREAS, the Property is located in the boundaries of the Participating Entity, and the Participating Entity has consented to (a) owners of property within its jurisdiction (the "Participating Property Owners") participating in the Program and (b) the Authority conducting assessment proceedings under Chapter 29 and issuing bonds under the 1915 Act to finance or refinance the Authorized Improvements; and

WHEREAS, pursuant to Chapter 29, the Authority and the Property Owner desire to enter into this Contract, pursuant to which the Property Owner will agree to pay an assessment in order to finance or refinance the installation of the Authorized Improvements described in Exhibit B (the "Improvements") and the Authority will agree to provide financing, all on the terms set forth in this Contract;

APP-2022-01-29

NOW, THEREFORE, in consideration of the foregoing and the material covenants hereinafter contained, the Property Owner and the Authority formally covenant, agree and bind themselves and their successors and assigns as follows:

## AGREEMENT

### 1. Purpose.

The Property Owner and the Authority are entering into this Contract for the purpose of financing or refinancing the installation of the Improvements identified on Exhibit B.

### 2. The Property.

This Contract relates to the Property, which is described on Exhibit A. The Property Owner has provided to the Authority evidence that the Property Owner is the owner of the fee interest in the Property and possesses all legal authority necessary to execute this Contract. The Property Owner agrees not to suffer or permit any change in such ownership or legal authority prior to completion of the Improvements.

### 3. Assessment; Bonds; Installment; Prepayment; Collection.

(a) The Assessment. The Property Owner hereby freely and willingly agrees that an assessment in the amount specified in Exhibit B (the "Assessment") shall be levied by the Authority on the Property pursuant to Chapter
29. The Assessment set forth in Exhibit B is an estimate only and will be modified and finalized by means of an Addendum to this Contract in substantially the form set forth as Exhibit C hereto (the "Addendum") upon completion of the Improvements. If no Addendum is required, then the estimated Assessment set forth in Exhibit B shall become the final Assessment upon completion of the Improvements. The amount of the Assessment shall be the amount specified in Exhibit B, or the Addendum as applicable, which includes an amount to pay the costs of the Improvements, an amount to pay administrative, recording, and other fees and, if so, specified in Exhibit B, or the Addendum as applicable, an amount for capitalized interest on bonds to be issued. The Property Owner acknowledges and agrees that the amount of the Assessment does not exceed the special benefit conferred on the Property by the installation of the Improvements thereon.

(b) Bonds. The Authority hereby determines that serial bonds, term bonds or both (the "Bonds") shall be issued as provided in the 1915 Act to represent and be secured by the Assessment to pay the cost of the Improvements. The principal and interest on the Bonds shall be repaid by the Assessment. The per annum interest rate borne by the Bonds shall not exceed the Maximum Interest Rate specified in Exhibit B. The final maturity date of the Bonds shall be no later than the Final Maturity Date specified in Exhibit B.

(c) Interest; Assessment Installments. Interest on the Assessment shall begin to run from the date upon which the contractor selected by the Property Owner ("Contractor") and the Property Owner have signed the certificate of completion ("Completion Certificate"), and shall be computed at the Maximum Interest Rate. For the period of time between when the Completion Certificate is signed by the Property Owner and Sept. 2, 2047 ("Bond Maturity Date"), the accrued interest will be calculated at the Maximum Interest Rate. Interest accrued for the period of time between when the Completion Certificate is signed by the Property Owner and Sept. 2, 2022 will be capitalized and included in the amount of the Assessment ("Capitalized Interest"). In the event the Assessment is not recorded on or before the current tax roll deadline, as defined below, the bond maturity year will be in 2048. The unpaid Assessment shall be payable in annual installments, with interest, corresponding in number and in a proportionate amount to the number of installments and principal amount of Bonds maturing or becoming subject to mandatory prior redemption in each year, and collected from the Property Owner at the same time and the same

APP-2022-01-29

manner and in the same installments as the general taxes on the real property are payable, as provided in subsection (e) below. An annual proportion of the Assessment shall be payable in each fiscal year preceding the date of maturity or mandatory prior redemption date of each of the Bonds, sufficient to pay the pro rata share of the Bonds when due.

(d)  Tax Roll Deadline. The Program Administrator's deadline for placing the assessment on the property tax roll is June 30, 2022 ("Current Tax Roll Deadline"). If the Completion Certificate is signed after the Current Tax Roll Deadline interest will continue to accrue from the date the Completion Certificate is signed until the following Sept. 2, 2023, which will result in additional Capitalized Interest being due and an increased annual Assessment amount.

(e)  Collection. The annual proportion of the Assessment coming due in any year, together with the annual interest thereon, shall be payable by the Property Owner in the same manner and at the same time and in the same installments as the general taxes on real property are payable, and have the same priority, become delinquent at the same time and in the same proportionate amounts and bear the same proportionate penalties and interest after delinquency as do the general taxes on real property.

(f)  Administrative Expenses. In addition to the annual installment of the Assessment described in subsection (c) of this Section, the Authority shall, in accordance with and subject to the limitations contained in Section 8682 and Section 8682.1 of the 1915 Act, add thereto amounts in order to pay for the costs of collecting the Assessment, the annual administration of the Assessment, the annual administration of the Bonds, recording fees and other administrative costs (the "Annual Assessment Administrative Fee").

(g)  Prepayment of the Assessment. The Assessment may be prepaid, in whole or in any amount of at least $2,500 , at any time upon the payment of (i) the amount of any delinquent installments of principal or interest on the Assessment, together with penalties accrued to the date of prepayment, plus (ii) the whole or a portion of the unpaid non-delinquent principal of the Assessment (the "Assessment Prepayment Amount"), plus (iii) interest on the Assessment Prepayment Amount to the earlier of March 2 or September 2 occurring at least 50 days following the date the prepayment is made, plus (iv) an amount equal to the redemption premium, if any, necessary to redeem the principal amount of Bonds corresponding to the amount of the Assessment Prepayment Amount, plus (v) a reasonable fee, if charged by the Authority or Program Administrator, for the cost of administering the prepayment and the redemption of bonds.

(h)  No Reduction or Offset. The Property Owner hereby acknowledges and agrees that the Assessment will not be subject to reduction, offset or credit of any kind in the event that the Improvements fail to perform in any way or for any reason.

APP-2022-01-29

4.  Lien; Penalties; Foreclosure.

(a)  Lien. The Assessment, and each installment thereof and the interest and penalties thereon shall constitute a lien against the Property until they are paid, which lien shall be coequal to and independent of the lien for general taxes.

(b)  Penalties. The Property Owner acknowledges and agrees that if any Assessment installment is not paid when due, the county tax collector will assess a 10 percent (10%) penalty and may assess related costs, as required by state law. If the delinquent payment continues past June 30 of a given year and defaults, the county tax collector will assess penalties at the rate of 1 ½ percent (1.5%) per month (18 percent (18%) per year).

(c)  Foreclosure. The Property Owner acknowledges and agrees that if any Assessment installment is not paid when due, the Property is subject to a tax sale per applicable law. Alternatively, the Authority has the right to have such delinquent installment and its associated penalties and interest stripped from the secured property tax roll and immediately enforced through a judicial foreclosure action that could result in a sale of the Property for the payment of the delinquent installments, associated penalties and interest, and all costs of suit, including attorneys' fees. The Property Owner acknowledges that the Authority may obligate itself, through a covenant with the owners of the Bonds, to exercise its judicial foreclosure rights with respect to delinquent Assessment installments in the manner and within the time frame specified in such covenant.

5.  Financing or Refinancing of the Improvements.

The parties hereby agree that the net proceeds of the Bonds allocable to the Assessment shall be used to finance or refinance the Improvements.

6.  Term; Contract Runs with the Land; Division.

(a)  Except as otherwise set forth in this Contract, this Contract shall expire upon the final payment or prepayment of the Assessment.

(b)  This Contract establishes rights and obligations that are for the benefit of the Property and, therefore, such rights and obligations run with the land pursuant to Civil Code Section 1462.

(c)  The obligation to pay the Assessment is an obligation of the Property and no agreement or action of the Property Owner shall be competent to impair in any way the Authority's rights, including, but not limited to, the right to pursue judicial foreclosure of the Assessment lien or the right to enforce the collection of the Assessment or any installment thereof against the Property.

(d)  In the event the Property is divided while the Assessment remains unpaid and all of the special benefit of the Improvements remain with one subdivided parcel, then such parcel shall be apportioned 100% of the Assessment. In the event the Property is divided while the Assessment remains unpaid and all of the special benefit of the Improvements does not remain with one subdivided parcel, then the Assessment shall be prepaid in accordance with the terms hereof.

7.  Recordation of Documents.

The Authority shall record or cause to be recorded in the office of the County Recorder the various notices  and other documents required by Chapter 29 and other applicable laws to be recorded against the Property.

8.  Notice.

To the extent required by applicable Law, the Property Owner shall provide written notice to any subsequent purchaser of the Property, or a portion thereof, of the obligation to pay the Assessment.

9.  Waivers, Acknowledgment and Contract.

(a)  Since the Assessment is voluntary and imposed, in accordance with Chapter 29, pursuant to this Contract, the Property Owner hereby waives any otherwise applicable requirements of Article XIIID of the California Constitution, or any other provision of California law, for an engineer's report, notice, public hearing, protest or ballot.

(b)  The Property Owner hereby waives its right to repeal the Assessment by initiative or any other action, or to file any lawsuit or other proceeding to challenge any aspect of the Assessment or any aspect of the proceedings of the Authority undertaken in connection with the Program. The Property Owner hereby agrees that the Property Owner and its successors in interest to fee title in the Property shall be solely responsible for the installation, operation and maintenance of the Improvements. The Property Owner hereby acknowledges that the Property will be responsible for payment of the Assessment regardless of whether the Improvements are properly installed, operated, maintained or perform as expected.

(c)  The Property Owner hereby agrees that the Authority is entering into this Contract solely for the purpose of assisting the Property Owner with the financing or refinancing of the installation of the Improvements, and that neither the Authority nor the Participating Entity has any responsibility of any kind for, and shall have no liability arising out of, the installation, operation, financing, refinancing, maintenance or performance of the Improvements. The Property Owner hereby waives the right to recover from and fully and irrevocably releases the Authority, the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives and successors and assigns of the Authority and the Participating Entity from any and all losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out-of-pocket litigation costs and reasonable attorney's fees), relating to the subject matter of this Contract that the Property Owner may now have or hereafter acquire against the Authority, the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives and successors and assigns of the Authority or the Participating Entity.

(d)  To the extent that the foregoing waivers and agreements are subject to Section 1542 of the California Civil Code or similar provisions of other applicable law, it is the intention of the Property Owner that the foregoing waivers and agreements will be effective as a bar to any and all losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out-of-pocket litigation costs and reasonable attorney's fees), of whatever character, nature and kind, known or unknown, suspected or unsuspected, and Property Owner agrees to waive any and all rights and benefits conferred upon the Property Owner by the provisions of Section 1542 of the California Civil Code or similar provisions of applicable law. Section 1542 reads as follows:

APP-2022-01-29

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

BY INITIALING BELOW, OWNER HEREBY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE MATTERS WHICH ARE THE SUBJECT OF THE FOREGOING WAIVERS AND



RELEASES.

(e) Property Owner hereby represents that the total amount of all current annual property taxes and assessments on the Property, including the Assessment, does not exceed five percent (5%) of the Property's current market value.

(f) The waivers, releases, representations and agreements set forth in this Section shall survive termination of this Contract.

## 10. Indemnification

(a) The Property Owner agrees to indemnify, defend, protect, and hold harmless the Authority, the Participating Entity and any and all agents, employees, program administrators, attorneys, representatives and successors and assigns of the Authority or the Participating Entity, from and against all losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out-of-pocket litigation costs and reasonable attorney's fees) and any demands of any nature whatsoever related directly or indirectly to, or arising out of or in connection with (i) the Property Owner's participation in the Program, (ii) the Assessment, (iii) the Improvements, or (iv) any other fact, circumstance or event related to the subject matter of this Contract, regardless of whether such losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out-of-pocket litigation costs and reasonable attorney's fees) accrue before or after the date of this Contract.

(b) The provisions of this Section shall survive the termination of this Contract.

## 11. Right to Inspect Property

The Property Owner hereby grants the Authority, its agents and representatives the right to enter at any reasonable time, upon reasonable notice, to inspect the Improvements. The Property Owner further hereby grants the Authority, its agents and representatives the right to examine and copy any documentation relating to the Improvements.

## 12. Carbon Credits

The Property Owner hereby agrees that any carbon credits attributable to the Improvements shall be owned by FortiFi Financial, Inc. or its assignee

## 13. Program Application

The Property Owner hereby represents and warrants to the Authority that the information set forth in the program application submitted to the Authority in connection with its request for financing ("Program Application") is true and correct as of the date hereof, and that the representations set forth in the Program Application with respect to the Property and the Property Owner are true and correct as of the date hereof as if made on the date hereof.

## 14. Amendment.

This Contract may be modified or amended only by means of the Addendum or another written agreement of the Authority and the Property Owner.

## 15. Binding Effect; Assignment.

This Contract inures to the benefit of and is binding upon the Authority, the Property Owner and their respective successors and assigns. The Authority has the right to assign any or all of its rights and obligations under this Contract without the consent of the Property Owner. The Authority intends to delegate certain of its functions under this Contract to the Program Administrator and may pledge and assign this Contract to a trustee as security for the Bonds.

## 16. Exhibits.

Exhibits A-E attached to this Contract, as modified and finalized by Addendum, if any, are incorporated into this Contract by this reference as if set forth in their entirety in this Contract.

## 17. Severability.

If any provision of this Contract is held invalid or unenforceable by any court of competent jurisdiction, such holding will not invalidate or render unenforceable any other provision of this Contract.

## 18. Corrective Instruments.

The Authority and the Property Owner shall, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements hereto and such further instruments as may reasonably be required in order to carry out the expressed intention of this Contract.

## 19. Governing Law: Venue.

This Contract shall be construed in accordance with and governed by the laws of the State of California applicable to contracts made and performed in the State of California. This Contract shall be enforceable in the State of California, and any action arising hereunder shall (unless waived by the Authority in writing) be filed and maintained in the Superior Court of California, San Joaquin County; provided, however, that actions to foreclose delinquent installments of the Assessment shall be filed and maintained in the Superior Court of California in the County identified in Exhibit A.

## 20. Counterparts.

This Contract may be executed in several counterparts, each of which is an original and all of which constitutes one and the same instrument.

## 21. Monitoring and Recording of Telephone Calls.

The Program may monitor and/or record telephone calls for security and customer service purposes. By agreeing to this Contract the Property Owner agrees to have his, her or its telephone calls with the Program recorded.

22.  Electronic Signatures.

(a)  The parties hereto acknowledge and agree that this Contract may be executed by one or more electronic means ("Electronic Signatures"). Each party hereto agrees that Electronic Signatures provided by such party shall constitute effective execution and delivery of this Contract by such party to all other parties to or relying on this Contract. Each party hereto agrees that Electronic Signatures shall constitute complete and satisfactory evidence of the intent of such party to be bound by those signatures and by the terms and conditions of this Contract as signed. Each party hereto agrees that Electronic Signatures shall be deemed to be original signatures for all purposes.

(b)  Each party hereto agrees to accept Electronic Signatures provided by any and all other parties to this Contract as (i) full and sufficient intent by such parties to be bound hereunder, (ii) effective execution and delivery of this Contract, and (iii) constituting this Contract an original for all purposes, without the necessity for any manually signed copies to be provided, maintained or to exist for back up or for any other purpose.

(c)  If Electronic Signatures are used to execute this Contract, each party hereto hereby accepts the terms of, and intends and does sign, this Contract by its Electronic Signature hereto.

23.  Contract Documents.

(a)  The Property Owner acknowledges and agrees that the entire agreement between Property Owner and the Authority includes each and every document specified in the List of Documents contained in Exhibit A (collectively, the "Contract Documents").

(b)  By executing this Contract, the Property Owner acknowledges and agrees that:

(i)  The Property Owner has had sufficient time to review and has reviewed each of the Contract Documents and has had the opportunity to ask any questions of the Authority that Property Owner may have regarding such Contract Documents;

(ii) The Property Owner has reviewed, understands and agrees to each and every additional requirement and term contained in the Program Handbook (as defined in Exhibit A to this Contract, the "Program Handbook");

(iii) The Property Owner has reviewed, understands, agrees to and affirms each and every representation and warranty contained in the Program Application and the Program Handbook; and

(iv) Prior to executing this Contract has read and understands the Property Owner's Acknowledgments and Disclosures contained in the (A) Program Application, (B) this Contract, (C) the Privacy Notice, (D) the Financing Estimate and Disclosure and Additional Information Regarding Your Financing documents, and (E) the Program Handbook. Section 24.

24.  Execution and Return of Contract.

The Property Owner must execute and return this Contract to the Authority at the address set forth in the "Notice Information" section of Exhibit A so that it is received by the Authority not later than July 28, 2022. If the Property Owner fails to return this Contract so executed to the Authority by the indicated date, the Program reserves the right to require the Property Owner to enter into a new Contract. The signature of each person signing as or on behalf of the Property Owner must be notarized by a duly licensed notary unless all such persons have previously successfully completed the identity verification process approved by the Authority.

25.  Mortgage Lender Treatment of PACE Assessments.

The Property Owner acknowledges that certain mortgage lenders may prohibit homeowners from participating in PACE programs such as the Authority's Program. See Exhibit D hereto for certain general information concerning such restrictions.

26.  Reassessment Disclaimer.

The Property Owner acknowledges and understands that installation of the Improvements on the Property may cause the property to be reassessed for property tax purposes, and neither the Authority nor the Program Administrator have any duty, obligation or intention of providing such reassessment information to the Property Owner. The Property Owner acknowledges and understands that it is the Property Owner's responsibility to understand what state and local reassessment rules and regulations, and exclusions therefrom, apply to the Property and the Improvements. The Property Owner may obtain additional information from the State Board of Equalization at www.boe.ca.gov.

27.  Disclosures

The Property Owner has received, reviewed, acknowledges and understands the important dislosures contained in the Financing Estimate and Disclosure and Exhibit D of this Contract.

28.  Right to Cancel.

The Property Owner has a right to cancel this Contract pursuant to the terms and conditions as set forth in Exhibit E.

IN WITNESS WHEREOF, the Authority and the Property Owner have caused this Contract to be executed in their respective names by their duly authorized representatives, all as of the Effective Date. The "Effective Date" is defined as the last date entered with the signatures of the parties below.

## Property Owners



Identity verification code                              Date          1/29/2022

Identity verification code                              Date          1/29/2022

## Authority: Authorized Signatory



Authorized Signatory

Name                                                   Date          1/31/2022

# Exhibit A

DESCRIPTION OF PROPERTY, NOTICE INFORMATION AND LIST OF CONTRACT DOCUMENTS

## Description of Property

Property Owner(s) Name(s):       ██████████████████████

Dixon Property Address:          ███████████████████, CA ██████

APN(s):                          █████████████

                                 ████████████████████████████████████████
                                 █████████████████████████████████████████
                                 ██████████████████████████████████████████
                                 ██████████████████████████████████████████

Legal Description:               ███████████████████████████████████

Participating Entity:            ████████████

County:                          █████████████ County

## Notice Information

FortiFi Financial

200 Spectrum Center Drive

Suite 1470

Irvine, CA 92618

info@fortifi.com

████████████████

████████████████

████████████████

████████████████████

███████████████████

████████████████

████████████████

██████████████████████

## List of Contract Documents

This Contract shall consist of the following documents:

- This Contract and the exhibits hereto and any Addendum hereto;
- The Financing Estimate and Disclosure;
- Additional Information Regarding Your Financing;
- The Program Application;
- The Completion Certificate;
- The Assessment Cost and Payment Summary;
- The Notice of Assessment;
- The Payment of Contractual Assessment Required;
- The Program Handbook (CSCDA Program); and
- The Program website located at www.fortifi.com

# Exhibit B

DESCRIPTION OF IMPROVEMENTS, DISBURSEMENT, AND SCHEDULE
OF ANNUAL ASSESSMENT INSTALLMENTS, INCLUDING PRINCIPAL,
INTEREST AND ANNUAL ASSESSMENT ADMINISTRATIVE FEE

## Description of Improvements:

The Improvements consist of the following:

| Improvements | Qty | Amount |
|---|---|---|
| Energy Star Window | 18 | $30,744.26 |
| NFRC & Energy Star certified window | | |
| Total cost of Improvements | | $30,744.26 |

## Assessment:

The amount of the Assessment is $34,220.50 (the "Assessment Amount"), of which $30,744.26 is allocable to the cost of the Improvements, $2,465.90 is allocable to incidental expenses and $1,010.34 is allocable to Capitalized Interest.

## Disbursement:

Subject to finalized inspection and/or permits, funds equal to the cost of the Improvements will be disbursed directly to the Contractor on behalf of the Property Owner(s) within 5 business days of the execution of the Completion Certificate.

## Maturity and Interest Rate:

1. The Final Maturity Date of the Bonds shall be no later than Sept. 2, 2047, unless the Assessment is recorded after the tax roll deadline in which case the date shall be no later than Sept. 2, 2048.
2. The Assessment bears interest at a rate equal to Maximum Interest Rate of the Bonds, which is 4.99%.
3. The Annual Percentage Rate (APR)[*] attributable to the Assessment is 5.85%. APR is the Effective Cost of Credit in consumer loans and real estate loans expressed as a percentage interest rate. The annual percentage rate is the interest rate the borrower actually pays, including fees required in order to participate in the Program.
4. The total administrative fees, recording fees and other fees and costs added to your Assessment is $3,476.24.

* Annualized effective rate over the full assessment term.

| Tax Year (Commencing July 1) | Interest | Principal | Total Assessment | Annual Administrative Assessment Fee[*] | Total Estimated Contractual Assessment payment |
|---|---|---|---|---|---|
| 2022 - 2023 | $1,707.60 | $718.00 | $2,425.60 | $95.00 | $2,520.60 |
| 2023 - 2024 | $1,671.77 | $753.83 | $2,425.60 | $95.00 | $2,520.60 |
| 2024 - 2025 | $1,634.16 | $791.44 | $2,425.60 | $95.00 | $2,520.60 |
| 2025 - 2026 | $1,594.67 | $830.93 | $2,425.60 | $95.00 | $2,520.60 |
| 2026 - 2027 | $1,553.20 | $872.40 | $2,425.60 | $95.00 | $2,520.60 |
| 2027 - 2028 | $1,509.67 | $915.93 | $2,425.60 | $95.00 | $2,520.60 |
| 2028 - 2029 | $1,463.96 | $961.64 | $2,425.60 | $95.00 | $2,520.60 |
| 2029 - 2030 | $1,415.98 | $1,009.62 | $2,425.60 | $95.00 | $2,520.60 |
| 2030 - 2031 | $1,365.60 | $1,060.00 | $2,425.60 | $95.00 | $2,520.60 |
| 2031 - 2032 | $1,312.70 | $1,112.90 | $2,425.60 | $95.00 | $2,520.60 |
| 2032 - 2033 | $1,257.17 | $1,168.43 | $2,425.60 | $95.00 | $2,520.60 |
| 2033 - 2034 | $1,198.87 | $1,226.73 | $2,425.60 | $95.00 | $2,520.60 |
| 2034 - 2035 | $1,137.65 | $1,287.95 | $2,425.60 | $95.00 | $2,520.60 |
| 2035 - 2036 | $1,073.38 | $1,352.22 | $2,425.60 | $95.00 | $2,520.60 |
| 2036 - 2037 | $1,005.91 | $1,419.69 | $2,425.60 | $95.00 | $2,520.60 |
| 2037 - 2038 | $935.07 | $1,490.53 | $2,425.60 | $95.00 | $2,520.60 |
| 2038 - 2039 | $860.69 | $1,564.91 | $2,425.60 | $95.00 | $2,520.60 |
| 2039 - 2040 | $782.60 | $1,643.00 | $2,425.60 | $95.00 | $2,520.60 |
| 2040 - 2041 | $700.61 | $1,724.99 | $2,425.60 | $95.00 | $2,520.60 |
| 2041 - 2042 | $614.54 | $1,811.06 | $2,425.60 | $95.00 | $2,520.60 |
| 2042 - 2043 | $524.16 | $1,901.44 | $2,425.60 | $95.00 | $2,520.60 |
| 2043 - 2044 | $429.28 | $1,996.32 | $2,425.60 | $95.00 | $2,520.60 |
| 2044 - 2045 | $329.67 | $2,095.93 | $2,425.60 | $95.00 | $2,520.60 |
| 2045 - 2046 | $225.08 | $2,200.52 | $2,425.60 | $95.00 | $2,520.60 |
| 2046 - 2047 | $115.27 | $2,310.09 | $2,425.36 | $95.00 | $2,520.36 |

| Total Assessment | | | | | $63,014.76 |

* Estimated, will remain subject to change

UPON THE ISSUANCE OF THE BONDS, THE ACTUAL ANNUAL ASSESSMENT INSTALLMENTS WILL BE DETERMINED IN ACCORDANCE WITH THE 1915 ACT, AS DESCRIBED IN THIS CONTRACT. THESE FINAL INSTALLMENTS WILL NOT EXCEED THE TOTAL ASSESSMENT PAYMENT LISTED ABOVE, BUT THE ANNUAL ADMINISTRATIVE ASSESSMENT FEES LISTED ABOVE MAY CHANGE. THE SCHEDULE OF ANNUAL ASSESSMENT INSTALLMENTS SHALL BE SPECIFIED IN THE "PAYMENT OF CONTRACTUAL ASSESSMENT REQUIRED" TO BE RECORDED BY THE AUTHORITY IN THE OFFICE OF THE COUNTY RECORDER OF THE COUNTY OF SAN JOAQUIN COUNTY.

## Prepayment:

The Assessment may be prepaid, in whole or in part, as described in Section 3(g) of this Contract.

# Exhibit C

FORM OF ADDENDUM TO ASSESSMENT CONTRACT

# Exhibit D

ADDITIONAL DISCLOSURES RELATING
TO YOUR MORTGAGE AND SUBSEQUENT
SALES OR REFINANCINGS
OF YOUR PROPERTY

In May, 2010, Fannie Mae and Freddie Mac, government sponsored enterprises that purchase a large segment of conforming single family home mortgages from lending institutions, issued new instructions to lending institutions on how to treat properties with assessments under Property Assessed Clean Energy ("PACE") programs such as this one administered by FortiFi Financial.

On August 31, 2010, the agencies issued additional instructions to lenders to the effect that Fannie Mae and Freddie Mac "will not purchase mortgage loans secured by properties with an outstanding PACE obligation."

These letters and statements may lead mortgage lenders to conclude the PACE assessment should be paid off before a property transfers or is refinanced. In addition, it may lead some lenders to conclude that participating in a PACE program is a violation of typical mortgage terms prohibiting senior liens without lender consent. If you are selling your property, a buyer's lender may refuse to finance the buyer's first mortgage loan unless the assessment is paid off. We urge you to carefully read the disclosure information in the Program Application, review your mortgage documents, evaluate the risks of proceeding with a Program Application at this time, and contact your lender if you have any concerns or for information regarding any other financing options that may be available to you.

Electronic links to the copies of certain letters from the Federal Financing Housing Authority re: PACE programs:

- https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/ll1006.pdf
- http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/iltr050510.pdf
- http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Statement-on-Certain-Energy-Retrofit-Loan-Programs.aspx
- http://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-FHFA-Acting-Director-Edward-J-DeMarco-on-PACE-Programs.aspx
- https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2010/sel1012.pdf
- http://www.freddiemac.com/singlefamily/guide/bulletins/pdf/bll1020.pdf

BEFORE ENTERING INTO THE ASSESSMENT CONTRACT, YOU SHOULD CAREFULLY REVIEW ANY MORTGAGE AGREEMENT(S) OR OTHER SECURITY INSTRUMENT(S) WHICH AFFECT THE PROPERTY OR TO WHICH YOU AS THE PROPERTY OWNER ARE A PARTY. ENTERING INTO A PROGRAM ASSESSMENT CONTRACT WITHOUT THE CONSENT OF YOUR EXISTING LENDER(S) COULD CONSTITUTE AN EVENT OF DEFAULT UNDER SUCH AGREEMENTS OR SECURITY INSTRUMENTS. DEFAULTING UNDER AN EXISTING MORTGAGE AGREEMENT OR SECURITY INSTRUMENT COULD HAVE SERIOUS CONSEQUENCES TO YOU, WHICH COULD INCLUDE THE ACCELERATION OF THE REPAYMENT OBLIGATIONS DUE UNDER SUCH AGREEMENT OR SECURITY INSTRUMENT.

IN ADDITION, FANNIE MAE AND FREDDIE MAC. THE OWNER OF A SIGNIFICANT PORTION OF ALL HOME MORTGAGES, STATED THAT THEY WOULD NOT PURCHASE HOME LOANS WITH ASSESSMENTS SUCH AS THOSE OFFERED BY THE AUTHORITY. THIS MAY MEAN THAT PROPERTY OWNERS WHO SELL OR REFINANCE THEIR PROPERTY MAY BE REQUIRED TO PREPAY SUCH ASSESSMENTS AT THE TIME THEY CLOSE THEIR SALE OR REFINANCING.

IF YOUR LENDER REQUIRES AN IMPOUND FOR YOUR PROPERTY TAXES IT IS YOUR RESPONSIBILITY TO NOTIFY THEM OF THE ANNUAL ASSESSMENT PAYMENT AMOUNT SO THEY CAN ADJUST YOUR IMPOUND AMOUNT.

The Authority and Program Administrator make no representation that the foregoing information and links are complete or up-to-date.

I/We have read this Exhibit D. All Property Owners on title must initial below:



| | Date | | Initials | | Date |

# Exhibit E

RIGHT TO CANCEL

Property Owner under the Age of 65

| | |
|---|---|
| Financing ID | ████████████ |
| Owners | ████████████████ |
| ███ Property Address | ████████████████ |

**Your Right to Cancel**   You are entering into an Assessment Contract with the California Statewide Communities Development Authority ("CSCDA") for Financing under the CSCDA FortiFi Financial Program ("Program") that will result in a lien on the property at 244 E Alpine Ave, Stockton, CA 95204. Under the Program, you may cancel this transaction, without cost, on or before midnight on the third business day after whichever of the following events occurs last:

1. The date on which you signed the Assessment Contract.
2. The date you received your Financing Estimate and Disclosure.
3. The date you received this notice of your right to

**cancel. If You Cancel**   If you Cancel the transaction the Program will:

- Not Charge you a cancellation fee;
- Refund any money you have given the Program, excluding application and processing fees as applicable; and
- If the lien on your property has been recorded, take the necessary steps to discharge such lien and remove it from the tax rolls within 20 calendar days after receiving your notification to cancel financing

After the Program has done the things mentioned above, you must return any money paid to you or on your behalf, whether to your contractor or any other person. All money must be returned to the address below.

**How to Cancel**   To Cancel this transaction, you may submit this form to FortiFi Financial in writing at:

FortiFi Financial, Inc.
Attn: Right To Cancel Notification
200 Spectrum Center Drive
Suite 1470
Irvine, CA 92618
Fax: (844) 622-5533

Email: underwriting@fortifi.com

## Acknowledgement of Receipt



Identity verification code    Date    1/29/2022

Identity verification code    Date    1/29/2022

## I Wish to Cancel

(Only sign here if you are canceling your financing)

If two or more people have the right to cancel this financing, cancellation by one person is effective for all of them.

Print Name    Signature    Date

# EXHIBIT B

 

## NOTICE TO MORTGAGE HOLDER AND MORTGAGE SERVICERS

You are receiving this notice because you are the holder or servicer of a mortgage loan which encumbers the real property described below ("Mortgaged Property"). The owner of such real property (the mortgagor with respect to the aforesaid mortgage hereinafter referred to as "Mortgagor") intends to enter into a Financing Agreement with the Florida PACE Funding Agency to obtain Property Assessed Clean Energy (PACE) financing for qualifying improvements to their property under Florida's PACE (Property Assessed Clean Energy) Funding Act section 163.08 Florida Statutes. Qualifying improvements are energy conservation and efficiency improvements, renewable energy improvements and wind resistance improvements "Qualifying Improvements"). This notice is provided by FortiFi, Inc. on behalf of the Mortgagor and the Florida PACE Funding Agency ("Agency").

### Background on Florida's PACE Funding Act

In 2008, the Florida Legislature amended the energy goal of the state comprehensive plan to provide, in part, that the state shall reduce its energy requirements through enhanced conservation and efficiency measures in all end-use sectors and reduce atmospheric carbon dioxide by promoting an increase use of renewable energy resources through the installation of Qualifying Improvements. The cost of the Qualifying Improvements is repaid by the property owner as a non-ad valorem assessment on the tax roll. The non-ad valorem assessment for these qualifying improvements has been judicially determined to constitute a lien of equal dignity to county taxes and other assessments. This Notice includes the maximum amount of the non-ad valorem assessment permitted to be placed on the Mortgaged Property ("Maximum Financed Amount") and the maximum annual payment on such assessment ("Maximum Annual Assessment Payment").

1. **Financing Agreement**. Notice is hereby given in accordance with Section 163.08, Florida Statues, that the Mortgagor has applied for special or non-ad valorem assessment funding for qualifying improvements to be constructed or installed on the Mortgaged Property identified below and intends to enter into a Financing Agreement with the Florida PACE Funding Agency.

2. **Assessment:** The Assessment is a non-ad valorem assessment imposed and levied by a local government and collected each year on the same bill as property taxes. When the Assessment is finalized, the Maximum Financed Amount and the Maximum Annual Assessment Payment necessary to repay that amount (exclusive of annual collection cost) may be reduced to reflect the actual amount financed for the costs of the qualifying improvements in accordance with a Notice of Assessment and if applicable Supplemental Notice of Assessment.

3. **Prepayment and Acceleration**: While the Assessment is subject to prepayment at the option of the Mortgagor, it is not subject to acceleration by the Agency or a third party. In addition, Section 163.08(13), Florida Statutes provides that a mortgage, note or lien may not be accelerated or unilaterally modified solely as a result of the Mortgagor entering into the aforesaid Financing agreement as follows: "A provision in any agreement between a mortgagee or other lienholder and a property owner, which allows for acceleration of payment of the mortgage, note or lien or other unilateral modification solely as a result of entering into a financing agreement as provided for in this section is not enforceable."

4. **Tax and Insurance Escrow**: A mortgagee has the right to adjust the monthly contribution amount to a tax and insurance escrow into which the Property Owner/Mortgagor presently contributes to account for the new assessment and the annual assessment payment.

5. **Mortgage Holder/Servicer**:

    Name:
    Address:
    Loan Number:
    Loan Number:

6 **Maximum Financed Amount**:   $     50,008        **Maximum Annual Assessment Payment**:   $ 12,991.90

7. **Mortgaged Property**
    a  County tax parcel number
    b  Property Address:
    c  Property Owner(s):

Date:        1/14/22

Rev 122618

# EXHIBIT C



FortiFi

Phone    **1 858 345 2000**

Email    **info@fortifi.com**

Address   **200 Spectrum Center Drive Suite 1470**

       **Irvine, CA 92618**

       **www.fortifi.com**

e3_fin_docs 6E3CF43D v1 r2

# FortiFi Financial

Thank you for choosing FortiFi Financial ("FORTIFI"), the smart choice for financing your home improvements.

The FPFA (Florida PACE Funding Agency) program is an innovative public-private partnership, designed to improve communities by providing low cost financing for energy conservation, energy efficiency, and wind resistance improvements. The process is simple: work with the contractor you have selected to determine which improvements you want, FORTIFI provides the financing and you make payments as part of your property taxes over the useful life of the improvements. Transfer of the proceeds of your PACE financing will be made directly to the contractor after you advise FORTIFI that the improvements are complete.

## Instructions

1. Sign Financing Documents
2. Install Improvements
3. Sign Completion Certificate
4. Enjoy Your Improvements
5. Tell Your Friends!

## Contact

Customer Service

| | |
|---|---|
| Phone | (858) 345-2000 |
| Email | info@fortifi.com |

## Contents

- PACE Disclosure Statement for Residential Properties
- Application Summary
- Truth-in-PACE™ Disclosure statement
- Finance Agreement
- Right to Cancel
- How to Cancel
- Notice of Assessment
- Privacy Statement
- Disclosures and Acknowledgements
- Exhibit A
- Exhibit B
- Attestation

# Please Read This Before Signing

## PACE Disclosure Statement for Residential Properties

**(This form is required by Broward County Administrative Code Ch. 22, Part XXVIII)**

I understand my PACE project is subject to the following:

1. PACE is NOT part of a Broward County governmental program; there is no Broward County government assistance or relief available for my inability to pay my financial obligation.

2. Property Owners are encouraged to get multiple bids to determine an appropriate range of costs for home improvements.

3. The estimated total PACE financing for my property, including all projects costs, fees and interest, is $21,515.15.

4. My annual property tax bill is estimated to increase by $1,421.98 for a period of 30 years to pay the PACE assessment.

5. If I have an existing mortgage with escrow payments that include the PACE assessment, my annual escrow payments will increase by an amount at least equal to the tax bill increase in #4 above.

BCD-2022-02-14

6.    My first-year escrow payments might be significantly higher unless I am able to arrange for an earlier escrow collection. I can contact my mortgage servicer after my PACE financing is finalized to request that my PACE-related escrow payments start earlier.

7.    I can cancel my PACE contract up to 3 business days after I sign my PACE finance agreement, unless I choose in the finance agreement to waive this term due to emergency circumstances.



Identity verification code

Date      2/14/2022

Identity verification code

2/14/2022

Property Address

BCD-2022-02-14

# Application Summary

The Florida PACE Funding Agency (the "Agency") is a Florida special purpose local government that funds and finances energy conservation and efficiency improvements, renewable energy improvements and wind resistance improvements ("Qualifying Improvements"), in each case that are permanently affixed to a building or facility that is part of the property owner's real property. The Florida State Legislature has encouraged and authorized the Agency to provide this service to private property owners, characterizing it as a compelling state interest to voluntarily advance environmental and storm hardening goals in Florida. Qualifying Improvements can only be funded and financed upon the Agency and a private property owner entering into a Financing Agreement ("Financing Agreement"). The Agency has engaged FortiFi Financial, Inc. ("FortiFi") as a program administrator (the "Program Administrator") to operate the property assessed clean energy (PACE) funding and financing program ("Program") under the FortiFi brand.

Each owner of record of real property (each, an "Applicant") is required to sign and submit this application (this "Application") to the Program Administrator. This Application is for residential properties.

The most important elements of the Program are described in this Application. More information about the Program can be found on the Program Administrator's website at www.fortifi.com or on the Agency's website at https://www.floridapace.gov/.

## Property Owner Acknowledgements

By submitting this Application, we acknowledge and represent that we and any other owner(s) of the real property which is the subject of this application (the "Property") meet these qualifications and we authorize FortiFi to obtain a credit report for each of the property owner(s) and/or trustee(s) whose social security number is provided on this application to verify such representations.

- We are current on all property taxes for the Property and have not had any delinquencies in the last 3 years or since we took ownership, whichever is shorter.
- We are current on all property-related debt.
- We are not aware of any involuntary liens, defaults or judgments on the Property.
- We are not party to an open bankruptcy proceeding and the Property is not subject to a bankruptcy proceeding.
- The Property is not subject to a reverse mortgage or similar financial instrument.
- Each applicant is an individual or private entity (that is no Applicant is a public or governmental entity).

WE VERIFY THAT WE HAVE READ AND UNDERSTAND THE ABOVE QUALIFICATIONS AND THAT ALL ARE TRUE.

By submitting this Application, we hereby declare under penalty of perjury under the laws of the State of Florida all of the following:

- That the information provided in this Application is true and correct as of the application date.
- We have access to the Florida Property Owner Handbook.
- We are applying to participate in the Program, have the authority, without the consent of any third party, to execute and deliver this Application, the Financing Agreement, as defined herein, and the various other documents and instruments referenced herein.

APP-2022-02-14

WE VERIFY THAT WE HAVE READ AND UNDERSTAND THE ABOVE STATEMENTS AND THAT ALL ARE TRUE.

By submitting this Application, we acknowledge the following:

- We understand that the financing provided by the Program will be repayable through an assessment levied against the Property.
- We understand that an assessment lien will be recorded by the Program against the Property in the office of the County Clerk of Courts upon completion of the project described in the Financing Agreement, as defined below.
- We understand that the property tax bill (which includes our assessments) for the Property will increase by the amount of these assessment installment payments as specified in the Financing Agreement.
- We understand, as with all tax and assessment liens, this assessment will be senior to all existing and future private liens against the Property, including mortgages, deeds of trust and other security instruments.

WE VERIFY THAT WE HAVE READ AND UNDERSTAND THE ABOVE STATEMENTS AND THAT ALL ARE TRUE.

We agree to the Website Terms of Use

**Qualifying Improvements Must Be Approved; Costs Must Be Reasonable**

Financing under the Program is available only for Qualifying Improvements and the Qualifying Improvements must be approved as part of the Application. The property owner selects the contractor to install the Qualifying Improvements. Any work requiring a license under any applicable law to make a Qualifying Improvement must be performed by a contractor properly certified or registered pursuant to Part I or Part II of Chapter 489 (Florida Statutes). In addition, a property owner must engage a contractor registered with the Program (a "Participating Contractor") regardless of whether the work being performed requires a license.

It is the responsibility of the property owner to determine that all required building permits are in effect prior to the installation of the Qualifying Improvements. Property owners should speak with their Participating Contractor (or the building department if the property owner desires to self-install Qualifying Improvements) to determine if the installation of the Qualifying Improvements will require a Notice of Commencement to be filed, a building permit and/or inspection. Prior to funding the Assessment ContractFinancing Agreement, the property owner and the Participating Contractor must execute a Completion Certificate confirming that all Qualifying Improvements have been installed to the property owner's satisfaction, and all required building permits were obtained, and inspections were performed satisfactorily. The property owner or the Participating Contractor on the property owner's behalf is required to submit permit and/or inspection documentation to the Program as a condition to a disbursement of PACE financing.

The property owner or a Participating Contractor must contact the Program Administrator to identify the proposed improvements and the proposed labor, equipment, materials and any other costs and receive approval that the proposed improvements are Qualifying Improvements and that the proposed labor, equipment, materials and any other costs are reasonable and eligible under the Program. The Program will not finance any labor, equipment, materials and any other costs that have not been approved by the Program Administrator and included in the Financing Agreement, as defined below, which is required by statute to evidence the assessment. Any change after the Financing Agreement has been signed must be approved by the Program Administrator.

Whenever a Notice of Commencement is required under Chapter 713, Florida Statutes, the property owner and Participating contractor must comply.

**Financing Agreement Must Be Executed**

APP-2022-02-14

Each Applicant must enter into a Financing Agreement ("Financing Agreement") with the Agency and execute a Notice of Assessment ("Notice of Assessment"). The Financing Agreement evidences the imposition of a non-ad valorem assessment. Exhibit A to the Financing Agreement which is incorporated therein describes the approved Qualifying Improvements. Exhibit B to the Financing Agreement which is incorporated therein provides a summary of the terms and Program Costs (see Section D.3. below) and a schedule of annual assessment installments and estimated annual collection cost. If there are any changes after the Financing Agreement is signed by the property owner and before the Financing Agreement or the Notice of Assessment is recorded, the terms of the Financing Agreement authorizes the Agency to amend the Exhibits to the Financing Agreement to comport with the changes. In addition to the Financing Agreement, the property owner must sign other agreements and documents described in this Application and the Financing Agreement. The property owner agrees that disbursement of the Project Cost shall be determined by the Completion Certificate.

## Notice to Holders or Loan Servicers of any Existing Mortgages

At least thirty (30) days before entering into a Financing Agreement with the Agency, the property owner must provide to the holders or loan servicers ("Loan Servicer") of any existing mortgages encumbering or otherwise secured by the Property ("Mortgage") a notice of the property owner's intent to enter into a Financing Agreement together with the maximum principal amount to be financed and the maximum annual assessment necessary to repay that amount. The Program Administrator will send this notice to the Loan Servicer on behalf of the Applicants after the receipt of information from the Applicants regarding the Loan Servicer and the Mortgage.

## Representations Regarding this Application and Participation in the Program Identity Verification

Each Applicant acknowledges that the Participating Contractor or the Program Administrator will collect information to verify his or her identity as required by law.

## Other Important Documents Have Been Reviewed

Each Applicant understands that it is their responsibility to receive, read and understand all documents comprising the Program, which, in addition to information on the Program website, include (a) this Application; (b) the FHFA Disclosure Acknowledgement; (c) the Privacy Policy (www.fortifi.com/privacy-policy); (d) the Terms of Use (www.fortifi.com/terms-of-service); (e) the Federal ESIGN Act Disclosure and Consent; (f) the Notice to Holder or Servicer of Mortgage; (g) the Financing Agreement; (h) the Notice of Right to Cancel; (i) the Notice to Proceed; (j) the Completion Certificate (k) the Notice of Assessment; (l) any Supplemental Notice of Assessment; (m) the Estimated Financing Summary (n) the Final Assessment Summary; and (o) the Florida Property Owner Handbook and the Florida Participating Contractors Handbook.

## Applicant Has Had Opportunity to Ask Questions

Each Applicant acknowledges and agrees that they have had an opportunity to ask Program representatives, and to seek Applicant's own legal counsel concerning, any questions that the Applicant has regarding the documents listed above. Each Applicant understands that every person or entity that is a record title owner of the Property will have to sign the Financing Agreement, among other documents, as a condition to the closing of the financing and to obtain funding.

## Third Party Consents Have Been or Will be Obtained

Each Applicant has the authority, without the consent of any third party, to execute and deliver this Application and has or will have the authority, without the consent of any third party that has not been, or will not have been, obtained,

to execute and deliver the Financing Agreement and all the other documents and instruments referenced in this Application or in the Financing Agreement.

**Assessment Lien has Priority Over Private Liens**

The assessment lien recorded by the Agency against the Property will be superior to all other titles, liens or mortgages, and is of equal dignity with property taxes and other governmental assessments.

**Assessment Lien Includes Collection Costs**

As with all property taxes and special or non-ad valorem assessment liens, the Applicant understands that, in addition to the assessment, the Annual Collection cost and any interest for late payments and costs of a tax deed sale will become a part of the assessment lien against the Property until all taxes and assessments are paid. This uniform method of collection required by statute requires that all real estate taxes and assessments must be paid at the same time and not separately.

**Dispute process**

The County is not operating or administering the PACE program in any way. All disputes should be addressed directly to FortiFi Financial, Inc. by email at compliance@fortifi.com or on our website at www.fortifi.com. All Disputes and complaints will be investigated and resolved in a timely manner.

APP-2022-02-14

# Truth-in-PACE™ Disclosure Statement

## Property Information

| | |
|---|---|
| Owners |  |
| Address | |
| APN | |
| Transaction # | |

## Summary of your Financing

| Estimated Financed Amount | Term of Assessment | Fixed Interest Rate | Estimated Annual Payment |
|---|---|---|---|
| $19,600.00 | 30 Years | 4.99% | $1,421.98 |
| Cost of your Improvements | Number of years that payments will be added to the Property Tax Bill. Does not exceed the useful life of the improvements | The amount charged for your credit, as a percentage | The estimated amount due on your Annual Property Tax Bill |

## Important Dates

| Application Date | Estimated Completion Date | First Payment Date |
|---|---|---|
| 01/14/2022 | 02/14/2022 | 11/01/2022 |
| The date your application was submitted | The date the Finance Agreement is generated | The date your first payment will be due |

If your Assessment is recorded on or before June 30, 2022 your first payment will be included on your November 2022 property tax bill which is due by March 31, 2023. If your Assessment is recorded after June 30, 2022, your first payment will be included on your November 2023 property tax bill which is due by March 31, 2024. There is no discount or penalty for paying the PACE assessment early.

The property owner may pay off the PACE assessment at any time and **has the right to pre-payment without penalty.**

## Improvements

This project includes installation of:
Roof - Shingle (qty: 2200) Roof - Flat (qty: 500)

These Improvements and the PACE assessment may or may not affect the overall value of the property.

## Items payable in connection with Financing/Fees

| | |
|---|---|
| **Program Administrative Expenses** | $1,370.04 |
| The estimated costs to provide financing for your Improvements. Includes: Processing, Ongoing annual administrative and bond issuance expenses. | |
| **Recording Fee** | $41.00 |
| Fee paid to your County to record and process your Assessment. | |
| **Interest Before First Payment** | $450.32 |
| The estimated amount of interest accrued between the Estimated Completion Date and Applicable Tax Roll Deadline. | |
| **Reserve Deposit** | $53.79 |
| Deposit for debt servicing on related Bond. | |
| **Total** | $1,915.15 |

## Calculations

| | |
|---|---|
| **Total Closing Costs** | $1,915.15 |
| The dollar amount that the Financing will cost you at the time of closing. | |
| **Financed Amount** | $21,515.15 |
| The amount of credit provided to you or on your behalf. | |
| **Annual Assessment Amount** | $1,421.98 |
| The amount added to your property taxes each year during the term. Includes principal, interest, and $10 for Administrative Expenses. | |
| **Total of Payments** | $42,659.22 |
| The total amount you will have paid over the life of the financing after you make all payments as scheduled (includes principal, interest, settlement charges, and fees). | |
| **Annual Percentage Rate** | 5.83% |
| The cost of your credit as a yearly rate. This represents your cost over the term of the financing, expressed as a rate. It is not your interest rate. This is also known as your effective rate of interest charged. | |

TIP-2022-02-14

PACE agencies/authorities/districts may only offer fixed simple interest rates and payments that fully amortize the obligation. Variable or negative amortization financing terms are not permitted. Capitalized interest included in the original balance of a PACE financing does not constitute negative amortization.

See Exhibit B of the Financing Agreement for the repayment process, terms, amounts, and a schedule that fully amortizes the amount financed including the estimated annual PACE assessment.

You are guaranteed a three-day right to cancel this financing.

TIP-2022-02-14

## Important Financing Terms

| | |
|---|---|
| Is the Interest Rate Fixed? | Yes |
| Can your Balance Increase? | No |
| Is there a Prepayment Penalty? | No |
| Is there a Balloon Payment? | No |
| Is the Interest Tax Deductible? | Consult with a tax professional |

## Understanding What Can Change at Settlement

This Truth-in-PACE™ Disclosure Statement estimates your settlement charges based on an estimated completion date of 02/14/2022. Actual amounts will be calculated based on the actual completion date of your project and will be listed in the Final Cost and Payment Summary.

Items that **Cannot** Increase at Settlement

- Interest Rate
- Recording Fee
- Reserve Deposit
- Project Amount

Items that **Can** Increase at Settlement

- Program Administrative Expense
- Interest before first payment
- Financed Amount

## Questions

If you have questions about the financing terms or costs on this form, contact FortiFi Financial at:

| | |
|---|---|
| Phone | 1-858-345-2000 |
| Email | info@fortifi.com |
| Address | 200 Spectrum Center Drive Suite 1470 |
| | Irvine, CA 92618 |
| | www.fortifi.com |

To dispute an issue related to your project, contact the FortiFi Financial at:

Phone: (858) 345-2000
Email: compliance@fortifi.com

TIP-2022-02-14

## Acknowledgements

The PACE assessment is secured by a lien on the property. In accordance with Florida law, the lien securing the obligation to pay the special assessments will be senior to all private liens, including existing mortgages and of equal dignity to County taxes and assessments. The PACE assessment will be collected in the same manner as real estate taxes. Failure to pay the PACE assessment may cause a tax certificate to be issued against the property, and **failure of payment thereof may result in the loss of property subject to the PACE assessment, including homestead property, in the same manner as failure to pay property taxes.**

I understand that by participating in the Program an Assessment will be levied on my property which will result in an additional payment that will be added to my Property Tax Bill and:



The PACE Assessment may affect the sale or refinance of the property.

If I refinance my property, my mortgage company may require me to pay off the remaining balance.

If I sell my property, the buyer or their mortgage company may require me to pay off the remaining balance.

If I pay my property taxes using an impound/escrow account, I need to contact my lender immediately to ensure the escrow payments are adjusted so that I am prepared for the increased payment amount and save an estimated $1,421.98 for my first payment in November 2022 or cause the trustee of such impound/escrow account to adjust my payments upon settlement.

I should consult a qualified tax professional regarding the tax deductibility of the interest payments and other potential tax benefits of participation in the Program and ownership of eligible improvements financed by the Program.

The total cost of the assessment may be greater than any realized savings.

I declare that I have received, read, and understand this Truth-in-PACE™ disclosure statement.



Identity verification code

Date        2/14/2022

TIP-2022-02-14



Identity verification code

Date    2/14/2022

TIP-2022-02-14

# FLORIDA PACE FUNDING AGENCY FINANCING AGREEMENT



THE DECLARATIONS, ACKNOWLEDGEMENTS AND AGREEMENTS CONTAINED HEREIN SHALL RUN WITH THE ASSESSED PROPERTY DESCRIBED HEREIN AND SHALL BE BINDING ON THE PROPERTY OWNER (INCLUDING ALL PERSONS OR ENTITIES OF ANY KIND), AND ANY AND ALL SUCCESSORS IN INTEREST. BY TAKING SUCH TITLE, PERSONS OR ENTITIES WHO ARE SUCCESSOR SHALL BE DEEMED TO HAVE CONSENTED AND AGREED TO THE PROVISIONS OF THIS AGREEMENT TO THE SAME EXTENT AS IF THEY HAD EXECUTED IT AND BY TAKING SUCH TITLE, SUCH PERSONS OR ENTITIES SHALL BE ESTOPPED FROM CONTESTING, IN COURT OR OTHERWISE, THE VALIDITY, LEGALITY AND ENFORCEABILITY OF THIS AGREEMENT.

THIS FINANCING AGREEMENT is made and entered into as of the date when last signed below by and between the FLORIDA PACE FUNDING AGENCY, a legally existing public body corporate and politic within the State of Florida (the "Agency") and ▓▓▓▓▓▓▓▓▓▓ ollectively, the "Property Owner"), the record owner(s) of the real property identified on Exhibit A (the "Assessed Property"). This Agreement evidences a voluntary agreement by the Property Owner to obtain and to repay the funding and financing described in this Agreement as a non-ad valorem assessment against the Assessed Property and is required by law to accomplish such financing.

## RECITALS

WHEREAS, the Agency is a public body corporate and politic and local unit of government duly organized and existing under the provisions of the Florida Interlocal Cooperation Act of 1969, Chapter 163, Part I, Florida Statutes, as amended (the "Interlocal Act");

WHEREAS, pursuant to the Interlocal Agreement Relating to the Establishment of the Florida PACE Funding Agency dated as of June 21, 2011 between Flagler County, Florida, and the City of Kissimmee, Florida, effective on June 22, 2011, and as amended, supplemented, or restated from time to time (the "Charter"), the Agency provides and operates its property assessed clean energy ("PACE") funding and financing programs ("Program"), in accordance with and as authorized by Section 163.08, Florida Statutes (the "Supplemental Act"), to provide for a scalable statewide funding and financing for energy conservation and efficiency improvements, renewable energy improvements and wind resistance improvements to real property ("Qualifying Improvements") through the levy of special assessments (sometimes referred to as non-ad valorem assessments) authorized by the Supplemental Act and the issuance of its bonds secured by the revenues from such non-ad valorem assessments in order to serve the public interest;

WHEREAS, pursuant to the Charter, the Interlocal Act and the Supplemental Act, the Agency is authorized to levy assessments to fund and finance Qualifying Improvements;

WHEREAS, the Board of the Agency has duly authorized the issuance of one or more series of limited obligation improvement bonds from time to time, and one or more indentures for the purpose, among others, of financing or refinancing of Qualifying Improvements; and

AGR-2022-02-14

WHEREAS, Property Owner has applied to the Agency to participate in the Program, and has agreed to freely and voluntarily subject the Assessed Property to a non-ad valorem assessment to provide for the acquisition, construction, installation and financing of the Qualifying Improvements described in Exhibit A.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties on behalf of themselves and their successors agree as follows:

SECTION 1. INCORPORATION OF PREAMBLE AND RECITALS

The preamble and recitals above are incorporated by reference herein and each of them is a material part of this Agreement.

SECTION 2. DEFINITIONS; EXHIBITS; ADDITIONAL DOCUMENTS

(A) Certain Capitalized Terms. As used in this Agreement, the following terms shall have the following meanings.

"Administrative Cost" means the costs incurred by the Agency in levying and servicing the Assessment and administering the Program, including, but not limited to, the fees and costs of the Agency and third parties engaged by or on behalf of the Agency related to the initial issuance and thereafter the servicing of the bonds, prepayment of the Assessment and redemption of the bonds.

"Agreement" means this Financing Agreement as amended, supplemented or modified from time to time.

"Agency" is defined in the preamble to this Agreement. Where the context permits, a reference to the Agency includes a reference to the Program Administrator.

"Annual Collection Cost" means, with respect to any Tax Year, the Collection Cost and any other Administrative Cost imposed by the Agency to service the Assessment and administer the Program. The estimated Annual Collection Cost is set forth on Exhibit B.

"Annual Payment" means, with respect to any Tax Year, the annual Assessment Installment, plus the Annual Collection Cost. The estimated Annual Payment is set forth on Exhibit B.

"Applicable Tax Roll Deadline" is defined in Section 3(B)(6) and is set forth on Exhibit B.

"Application" is defined in Section 6(W).

"Assessed Property" is the property subjected to a non-ad valorem assessment and is referenced in the recitals to this Agreement.

"Assessment" means the non-ad valorem assessment levied by the Agency hereunder against the Assessed Property pursuant to the Supplemental Act and collected pursuant to Section 197.3632, Florida Statutes, and as more particularly described in Sections 3 and 4, for the funding and financing of the Qualifying Improvements and the Closing Costs, together with interest thereon, and all Administrative Cost and Collection Cost associated therewith.

"Assessment Amount" is the Financed Amount plus the total amount of interest payable on such amount over the term of the Assessment. The Assessment Amount does not include the Collection Cost and any Administrative Cost that is not included in the Closing Costs.

"**Assessment Installment**" is defined in Section 3(A) and the amount of each Assessment Installment is set forth on Exhibit B.

"**Assessment Prepayment Amount**" is defined in Section 3(D).

"**Assessment Summary**" means the summary and explanation to be provided to the Property Owner concerning programmatic, financing and issuance costs associated with imposing, documenting, initially administering and funding the Assessment as of the Closing Date which (1) specifically includes a reference to the Assessed Property, a summary description of the Qualifying Improvements, the Official Records recording reference for the Financing Agreement (or the applicable Notice of Assessment), the Financed Amount, which includes Prepaid Interest or other Closing Costs, the interest rate, and the term of the Assessment, and (2) includes a reminder concerning when and how Annual Payments are made and collected, a brief summary of the costs and charges from the local tax collector, property appraiser or the Agency which may be associated with the annual administration and/or uniform collection process on the same bill as for property taxes, how to prepay the Assessment, and appropriate contact information for interacting with the Agency through the Program Administrator during the term of the Assessment.

"**Charter**" is defined in the recitals to this Agreement.

"**Closing Costs**" means the fees, costs and charges incurred in connection with the Assessment that are eligible for financing pursuant to Section 3(B). The Closing Costs are set forth on Exhibit B.

"**Closing Date**" is defined as the date the Program Administrator funds the qualifying improvements, subject to the Program Administrator's compliance with the required Notice To Lender provision as defined in the State Statute Law 163.08, if any.

"**Completion Certificate**" means each certificate in the form provided by the Program Administrator with respect to the Qualifying Improvements that is required to be executed and delivered to the Agency as a condition to the disbursement of funds pursuant to this Agreement.

"**Collection Cost**" means the collection costs associated with the collection of Annual Payments on the property tax bill, which costs may include charges for Administrative Costs, or charges imposed by the County property appraiser and tax collector pursuant to Section 197.3632, Florida Statutes, or its successor in function.

"**Contractor**" " means the contractor(s), dealers or other professionals selected and engaged by the Property Owner to provide, deliver and install the Qualifying Improvements.

"**County**" means the political subdivision of the State of Florida designated as a county within whose geographic boundary the Assessed Property is located.

"**Estimated Completion Date**" means the date by which the Completion Certificate is estimated to be delivered to the Program Administrator if only one disbursement is contemplated by this Agreement or the first Completion Certificate if more than one disbursement is contemplated by this Agreement. The Estimated Completion Date is set forth on Exhibit B.

"**Financed Amount**" is defined in Section 3(A) as the Project Amount and Closing Costs being funded and financed as more particularly described therein and in Exhibit B.

"**Interlocal Act**" is defined in the recitals to this Agreement.

"**Maximum Assessment Amount**" is defined in Section 14(B) and is set forth on the initial Exhibit B attached to this Agreement at the time of the execution by the Property Owner.

"**Maximum Project Amount**" is defined in Section 14(B) and is set forth on the initial Exhibit B attached to this Agreement at the time of the execution by the Property Owner.

"**Milestones**" (if applicable) is described in Exhibit B where there is more than one disbursement pursuant to Section 5 and in the related Completion Certificate provided by the Program Administrator.

"**Notice of Assessment**" means the Notice of Assessment recorded in the Official Records that constitutes a summary or condensed memorandum of this Agreement.

"**Official Records**" means the official location for the recording of constructive notice of matters affecting real estate in the County.

"**PACE**" is defined in the recitals to this Agreement.

"**Prepaid Interest**" is defined in Section 3(B)(6) and is set forth on Exhibit B.

"**Project Amount**" means the amount of the cost of the Qualifying Improvements that is approved for financing under this Agreement and is set forth on Exhibit B.

"**Program**" is defined in the recitals to this Agreement.

"**Program Administrator**" means FortiFi Financial, Inc. and its successors and permitted assigns.

"**Property Owner**" is defined in the preamble to this Agreement.

"**Qualifying Improvements**" is defined in the recitals to this Agreement, must be installed on the Assessed Property, are more specifically described on Exhibit A and will be generally described in the Notice of Assessment.

"**Required Documents**" means the documents required to be delivered with a Completion Certificate. The Required Documents are identified in Exhibit B and in the related Completion Certificate provided by the Program Administrator.

"**Supplemental Act**" is described in the recitals to this Agreement.

"**Supplemental Notice of Assessment**" means the Supplemental Notice of Assessment recorded in the Official Records by the Agency that reflects one or more amendments to the terms and conditions of this Agreement.

"**Tax Year**" means the period from January 1 of a year through the following December 31 of that year.

(B) Exhibits Defined and Incorporated.

"**Exhibit A**" means Exhibit A attached to this Agreement as it may be amended pursuant to the terms of this Agreement and is incorporated into this Agreement by this reference as if set forth in its entirety in this Agreement.

"**Exhibit B**" means Exhibit B attached to this Agreement as it may be amended pursuant to the terms of this Agreement and is incorporated into this Agreement by this reference as if set forth in its entirety in this Agreement.

AGR-2022-02-14

(C) Contract Documents: The Table of Contents that the Property Owner receives as a part of the application package lists other documents to which the Property Owner or the Assessed Property are subject in connection with the Assessment and this Agreement.

## SECTION 3. ASSESSMENT AMOUNT; USE OF PROCEEDS; ADMINISTRATIVE COST

(A) Assessment; Financed Amount and Payment of Assessment Amount. The Property Owner hereby consents and agrees to the imposition of the Assessment. The Financed Amount is equal to the sum of (1) the amount of the Qualifying Improvements described on Exhibit A that is being funded and financed, which amount is shown as the "Project Amount" on Exhibit B, plus (2) the amount of the closing costs described in Section 3(B) that is being funded and financed, which amount is shown as the "Closing Costs" on Exhibit B. The Agency will not provide financing under this Agreement in an amount in excess of the Financed Amount. Interest will accrue on the Financed Amount at the interest rate set forth on Exhibit B beginning on the Closing Date on the basis of a three hundred sixty (360) day year. Except as otherwise provided with respect to the Prepaid Interest and the Assessment Prepayment Amount, the Assessment Amount will be paid in installments of principal (representing the amortization of the Financed Amount over the period shown on Exhibit B) and interest on the unpaid Financed Amount at the rate set forth on Exhibit B (each, an "Assessment Installment"). Each Tax Year, the Annual Collection Cost will be added to the Assessment Installment and the resulting Annual Payment, as required by law, will be included in the Property Owner's tax bill pertaining to the Assessed Property. The Assessment will be satisfied by the payment of the Annual Payment for each Tax Year until the Assessment is paid in full unless the Assessment is prepaid in full.

(B) Financing the Closing Costs. In addition to financing the Project Amount, the Agency will finance the following amounts, which are included in the Financed Amount as Closing Costs on Exhibit B, from a portion of the proceeds of the bonds. If a particular category of Closing Costs is not applicable, Exhibit B will show the amount as zero ($0.00). Closing Costs that the Property Owner elects to finance (i.e. add to the Financed Amount), rather than to pay directly to the Contractor on or before the Closing Date, are sometimes referred to as capitalized costs.

(1)  Application Charge(s). These are charges paid to the Program Administrator or third parties to cover certain costs, for example an appraisal, in connection with the Application that the Property Owner has elected to capitalize.

(2)  Program Administration Charge. This one-time charge covers or defrays the Administrative Cost, including certain costs of the Agency, the Program Administrator, bond counsel, special counsel, financial advisors, depositories, trustees and other entities responsible for Program administration, support and management.

(3)  Recording Fee. This one-time fee covers the cost of filing documents relating to the Assessment, including the Notice of Assessment and if required the Supplemental Notice of Assessment.

(4)  Reserve Fund Deposit. This one-time, non-refundable charge covers a deposit the Agency is required to make into a debt service reserve fund for the bonds.

(5)  Administrative Reserve Account Deposit. The initial, non-refundable charge by the Agency for a reserve for expenses of the bond trustee(s) and administrative and similar expenses.

(6)  Prepaid Interest. The Program Administrator's deadline for placing the Assessment on the property tax roll is shown on Exhibit B as the "Applicable Tax Roll Deadline." If the Closing Date occurs after the Applicable Tax Roll Deadline and before the following July 15th, then the Property Owner will be responsible to pay on the Closing Date prepaid interest from the Closing Date to the following July 15th ("Prepaid Interest"). If the Closing Date occurs from and after July 15th and on or before the Applicable Tax Roll Deadline, then there will be no Prepaid Interest charged to the Property Owner. The Property Owner may capitalize any such prepaid interest by electing to add the Prepaid Interest to the Assessment Amount as an additional Closing Cost.

AGR-2022-02-14

(C) Annual Collection Cost. The Property Owner consents to, acknowledges, directs and authorizes the Agency to add to each Assessment Installment the Annual Collection Cost. Exhibit B shows the estimated Annual Collection Cost based on the best information available. Such estimated Annual Collection Cost is likely to increase or decrease as any of the costs and expenses comprising the Collection Cost or Administrative Cost change in the future.

(D) Prepayment of the Assessment. The Assessment may be prepaid, in whole or in any amount of at least $2,500, at any time upon the payment of (1) the amount of any delinquent Assessment Installments, together with statutory penalties accrued to the date of prepayment, plus (2) all or, subject to the minimum amount set forth in this subsection, a portion of the unpaid non-delinquent Financed Amount (the "Assessment Prepayment Amount"), plus (3) interest on the Assessment Prepayment Amount to the 15th day of the month occurring at least twenty (20) days following the date the prepayment is made, plus (4) the Annual Collection Cost and any additional associated Administrative Cost or Collection Cost, if charged by the Agency, for the cost of administering the prepayment and the early redemption of bonds.

(E) Absolute Obligation. The Property Owner hereby agrees that the Assessment will not be subject to reduction, offset or credit of any kind for any reason whatsoever, including but not limited to, a claim that the Qualifying Improvements described on Exhibit A failed to perform in any way or the bonds secured thereby are refunded.

## SECTION 4. ASSESSMENT AND LIEN

(A) Property Owner acknowledges and confirms that upon the execution of this Agreement by the parties, the Assessment is imposed and levied, the Assessed Property is subject to a special non-ad valorem assessment levied against the Assessed Property pursuant to this Agreement, the Supplemental Act and applicable law, together with interest and all costs of implementation and collection associated therewith, and consents to the levy of the Assessment upon execution hereof as a governmental or municipal lien against the Assessed Property.

(B) The execution of this Agreement by the parties evidences the levy of the Assessment against the Assessed Property without any further action required by the parties.

(C) Upon recordation of this Agreement or the Notice of Assessment in the Official Records, the Assessment and each Annual Payment shall constitute a legal, valid and binding lien upon the Assessed Property, equal in rank and dignity with the lien of county taxes and assessments, superior in dignity to all other liens, titles and claims, until paid.

## SECTION 5. DISBURSEMENT OF PROCEEDS

(A) Subject to the terms and conditions set forth herein, the Agency will impose the Assessment and cause or direct the disbursement of funds as set forth in Exhibit B and either the Completion Certificate or if there is more than one disbursement of funds the applicable Completion Certificate in accordance with the terms and conditions set forth in this Section 5, Exhibit B and such Completion Certificate.

(B) The Property Owner acknowledges that the amount, terms and conditions of the disbursement(s) of the funds for the Project Amount are based on the representations made by the Property Owner regarding the Qualifying Improvements and the Property Owner's actual written arrangements with the Contractor with respect to the Qualifying Improvements, in each case determined acceptable to the Program Administrator, at the Program Administrator's discretion.

AGR-2022-02-14

(C) The Property Owner shall request written approval from the Program Administrator with respect to any changes to the matters described in Exhibits A or B or in any Completion Certificate before it is signed and returned, including, without limiting the generality of the foregoing:

(1)   changes to the approved Qualifying Improvements described in Exhibit A,

(2)   cost overruns in excess of the Maximum Project Amount or the Project Amount set forth in Exhibit B,

(3)   if there is more than one disbursement of funds, progress will not accomplish timely completion of the Milestones or delivery of the Required Documentation set forth in Exhibit B and Completion Certificate (if and as applicable), or

(4)   the Property Owner expects difficulty meeting the Estimated Completion Date set forth in Exhibit B.

The Property Owner acknowledges that failure to timely request and obtain prior written approval of any of the foregoing may jeopardize funding and financing to the Property Owner by the Agency.

(D) The Property Owner shall make any such request for changes in writing, which request shall specify the desired change or changes. The Program Administrator in its sole and absolute discretion may agree in whole or in part to the requested change or changes, subject to such terms and conditions (including, without limitation, the payment of its reasonable costs and expenses). If the requested change or changes are approved, a new Completion Certificate will be issued by the Program Administrator for any disbursement affected by such approval.

(E) Any agreement to any change by or on behalf of the Agency or the Program Administrator shall not be, and shall not be construed to be, a commitment to subsequently agree to any other changes thereafter.

(F) The Property Owner shall request a disbursement of the Project Amount to the Contractor on behalf of the Property Owner by submitting a completed Completion Certificate executed by the Property Owner and the Contractor, and providing the Required Documents described in such Completion Certificate or reasonably required by the Program Administrator. If the Qualifying Improvement involves more than one project and if there is more than one Contractor, then there may be one or more Completion Certificates required for each project. Submission of a Completion Certificate is an irrevocable request to make the related disbursement in accordance with the terms and conditions of this Agreement, including Exhibit B, and such Completion Certificate.

(G) If there is only one disbursement of funds, the funds will be disbursed on the Closing Date from the net proceeds of the bonds issued to fund the Assessment. If there is more than one disbursement of funds, the first disbursement will be made from the net proceeds of the bonds and the balance of the net proceeds from the bonds will be held by the bond trustee to fund the remaining Project Amount. If the Project Amount is not fully disbursed, then there will be a mandatory prepayment of the Assessment to the extent the Project Amount is in excess of the aggregate amount of the disbursement(s). Such excess will be applied as a mandatory prepayment of the Assessment Amount in the manner specified in Section 3(D).

(H) Following a disbursement, or the final disbursement if there is more than one disbursement, the Program Administrator will provide an Assessment Summary to the Property Owner.

## SECTION 6. PROPERTY OWNER REPRESENTATIONS AND ACKNOWLEDGEMENTS

To induce the Agency to fund and finance the Qualifying Improvements in accordance with this Agreement, the Property Owner, by execution hereof, represents, warrants, acknowledges, consents and declares under penalty of perjury as follows:

AGR-2022-02-14

(A) The Property Owner, and no other person, is vested with fee simple title of record to the Assessed Property, and no other person has any interest in the Assessed Property that would require the consent of such person to the attachment of the Assessment lien against the Assessed Property.

(B) All property taxes and any other assessments associated with the Assessed Property are paid and have not been delinquent for the preceding three (3) years or the Property Owner's period of ownership, whichever is less.

(C) There are no involuntary liens, including, but not limited to, construction liens, on the Assessed Property and no such liens have been filed against the Assessed Property for the preceding three (3) years or the Property Owner's period of ownership, whichever is less.

(D) No notice of default or other evidence of property-based debt delinquency has been recorded against the Assessed Property during the preceding three (3) years or the Property Owner's period of ownership, whichever is less.

(E) The Property Owner is current on all mortgage-related debt on the Assessed Property.

(F) The Property Owner acknowledges that the Qualifying Improvements confer direct special benefits and the relief of burdens emanating from Assessed Property of the like and kind described in the Supplemental Act, all equal to or in excess of any amounts due hereunder, and that such amounts due and payable hereunder represent a fair and reasonable apportionment, in all respects, of the costs and all charges attributed to the Assessed Property in association with the acquisition, construction, funding and financing of the Qualifying Improvements.

(G) The Property Owner waives all right to subsequently challenge the Assessment on the basis of any procedural irregularities, insufficient benefits or relief of burdens, improper or unfair apportionment or any other basis. The Property Owner expressly waives any claim or defense associated with the validity of the Assessment based upon omission of information, or inaccurate or false written information supplied by or confirmed by the Property Owner.

(H) The Property Owner acknowledges that the Assessment may be pledged to the repayment of bonds or other debt obligations issued by the Agency.

(I) The Property Owner agrees and covenants to timely and faithfully pay the Assessment in full and understands and acknowledges that failure to pay the Assessment may result in loss of title.

(J) The Property Owner acknowledges and covenants that this Agreement shall run with, touch and concern the Assessed Property and shall be binding on the Assessed Property and the Property Owner and all successors in interest.

(K) The Property Owner agrees to promptly execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, from time to time such supplements hereto and such further instruments, corrective or otherwise, as may reasonably be required to document or carry out the intention of this Agreement, including, but not limited to, any Supplemental Notice of Assessment and the instruments listed in the Table of Contents.

(L) The Property Owner acknowledges that the Agency has or is authorized to provide to the holders or loan servicers of any existing mortgages encumbering or otherwise secured by the Assessed Property, if any, a notice of the Property Owner's intent to enter into this Agreement together with the maximum principal amount that the Property Owner may be able to finance and the estimated maximum annual payment necessary to repay that amount. The Property Owner understands and acknowledges that such maximum principal amount and such

estimated maximum annual payment may be in excess of the amounts set forth on Exhibit B. The Property Owner understands and acknowledges that a holder or loan servicer of a mortgage encumbering or otherwise secured by the Assessed Property may require or increase a monthly escrow in an amount necessary to annually pay the Assessment, and the Property Owner hereby specifically agrees to any such adjustment or imposition requested by such noticed mortgage holder or servicer.

(M) Property Owner acknowledges its obligation to maintain the Qualifying Improvements and provide for the timely repair of the Qualifying Improvements, at Property Owner's expense, throughout the term of this Agreement.

(N) Property Owner is solely responsible for obtaining permits necessary for construction or installation of the Qualifying Improvements and for selecting and engaging a Contractor that is registered with the Program. The Property Owner or its Contractor(s)are responsible for properly filing and naming the Agency whenever applicable law requires in a Notice of Commencement. Property Owner shall timely provide copies of any permit, inspection report or Notice of Commencement necessary for construction of the Qualifying Improvements to the Program Administrator upon request.

(O) The Property Owner acknowledges that any inspection of the Qualifying Improvements required by applicable building codes or the Program does not ensure quality of workmanship, and Property Owner is solely responsible for ensuring that the Qualifying Improvements are completed as proposed in any proposal, estimate, and/or binding written agreement or invoice provided by the Contractor.

(P) The Property Owner agrees to provide utility records to assist the Agency in tracking utility savings resulting from the Qualifying Improvements, including authorization hereby to the utility provider delivering utility services to the Assessed Property to directly transmit utility records for the Assessed Property to the Agency or the Program Administrator.

(Q) The Property Owner hereby consents to providing the Agency, the Program Administrator or their representatives with access to the Assessed Property for purposes of inspecting the Qualifying Improvements during the term hereof.

(R) The Property Owner is not currently a debtor in a bankruptcy proceeding at the time of application.

(S) The Assessed Property is not an asset in any bankruptcy proceeding.

(T) The Property Owner shall not, without the express written consent of the Agency, allow the Assessed Property to be demolished, condemned, severed, subdivided or submitted to condominium or cooperative ownership, by act, omission or otherwise, either as a part of or apart from the Assessed Property owned by the Property Owner. Written consent shall be in the form of a partial release in a recordable form satisfactory to the Agency that is prepared and recorded at the expense of the Property Owner. Such written consent shall be given in good faith by the Agency only upon a determination, in the Agency's sole discretion, that the prospect of full payment of the Assessment is not impaired or threatened by reason of any requested partial release. The Property Owner, without cost or charge to the Agency upon request on behalf of the Agency, will name the Agency and provide proof that the Agency is named as an additional insured on any insurance policy.

(U) The Assessed Property is not and shall not be subject to more than two existing PACE or similar assessments (including the Assessment contemplated by this Agreement) during the term hereof unless otherwise approved by the Agency.

AGR-2022-02-14

(V) In advance constructive notice compliance, and as required by the Supplemental Act, and so long as the Assessment provided for hereunder has an unpaid balance, at or before the time Property Owner enters into a contract to sell the Assessed Property, the Property Owner must give the prospective purchaser by law a written disclosure statement in the following form:

**"QUALIFYING IMPROVEMENTS FOR ENERGY EFFICIENCY, RENEWABLE ENERGY, OR WIND RESISTANCE – The property being purchased is located within the jurisdiction of a local government that has placed an assessment on the property pursuant to s. 163.08, Florida Statutes. The assessment is for a qualifying improvement to the property relating to energy efficiency, renewable energy, or wind resistance, and is not based on the value of the property. You are encouraged to contact the county property appraiser's office to learn more about this and other assessments that may be provided by law."**

(W) This Agreement is not a commitment to fund, and no disbursements shall be made unless and until all of the conditions of the Agency and the Program Administrator have been satisfied or waived in the sole discretion of the Agency or the Program Administrator. The risk of failure to fund is upon the Property Owner. Failure to fund can occur upon a material adverse change including, but not limited to: (1) the eligibility of the Property Owner, the Assessed Property, the Contractor(s) or the proposed Qualifying Improvements; (2) the physical condition of the Assessed Property; or (3) any change in circumstances which makes any of the representations or warranties of the Property Owner herein or in the Property Owner's FortiFi Financial, Inc. Program Financing Application (the "Application") untrue or inaccurate or a breach of any of the Property Owner's covenants or agreements herein or in the Application.

(X) The Property Owner confirms and declares that it has read this Agreement and each of the other documents listed on the Table of Contents and has had an opportunity to read the Supplemental Act (s.163.08, Florida Statutes), which can be found at http://www.leg.state.fl.us/Statutes or a copy of which can be obtained from the Program Administrator upon request. The Agency and Program Administrator will rely on the representations and attestations of the Property Owner and its Contractor throughout the process from the submission of the Application through the payment in full of the Assessment. Property Owner affirms under penalty of perjury that facts stated herein, in the Application and in any document or instrument delivered in connection herewith or therewith are true and accurate, and agrees to the continuing responsibility to candidly, truthfully and promptly bring to the attention of the Program Administrator upon becoming aware of any error, omission, inaccuracy or change in circumstances during the process from the submission of the Application through the payment in full of the Assessment.

**(Y) Property Owner acknowledges that at the time of a transfer of the ownership of the Assessed Property (except a transfer resulting from foreclosure), the past due portion of any Assessment Installment may be required to be paid, but future Assessment Installments may continue as a lien on the Assessed Property, if the buyer of the Assessed Property and the buyer's mortgagor, if any, so agree.**

**(Z) THE PROPERTY OWNER ACKNOWLEDGES THAT THE ASSESSMENT MAY DISCOURAGE POTENTIAL BUYERS FROM PURCHASING THE ASSESSED PROPERTY AND LENDERS FROM REFINANCING THE ASSESSED PROPERTY, THE ASSESSMENT MAY ALSO CAUSE THE LENDER OF A POTENTIAL BUYER TO REFUSE TO FINANCE THE PURCHASE OF THE ASSESSED PROPERTY, AND, AS A RESULT, WHEN THE PROPERTY OWNER SEEKS TO SELL OR REFINANCE THE ASSESSED PROPERTY, THE PROPERTY OWNER MAY BE REQUIRED TO PREPAY THE ASSESSMENT AT THE TIME OF CLOSING THE SALE OR REFINANCING.**

SECTION 7. COLLECTION OF ASSESSMENT ON PROPERTY TAX BILL

AGR-2022-02-14

(A) Each Annual Payment shall be collected on the property tax bill pertaining to the Assessed Property as provided in the Supplemental Act and Section 197.3632, Florida Statutes, or their successors in function. The Annual Payment coming due in any Tax Year shall be payable in the same manner and at the same time as ad valorem taxes on real property are payable and shall become delinquent at the same time and shall be subject to the same collection and enforcement mechanisms as ad valorem taxes; provided, however that pursuant to the Supplemental Act Annual Payments are not subject to discount for early payment. BY EXECUTION HEREOF, PROPERTY OWNER ACKNOWLEDGES THAT FAILURE TO PAY ANY ASSESSMENT INSTALLMENT MAY RESULT IN THE ISSUANCE OF A TAX CERTIFICATE AND/OR TAX DEED AND MAY RESULT IN LOSS OF TITLE TO THE ASSESSED PROPERTY PURSUANT TO CHAPTER 197, FLORIDA STATUTES.

(B) Following the Closing Date, the Annual Payments shall be placed on the property tax bill for collection each year.

## SECTION 8. REBATES AND TAX CREDITS

(A) The Property Owner bears sole responsibility for identifying, applying for and obtaining any rebates, refunds, credits or allowances pertaining to the Qualifying Improvements which may be available from manufacturers, federal, state or local authorities or any other source. No rebates, refunds, tax credits or allowances shall be assigned to the Agency.

(B) Carbon and similar credits in the context of this subsection are a component of a market-based attempt to manage the growth in concentration of greenhouse gases. Such markets are not mature and are evolving. In order to effectively aggregate such credits, the Property Owner hereby conveys, in consideration of the Agency's agreement to allow for prepayment of the Assessment pursuant to Section 3(D) hereof received from, and hereby transfers to, the Agency any carbon, renewable energy, or similar credits attributable to the Qualifying Improvements, if any. Any proceeds or earnings resulting therefrom, if any, shall be deposited into a general or performance assurance fund and may be used to reimburse the Agency for any start up or ongoing program costs, the advancement of educational programs or energy audits, performance assurance funding or other reasonable costs or expenditures determined by the Agency to advance its mission and purpose of the Agency.

## SECTION 9. ATTORNEY-IN-FACT; PROGRAM APPLICATION

ATTORNEY-IN-FACT; PROGRAM APPLICATION. If the Property Owner consists of more than one individual or entity as record owner or there is an authorized signatory for any such record owner, then, except for the execution of this Agreement and any Notice of Assessment or Supplemental Notice of Assessment, each of which is required to be signed by all record owners by applicable law, each such record owner hereby appoints each of the other record owners and their authorized signatories of any joint tenancy or entity record owner as their agent or attorney-in-fact to act singularly (under a contingent or Florida general durable power of attorney or otherwise) and individually for each and every other record owner of the Assessed Property in order to apply for, cause the imposition of the Assessment, or undertake any act, transact any business and execute any documents associated with the Assessment in any way or as requested or required by the Agency or the Program Administrator; such that any instrument executed by any one of the record owners of the Assessed Property shall hereafter be ratified and deemed done on behalf of, and be binding upon, all record owners of the Assessed Property as if each record owner of the Assessed Property had separately signed and executed any instrument signed by any one of them. As required by law, any power will not be affected by subsequent incapacity of any of the record owners, unless as otherwise provided in Section 709.08, Florida Statutes.

## SECTION 10. MONITORING AND RECORDING OF TELEPHONE CALLS

AGR-2022-02-14

The Agency or Program Administrator may monitor and/or record telephone calls for security, customer service and training purposes. By executing this Agreement, the Property Owner agrees to have telephone calls with the Agency and the Program Administrator monitored and recorded.

## SECTION 11. HOLD HARMLESS AND WAIVER PROVISIONS

(A) The Property Owner understands that the selection of any products, equipment, and measures associated with the Qualifying Improvements, the selection of any Contractor, manufacturers, dealers, suppliers, contractors, and/or installers and the decision regarding the purchase, installation and ownership/maintenance of the Qualifying Improvements are the Property Owner's sole responsibility. Property Owner has not and shall not rely upon any representations or recommendations of the Agency, the Program Administrator, or any agents, representatives, assignees, or employees thereof, in making such selection or any decision concerning a Contractor , and the Property Owner understands that neither the Contractor nor any manufacturer, dealer, supplier, contractor or installer of the Qualifying Improvements is an agent, employee, assignee or representative of the Agency or the Program Administrator..

(B) Property Owner agrees and acknowledges that neither the Agency nor the Program Administrator make any warranty, whether express or implied, with respect to the choice, use or application of the Qualifying Improvements, including without limitation, the implied warranties of merchantability and fitness for any particular purpose, or the use or application of the Qualifying Improvements.

(C) Property Owner agrees and acknowledges that the Agency and the Program Administrator do not have or shall have no liability whatsoever and agrees to hold the Agency, the Program Administrator, and any other local government incorporator, participant or subscriber, or their officers, employees or agents, harmless concerning (1) the quality or safety of any Qualifying Improvements, including their fitness for any purpose, (2) the estimated energy savings or wind resistance produced by or performance of the Qualifying Improvements, (3) the workmanship of any Contractor or third parties, (4) the installation or use of the Qualifying Improvements including, but not limited to, any effect on indoor or outdoor pollutants, (5) the gathering and use of information associated with the Property Owner, the Assessed Property, or any other reasonably associated information authorized, provided or made available to the Agency and the Program Administrator, or (6) any other liability or matter whatsoever with respect to the provision, funding or financing of the Qualifying Improvements.

(D) The Property Owner hereby agrees and acknowledges that the Agency is entering into this Agreement solely for the purpose of assisting the Property Owner with the financing of the installation of the Qualifying Improvements on private property, and that the Agency, the Program Administrator, the owners of the bonds and the State and any local government have no responsibility of any kind for, and shall have no liability arising out of, the installation, operation, financing, refinancing, maintenance or performance of the Qualifying Improvements. Based upon the foregoing, the Property Owner hereby waives the right to recover from and fully and irrevocably releases the Agency, the Program Administrator, the owners of the bonds and the State and any local government and any and all agents, employees, program administrators, attorneys, representatives and successors and assigns of same from any and all losses, liabilities, claims, damages (including consequential damages), penalties, fines, forfeitures, costs and expenses (including all reasonable out-of-pocket litigation costs and reasonable attorney's fees), relating to the subject matter of this Agreement that the Property Owner may now have or hereafter acquire against any of the foregoing.

## SECTION 12. GOVERNING LAW; NON-JURY TRIAL

This Agreement shall be governed by the law of the State of Florida. Unless otherwise required by law, venue for any action or proceeding to construe or enforce the provisions of this Agreement or any matters associated therewith shall lie in the Circuit Court in and for Leon County, Florida. IN ANY ACTION, THE PARTIES WAIVE ANY RIGHT TO JURY TRIAL.

## SECTION 13. CONSTRUCTION; SEVERABILITY

This Agreement is a financing agreement as described in the Supplemental Act which evidences a duly levied and imposed non-ad valorem assessment constituting a valid and enforceable lien permitted by Article X, Section 4 of the Florida Constitution, of equal dignity to taxes and other non-ad valorem assessments and is paramount to all other titles, liens or mortgages not otherwise on parity with the lien for taxes and non-ad valorem assessments, which lien runs with, touches and concerns the Assessed Property. The drafting or preparation of this Agreement, and provisions hereof and any other associated documentation, shall not be construed for or against any party by reason of authorship. Each and every provision of this Agreement is, and shall be construed to be, a separate and independent covenant and agreement. If any term or provision of this Agreement or the application thereof shall to any extent be held to be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to circumstances other than those to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the extent permitted by law.

## SECTION 14. ENTIRE AGREEMENT; AMENDMENT; COUNTERPARTS

(A) This Agreement, together with the Exhibits A and B and the other documents listed in the Table of Contents, is the entire agreement between the parties. This Agreement may be modified only by the written agreement of the Agency and the Property Owner, except as otherwise provided herein with respect to amendment to Exhibits A and B and the Notice of Assessment. Any such agreement must be signed in writing by both parties, their authorized agents, and/or their respective successors. If there is more than one record owner of the Assessed Property, the obligations hereunder of the Property Owner shall be joint and several among all record owners and all record owners must execute this Agreement.

(B) The Exhibit B attached to this Agreement when executed by the Property Owner is referred to as the initial Exhibit B. The initial Exhibit B sets forth the estimated amounts of the terms of the Assessment based on the approval of the Application and the Estimated Completion Date, including, but not limited to, the maximum Assessment Amount (the "Maximum Assessment Amount"), the Project Amount (the "Project Amount"), and other amounts set forth on the initial Exhibit B also are estimated based on these amounts. The Property Owner hereby authorizes the Agency to prepare and record the Notice of Assessment. Once the Closing Date is established, the Agency is hereby directed and authorized to amend the initial Exhibit B to reflect the actual amounts that are estimated on the initial Exhibit B and substitute the amended Exhibit B for the initial Exhibit B attached to this Agreement and to amend the Notice of Assessment, in each case prior to the recordation of the Notice of Assessment. If the Property Owner at any time requests the Agency to approve a change to the Qualifying Improvements, the Project Amount, the Estimated Completion Date or any term set forth on Exhibit A or Exhibit B, and such change or changes are approved, as evidenced by the Agency issuing one or more amended Completion Certificates or other written document, the Agency is hereby directed and authorized to amend Exhibit A or Exhibit B or both and substitute the amended Exhibit(s) for the Exhibit(s) attached to this Agreement and to amend the Notice of Assessment, in each case prior to the recordation of the Notice of Assessment. If any such approved change occurs after the recordation of the Notice of Assessment, the Agency shall independently record in the Official Records, a Supplemental Notice of Assessment reflecting the applicable changes. Additionally, the Agency at any time may independently execute and record a Supplemental Notice of Assessment in order to unilaterally notice any change or matter otherwise not inconsistent with this Agreement or general law, including the correction of scrivener errors, for purposes of constructive notice;

AGR-2022-02-14

and, the Agency will in each such instance provide the Property Owner with a copy of such Supplemental Notice of Assessment. See Section 5 for additional information regarding the disbursement of the Project Amount.

(C) This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of such counterparts together shall constitute one and the same instrument. A certified copy of any document produced by the Agency shall be considered an original for all purposes under Chapter 90, Florida Statutes.

**IN WITNESS WHEREOF,** Property Owner and Agency have entered into this Agreement as of the last day signed below.

**FLORIDA PACE FUNDING AGENCY**



| | |
|---|---|
| ███████ | 4/20/2022 |
| Signature | Date |

| | |
|---|---|
| █████ | Authorized Signatory |
| Name | Title |

**IN** WITNESS WHEREOF, Property Owner and Agency have entered into this Agreement as of the last day signed below.

UNDER PENALTIES OF PERJURY
PROPERTY OWNER HAS READ THIS FINANCING AGREEMENT AND EACH OF THE OTHER DOCUMENTS LISTED ON THE TABLE OF CONTENTS AND HAS HAD AN OPPORTUNITY TO READ THE SUPPLEMENTAL ACT (s. 163.08, FLORIDA STATUTES). PROPERTY OWNER ACKNOWLEDGES THAT THIS IS A LEGALLY BINDING AGREEMENT ENFORCEABLE AGAINST THE PROPERTY OWNER AND THE SUCCESSORS IN INTEREST OF THE PROPERTY OWNER. IF THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE NOT UNDERSTOOD BY THE PROPERTY OWNER, PROPERTY OWNER CAN AND SHOULD SEEK THE ADVICE OF AN ATTORNEY BEFORE SIGNING THIS FINANCING AGREEMENT.

Property Owners:



Identity verification code                                    Date        2/14/2022

Identity verification code                                    Date        2/14/2022

AGR-2022-02-14

# Right to Cancel

| | |
|---|---|
| Financing ID |  |
| Owners | |
| | |
| Property Address | |
| Program Type | FPFA Residential |

**Your Right To Cancel the Financing Agreement:**

You are entering into a Financing Agreement with the Florida PACE Funding Agency ("Agency") for the financing of Qualified Improvements that will result in a governmental lien on the property at ███████████████. Under this Program, administered by FortiFi Financial, Inc. (the "Program Administrator"), you may cancel this transaction, without cost, within three (3) business days from the date on which you signed the Financing Agreement.

If you cancel this financing transaction, within 20 calendar days after the Agency receives notice of cancellation, the Agency must take the steps necessary to reflect the fact that, if recorded, the lien on your property has been discharged or nullified, and the Agency must return to you any money you have given to the Program Administrator in connection with your application for financing under the Program, not including any application processing fees, whether paid to the Agency, the Program Administrator, or third parties. You must return any funds paid to you or on your behalf, by or on behalf of the Agency, whether to your contractor or any other person, immediately. All money must be returned to the address below.

Florida PACE Funding Agency
ATTN: Cancellation
c/o FortiFi Financial, Inc.
200 Spectrum Center Drive Suite 1470
Irvine, CA 92618

**Acknowledgement (this page must be signed returned with the Financing Agreement)**
I/We hereby acknowledge receiving and reading this Notice of Right to Cancel.



Identity verification code          Date          2/14/2022

RTC-2022-02-14



Identity verification code                              Date        2/14/2022

# How to Cancel

If you decide to cancel this financing transaction for Qualifying Improvement(s), you must do so by notifying the Florida PACE Funding Agency in writing at:

> Florida PACE Funding Agency
> ATTN: Cancellation
> c/o FortiFi Financial, Inc.
> 200 Spectrum Center Drive Suite 1470
> Irvine, CA 92618

You may use any written statement that is signed and dated by you and states that you wish to cancel the Financing Agreement, or you may use this Cancellation of Financing Agreement by dating and signing below. Please keep a copy of this Cancellation of Financing Agreement for your records. If you cancel by mail, fax or email, you must send your written statement no later than midnight of the third business day following the date on which you signed the Financing Agreement. If you send or deliver your written statement to cancel some other way, it must actually be delivered to the above address no later than the date indicated in the preceding sentence.

## I/We Wish to Cancel

**(Only sign here if you are canceling your financing)**

|                          | Date |
|--------------------------|------|

|                          | Date |
|--------------------------|------|

CAN-2022-02-14

This instrument prepared by and executed
by a public office of the Florida PACE Funding
Agency and after recording return to:
FortiFi Financial, Inc.
200 Spectrum Center Drive Suite 1470
Irvine, CA 92618

------------------------------ (Space above this line for recording data) ------------------------------

# NOTICE OF ASSESSMENT

## Broward County

**THIS NOTICE OF ASSESSMENT** ("Notice") provides a summary memorandum of a Financing Agreement entered into by and between the FLORIDA PACE FUNDING AGENCY (the "Agency") and the record owner(s) of the Assessed Property (the "Property Owner"), both as described hereinafter. This Notice is executed pursuant to such Financing Agreement in substantially the form appended to Agency Resolution 2016-0809-3, a certified copy of which is recorded in the Official Records at ███████████ an Interlocal Subscription Agreement recorded at ███████████ a Final Judgment, a certified copy of which is recorded at ███████████ all in the Public Records of Broward County, Florida, and all of the terms and provisions thereof are incorporated herein by reference . The Agency has levied and imposed a non-ad valorem assessment as a lien of equal dignity to taxes and assessments, and as more particularly described herein and in such Financing Agreement, on the Assessed Property in conformance with Section 163.08, Florida Statutes (the "Supplemental Act").

1. Property Owner ████████████
2. Assessed Property: See Legal Description in Attachment I.
3. Street Address of Assessed Property: ████████████
4. Property Appraiser Parcel Identification Number: ████████████
5. Qualifying Improvements:
   Eligible Improvements: Roof - Shingle, Roof - Flat
6. Financed Amount (pursuant to the Financing Agreement; this amount may be reduced WITH SUCH REDUCED AMOUNT REFLECTED IN A RECORDED NOTICE OF ASSESSMENT): $21,515.15
7. Interest Rate (to be applied to the principal amount of the Financed Amount): 4.99%
8. Assessment Installment (pursuant to the Financing Agreement; this amount may be reduced WITH SUCH REDUCED AMOUNT REFLECTED IN A RECORDED NOTICE OF ASSESSMENT): $1,398.00
9. Period of years (number of Annual Payments): 30
10. The Annual Payment of the Assessment will appear on the same bill as for property taxes, and will include the Assessment Installment, plus any annual costs of administration and charges associated with the Assessment, annual collection costs, and annual charges required by the local property appraiser and tax collector.
11. The Assessment is NOT due on sale or transfer of the Assessed Property. Payoff and release information may be obtained by contacting the Florida PACE Funding Agency at: www.floridapace.gov; Telephone: (800) 969-4382; Email: Payoffs@FloridaPACE.gov
12. NOTE: Prepayment information must be requested ten (10) business days prior to any prepayment. Prepayments must be in immediately available funds.

13.  Suggested ALTA, Schedule B exclusion to coverage for title insurance professionals: "Non-ad valorem assessment, which by its term is not due upon sale, evidenced by notice recorded in Official Record Book _____, at Page_____,"

14.  The following caveat is intended to be supplemental, constructive notice provided in writing to any prospective purchaser as required by the Supplemental Act. So long as the Assessment provided for hereunder has an unpaid balance, at or before the time Property Owner enters into a contract to sell the Assessed Property, the Property Owner gives any prospective purchaser by law a written disclosure statement in the following form:

QUALIFYING IMPROVEMENTS FOR ENERGY EFFICIENCY, RENEWABLE ENERGY, OR WIND RESISTANCE - The property being purchased is located within the jurisdiction of a local government that has placed an assessment on the property pursuant to s. 163.08, Florida Statutes. The assessment is for a qualifying improvement to the property relating to energy efficiency, renewable energy, or wind resistance, and is not based on the value of the property. You are encouraged to contact the county property appraiser's office to learn more about this and other assessments that may be provided by law.

THE DECLARATIONS, ACKNOWLEDGEMENTS AND AGREEMENTS CONTAINED AND INCORPORATED HEREIN SHALL RUN WITH THE LAND DESCRIBED HEREIN AND SHALL BE BINDING ON THE PROPERTY OWNER (INCLUDING ALL PERSONS OR ENTITIES OF ANY KIND), AND ANY AND ALL SUCCESSORS IN INTEREST. BY TAKING SUCH TITLE, PERSONS OR ENTITIES WHO ARE SUCCESSOR SHALL BE DEEMED TO HAVE CONSENTED AND AGREED TO THE PROVISIONS OF THIS NOTICE AND THE REFERENCED FINANCING AGREEMENT TO THE SAME EXTENT AS IF THEY HAD EXECUTED IT AND BY TAKING SUCH TITLE, SUCH PERSONS OR ENTITIES SHALL BE ESTOPPED FROM CONTESTING, IN COURT OR OTHERWISE, THE VALIDITY, LEGALITY AND ENFORCEABILITY OF THIS AGREEMENT.

**IN WITNESS WHEREOF,** The Agency has executed this Notice, which is a summary memorandum of the Financing Agreement, as of the last day signed below.

Florida PACE Funding Agency



| ▇▇▇▇▇▇▇▇▇▇ | 4/20/2022 |
|---|---|
| Signature | Date |

| ▇▇▇▇▇▇▇ | Authorized Signatory |
|---|---|
| Name | Title |

**Attachment I**
**Legal Description of Property**

███████████████████████████

# FortiFi Financial, Inc. Privacy Statement

## IMPORTANT PRIVACY INFORMATION

### Understanding Your Rights

Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some, but not all sharing. Federal law also requires financial companies to tell you how they collect, share, and protect your personal information. Please read this notice carefully to understand what we do.

### Our Commitment

This statement is being provided by FortiFi Financial, Inc. which administers the origination of residential Property Assessed Clean Energy ("PACE") under the program (the "Program"). We appreciate and respect the trust you show in providing your personal information to us. We value our relationship with you, so therefore, explaining to you how we collect, use, and protect your personal information is important to us.

### Why We Collect Your Personal Information

We obtain and use your personal information to enable you to obtain financing for your property improvement projects which are eligible for PACE financing. We collect your personal information to identify you, confirm facts about you, and to help us assess your request for financing as well as to comply with the rules and requirements of the Program.

### Information We Collect

We obtain your personal information from a variety of sources, such as:

- Information that you, or others on your behalf, provided on applications and other forms you submit to the Program, including identifying information such as name, address, telephone number, email address, Social Security number and credit-related information such as your assets, income, and liabilities. We also collect your name, email address and telephone number when you contact the Program with a question or complaint (i.e. through a visit to our website, a telephone call to our offices which may be monitored and recorded for security and other purposes) and by fax or email correspondence you initiate with the Program.
- Information from your dealings and relationships with us, contractors which participate in the Program on your behalf, and others, such as financing information, services provided to you, and how you perform on your outstanding credit obligations.
- Information from consumer reporting agencies such as your credit history and credit score.
- Information, such as employment status and demographic data, from outside sources like, employers, government agencies, marketing firms, and other sources.

### Protecting Your Personal Information

Safeguarding your personal information is important to us. We use systems, policies, and procedures that represent current best practices, and which comply with federal law to maintain the accuracy of your personal information and to protect it from loss, misuse, or alteration. Your personal information is accessible by appropriate personnel who

PRV-2022-02-14

have a business need for your personal information. We provide training and communications programs to educate our personnel about the meaning and requirements of this statement.

## How We Use Customer Information

We use your personal information for our everyday business purposes such as to meet your requests for financing of your property improvement project under the Program, administer your account, comply with legal requirements, or report to credit bureaus.

## Sharing Information with Unrelated Companies

All financial companies need to share personal information to run their everyday business. In order to provide you with the services you request, we share your personal information with unrelated companies—companies that are not affiliated with us. This sharing allows us to service accounts, provide the services or products requested, report our experiences to credit bureaus, protect our business against fraud and unauthorized transactions, and respond to governmental requests and regulatory requirements, including reporting requirements of the Program. We do not share your personal information with other companies unless an agreement to protect your personal information is in place, except as otherwise permitted by law or regulation.

Most commonly, we may share your personal information with financial service providers and non-financial companies that provide services for us or on our behalf, such as companies that prepare account invoices or statements, help us service accounts, provide computer and systems support, and other services. We also share your personal information with the contractor you have selected to complete your property improvement project and we require that the contractor to maintain the confidentiality of your personal information and to use it solely for the purpose of completing your property improvement project.

We also share your personal information with municipalities, counties, joint power authorities and the agencies of the state in which your property is located as required by the terms of the Program and applicable laws and regulations.

Simply put, we share your personal information as necessary to effect, administer and consummate the financing of your property improvement project that you have requested we provide to you. We do not use your personal information in any fashion to market products or services to you other than the products and services directly related to the financing you have requested that we provide under the Program.

It is important to note that we do not sell your personal information and we do not provide your account or other personal information to non-affiliated third parties for the purpose of independent telemarketing or direct mail marketing of any products or services.

PRV-2022-02-14

# FortiFi Financial, Inc. Disclosure and Acknowledgment

Please read this FortiFi Financial, Inc. Disclosure and Acknowledgment carefully and print and/download or otherwise keep a copy for your records.

The following disclosures contain important information about the FortiFi Financial, Inc. ("FortiFi") PACE program (the "Program") with specific reference to the consequences and potential consequences of your agreement to finance your property improvement project by agreeing to place a non-ad valorem tax assessment ("PACE Assessment") on your property. These disclosures are in addition to the disclosures and other information set forth in (1) the Florida Residential Financing Application, (2) the Florida Property Owner Handbook and (3) the Financing Agreement, all of which should be reviewed carefully before you decide to participate in the Program.

Your acknowledgment that you have read and understood each of the following disclosures and is evidenced by your completion of this form as indicated below. If you require additional information regarding any of the disclosures set forth below, or any other aspect of the Program, you should contact the Program at (858) 345-2000 and speak to a representative of FortiFi If, after reviewing the disclosures set forth below, you do not want to accept one or more of the consequences or potential consequences of accepting PACE Financing, you should not proceed with your Application to participate in the Program.

## Federal Housing Finance Agency; Potential Restriction on Sale and/or Refinance

On December 22, 2014, the Federal Housing Finance Agency ("FHFA") which oversees the eleven Federal Home Loan Banks ("FHLBanks") and Fannie Mae and Freddie Mac issued a statement (which has been confirmed by subsequent statements and remarks) in which it made clear that Fannie Mae and Freddie Mac's policies prohibit them from purchasing a mortgage where the property is subject to a first lien PACE Assessment. FHFA has made it clear that Fannie Mae and Freddie Mac should neither purchase nor refinance mortgages which are encumbered by PACE Assessments.

As a consequence of the FHFA position on PACE Assessments, you may have difficulty selling your home or refinancing your mortgage if you agree to a PACE Assessment attached to your property. Specifically, some Mortgage Lenders or Secondary Mortgage Market Purchasers may either (1) refuse to refinance an existing mortgage, (2) refuse to finance the purchase of any property or (3) refuse to purchase mortgages in the secondary mortgage market with respect to property subject to the type of assessment which would be created by participating in the Program. This may mean that if you desire to sell your property or refinance your mortgage after you obtain a PACE Assessment, you may be required to prepay the Assessment before you can close such a transaction.

## Notice to Lender; Monthly Mortgage Escrow Payment

In the event you choose to enter into a Financing Agreement, we will provide on your behalf at least thirty (30) days before you enter into a Financing Agreement written notice of that fact to your mortgage holder or mortgage servicer. This notice will include the maximum principal amount to be financed and the maximum annual assessment payment necessary to repay that amount which may cause an increase in the monthly escrow payments which are required pursuant to the terms of your mortgage with respect to your annual real estate tax payment obligation. We urge you to carefully review your mortgage documents and contact your lender before you execute a Financing Agreement if

DIS-2022-02-14

you have any concerns with respect to the impact of a PACE Assessment on your mortgage.

## Progress Disbursements

You have the right to withhold payment to the contractor you have selected to install the PACE Qualifying Improvements until your property improvement project is completed to your satisfaction. Many contractors require payment of a portion of the project cost before the project is completed ("Progress Disbursement"). Progress Disbursements are governed by the terms of the Florida Completion Certificate (Multiple Disbursements) and you should discuss all aspects of your contractor's request for a Progress Disbursement with your contractor and determine that you are comfortable authorizing a Progress Disbursement. If you authorize a Progress Disbursement, interest on the full amount of the PACE Assessment will begin to accrue from the date of the Progress Disbursement.

## Assessment Lien

When you finance your property improvement through a PACE Assessment you are creating a non-ad valorem special assessment lien on your property. The assessment lien recorded by the Agency against your property will be superior to all other titles, liens or mortgages, and is of equal dignity with property taxes and other governmental assessments.

## Annual Assessment Installment

The annual installment on your PACE Assessment will be included on your real estate tax bill which is sent to you in early November of each year. Unlike your annual real estate taxes, there is no discount for paying the annual installment on your PACE Assessment early.

## Tax Lien Certificates

In the event you do not pay the annual assessment installment when due, the Tax Collector will sell a tax lien certificate at a date and time advertised by the Tax Collector on or before June 1st of the year following the tax year for which the taxes were not paid. A tax certificate represents a lien for unpaid real estate taxes. The amount of the tax lien certificate is the sum of the unpaid real estate taxes and non-ad valorem assessments, penalties, advertising costs and fees. As a result of this process there is a significant risk that you may ultimately lose title to your property if you do not pay the annual assessment installment when due.

## Prepayment of the PACE Assessment and Prepayment Fee

You have the right to prepay all or a portion of the remaining balance of your PACE Assessment at any time subject to certain requirements, including the payment of interest on the PACE Assessment for a period subsequent to the date you prepay the PACE Assessment. You have the option to pay off the remaining balance of your PACE Assessment amount at any time in full or in any amount of at least $2,500.

A prepayment is calculated to include the principal amount of the assessment to be prepaid (Assessment Prepayment Amount) and interest on the Assessment Prepayment Amount to the 15th day of the month occurring at least 20 days following the date the prepayment is made. There is no premium or prepayment penalty. A recording fee and an administrative fee will be added to the Assessment Prepayment Amount. There is no discount for prepaying all or a portion of the remaining balance on your PACE Assessment.

## Closing Costs; Prepaid Interest

You will incur fees and other costs for using the Program as set forth in Section 3 (B) of the Financing Agreement ("Closing Costs"). In addition, interest on the full amount of the PACE Assessment will begin to accrue on the date the bond to fund the PACE Assessment is issued, which is the date the first disbursement to your contractor is made. Depending on the timing of enrollment of your PACE Assessment in the County tax roll, an interest payment on such bond may be due before your first payment under the Financing Agreement. In such case, you must prepay the amount of that interest at the closing of your PACE Assessment ("Prepaid Interest").

You have a right to either finance or pay the Closing Costs and Prepaid Interest on the closing of your PACE Assessment. If you decide to pay these amounts at closing, you must notify the Program of your decision prior to closing by calling the Program at (855) 500-9505. If you fail to so notify the Program, Closing Costs and Prepaid Interest will be capitalized and added to the amount of the PACE Assessment.

## Tax Advice

Nothing in any publication of the Program should be considered as tax advice and it your responsibility to consult with your personal tax advisor regarding any tax benefits which may be available to you as a result of your participation in the Program.

## Property Valuation

The Program makes no representation or warranty that the property improvements to be financed by the PACE Assessment will increase the overall value of your property.



Identity verification code                          Date     2/14/2022

Identity verification code                          Date     2/14/2022

DIS-2022-02-14

# EXHIBIT A TO FINANCING AGREEMENT

DESCRIPTION OF ASSESSED PROPERTY, DESCRIPTION OF QUALIFYING IMPROVEMENTS, AND ADDRESSES
FOR NOTICES



Property Owners Names:

Property Address:

Property ID:

County:                  Broward County

Legal Description of Property:

## Description of Qualifying Improvements:

| Improvement | Useful Life | Quantity | Amount |
|---|---|---|---|
| Roof - Shingle | - | 2200 | $16,100.00 |
| Roof - Flat | - | 500 | $3,500.00 |

## Addresses for Notices:

Program Administrator:        FortiFi Financial

Attn: Assessment Notice

200 Spectrum Center Drive Suite 1470

Irvine, CA 92618

Property Owner:



A-2022-02-14

# EXHIBIT B TO FINANCING AGREEMENT[1]

SUMMARY OF ASSESSMENT TERMS; SINGLE PAYMENT DISBURSEMENT SUMMARY; SCHEDULE OF ANNUAL PAYMENTS (ASSESSMENT INSTALLMENTS AND ESTIMATED ANNUAL COLLECTION COST)

## Summary of Assessment Terms:

The schedule of the estimated Annual Payments set forth in this Exhibit B is based on the following. Those items which are based on estimates or assumptions and, therefore, subject to change are footnoted.

| | |
|---|---|
| Maximum Assessment Amount[2] | $32,500.00 |
| Maximum Annual Payment | $2,349.49 |
| Project Amount | $19,600.00 |
| **Closing Costs** | |
| Application Charge(s) pursuant to Section (3)(B)(1) | $0.00 |
| Program Administration Charge pursuant to Section 3(B)(2)[3] | $1,370.04 |
| Recording Fee(s) pursuant to Section 3(B)(3) | $41.00 |
| Reserve Fund Deposit pursuant to Section 3(B)(4)[4] | $53.79 |
| Prepaid Interest pursuant Section 3(B)(6)[5] | $450.32 |
| Total Closing Costs | $1,915.15 |
| Financed Amount (Project Amount + Total Closing Costs)[6] | $21,515.15 |
| **INTEREST RATE** | **4.99%** |
| Term of Assessment (in years) | 30 years |
| Administrative Reserve Account Deposit pursuant to Section 3(B)(5) | $10.00 |
| Estimated Annual Payment | $1,421.98 |
| **TOTAL INTEREST (OVER THE TERM OF THE ASSESSMENT)** | **$20,424.67** |
| Assessment Amount (Financed Amount + Total Interest) | $41,939.82 |
| Estimated Completion Date | Feb. 14, 2022 |
| Initial Tax Year on Roll[7] | 2022 |
| Applicable Tax Roll Deadline | July 1, 2022 |
| Prepayment Fee Applicable | $0.00 |

1. This is the initial Exhibit B setting forth the estimated amounts relating to the Assessment. This Exhibit B will be amended to reflect the actual amounts of the Assessment as described in Section 14(B) of this Financing Agreement.
2. The Maximum Assessment Amount is the maximum amount that the Agency will finance under this Agreement for Qualifying Improvements assuming a bond will be issued to obtain the funds necessary to finance the

Assessment on Estimated Completion Date.

3. The Program Administration Charge is a percentage of the Financed Amount. The amount listed above is based on the Financed Amount. If the Financed Amount is reduced, then the amount of this charge will be reduced pro-rata.

4. The Reserve Fund Deposit is 0.25% of the Financed Amount. The amount listed above is based on the Maximum Financed Amount. If the Maximum Financed Amount is reduced, then the amount of this charge will be reduced accordingly.

5. The Prepaid Interest is the amount assuming the Financed Amount and assuming a bond will be issued to obtain the funds necessary to finance the Assessment on the Estimated Completion Date.

6. The Financed Amount is based on the Project Amount and the amounts affected by that amount.

7. The Estimated Initial Tax Year on Roll shown on this schedule is based upon the assumed bond issuance date of Estimated Completion Date. The actual Initial Tax Year on Roll will be based upon the actual bond issuance date.

8. Collection fees may be added to the final assessment amount. These fees vary and are based on changes in the Tax Collector's fees schedules and policies.

B-2022-02-14

## Annual Percentage Rate:

Based on the schedule above, the Annual Percentage Rate (APR) of the Assessment is 5.83%. APR is the effective cost of credit, expressed as a percentage interest rate, which includes the interest and certain other costs over the Assessment term, but does not include the Annual Collection Cost.

## Prepayment:

As the Property Owner you have the right to pay off your Assessment at any time in full, or in any incremental amount of at least $2,500 pursuant to Section 3(D) of this Financing Agreement. However, if you do so, you will have to pay any delinquent installments of the Assessment together with any statutory penalties thereon, the Financed Amount to be prepaid ("Assessment Prepayment Amount"), interest on the Assessment Prepayment Amount to the 15th day of the month occurring at least 20 days following the date the prepayment is made, the Annual Collection Cost and any other charges associated with such prepayment as specified in Section 3(D) of this Financing Agreement.

## Disbursement Summary:

Summary of disbursements will be set forth in the Certificate of Completion.

B-2022-02-14

## Schedule of Estimated Annual Payments (Assessment Installments and Estimated Annual Collection Cost):

This schedule of the estimated Annual Payments (Assessment Installments and estimated Annual Collection Cost) is based on the estimates and assumptions set forth on the table of Summary of Assessment Terms in this Exhibit B.

| Tax Year | Principal (a) | Interest (b) | Assessment Installment (a) + (b) | Estimated Annual Collection Cost* (c) | Estimated Annual Payment (a) + (b) + (c) |
|---|---|---|---|---|---|
| 2022[2] | $324.39 | $1,073.61 | $1,398.00 | $23.98 | $1,421.98 |
| 2023 | $340.58 | $1,057.42 | $1,398.00 | $23.98 | $1,421.98 |
| 2024 | $357.58 | $1,040.42 | $1,398.00 | $23.98 | $1,421.98 |
| 2025 | $375.42 | $1,022.58 | $1,398.00 | $23.98 | $1,421.98 |
| 2026 | $394.15 | $1,003.85 | $1,398.00 | $23.98 | $1,421.98 |
| 2027 | $413.82 | $984.18 | $1,398.00 | $23.98 | $1,421.98 |
| 2028 | $434.47 | $963.53 | $1,398.00 | $23.98 | $1,421.98 |
| 2029 | $456.15 | $941.85 | $1,398.00 | $23.98 | $1,421.98 |
| 2030 | $478.91 | $919.09 | $1,398.00 | $23.98 | $1,421.98 |
| 2031 | $502.81 | $895.19 | $1,398.00 | $23.98 | $1,421.98 |
| 2032 | $527.90 | $870.10 | $1,398.00 | $23.98 | $1,421.98 |
| 2033 | $554.24 | $843.76 | $1,398.00 | $23.98 | $1,421.98 |
| 2034 | $581.90 | $816.10 | $1,398.00 | $23.98 | $1,421.98 |
| 2035 | $610.94 | $787.06 | $1,398.00 | $23.98 | $1,421.98 |
| 2036 | $641.42 | $756.58 | $1,398.00 | $23.98 | $1,421.98 |
| 2037 | $673.43 | $724.57 | $1,398.00 | $23.98 | $1,421.98 |
| 2038 | $707.03 | $690.97 | $1,398.00 | $23.98 | $1,421.98 |
| 2039 | $742.31 | $655.69 | $1,398.00 | $23.98 | $1,421.98 |
| 2040 | $779.35 | $618.65 | $1,398.00 | $23.98 | $1,421.98 |
| 2041 | $818.24 | $579.76 | $1,398.00 | $23.98 | $1,421.98 |
| 2042 | $859.07 | $538.93 | $1,398.00 | $23.98 | $1,421.98 |
| 2043 | $901.94 | $496.06 | $1,398.00 | $23.98 | $1,421.98 |
| 2044 | $946.95 | $451.05 | $1,398.00 | $23.98 | $1,421.98 |
| 2045 | $994.20 | $403.80 | $1,398.00 | $23.98 | $1,421.98 |
| 2046 | $1,043.81 | $354.19 | $1,398.00 | $23.98 | $1,421.98 |
| 2047 | $1,095.90 | $302.10 | $1,398.00 | $23.98 | $1,421.98 |

B-2022-02-14

| Tax Year | Principal (a) | Interest (b) | Assessment Installment (a) + (b) | Estimated Annual Collection Cost* (c) | Estimated Annual Payment (a) + (b) + (c) |
|---|---|---|---|---|---|
| 2048 | $1,150.58 | $247.42 | $1,398.00 | $23.98 | $1,421.98 |
| 2049 | $1,208.00 | $190.00 | $1,398.00 | $23.98 | $1,421.98 |
| 2050 | $1,268.28 | $129.72 | $1,398.00 | $23.98 | $1,421.98 |
| 2051 | $1,331.38 | $66.44 | $1,397.82 | $23.98 | $1,421.80 |

* Estimated Annual Collection Cost may increase or decrease as provided in Section 3(C).

B-2022-02-14

# BROWARD COUNTY PROPERTY OWNER INCOME ATTESTATION

The Broward County program requires that the **total amount of annual PACE assessments** do not exceed four percent (4%) of the total annual gross income of the property owner in the prior calendar or fiscal year, based upon an affidavit or attestation by the property owner of the owner's total annual gross income.

The estimated annual assessment payment to repay your financing is **$1,421.98**.

 am/are the owner(s) of the property located at:

attest that our annual gross household income is at least $35,549.50 and that our property taxes plus new assessment $7,232.98 does not exceed five percent of property fair market value $440,542.00



Identity verification code                    Date        **2/14/2022**

Identity verification code                    Date        **2/14/2022**



BIA-2022-02-14

# EXHIBIT D



Completion Certificate

# FortiFi

Phone        1 858 345 2000

Email        info@fortifi.com

Address      200 Spectrum Center Drive Suite 1470

             Irvine, CA 92618

             www.fortifi.com

e3_cc 76A79CE8 v1 r1

# Completion Certificate



| | |
|---|---|
| Contractor | |
| Address | |
| Contact | |
| Property Address | |
| Owners | |

## Instructions

1. Upon completion of the Installed Improvements ("Improvements") listed below:
2. Sign this Completion Certificate;
3. Prepare required attachments, as applicable; and
4. Submit to PACE Program ("Program") Administrator FortiFi Financial ("FortiFi");

Upon receipt of this Completion Certificate and attachments, FortiFi will transfer the proceeds of the PACE financing assigned by the Property Owner to G&R Doors and Windows for the Improvements.

## Installed Improvements

| Improvements | Qty | Amount |
|---|---|---|
| Roof - Shingle | 2,200 | $16,100.00 |
| Roof - Flat | 500 | $3,500.00 |
| | Total cost of Improvements | $19,600.00 |

CC1-2022-04-15



I, the undersigned hereby certify that:

1. The Improvements made to the Property are complete to the satisfaction of the Property Owner;
2. All Improvements contracted to be provided by Contractor have been fulfilled with new equipment, in accordance with manufacturers' recommendations, to the satisfaction of the Property Owner;
3. I have read, understand and complied with all terms of the Contractor Program Participation Agreement;
4. All Improvements made to the Property meet the program eligibility criteria as described in the Florida PACE Financing Agency ("FPFA") Program Handbook;
5. I have the correct and current licensing/classifications from the Contractors State Licensing Board to install the Improvements;
6. I have verified that the Property Owner has obtained all necessary final permits and inspections required for the Improvements made;
7. I have inspected the Improvements made, and certify that they are properly installed and in good working condition as of the date of my signature below;
8. The Property Owner signed this Completion Certificate after the Improvements were complete and the signature is genuine;
9. I hereby assign my rights to place a mechanics lien, stop notice, or any right against labor and material bond on the job to FortiFi Financial, Inc.; and
10. I have the authority to sign this Completion Certificate on behalf of G&R Doors and Windows

Authorized Signatory

Name

Date    4/15/2022

CC1-2022-04-15

## Property Owners

## Do NOT sign until the improvements have been completed to your satisfaction

I, the undersigned hereby certify that:

1. The Improvements listed above have been made to the Property and are complete to my satisfaction;
2. I have read, understood and complied with all terms of the FPFA Program Handbook;
3. I understand that the selection of the Contractor and acceptance of the materials used and work performed to complete the Improvements is my responsibility;
4. I understand that the Contractor is not an agent of FortiFi, and FortiFi does not endorse the Contractor or make any representations as to the completion, installation, design, economic value, energy savings, water savings, durability or reliability of the Improvements;
5. I have obtained all necessary final permits and inspections required for the Improvements;
6. The products procured or installed on the Property in the process of completing the Improvements were new, comply with FortiFi's eligible improvements list and are as agreed upon; and
7. I hereby instruct FortiFi to release to the Contractor the total cost of the Improvements indicated on this Completion Certificate.



Identity verification code                                      Date        **4/19/2022**

Identity verification code                                                  **4/19/2022**

CC1-2022-04-15

# EXHIBIT E



## FIONA MA, CPA
### CALIFORNIA STATE TREASURER

March 3, 2020

Federal Housing Finance Agency
400 Seventh Street SW, Eighth Floor
Washington, DC 20219
ATTENTION: PACE Request for Input, Notice No. 2020-N-1

Re: PACE Request for Input, Notice No. 2020-N-1

Sent via email: RegComments@fhfa.gov

To Whom It May Concern:

I am writing on behalf of the California Alternative Energy and Advanced Transportation Financing Authority (CAEATFA) with regards to the Property Assessed Clean Energy (PACE) request for information (RFI).

For some background, CAEATFA operates the California PACE Loan Loss Reserve Fund, which was created in 2014 in response to concerns raised by FHFA about the potential risks PACE may pose to first mortgage holdersSpecifically, the PACE Loss Reserve Program seeks to mitigate potential risk to first mortgage lenders by making them whole for losses incurred due to the existence of a first-priority PACE lien on a property during a foreclosure or forced sale.

FHFA has voiced its concern on several occasions that PACE may materially increase financial risks to first mortgage holders and, by extension, the Enterprises. As the California state entity charged with managing the PACE Loan Loss Reserve Fund, my office has a unique perspective to share on this issue. Over the last six years, the degree of financial risk PACE poses to first mortgage lenders has been rigorously put to the test in California, the nation's largest housing market.

In 2014, the PACE Loss Reserve Program was launched to support residential PACE financing for energy or water efficiency improvements, the installation of distributed generation renewable energy sources, and electric vehicle charging infrastructure. Specifically, the PACE Loss Reserve Program mitigates potential risk to first mortgage lenders by making them whole for losses incurred due to the existence of a first-priority PACE lien on a property during a foreclosure or forced sale.

The results over the last six years speak for themselves: The California PACE Loss Reserve Program has not been used at all. The California Budget Act of 2013 originally funded the Program with $10 million. According to the public agency managing the Loss Reserve, the California Alternative Energy and Advanced Transportation Financing Authority (CAEATFA), there have been no claims against the Loss Reserve and the original $10M funding is expected to last beyond ten years.

From a risk-mitigation perspective, these empirical results from California collected over the last six years clearly demonstrate that the risk PACE poses to first mortgage lenders and the Enterprises is essentially non-existent. This extremely positive outcome actually exceeds the performance of mortgages more generally, since the first mortgage lender always assumes some risk in lending. What's statistically significant, in this case, is that all evidence to date suggests that there is no new or added financial risk posed by PACE to mortgage lenders or the Enterprises.

Federal regulatory action to potentially limit access to PACE without proper data or cause would infringe on the rights of state and local governments to provide a safe and affordable financing solution to their constituents, and to advance critical sustainability goals through the use of private funds. Should you require further information, feel free to contact my me at Fiona.Ma@treasurer.ca.gov or 916-653-2995.

In Peace and Friendship,

Fiona Ma, CPA
Treasurer, State of California