## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BUILDING RESILIENT INFRASTRUCTURE
& DEVELOPING GREATER EQUITY, INC.,
   *Plaintiff,*

*v.*

CONSUMER FINANCIAL PROTECTION
BUREAU *and* RUSSELL VOUGHT, *in his
official capacity as Acting Director, Consumer
Financial Protection Bureau,*
   *Defendants.*

Case No. 8:25-cv-1367

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

### INTRODUCTION

Property Assessed Clean Energy ("PACE") financing is a government initiative that multiple States—including Florida—have adopted to offer homeowners the ability to finance certain energy efficient and weather-hardening home-improvement projects through a voluntary assessment on their regular property tax bill. PACE financing empowers States, through their state taxing power, to provide low- and middle-income property owners an affordable and equitable means to finance critical home-improvement projects that they may otherwise have to forgo—projects that are crucial in natural-disaster-prone States like Florida. PACE programs also provide States with an effective tool to pursue their sovereign objectives, such as water conservation, disaster readiness, storm hardening, and infrastructure maintenance.

In 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA" or "the Act"). Section 307 of the Act, in

turn, directed the Consumer Financial Protection Bureau ("CFPB") to "prescribe regulations that carry out the purposes of" two identified sections of the Truth in Lending Act ("TILA"), related to determining a consumer's ability to repay certain loans, while "account[ing] for the unique nature of [PACE] financing" when issuing those regulations.  15 U.S.C. § 1639c(b)(3)(C)(ii).  CFPB then promulgated the clearly illegal *Residential Property Assessed Clean Energy Financing (Regulation Z)*, 90 Fed. Reg. 2434 (Jan. 10, 2025) ("Final Rule"), which purports to apply essentially *all* TILA provisions—not just statutorily authorized ability-to-pay provisions—as well as portions of the Real Estate Settlement Procedures Act ("RESPA") and the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act"), to PACE financing transactions.

This Court should preliminarily enjoin the unlawful Final Rule, which will devastate the PACE industry.  The Final Rule is unlawful in numerous respects, including wildly exceeding CFPB's narrow statutory authority by applying essentially *all* TILA provisions, and much more, to PACE financing, while also violating the Tenth Amendment by regulating and commandeering States' sovereign taxing authority.  The Final Rule also irreparably harms Plaintiff's members by requiring compliance with onerous regulations that CFPB has no authority to mandate and that will devastate their businesses, while undermining public interest by removing this valuable financing option from consumers and States.

## BACKGROUND

*PACE Financing*. PACE is a financing method authorized and regulated by state and local governments that allows homeowners to fund clean-energy, natural-disaster-mitigation, and other critical infrastructure improvements through voluntary property tax assessments. Gibbs Decl., Ex.B at 1-3 (hereinafter "Renew Comment"); *see id.*, Ex.C at 1 (hereinafter "FortiFi Comment"); *id.*, Ex.D at 1–2 (hereinafter "PACENation Comment"). PACE financing relies on States' power to issue property tax assessments, *see* Renew Comment at 1–2*;* FortiFi Comment at 6–11, and the "creditor" in PACE transactions is the local government entity sponsoring the PACE program, 90 Fed. Reg. at 2449. PACE administrators help consumers determine whether proposed projects qualify for PACE and work with PACE contractors to complete the project. Renew Comment at 2, 17, 29. The PACE assessment then appears as a line item on the homeowner's regular tax bill, *id.* at 2, 22, such that PACE assessments "are collected in the same manner and at the same time as the general taxes of the city or county on real property," *In re Hero Loan Litig.*, No.EDCV-16-08943-AB, 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017) (citation omitted).

PACE programs are "active" in Florida, California, and Missouri, with enabling legislation present in many other States. 90 Fed. Reg. at 2435. Florida, in particular, has multiple active residential PACE programs currently operating, *see* Gibbs Decl., Ex.E,[1] enacted as an exercise of the State's taxing power, Fla. Stat.

---

[1] Available at https://www.pacenation.org/pace-programs (all webpages last accessed June 4, 2025).

§ 163.081(1)–(2), to support Florida's energy and disaster mitigation policies, *id.* §§ 163.08(1)(b), 163.08(4)(b), subject to careful State regulation, *see id.* § 163.081.

*EGRRCPA and TILA*. TILA requires creditors "to disclose information [to consumers] relating to such things as finance charges, annual percentage rates of interest, and borrowers' rights," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004), and to comply with other rules for "consumer credit transaction[s]," including lending requirements related to residential mortgages, *id.*; *see, e.g.*, 15 U.S.C. § 1639c. TILA's requirements only apply to transactions where a creditor offers or extends credit to a consumer, *see* 12 C.F.R. § 1026.1(c); *see also* 15 U.S.C. § 1602(f), (i)—with "credit" defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," 15 U.S.C. § 1602(f), and "consumer" defined as a "natural person" to whom credit is extended, *id.* § 1602(i). TILA imposes various obligations on a creditor who lends credit to a consumer in the form of a "residential mortgage loan"—defined, in relevant part, as "any consumer credit transaction that is secured by a mortgage . . . or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling." *Id.* § 1602(dd)(5). CFPB is responsible for enforcing TILA and "prescrib[ing] regulations to carry out [TILA's] purposes," 15 U.S.C. § 1604(a), which are found within "Regulation Z," 12 C.F.R. § 1026. Regulation Z also implements certain related provisions of RESPA, 12 U.S.C. § 2601 *et seq.*, which sets forth additional disclosure requirements for mortgage loan transactions, *see* 90 Fed. Reg. at 2442.

Section 307 of EGRRCPA, in turn, directed CFPB to promulgate regulations to adapt specific portions of TILA's ability-to-repay requirements for residential mortgage loans to PACE financing transactions, "which [regulations] shall account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii).

*The Final Rule*. On January 10, 2025, CFPB promulgated its Final Rule, which has several notable features. *First*, the Rule classifies "PACE transactions as credit under TILA," meaning PACE transactions are now subject "generally to TILA," 90 Fed. Reg. at 2447–48. CFPB achieved this sleight of hand by changing a decades-old exclusion from the definition of "credit" for all "tax liens and tax assessments" so that now the exclusion would only apply to *involuntary* tax liens and assessments. *See id*. at 2443. *Second*, by defining PACE transactions as residential "credit" under TILA, PACE transactions are now mortgage "*loans*" under the SAFE Act. The SAFE Act requires States to fingerprint, test, and license any individual who takes applications or offers or negotiates the terms of mortgage "loans" (other than bank employees)— so-called "mortgage loan originator[s]." *Id*. at 2495; *see* 12 C.F.R. pt. 1008. *Third*, under the Final Rule, PACE transactions also qualify as mortgage "loan[s]" under RESPA. CFPB, Proposed Rule, 88 Fed. Reg. 30388, 30405 & n.159 (May 11, 2023). This, combined with defining PACE transactions as "credit" under TILA, means local government sponsors—as the PACE "creditors"—are obligated to provide consumers "the TILA-RESPA integrated disclosure forms" applicable to mortgage loans, with limited exemptions. 90 Fed. Reg. at 2452–53. *Fourth*, the Final Rule applies "TILA's ability-to-repay requirements" under TILA and Regulation Z's "existing [ ]

framework" to PACE transactions, with certain "adjustments." 90 Fed. Reg. at 2464–65. *Finally*, the Final Rule applies "the TILA-RESPA waiting period" to PACE transactions, *id.* at 2455, under which any loan estimate incurs a seven-day waiting period before the consumer can consummate the loan. To support the Final Rule, CFPB relied on its own report entitled "PACE Financing and Consumer Financial Outcomes: Data Point," *id.* at 2440; *see* Gibbs Decl. Ex.A (hereinafter "PACE Report"), which is flawed in numerous respects, *infra* pp.17–20.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish four factors: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015) (citation omitted). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success," *Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020) (citation omitted), and courts must balance the strength of a plaintiff's showings on likelihood of success and the equities, *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (citation omitted). Suffering monetary losses "with no guarantee of eventual recovery" constitutes "irreparable harm," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam), including "because of sovereign immunity," *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Because the APA's limited waiver of sovereign immunity does not permit recovery of money damages, substantial, "nonrecoverable" compliance "costs" incurred because of an agency's challenged rule constitute irreparable harm, *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted).  The third and fourth factors "merge" where "the Government is the opposing party," *Nken v. Holder*, 556 U.S 418, 435 (2009), with the Government having no interest in enforcing an illegal rule, *see Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580–81 (2017) (per curiam).

## ARGUMENT

I.   **The Court Should Preliminarily Enjoin The Final Rule**

   **A. Plaintiff Has Shown That The Final Rule Is Likely Unlawful**

   **1. The Final Rule Exceeds CFPB's Statutory Authority Under Section 307 Of EGRRCPA In Two Respects**

a. The Final Rule vastly exceeds Congress' grant of rule-making authority to CFPB under Section 307 of EGRRCPA by applying essentially all of TILA, parts of RESPA, and other consumer protection laws, to PACE financing.

Under Section 307's text, Congress specified that CFPB only had authority to apply a single conduct-specific TILA provision and an accompanying liability provision to PACE financing transactions.  Section 307 directs CFPB to "prescribe regulations that carry out the purposes of subsection (a) [of 15 U.S.C. § 1639c, within TILA] and apply section 1640 of this title with respect to violations under subsection (a) of [§ 1639c] with respect to [PACE] financing."  15 U.S.C. § 1639c(b)(3)(C)(ii).  Subsection (a), entitled "Ability to repay," prohibits creditors from making residential

mortgage loans without first making "a reasonable and good faith determination" that "the consumer has a reasonable ability to repay the loan" and its associated fees according to the loan's terms. *Id.* § 1639c(a). Section 1640, TILA's "Civil liability" provision, sets out the procedures a consumer must follow to seek a civil remedy against "creditors" for violations of TILA's ability-to-repay requirement. *Id.* § 1640. CFPB thus *only* had the authority to apply Sections 1639c(a) and 1640 to PACE financing.

The Final Rule wildly exceeds this authority by applying almost all of TILA, portions of RESPA, and other laws to PACE financing. *See* 90 Fed. Reg. at 2442; 15 U.S.C. § 1639c(b)(3)(C). The Rule applies the far-reaching "TILA-RESPA integrated disclosure[s]," 90 Fed. Reg. at 2446, 2452–53, 2459, and defines PACE transactions as "residential mortgage loans" under the SAFE Act, which then requires States to test and license individuals deemed to be "loan originators" of PACE transactions, *id.* at 2495. Applying these additional provisions to PACE financing "add[s] words" to Section 307, *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009), and exceeds CFPB's "authority," rendering the Rule unlawful, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024); *see* 5 U.S.C. § 706(2)(C).

CFPB achieved this illegal result by purporting to change the definition of "credit" under Regulation Z, which for 40 years had excluded all "tax liens and tax assessments," to exclude only *involuntary* assessments. 90 Fed. Reg. at 2447–48. This means that all *voluntary* tax assessments, including PACE transactions, are now "generally" subject "to TILA" and related RESPA and other requirements, unless

specifically exempted by CFPB. *Id.* CFPB cannot avoid Section 307's clear command by amending a preexisting regulation to apply essentially the entirety of TILA and portions of RESPA to PACE financing transactions, as that is a bank-shot attempt to "add or subtract words" in Section 307. *Friends of Everglades*, 570 F.3d at 1224.

CFPB's change here is also contrary to the plain meaning of "credit" under TILA. TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," and only applies when a "creditor" extends such debt to a "natural person." 15 U.S.C. § 1602(f), (i). "PACE assessments are obligations *imposed on the property, not the homeowner*, and they are collected in the same manner and at the same time as the general taxes of the city or county on real property," meaning "they are not a debt *incurred by the homeowner, the consumer or 'natural person'* to whom credit is extended." *In re Hero Loan Litig.*, 2017 WL 3038250, at *3 (citations omitted) (emphases added). Thus, "PACE assessments cannot be a credit transaction" within the meaning of TILA. *Id.*; *see Burke v. Renew Fin. Grp., Inc.*, No.2:21-CV-02938-RGK-PD, 2021 WL 5177776, at *3 (C.D. Cal. Aug. 13, 2021); *see also Concepcion v. Ygrene, Inc.*, No.19-CV-1465-BAS-MDD, 2020 WL 1493617, at *6 (S.D. Cal. Mar. 27, 2020). CFPB previously accepted this plain text definition of consumer "credit." 12 C.F.R. § 1026.2, Supp. I, cmt.(2)(a)(14)(1.ii).

b. The Final Rule also exceeds CFPB's statutory authority by failing to "account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii).

PACE financing is unique in many fundamental ways. *Supra* pp.3–4. PACE assessments are tax assessments imposed by local governments on property, not debt

obligations on homeowners. *Supra* p.3. Further, as CFPB acknowledges, the "creditor" in a PACE financing transaction is the local government entity sponsoring the state-authorized PACE program in its jurisdiction. 90 Fed. Reg. at 2449; *supra* p.3. PACE financing is also only available for projects selected by the State that that will advance the State's public-policy goals, such as energy conservation and natural-disaster preparedness. *See* Renew Comment at 3; FortiFi Comment at 7–10. And due to this limited availability, "PACE transactions [are] typically much smaller [in] size when compared to regular mortgages." Renew Comment at 25. Finally, the relevant States as well as local governments "have already adopted measures to ensure that consumers understand PACE transactions, are able to pay the assessments, and are not subject to unscrupulous sales practices," FortiFi Comment at 11, while PACE administrators—including Plaintiff's members—already voluntarily apply multiple underwriting practices designed to ensure consumers' ability to repay, Renew Comment at 17.

The Final Rule fails to account for this unique nature of PACE assessments, contrary to Section 307's express instruction, 15 U.S.C. § 1639c(b)(3)(C)(ii), thereby exceeding CFPB's "statutory . . . authority," 5 U.S.C. § 706(2)(C). The Rule treats PACE transactions like the purchase-money and refinance mortgage loans that are the primary objects of TILA's mortgage requirements, disregarding: PACE assessments' unique "small size," Renew Comment at 26; the fact that they are tax assessment liens "assessed by local governments against real property" rather than "a debt incurred by the homeowner," *In re Hero Loan Litig.*, 2017 WL 3038250, at *3; and that the creditor

in these transactions is a government entity, 90 Fed. Reg. at 2449.  Further, the Rule does not adequately account for post-2018 underwriting practices and regulatory schemes unique to PACE financing that render additional requirements unnecessary to achieve "the purposes of subsection (a)," 15 U.S.C. § 1639c(b)(3)(C)(ii), which are to ensure that creditors only give loans that consumers can repay, *see id.* § 1639c(a).

CFPB wrongly claims in the Final Rule that it did "account for the unique nature of PACE financing" because it applied "the existing statutory and regulatory regime governing residential mortgage loans" to PACE transactions with some minor "adjustments," 90 Fed. Reg. at 2465, referring to the limited exemptions for requirements related to escrow accounts and periodic statements, *see id.* at 2434.  But CFPB determined that applying "TILA's ability-to-repay regime"—along with the other TILA, RESPA, and SAFE Act requirements discussed above, *supra* pp.5–6—"is appropriate for PACE loans *notwithstanding certain characteristics of PACE financing or PACE programs discussed by commenters,*" 90 Fed. Reg. at 2465 (emphasis added).  CFPB disregarded the "unique nature" of PACE financing and chose to apply those regulatory requirements "broadly" to PACE transactions as if they were standard "consumer credit transactions" or "other types of mortgages."  *Id.* at 2465–66.

### 2.    CFPB's Final Rule And Section 307 Of EGRRCPA Exceed Congressional Authority By Violating The Tenth Amendment

a. The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.  Most relevant here, the

Tenth Amendment protects "the taxation authority of state government" as a "central" attribute of "state sovereignty" upon which Congress may not tread, *Dep't of Rev. of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994)—a principle recognized at the Founding and today, *see, e.g.*, *The Federalist* No.32 (Alexander Hamilton); *McCulloch v. Maryland*, 17 U.S. 316, 430 (1819); *Gibbons v. Ogden*, 22 U.S. 1, 199–200 (1824); *Lane Cnty. v. Oregon*, 74 U.S. 71, 76–78 (1868); *Union Pac. R.R. Co. v. Peniston*, 85 U.S. 5, 30 (1873). Regarding taxation of "property, business, and persons, within their respective limits," the States have the "discretion" regarding "[t]he extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised." *Lane Cnty.*, 74 U.S. at 77. Congress may not "[ ]impair[ ]" the State's "power of taxing the people and property of [the] state," nor may the "judicial department" ask "what degree of taxation is [a] legitimate use, and what degree may amo[u]nt to [an] abuse of power." *McCulloch*, 17 U.S. at 430. The Tenth Amendment also enshrines an "anticommandeering principle" that "Congress [has no] power to issue direct orders to the governments of the States." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018); *see New York v. U.S.*, 505 U.S. 144, 162 (1992). "The Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs," *Printz v. U.S.*, 521 U.S. 898, 925 (1997), and this rule applies to officials at the "state [or] local" level, *Murphy*, 584 U.S. at 473. When interpreting a statute, courts presume that Congress did not intend to violate the

Constitution or direct agencies to do so. *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1270–71 (11th Cir. 2014).

b. The Final Rule and Section 307, the purported statutory authority for the Rule, *but see supra* Part I.A.1, violate the Tenth Amendment by abridging States' taxing authority and commandeering them to enforce the Federal Government's priorities.

PACE financing is an exercise of States' taxing authority "[i]n respect . . . to property, business, and persons" which "remains entire[ly]" with the States. *Lane Cnty.*, 74 U.S. at 77. PACE transactions deal directly with "the subjects upon which" States determine to exercise their taxing power and "the mode in which" they choose to do so. *Id.* States impose and collect these tax assessments just like other property tax assessments, as a "tax assessment lien on property [that] does not constitute a personal debt owed by a consumer," which must be "collect[ed] . . . in the same manner and at the same time as the general taxes." *In re Hero Loan Litig.*, 2017 WL 3038250, at *3 (citation omitted); *see, e.g.*, Fla. Stat. § 163.081(1)(e). Section 307 itself recognizes that PACE financing is a product of state taxing authority, defining it as "financing to cover the costs of home improvements *that results in a tax assessment* on the real property of the consumer." 15 U.S.C. § 1639c(b)(3)(C)(i) (emphasis added); *see also, e.g.*, Fla. Stat. §§ 163.081(1)(e), 197.3632(8)(a).

The Final Rule and Section 307 "direct[ly] abridg[e]," *Lane Cnty.*, 74 U.S. at 77, and "[ ]impair," *McCulloch*, 17 U.S. at 430, the States' sovereign taxing power by prohibiting States from imposing "tax liens and tax assessments," 90 Fed. Reg.

at 2434. For example, the Rule and Section 307 purport to transform state "tax liens and tax assessments [upon residential property itself] that are voluntary" into debt that is owed personally by consumers and thus "subject generally to TILA." 90 Fed. Reg. at 2447; *see id.* at 2434, 2443. Additionally, States will have to provide federally-mandated disclosures on top of existing State disclosures, *see id.* at 2452–61; Fla. Stat. § 163.081(4), and much more, *infra* p.15. These requirements lead to a *federal* directive that certain *State* citizens may not participate in State PACE financing programs because the *State* citizens fail to meet *federal* standards.

Congress does not have the power to abridge or impair the States' exercise of their taxing authority by prohibiting the States from authorizing PACE financing transactions unless certain Federal requirements are met. *See Lane Cnty.*, 74 U.S. at 77. "There is nothing in the Constitution which contemplates or authorizes *any* direct abridgment of this power by national legislation," such as by Section 307 and the Final Rule. *Id.* (emphasis added). Again, PACE financing is an exercise of State taxing authority, *supra* pp.3–4, 13, so Congress may not "[ ]impair[ ]" the State's "power of taxing the people and property of [the] state," through PACE assessments, nor may the "judicial department" ask "what degree of taxation is [a] legitimate use, and what degree may amo[u]nt to [an] abuse of . . . power," *McCulloch*, 17 U.S. at 430.

Section 307 and the Final Rule also violate the Tenth Amendment's anticommandeering principle, as they "compel the States to implement, by legislation or executive action, [a] federal regulatory program[ ]," for PACE financing

transactions. *Printz*, 521 U.S. at 925. The Rule and Section 307 impose TILA and Regulation Z obligations and liability on "creditors," "which the CFPB understands is typically the government sponsor in a PACE transaction," not the private PACE companies. 90 Fed. Reg. at 2449. Thus, for example, state officials must provide integrated TILA-RESPA disclosures to the consumer, 15 U.S.C. § 1638(b)(2)(A); 90 Fed. Reg. at 2502–03 (listing contents of disclosures); must deny potentially-otherwise eligible PACE applications based off TILA ability-to-repay requirements, 90 Fed. Reg. at 2463; *id.* at 2503; and fingerprint, test, and license individuals who take offers or negotiate PACE transactions, *id.* at 2495. Consequently, the Final Rule and Section 307 directly "compel the States to implement . . . [a] federal regulatory program[ ]," *Printz*, 521 U.S. at 925, as the local government sponsor is the "creditor."[2]

Finally, if any doubt remains, the Court should presume that Congress did not intend to violate the Constitution because it did not provide a "clear statement" that it intended CFPB to violate the States' tax authority and alter the "federal balance." *United States v. Bass*, 404 U.S. 336, 349 (1971). Section 307 directs CFPB to "prescribe" ability-to-repay regulations for PACE financing while "account[ing] for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). That is no "clearly"

---

[2] While Plaintiff believes that the Tenth Amendment makes any impairment or abridgment of the States' taxing authority by Congress unconstitutional, should the Court conclude that the Tenth Amendment left Congress some marginal power to check States' exercise of their taxing authority, the Final Rule would still violate the Tenth Amendment because it exceeds the regulation Section 307 called for and would significantly burden and ultimately destroy PACE financing. *Supra* Part I.A.1.

"convey[ed] . . . purpose" to alter the federal-state balance, so the Court must construe Section 307 so as to limit any burdens on state tax authority. *Bass*, 404 U.S. at 349.

c. CFPB argued in the Rule that "PACE transactions are voluntary financing agreements between homeowners and creditors that do not implicate or restrict States' sovereign taxation authority," 90 Fed. Reg. at 2450, but PACE financing is built on the exercise of state taxing authority by assessing tax liens that the taxpayer then repays through their annual tax bills, *supra* pp.3–4. CFPB also claims that "[f]ederal limits on State taxation are authorized under the Commerce Clause" and that "Congress expressly directed the application of ability-to-repay rules and civil liability provisions to PACE transactions in EGRRCPA section 307." 90 Fed. Reg. at 2450. CFPB's position wrongly implies that the Commerce Clause supersedes the "system of 'dual sovereignty'" and the States' "residuary and inviolable sovereignty.'" *Printz*, 521 U.S. at 918–22 (citation omitted). The Constitution prohibits Congress from using its enumerated constitutional powers to impede States' sovereign tax authority. *Gibbons*, 22 U.S. at 200. As to anticommandeering, CFPB claims the Final Rule does not "direct[ ] States to enact, administer, or enforce a Federal program," but only "ensure[s] that States choosing to extend PACE credit to consumers comply with applicable Federal requirements." 90 Fed. Reg. at 2450. But the only way States can "comply with applicable Federal requirements" in the Final Rule, *id.*, is to "enforce a federal regulatory program," *Murphy*, 584 U.S. at 472 (citation omitted)—namely, the TILA, RESPA, and SAFE Act requirements that the Rule imposes upon PACE financing, 90 Fed. Reg. at 2452–59, 2464–73, 2495.

### 3.    The Rule Is Also Arbitrary And Capricious Because It Is Based On The Flawed And Incomplete Data In The PACE Report

In promulgating the Final Rule, CFPB relied exclusively on the PACE Report to provide "data-based support."  Renew Comment at 4; *see* FortiFi Comment at 39; 90 Fed. Reg. at 2476–82.  The report found that PACE financing for consumers who applied for a PACE transaction between July 2014 and June 2020 resulted in a 2.5% mortgage delinquency rate difference over a two-year span following the transaction's origination.  90 Fed. Reg. at 2440.  The report suggests PACE consumers in the two-year period before obtaining PACE financing had a 7.1% mortgage delinquency rate, so a 2.5% increase is a 35% increase over two years.  PACE Report at 3.  CFPB justifies the Final Rule on these findings.  CFPB's reliance on the PACE Report was arbitrary and capricious given its numerous and fatal flaws.

The PACE Report is significantly outdated because "lending practices and State law have evolved since the origination of the PACE loans reflected in the PACE Report."  90 Fed. Reg. at 2451.  The PACE reforms that California enacted in 2018 produced beneficial results for consumers, PACENation Comment at 10–11, which CFPB itself recognized as very effective at reducing negative impacts on PACE homeowners' credit health, 90 Fed. Reg. at 2441 (acknowledging that "the 2018 California PACE Reforms . . . improved consumer outcomes").  However, CFPB's dataset only included PACE homeowners who originated a PACE assessment between July 2016 and June 2020—meaning nearly two-thirds of homeowners CFPB analyzed had their assessment originated before the far-reaching PACE reforms.  *Id.*

at 2440. The PACE Report's underlying data did not distinguish PACE homeowners between the relevant, post-reform period—which showed better results—and the previous, less regulated period. *Id.* CFPB thus failed to use "relevant data" and did not "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). It is impossible to "reasonably consider[ ] the relevant issues," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), using data from an inapplicable period.

The PACE Report also uses an improper control group to conclude that PACE financing exploits consumers. The report compares two groups of consumers: a control group (those who applied for PACE transactions, were approved, but did not proceed with the transactions), and a test group (those who applied, were approved, and did proceed with the transactions). PACE Report at 26–27; *see* Renew Comment at 5–6; PACENation Comment at 6–11. CFPB's choice of a control group is flawed for several reasons. PACE applicants who forego entering a PACE transaction are either denied or self-select to not obtain PACE financing, and CFPB never assesses the groups' similarities on important metrics. Renew Comment at 5–6; Ygrene Comment at 4–5. Further, prior research shows that several characteristics of borrowers and their loans affect the frequency of mortgage delinquencies, but CFPB does not bother identifying the differences between the control and test groups. Ygrene Comment at 4–5 (identifying these characteristics). The PACE Report's failure to account for these variables suggests that any individual variable could cause the 2.5% difference between the control and test groups. *Id.* This skewing of the control group shows that

the PACE Report relied on "[ir]relevant data" that provides no "satisfactory explanation for [CFPB's] action." *State Farm*, 463 U.S. at 43 (citation omitted).

The PACE Report omits 22% of PACE applicants from its control group because it could not find their credit histories, meaning *almost a quarter* of the relevant dataset—likely those denied financing—were not included in the study, inflating approval rates to a level CFPB finds problematic. Ygrene Comment at 4–5, 12. Finally, the report's own data shows that consumers who obtained a PACE assessment *performed better* than a "demonstration" control group of consumers in the application-only group who also opened a (presumably) low-cost mortgage type account within a year of the PACE application. Renew Comment at 5–6; PACENation Comment at 11. In sum, CFPB's reliance on the PACE Report's flawed analysis demonstrates that CFPB did not "examine the relevant data," did not "articulate a satisfactory explanation" for its failure to do so, and did not engage in "reasoned decisionmaking," *State Farm*, 463 U.S. at 43–44, 52 (citation omitted), or "reasonably consider[ ] the relevant issues," *Prometheus*, 592 U.S. at 423; *accord Hewitt v. Comm'r of IRS*, 21 F.4th 1336, 1342 (11th Cir. 2021).

Finally, the PACE Report found only a small difference of 2.5% in mortgage delinquencies between the control and test groups, suggesting—even under the report's flawed methodology—that there is *at most* only a negligible difference in delinquency rates between those who did and did not obtain PACE financing. Renew Comment at 4. Nowhere does the report identify that this delinquency rate resulted from PACE debt rather than other sources, and those in the control group likely did not choose

PACE financing because they determined they could not afford to. *See* Gibbs Decl. Ex.I at 56. Such a small (potential) difference, alone, cannot justify CFPB's burdensome rule that will limit access to financing for critical home improvement projects. *Infra* pp.20–24 (explaining harms); Renew Comment at 4. Indeed, this small number shrinks *even more* when the report uses data from after the 2018 California PACE reforms. Renew Comment at 4. CFPB's reliance on the PACE Report does not constitute a "reasoned" "consideration of the relevant factors." *Hewitt*, 21 F.4th at 1342 (citations omitted); *see State Farm*, 463 U.S. at 43.

### B. Plaintiff Will Be Irreparably Harmed Without A Preliminary Injunction Against The Enforcement Of The Final Rule

Monetary losses that cannot be recouped constitute "irreparable harm," *Ala. Ass'n of Realtors*, 594 U.S. at 765, including where a plaintiff cannot "recover monetary damages because of sovereign immunity," *Odebrecht*, 715 F.3d at 1289. Significant "disruption" and "disorgan[ization]" of businesses by unlawful regulation constitutes an "irreparable injury to [the] business[es]," *Columbia Broad. Sys. v. U.S.*, 316 U.S. 407, 409, 414, 419, 423 (1942), as does the threatened "loss of one's market position," *Bee Warehouse, LLC v. Blazer*, 671 F. Supp. 3d 1347, 1362 (N.D. Ala. 2023), or "the loss of customers and goodwill," *Jysk Bed'N Linen*, 810 F.3d at 780 (citations omitted).

Plaintiff and its members are likely to suffer significant financial harm from the Rule—including a serious risk of business closure—that cannot be remedied via money damages from CFPB. *See Ala. Ass'n of Realtors*, 594 U.S. at 765. And no money damages from CFPB could compensate Plaintiff if it and its members are forced to

shutter their businesses because of the Final Rule during the pendency of this case. *Alsop v. Desantis*, No.8:20-cv-1052-T-23SPF, 2020 WL 4927592, at *4 (M.D. Fla. Aug. 21, 2020); *see Columbia Broad. Sys.*, 316 U.S. at 409, 414, 419, 423; *Bee Warehouse, LLC*, 671 F. Supp. 3d at 1362; *Jysk Bed'N Linen*, 810 F.3d at 780; 11A Fed. Prac. & Proc. Civ. § 2948.1 & n.24.  That is sufficient to show irreparable harm.

Plaintiff's powerful declarations demonstrate the significant financial harm, including the risk of business closure, that the Final Rule threatens to inflict upon it. Plaintiff's members have incurred and, absent an injunction, will continue to incur significant costs to ensure accurate and timely implementation of the Final Rule before its March 1, 2026 effective date.  *See* Chen Decl. ¶¶ 10–11; Sachar Decl. ¶¶ 9–13.

For example, Renew estimates its total compliance costs before the Final Rule's March 1, 2026 effective date to be "$2,528,000 across legal, engineering, product, project management, and operations," Chen Decl. ¶ 10(e), and "that it will lose close to 72% of its funding volume after the rule goes into effect," devastating its ability to do business, *id.* ¶ 11.  In January 2025 alone, Renew "spent approximately $32,000 in legal fees to engage outside counsel for the purposes of implementing the Final PACE Rule" because Renew "needs additional clarifications and legal guidance on certain aspects of the rule," given its "complexity."  *Id.* ¶ 10(d).  Renew anticipates an additional "$448,000 in legal fees across the 14-month period from January 2025 to March 1, 2026 for the compliant implementation of the Final PACE Rule." *Id.*  Renew expects to "incur about $980,000 in additional headcount costs for the implementation of the Final PACE Rule," because Renew will "need to devote additional internal

technology and product resources to ensure that it can implement the Final PACE Rule from an operational and technological perspective," including by hiring four "subject matter experts in the areas of technology and product management" "to work full time on the implementation." *Id.* ¶ 10(b). Further, Renew expects to incur $1,100,000 "to hire third-party consultants in areas such as engineering and product management to ensure [ ] timely implementation." *Id.* ¶ 10(c). Renew would "continue to incur significant" costs once the Rule is effective, as it anticipates losing most funding volume. *Id.* ¶ 11.

"Ygrene has already shifted internal resources to assess the impact of the Final PACE Rule and develop a strategic plan for implementation and compliance." Sachar Decl. ¶ 10. "In addition to the strain on current resources, Ygrene has been required to supplement internal resources with outside legal and compliance counsel." *Id.* Ygrene has already spent almost $100,000 and "anticipates spending an additional $500,000 over the next year to assist in both compliance and Final PACE Rule implementation." *Id.* Further, implementing the Final Rule will require purchasing a new technology platform and corresponding internal resources to manage it. *Id.* ¶ 11. Ygrene employees have dedicated more than 1,000 hours examining current systems for enhancements and evaluating potential outside platforms, and "Ygrene projects the implementation cost and corresponding project management costs to be well over $1,000,000," in part due to limited availability of third-party technology. *Id.* As only mortgage platforms and providers incorporate compliance tolerance regulatory testing for TILA and RESPA, Ygrene anticipates on-going outside technology expenditures

will exceed $1,000,000 annually. *Id.* "Ygrene will also need to increase its internal headcount by at least eight additional full-time employees . . . resulting in an additional expenditure of $880,000." *Id.* ¶ 12. Finally, "Ygrene will continue to incur significant on-going costs to comply with the Final PACE Rule's numerous and burdensome requirements" and anticipates losing approximately 78% of its funding volume after the rule goes into effect." *Id.* ¶ 13.

## C. The Public Interest And The Equities Strongly Favor A Preliminary Injunction Against The Final Rule

Where the nonmovant is the government, the consideration of the harm to the nonmovant and where the public interest lies "merge." *Nken*, 556 U.S. at 435. The government and the public have no interest in enforcing an unlawful regulation or law. *Scott*, 612 F.3d at 1297; *Odebrecht*, 715 F.3d at 1290; *Brantley Cnty. Dev. Partners, LLC v. Brantley Cnty., Ga.*, 540 F. Supp. 3d 1291, 1319 (S.D. Ga. 2021). Further, it "serves the public interest" to "help[ ] preserve state sovereignty" and "the States' sovereign rights" that are essential to "the 'two-government system established by the Framers.'" *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (citations omitted). Courts should consider an injunction's impact on nonparties. *See Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1298–99 (S.D. Fla. 2020).

The equities and public interest strongly favor preliminarily enjoining the Final Rule during the pendency of Plaintiff's APA lawsuit. Plaintiff has sufficiently shown at this stage that the Rule exceeds CFPB's statutory authority under EGRRCPA, *supra* Part I.A.1; violates the Tenth Amendment by infringing upon the States' sovereign

power of taxation and/or commandeering them to enforce federal law and policies, *supra* Part I.A.2; and is arbitrary and capricious under the APA, *supra* Part I.A.3. Given these violations of federal law, neither CFPB nor the public have any interest in enforcing the Rule during this litigation.  *See Scott*, 612 F.3d at 1297; *Odebrecht*, 715 F.3d at 1290; *Brantley Cnty.*, 540 F. Supp. 3d at 1319; *West Virginia*, 59 F.4th at 1149.

The important public benefits that States' current PACE programs offer further weigh in favor of preliminarily enjoining the Final Rule.  *See Fla. Atl. Univ. Bd. of Trs.*, 465 F. Supp. 3d at 1298–99 (considering impact on "interests of nonparties"); *accord Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 931–32 (9th Cir. 2003); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).   PACE financing gives homeowners, especially vulnerable, low-income homeowners in natural-disaster-prone States, a reliable method to finance critical and socially beneficial home-improvement projects without relying on credit cards, making a down payment, or incurring personal debt. *Supra* pp.3–4.  That is why the Obama Administration championed PACE initiatives to "lead to reduced energy bills, more empowered consumers, and cleaner communities." Gibbs Decl., Ex.K.[3]  The Rule threatens to delay, increase the cost of, or make unavailable PACE financing, thus depriving the public of these critical benefits.  *Supra* pp.20–23.  Further, because the Rule abridges States' sovereign power of taxation and commandeers them to enforce federal law and policies, *supra* Part

---

[3]    Available    at    https://obamawhitehouse.archives.gov/the-press-office/2016/07/19/fact-sheet-obama-administration-announces-clean-energy-savings-all.

I.A.2, an injunction would "serve[ ] the public interest" by "help[ing] preserve state sovereignty" and "the States' sovereign rights," *West Virginia*, 59 F.4th at 1149.

## CONCLUSION

This Court should preliminarily enjoin enforcement of the Final Rule.

Dated: June 5, 2025.

|  | Respectfully submitted, |
|---|---|
| MISHA TSEYTLIN* | */s/ John S. Gibbs III* |
| KEVIN M. LEROY* | JOHN S. GIBBS III |
| CARSON A. COX* | *Counsel of Record* |
| ALEXANDER J. HILL* | Florida Bar No. 91102 |
| TROUTMAN PEPPER LOCKE LLP | TROUTMAN PEPPER LOCKE LLP |
| 111 South Wacker Dr., Suite 4100 | 600 Peachtree Street N.E., Suite 3000 |
| Chicago, Illinois 60606 | Atlanta, Georgia 30308 |
| (608) 999-1240 (MT) | Phone: (404) 885-3000 |
| misha.tseytlin@troutman.com | Email: evan.gibbs@troutman.com |
| | |
| *Admitted pro hac vice | *Attorneys for Plaintiff* |

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of June, 2025, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record, and served via mail on the following parties:

General Counsel,
Consumer Financial Protection Bureau
1700 G Street NW
Washington, D.C. 20552

Russell Vought,
Consumer Financial Protection Bureau
1700 G Street NW
Washington, D.C. 20552

Pam Bondi,
Department of Justice
950 Pennsylvania Ave, NW
Washington, D.C. 20530-0001

Gregory W. Kehoe,
Middle District of Florida
U.S. Attorney's Office
400 N. Tampa Street, Suite 3200
Tampa, FL 33602

*/s/ John S. Gibbs III*
JOHN S. GIBBS III