UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BUILDING RESILIENT INFRASTRUCTURE
& DEVELOPING GREATER EQUITY, INC.,

      Plaintiff,

v.                                  Case No. 8:25-cv-1367-TPB-NHA

CONSUMER FINANCIAL PROTECTION
BUREAU *and* RUSSELL VOUGHT, *in his
official capacity as Director of the Consumer
Financial Protection Bureau*,

      Defendants.

## Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction

Residential Property Assessed Clean Energy (PACE) financing transactions are voluntary agreements between a consumer and their local government to fund home improvement projects that are repaid in installments via an assessment on the consumer's property. Like other mortgage loans, PACE loans use the consumer's home as collateral. In 2018, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA), which mandated that the Consumer Financial Protection Bureau promulgate a rule applying the Truth In Lending Act's (TILA's) ability-to-repay protections and civil liability provision to PACE financing. When the Bureau implemented EGRRCPA, it also exercised its preexisting TILA authority to adjust a decades-old regulatory exception and clarify that PACE loans are "credit" when they meet TILA's credit definition. Nearly five

months after the PACE Rule was issued, Plaintiff—a trade group representing private PACE companies—filed suit seeking a preliminary injunction.

Plaintiff's motion should be denied. To start, Plaintiff is unlikely to succeed on its claims. Plaintiff's lead statutory argument—that EGRRCPA did not authorize the Rule's application of the usual rules for consumer credit to PACE loans—misses the point. That's because the Bureau correctly concluded that PACE loans are credit under TILA's longstanding definition, which Plaintiff barely contests. Plaintiff's Tenth Amendment challenges are meritless also. The Rule neither commandeers States into enforcing a federal program nor infringes States' taxing powers because the Rule governs PACE loans—not taxes—and only imposes generally applicable rules on those engaging in PACE lending. Finally, the Bureau's consideration of an original study of PACE lending was reasonable and reasonably explained.

As for the remaining preliminary injunction factors, Plaintiff's claimed need for immediate preliminary relief is severely undermined by the fact that it waited five months after the Rule was issued to challenge it. Further, the balance-of-the-harms and public-interest factors weigh against preliminary relief because the Rule furthers the important consumer protections established and applied by Congress.

## BACKGROUND

<u>PACE Financing and its Super-Priority Regime</u>. PACE loans are voluntary financing agreements between a consumer and their local government to fund home improvement projects. 90. Fed. Reg. 2434, 2435 (Jan. 10, 2025). Local governments typically contract with private PACE companies to handle the day-to-day operations

of these programs, including originations, underwriting, and making decisions about whether to extend the loans. *Id*. The loans themselves generally carry between five- and 30-year terms with average annual percentage rates several points higher than the prevailing mortgage rate. *Id*.

Consumers repay these loans through the property tax system alongside the consumer's property tax obligations. *Id*. If not paid off, PACE loans transfer with the property upon sale. Repayment is secured by a "super-priority" lien on the consumer's home, meaning that if the house is sold through foreclosure, sale proceeds will first go to amounts due on the PACE loan before any other mortgage debt, even if the other debt predated the PACE loan. *Id*.

TILA. TILA is a consumer protection statute governing the offering and extending of consumer credit by "creditors," which includes a "government or governmental subdivision or agency." 15 U.S.C. § 1602(g), (e), (d). TILA's express purposes include promoting the "informed use of credit" through "meaningful disclosure of credit terms," *id*. § 1601(a), and assuring that consumers are offered and receive residential mortgage loans that reasonably reflect their ability to repay the loans, *id*. § 1639b(a)(2). TILA provides a private cause of action for violations of these disclosure and ability-to-repay requirements. *See id*. § 1640.

The Bureau is charged with interpreting TILA and promulgating rules to effectuate its purposes. *Id*. § 1604(a). That rulemaking authority includes the ability to "provide for such adjustments and exceptions for all or any class of transactions." *Id*. TILA is implemented through Regulation Z. *See* 12 C.F.R. part 1026.

3

EGRRCPA. In 2018, Section 307 of EGRRCPA amended TILA to provide that the Bureau "shall prescribe regulations that carry out the purposes of [TILA's ability-to-repay requirements] and apply [TILA's civil liability provision] with respect to violations of [the ability-to-repay requirements] with respect to [PACE] financing, which shall account for the unique nature of [PACE] financing." Pub. L. No. 115-174, 132 Stat. 1296, 1347 (2018).

PACE Report. In May 2023, the Bureau published its PACE Financing and Consumer Financial Outcomes Report (PACE Report), a first-of-its-kind study analyzing data from more than 200,000 consumers who applied for PACE loans between July 2014 and December 2019. 90 Fed. Reg. at 2440; PACE Report at 8-11.[1] Among other things, the report found that PACE loans increased a consumer's probability of mortgage delinquency by 35%. *Id*. at 26-27.

Final PACE Rule. The Residential PACE Financing Rule was published in the Federal Register on January 10, 2025, with an effective date of March 1, 2026. 90 Fed. Reg. at 2434. As directed by Congress, the Rule applies TILA's ability-to-repay requirements to PACE loans. Though the Rule largely applies to PACE loans the existing ability-to-repay framework for other mortgage loans, it also makes adjustments to account for the unique characteristics of PACE loans. *Id*. at 2465.

Separately, recognizing that EGRRCPA does not explicitly state whether PACE loans are TILA "credit" despite mandating that the Bureau regulate them

---

[1] *Available at* https://files.consumerfinance.gov/f/documents/cfpb_pace-rulemaking-report_2023-04.pdf.

4

under TILA, the Bureau exercised its preexisting interpretive authority, *see* 15 U.S.C. § 1604(a), to clarify that PACE loans are "credit" under TILA. Specifically, the Rule clarified that the decades-old exception from Regulation Z's definition of credit for "tax liens" and "tax assessments" only applies to *involuntary* tax liens and assessments. 90 Fed. Reg. at 2443. After all, the original rationale for this exception—that TILA "credit" requires a "contractual relationship, voluntarily entered into, between the debtor and creditor"—does not apply to voluntary tax liens and assessments (which were not contemplated when the exception was created). *Id*. at 2448. The Rule thus made clear that voluntary tax liens and tax assessments, like PACE financing, could be TILA "credit" if they otherwise meet the term's definition. The Bureau subsequently concluded that because consumers voluntarily agree to incur a debt for the right to defer payment of that debt over time, PACE financing "easily fit[s]" TILA's definition of "credit." *Id*. at 2447.

Because PACE loans are credit, TILA's other mortgage protections, like mandatory disclosures, will apply when the Rule takes effect. So too will other federal statutes whose protections apply to certain TILA credit, such as the Real Estate Settlement Procedures Act. Accordingly, the Rule made certain exceptions and adjustments to statutory and regulatory requirements to account for PACE financing's characteristics. For instance, the Rule exempted PACE creditors from having to establish escrow accounts for PACE loans that are higher-priced mortgage loans, and from the requirement to issue periodic statements. *Id*. at 2451, 2461-62.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Swain v. Junior*, 961 F.3d 1276, 1284 (11th Cir. 2020). To obtain one, a party must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Id.* at 1284-85. "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Here, Plaintiff fails to establish *any* factor.

## ARGUMENT

### I. Plaintiff cannot show a likelihood of success on any claim.

Plaintiff claims it is entitled to a preliminary injunction because the Rule (1) exceeds the Bureau's authority under EGRRCPA; (2) violates nonparty States' Tenth Amendment rights; and (3) is arbitrary and capricious as it relied on a report it says was flawed. Plaintiff is not likely to succeed on any of these claims.

#### A. The Bureau did not exceed its statutory authority.

Plaintiff claims (at 8-9) that the PACE Rule exceeded the Bureau's statutory authority under EGRRCPA in two ways: (1) by "applying almost all of TILA…and other laws to PACE financing" and (2) by failing to account for the unique nature of PACE financing. Both arguments are without merit.

6

1. Plaintiff's first argument fails because the Rule's application of TILA and other consumer protection laws to PACE financing was based not on EGRRCPA, but on the Bureau's preexisting authority under TILA to interpret the Act's definition of credit. TILA provides that the "Bureau shall prescribe regulations to carry out the purposes of [TILA]" and that these regulations "may provide for such adjustments and exceptions for all or any class of transactions[.]" 15 U.S.C. § 1604(a). Using this authority, the Rule clarified that Regulation Z's previous "exception" for all tax liens and tax assessments applies only to *involuntary* tax liens and tax assessments. 90 Fed. Reg. at 2447. As noted above, this change brought the exclusion in line with its original basis: that TILA "credit" requires a "contractual relationship, voluntarily entered into, between the debtor and creditor," which did not include the (involuntary) tax liens and tax assessments under consideration at the time. *Id*. at 2448. Thus, voluntary tax liens and tax assessments that meet TILA's definition of "credit" are covered by the Act. *See infra* at 12-13.

This includes PACE loans. Credit is defined as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). And a "consumer" credit transaction is "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id.* § 1602(i). PACE loans are plainly consumer credit. PACE lenders offer consumers money to pay for home improvement projects; if consumers accept the deal, they repay the loan in installments over time through property tax

assessments. *Id.* In other words, PACE creditors grant debtors (here, the homeowners) the right to incur debt (the PACE loan) and defer its payment (typically repaid semi-annually or annually, alongside property taxes).

Plaintiff argues (at 9) that because PACE assessments—the method for collecting PACE loan payments from consumers—run with the property, PACE loans are neither "extended" to a natural person nor are they a debt "incurred by the homeowner," and thus PACE loans are not "credit" under TILA. Plaintiff is wrong.

To begin, PACE loans are plainly "offered and extended" to natural persons, i.e., homeowners. PACE loans are frequently marketed "directly" to homeowners, "often door-to-door." 90 Fed. Reg. at 2435. Homeowners sign the financing agreements. The underlying real property, on the other hand, is not a legal entity that can even sign contracts. Likewise, PACE loans create a debt incurred by the homeowner. It is the homeowner's responsibility—not the property's—to pay the PACE loan each time the assessment comes due. *Cf. Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833, 837 (11th Cir. 2010) (a "debt is created" when the "transaction creates an obligation to pay"). Indeed, if the homeowner doesn't pay, he risks losing his home in a tax sale or a foreclosure. That the obligation to pay the assessment runs with title to the property does not change the homeowner's obligation to repay.[2]

---

[2] Nor does it matter that PACE loans are nonrecourse, i.e., that lenders can only pursue the collateral. As the Bureau noted in the Rule, "TILA explicitly treats other nonrecourse obligations as consumer credit," such as nonrecourse reverse mortgages and mortgages that are effectively nonrecourse under State anti-deficiency statutes. 90 Fed. Reg. at 2448.

8

Plaintiff largely skirts this analysis and instead argues (at 7-8) that through EGRRCPA, Congress limited the Bureau to applying "only" two specific TILA provisions to PACE financing. That is incorrect. Conspicuously absent from Section 307 of EGRRCPA is the word "only." Giving effect to Plaintiff's reading would therefore impermissibly "rewrite" the statute by judicially "add[ing]" words to it. *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) (refusing to add "any" in a definition because Congress "knows how to use th[at] term" and did not). Also absent is any change to TILA's existing definition of credit or the Bureau's authority to administer the statute. *See Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1160 (11th Cir. 2021) ("[W]e apply a presumption against implied changes to the meaning of a still-in-force statute."). Plaintiff thus cannot show that the Bureau exceeded its statutory authority.

2. Plaintiff's claim (at 9) that the Bureau violated EGRRCPA's instruction to "account for the unique nature of [PACE] financing" is similarly unavailing. Plaintiff asserts (at 10) that the Bureau "fail[ed] to account" for a litany of characteristics it claims make PACE "unique." But the Bureau did account for each factor (and others). *See, e.g.*, 90 Fed. Reg. 2445-2450. Take the first feature that Plaintiff highlights: that PACE creditors are typically local governments. That is not unique in the TILA context; TILA explicitly defines "creditor" to include local governments. 15 U.S.C. § 1602(g), (e), (d). Nor does Plaintiff explain why that feature compels a loosening of TILA's ability-to-repay requirements for PACE loans. The same is true for the fact that PACE loans are collected via property assessments

9

and that PACE loans generally advance a state's policy goals. Then there's PACE loans typically being smaller in size than certain other mortgage loans. But that is already factored into the framework for determining whether consumers can afford the PACE loans to begin with. Finally, that some states have adopted some consumer protections for PACE financing does not militate against applying a uniform national ability-to-repay requirement for all consumers. Not all states with PACE-enabling legislation have such requirements, and no State requirements fully reflect the Federal requirements as implemented by the Rule. 90 Fed. Reg. at 2465.

Plaintiff's true complaint is that, after considering PACE loans' features, the Bureau concluded that it was appropriate to apply much of the existing ability-to-repay framework to PACE financing—and that the adjustments the Bureau did make to those requirements were not to Plaintiff's liking. But that Plaintiff desires more favorable adjustments—or for TILA's ability-to-repay requirements to not apply at all—does not mean that the Bureau failed to "account for the unique nature of [PACE] financing" in implementing EGRRCPA's mandate.

### B. Plaintiff's Tenth Amendment claims fail.

Plaintiff is also unlikely to succeed on its Tenth Amendment claims (at 13-16) that Section 307 of EGRRCPA and the PACE Rule impermissibly commandeer States into enforcing a federal program and abridge States' taxing power. At bottom, Plaintiff's apparent view is that the Tenth Amendment barred Congress from requiring PACE creditors to follow the same rules for offering consumer credit that bind their private sector competitors. But it is well settled that the fact "[t]hat a State

10

wishing to engage in a certain activity must take…action to comply with federal standards regulating that activity…presents no constitutional defect." *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988). And the mere fact that PACE assessments are collected alongside property taxes does not give PACE creditors immunity from evenhanded federal commercial regulation.

 1. Plaintiff nevertheless argues (at 14-15) that Congress cannot "compel the States to enact or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997), and the PACE Rule impermissibly compels States to take certain actions required by TILA. But Plaintiff ignores that the "anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Murphy v. NCAA*, 584 U.S. 453, 475-76 (2018). Similarly, there is no Tenth Amendment violation where, as here, Congress does not regulate "States in their sovereign capacity to regulate their own citizens," but rather as voluntary participants in a generally applicable regulatory scheme. *See Reno v. Condon*, 528 U.S. 141, 151 (2000).

 That is the case here. Section 307 of EGRRCPA and the PACE Rule impose obligations on "creditors" wishing to engage in offering and extending credit as defined by TILA. They do not compel States to enforce a federal regulatory program against their citizens, but rather require local governments to follow the generally applicable federal requirements for consumer lending.

 2. Plaintiff's State taxing power argument fares no better. There is no impermissible abridgment of such power because PACE loans are not taxes for

11

purposes of the Tenth Amendment. The Supreme Court has long distinguished between taxation, which is an involuntary "impost[] levied for the support of the government," and the creation of debt, which is "founded upon contract." *Meriwether v. Garrett*, 102 U.S. 472, 514 (1880). The case on which Plaintiff principally relies makes the same point: a "tax is an impost levied by authority of government upon its citizens[; i]t is not founded on contract or agreement." *See Lane Cnty. v. Oregon*, 74 U.S. 71, 76–78 (1868).

PACE assessments, by contrast, are created voluntarily by contract with individual homeowners. They are not imposts levied on the general public for revenue-raising purposes. In fact, one of Plaintiff's members made this exact point in another federal case, explaining that PACE assessments "are not a state tax…because they are not used for general revenue…; [r]ather, PACE assessments are levied as a repayment mechanism for the…financing of energy efficiency and renewable energy [home] improvements." *Midland States Bank v. Ygrene Energy Fund Inc.*, 564 F. Supp. 3d 805, 813, 815 (E.D. Mo. 2021) (holding that PACE assessments are not taxes under state law).

Even assuming PACE loans are taxes, the PACE Rule still would not run afoul of the Tenth Amendment because the Rule does not meaningfully affect States' taxing powers. Contrary to Plaintiff's claims (at 13), the Rule does not "prohibit[] States from imposing" tax assessments. Nor does the Rule impose any burdens or restrictions on States' collection of those assessments. Rather, the Rule merely regulates the conditions under which PACE loans are offered and extended.

12

And even if the PACE Rule did minimally encroach on States' taxing power (it does not), Congress has broad authority to preempt state tax powers under the Commerce Clause. Indeed, the Supreme Court has long held that a federal statute can be "construed to invalidate" a State tax, given "the broad power of Congress to regulate interstate commerce." *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 150 (1979). And far from invalidating a State tax (again, assuming PACE assessments are taxes), the alleged infringement here is merely the reduction in assessments from the potential reduction in consummated PACE loans. *Cf. Montgomery Cnty. Comm'n v. Fed. Hous. Fin. Agency*, 776 F.3d 1247, 1258 (11th Cir. 2015) (Commerce Clause authorized Congress to exempt certain federal entities from state transfer taxes).[3]

Plaintiff responds (at 15-16) that even if Congress has some authority to abridge States' taxing powers, it must provide a "clear statement" of its intent to alter the "federal balance[.]" Even assuming that a clear statement is necessary for a generally applicable economic regulation to apply to local governments, Congress spoke clearly here, both in Section 307's mandate that the Bureau issue a rule regulating PACE financing, and in TILA's inclusion of "government[s] or governmental subdivision[s]" within the definition of persons who can be creditors subject to the statute, 15 U.S.C. § 1602(d), (e), (g).

---

[3] Plaintiff also asserts in passing (at 15 n.2) that the PACE Rule would "ultimately destroy PACE financing." Even putting aside Plaintiff's failure to substantiate that speculative claim, the Supreme Court has recognized that there is no Tenth Amendment violation where Congress "evenhandedly regulates an activity in which both States and private actors engage," even if that regulation is "tantamount to an outright prohibition" of the States' activity. *Murphy*, 584 U.S. at 475-76.

13

### C. The PACE Report provides no basis to set aside the Rule.

Plaintiff is also unlikely to succeed on its APA claim related to the PACE Report. Plaintiff raises a series of objections to the Report and insists (at 17) that the Rule must be arbitrary and capricious because the Bureau considered the Report in the analysis of the Rule's potential benefits, costs, and impacts required by the Bureau's organic statute.[4] But the Bureau's consideration of the Report satisfied the APA's requirements because it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1216 (11th Cir. 2025). Plaintiff's objections to the Report establish nothing to the contrary.

*First*, Plaintiff asserts (at 17-18) that the Report's data were outdated because the dataset included loans that pre-dated and post-dated California's consumer protections enacted in 2018. As a result, Plaintiff insists, the Bureau could not have reasonably considered the relevant issues during the rulemaking. But the opposite is true: The Bureau specifically measured and considered the effects of the California reforms. 90 Fed. Reg. at 2476.[5] The Report's dataset spans the implementation of the California reforms "and presents results separately for loans originated before and after" the reforms became law. *Id*. at 2478. The Bureau acknowledged that

---

[4] In addition to the Report, the Bureau also considered "information that the CFPB has obtained from industry, other regulatory agencies, and publicly available sources[.]" 90 Fed. Reg. at 2476.

[5] In addition, in the Rule's analysis of benefits, costs, and impacts, the Bureau considered the Rule's impacts against a baseline that explicitly included the California reforms. 90 Fed. Reg. at 2476.

14

California's reforms "are informative" to its consideration of the Rule's impacts, but ultimately concluded that the Rule's requirements are different "such that the potential impacts may differ." *Id*. at 2476. The Bureau noted that the benefits of the Rule may be lower if some state laws provide protections covered by the Rule. *Id*. at 2478. But its analysis found that PACE loans "still increase[d] primary mortgage delinquency in California during the post-Reform period." *Id.* In short, the Bureau "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,]"*Gray Television, Inc.*, 130 F.4th at 1216, which is precisely what the APA requires.

*Second*, Plaintiff argues (at 18) that the Report used the wrong control group when it compared PACE borrowers to consumers who had applied for PACE loans and were approved, but did not proceed with the transactions.[6] Plaintiff argues that the Bureau "does not bother identifying the differences between the control and test groups," and claims that as a result, any variable could have caused the difference in mortgage delinquency rates between the control and PACE loan consumers, not just the control group's lack of a PACE loan. But in fact, "the PACE Report includes extensive analysis to substantiate the similarity" of the control and PACE borrowers, and "includes several robustness checks exploring alternate control groups, all of which are consistent with the results based on the main control group of Application-

---

[6] Plaintiff suggests (at 18) that members of the control group could have been denied PACE financing. This is not accurate: the control group consumers were approved for PACE loans. *See* 90 Fed. Reg. at 2470; PACE Report at 26-27.

Only Consumers." 90 Fed. Reg. 2477-78; *see also* PACE Report at Table 6 (comparing credit characteristics of PACE borrowers and control group). Far from relying on "irrelevant data" as Plaintiff charges, the PACE Report substantiated the similarities between the control and test groups and considered alternate control groups precisely in order to determine which comparison was the most valid.

*Third*, Plaintiff argues (at 19) that the Report's omission of 22% of consumers from its sample, because their credit records could not be matched, must have biased the Report's results by omitting less-creditworthy consumers from the control group (even though the unmatched consumers affected both the control and PACE loan groups). But Plaintiff provides no basis to conclude that the omitted consumers were less creditworthy such that the Report's findings were skewed. And the Bureau explained that "data issues" such as out-of-date addresses or misspelled identifying information received from PACE companies were the likely reason records didn't match, which is unrelated to consumers' creditworthiness. 90 Fed. Reg. at 2479. In short, Plaintiff fails to show that the Report's analysis was unreasonable.

*Finally*, Plaintiff complains (at 18-19) that the 2.5% increase in mortgage delinquency as between control and PACE loan consumers is "such a small" difference that it "alone[] cannot justify" the Rule. First, the Rule is not justified on that finding "alone"—far from it. Recall that Congress instructed the Bureau to extend TILA's ability-to-repay provisions to PACE loans; and the Bureau's conclusion that PACE loans are TILA credit, which had the effect of applying TILA's other protections, was not predicated on the PACE Report's findings.

16

More to the point, Plaintiff's attempt to minimize the Report's findings doesn't change the facts: Because the Report found a baseline delinquency rate of just over 7%, "getting a PACE loan increased the risk of mortgage delinquency by about *35 percent*." 90 Fed. Reg. at 2451 (emphasis added). Plaintiffs urge this Court to dismiss these findings as uncompelling, but under the APA's "deferential and narrow standard, [a court] will not substitute [its] judgment for that of the agency." *Gray Television, Inc.*, 130 F.4th at 1212 (cleaned up). The Bureau's issuance of the Rule was reasonable in light of Congress's directive, the multitude of sources the Bureau considered from a variety of commenters and stakeholders, and the increased risk of harm to consumers demonstrated by the record evidence.

Even if the Report were flawed (it is not), any error would not affect the portions of the Rule that Plaintiff claims will harm its members. After all, the Rule's application of TILA's ability-to-repay regime to PACE financing was mandated by Congress, to be done whether the Bureau issued the PACE Report or not. And the Report had no bearing on the Bureau's conclusion that PACE financing meets the definition of TILA credit; that conclusion was based on the Bureau's interpretation of the text and purpose of TILA. *See* 90 Fed. Reg. at 2443-50. Thus, any purported defect in the PACE Report would not provide cause to set aside those aspects of the Rule. *United States v. Schwarzbaum*, 24 F.4th 1355, 1366 (11th Cir. 2022) (an error is harmless where it had "no bearing on…the substance of [the] decision reached").

17

## II. Plaintiff has not established an imminent likelihood of irreparable injury.

"A showing of irreparable injury is the *sine qua non* of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (cleaned up). The irreparable injury must be "imminent," as "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). As a result, "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.*

Plaintiff filed this action approximately five months after the Rule was finalized and offers no explanation for its delay. *See* ECF No. 23; 90 Fed. Reg. 2434 (Jan. 10, 2025). Plaintiff cannot possibly assert that the Rule was a surprise; the Bureau issued its proposed rule in May 2023. *See* 90 Fed. Reg. at 2441. And even if Plaintiff were to assert that it took a month to ascertain the compliance costs it claims in its motion, *see* ECF No. 23 at 21 (pointing to costs incurred in January), that provides no cover for the nearly five months that have elapsed since. These circumstances fit neatly among cases in which courts have "routinely refuse[d] to grant preliminary injunctions" due to "unexplained delays of only a few months." *Swiler v. RSJ Ventures, LLC*, 2025 WL 903543, at *2 (M.D. Fla. Mar. 25, 2025) (internal citation omitted); *see also Wreal*, 840 F.3d at 1249 (no imminent injury where movant "failed to offer any explanation for its five-month delay").

18

Even were its delay explained, Plaintiff fails to demonstrate that it will incur irreparable injury "during the pendency of the suit…unless the injunction issues immediately[.]" *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). While Plaintiff asserts that the Rule imposes compliance costs, it provides no credible evidence that any such costs must be incurred before a final judgment on the legality of the Rule is entered by this Court. At best, Plaintiff's declarations invoke "the short timeframe and the complexity" of the Rule, ECF No. 25 at para. 10b. But these bare assertions do not establish that costs must be incurred during the pendency of this suit. Similarly, Plaintiff asserts that its members have already incurred compliance costs, *see* ECF No. 23 at 21, but it is not enough for a challenger to self-harm to establish irreparable injury, *see, e.g.*, *Scroos LLC v. Att'y Gen. of United States*, 2020 WL 5534281, at *3 (M.D. Fla. Aug. 27, 2020) ("Self-inflicted wounds do not constitute irreparable harm.") (citing cases). As a result, Plaintiff cannot demonstrate imminent injury that warrants the "extraordinary and drastic remedy" of a preliminary injunction, *Wreal*, 840 F.3d at 1249.

### III. The remaining factors weigh against preliminary relief.

The remaining balance-of-the-harms and public-interest factors "merge" when "the Government is the opposing party." *Swain*, 961 F.3d at 1293. The public interest is particularly acute when furthered through a legislative enactment, as preliminary relief "interfere[s] with the democratic process and lack[s] the safeguards against abuse or error that come with a full trial on the merits[.]" *Ne. Fla. Chapter of Ass'n of*

*Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990). Here, the remaining factors weigh against an injunction.

In requiring the Bureau to prescribe regulations for PACE financing under TILA, Congress advanced the public's interest in extending TILA's ability-to-repay protections to PACE transactions. And the Bureau reasonably exercised its regulatory authority in applying TILA's other protections, like the mandatory disclosures, to further TILA's purposes of enabling consumers "to compare more readily the various credit terms available" to them, and "avoid the uninformed use of credit." 15 U.S.C. § 1601(a). These legitimate consumer protection functions would be obstructed if the Court entered Plaintiffs' desired relief. The balance of equities weighs in favor of denying Plaintiff's motion.

## CONCLUSION

Plaintiff's motion for preliminary injunction should be denied.

Dated: July 3, 2025                                                             Respectfully Submitted,

MARK PAOLETTA                                   /s/ Joseph Frisone
*Chief Legal Officer*                                   Joseph Frisone (VA Bar No. 90728)
DANIEL SHAPIRO                                   Andrea Matthews (MA Bar No. 694538)
*Deputy Chief Legal Officer*                    *Senior Counsel*
VICTORIA DORFMAN                              Consumer Financial Protection Bureau
*Senior Legal Advisor*                              1700 G Street NW
CHRISTOPHER DEAL                              Washington, DC 20552
*Assistant General Counsel for Litigation*   Joseph.Frisone@cfpb.gov
                                                                    Andrea.Matthews@cfpb.gov
                                                                    (202) 435-9287
                                                                    (202) 407-2324