# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| BUILDING RESILIENT INFRASTRUCTURE & DEVELOPING GREATER EQUITY, INC., *Plaintiff,* <br> v. <br> CONSUMER FINANCIAL PROTECTION BUREAU *et al.*, *Defendants*. | Case No. 8:25-cv-1367 |

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

For decades, the Federal Reserve Board, CFPB, and every court to consider the issue has held that voluntary tax assessments like PACE are not TILA "credit," and thus are not subject to Regulation Z's extensive rules. In 2018, Congress adopted Section 307 of EGRRCPA, requiring CFPB to regulate PACE by applying a sliver of Regulation Z to PACE. But CFPB refused to limit its bureaucratic ambitions to Congress' directive, instead imposing virtually all of Regulation Z's mandates (and more) on PACE. In resisting Plaintiff's likelihood-of-success arguments against the illegal Final Rule, CFPB rests the Final Rule entirely on its remarkable assertion that everyone was wrong for decades that voluntary property tax assessments are not TILA "credit." But that is contrary to TILA's text, as uniform court and well-settled agency interpretations of TILA before the Final Rule correctly explain. Further, rewriting TILA "credit" as CFPB now does would render Section 307 a nullity, and thus fails on that basis alone. CFPB's equitable arguments fare no better. CFPB's hand-waving cannot evade that Plaintiff's unrebutted declarations show that the Rule will have devastating, irreversible impacts on Plaintiff's members during the pendency of this case, which is what Plaintiff needs to show to obtain preliminary injunctive relief.

## ARGUMENT

I. **Plaintiff Prevails On The Likelihood Of Success On The Merits**

   **A. CFPB Clearly Exceeded Its Authority Under Section 307 Of EGRRCPA**

1. The Rule exceeds CFPB's authority under Section 307. Dkt.23 ("Mot.") at 7–11. Section 307 directed CFPB to "prescribe regulations that carry out the purposes of" TILA's ability-to-repay and liability provisions "with respect to [PACE] financing, which shall account for the unique nature of [PACE]." 15 U.S.C. § 1639c(b)(3)(C)(ii). The Rule wildly exceeds Section 307 by applying almost all of TILA, portions of RESPA, and other laws to PACE. Mot.8–9. The Rule also violates Section 307 by not "account[ing] for the unique nature of [PACE]." *See* Mot.9–11.

2. CFPB now disclaims Section 307 as its authority for the Rule, asserting—contrary to the conclusion of CFPB itself, its predecessor Federal Reserve Board, and all courts to have considered the issue, Mot.8–9—that "credit" to a "consumer" under TILA has always covered PACE, Dkt.40 ("Opp.") at 6–9. The CFPB's novel, belated position is wrong. "[C]redit," to a "consumer," 15 U.S.C. § 1602(f), (i), under TILA is "the right granted by a creditor to a debtor" "to incur debt and defer its payment," *id.* § 1602(f)—with the "consumer" being "a natural person," *id.* § 1602(i). So, "credit" to a "consumer" requires the "natural person" to "incur debt." *Id.* § 1602(f), (i). As *In re Hero Loan Litigation*, No.EDCV-16-08943-AB, 2017 WL 3038250 (C.D. Cal. July 17, 2017), explained, "PACE assessments are against the property; they are not a debt incurred by the homeowner, the consumer or 'natural person' . . . . Accordingly, under TILA's applicable definitions, PACE assessments cannot be a credit

transaction[.]" *Id.* at *3. With PACE, *property itself* incurs the tax obligation, which is why, when a homeowner sells a home with a PACE assessment, the assessment runs with the property. *Id.*[1] CFPB's only response to this irrefutable textual argument—previously accepted by every agency and court—is to assert that PACE must be TILA "credit" because "natural persons, i.e., homeowners" "accept the deal." Opp.7–8. But TILA's definition of "credit" does not hinge on a natural person initiating the transaction, but on him incurring the obligation. 15 U.S.C. § 1602(f), (i).

If this Court had any doubts, CFPB's new reading of TILA would still be a nonstarter because it would render Section 307 a nullity. As the Supreme Court held in materially similar circumstances in *Bilski v. Kappos*, 561 U.S. 593 (2010), the canon against statutory surplusage "applies to interpreting any two provisions," even "provisions [enacted] at different times," *such that a new interpretation of prior enacted text cannot nullify later-enacted text responding to court or agency interpretation of that prior text*. *Id.* at 608 (citation omitted); *see also McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013) ("Congress legislates against the backdrop of existing law," including court "decisions"); *Monsalvo Velazquez v. Bondi*, 145 S. Ct. 1232, 1242 (2025) (same as to "longstanding administrative construction"). For over 40 years before the Rule, every authority—from regulators to courts—understood TILA as not covering voluntary tax assessments like PACE, and Congress enacted Section 307 in response to that uniform understanding. Mot.9. CFPB's new reading would violate *Bilski* by rendering the

---

[1] That is entirely unlike mortgages covered by TILA, which CFPB invokes, Opp.1,5, where the repayment obligation follows the mortgagee who incurred it, even after the sale of the home.

later-enacted Section 307 superfluous. After all, if PACE is "credit" under TILA, then Regulation Z already applied TILA's ability-to-repay provision to PACE.

Finally, CFPB argues that the Rule accounts for the "unique nature" of PACE, but that is simply not true. Opp.9–10. CFPB claims that PACE is *not* unique from TILA credit transactions because "TILA explicitly defines 'creditor' to include local governments." Opp.9 (citation omitted). That misses the point, as the difference—disregarded by the Final Rule—is that local governments use PACE *by exercising their tax-assessing power*, unlike with TILA "credit transactions." *See* Mot.9–11. As for other unique aspects of PACE, Mot.9–11, CFPB merely asserts that "it was appropriate to apply much of the existing ability-to-repay framework to PACE" notwithstanding those features, Opp.10—an *ipse dixit* that does not comply with Section 307.

### B. The Final Rule And Section 307 Violate The Tenth Amendment

The Final Rule and Section 307 violate the Tenth Amendment by regulating and commandeering state taxing authority. Mot.11–16. CFPB claims that the Rule evenhandedly regulates "activity in which both States and private actors engage," Opp.11 (citation omitted), but there is no comparable private actor because only States exercise the taxing power that is the foundation of PACE*,* Mot.13–14*.* CFPB's cases do not help. Opp.11–12. *Meriwether v. Garrett*, 102 U.S. 472, 513–14 (1880), and *Lane County v. Oregon*, 74 U.S. 71, 76–78 (1868), do not hold that taxes that depend on consensual conduct fall outside of the Tenth Amendment. Many taxes—including special-use taxes like PACE, *see Assessment–Special Assessment*, Black's Law Dictionary (12th ed. 2024)—depend on voluntary action, *see City of Pittsburgh v. Alco Parking Corp.*,

417 U.S. 369, 370, 374–75 (1974). *Midland States Bank v. Ygrene Energy Fund Inc.*, 564 F. Supp. 3d 805, 813–15 (E.D. Mo. 2021), considered whether PACE was a tax under the Tax Injunction Act, a distinct question, *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012).

### C. CFPB Cannot Justify Reliance On The Flawed, Outdated PACE Report

The Final Rule is arbitrary and capricious by relying upon the "PACE Report," which rested on outdated data, used an improper control group, and found only a 2.5% difference in delinquency rates between users and nonusers of PACE. Mot.17–20. CFPB claims the Report's dataset was not outdated because it included some post-California-reform applications. Opp.14–15. The dataset spanned 2014–2019, while California's reforms came into effect January 1, 2019. Mot.17–18; 90 Fed. Reg. at 2440. CFPB fails to provide any real assurances that the Report's exclusion of 22% of control-group applicants did not skew the conclusions, speculating that this was due to reasons other than creditworthiness. Opp.16. Finally, CFPB expresses the 2.5% difference between the control and test groups as a percentage-change increase (35%), which is a transparent gimmick to inflate the Report's minimal findings. Opp.17.

## II. All Equitable Considerations Favor Preliminarily Enjoining The Final Rule

Without a preliminary injunction, Plaintiff's members will suffer significant financial harm preparing to comply with the Final Rule during this case. Mot.20–21 ($2,528,000 in compliance costs for Renew before the March 1, 2026 effective date). Further, Renew estimates close to a 72% loss of its funding volume without a preliminary injunction, while Ygrene anticipates an approximately 78% loss. Mot.21–23. And all other equitable considerations also favor relief. Mot.24–25.

CFPB faults Plaintiff for not filing until "nearly five months" after the Rule's finalization, Opp.18, but this is an astounding position from *this* CFPB.  Just three weeks after finalizing the Rule here and after the change in Administrations, CFPB publicly engaged in reassessing all actions taken by the prior Administration's CFPB.  This included telling courts that it could not even take a position as to whether to defend multiple rules recently issued by the prior Administration's CFPB,[2] as well as suspending or withdrawing multiple such rules.[3]  Plaintiff's reasonable decision to wait a couple of months to see if the new Administration would withdraw the Rule, as CFPB has with so much else that it had recently done, did not doom Plaintiff's members to having to suffer irreparable harm for the entirety of this lawsuit.

But even if CFPB had not been publicly engaged in reconsidering the prior Administration's final rules, Plaintiff acted with more than sufficient dispatch by seeking relief a couple of months after the Rule's finalization and over nine months before the effective date.  Dkt.1; 90 Fed. Reg. at 2434.  As Plaintiff's undisputed declarations show, its members will suffer irreparable harm from the Rule during this case.  Dkt.25 ¶ 10(d); Dkt.27 ¶¶ 10–12.  Without preliminary injunctive relief, Plaintiff's members must hire or re-task additional staff, and acquire or re-purpose additional technology and product resources.  Dkt.25 ¶ 10; Dkt.27 ¶¶ 10–12.  **CFPB**

---

[2] *E.g.*, *Tex. Bankers Ass'n v. CFPB*, No.24-40705, Dkt.117 at 2 (5th Cir. Feb. 3, 2025); *Cornerstone Credit Union League & Consumer Data Indus. Ass'n v. CFPB*, No.4:25-cv-00016, Dkt.23 at 1–2 (E.D. Tex. Feb. 5, 2025); *Aca Int'l v. CFPB*, No.4:25-cv-00094, Dkt.23-2 at 1–2 (S.D. Tex. Feb. 12, 2025).  In the first case, the CFPB took until July 2 to reveal its new position.  *Tex. Bankers Ass'n*, Dkt.139 at 3.

[3] *E.g.*, S.J. Res. 18, 119th Cong. (2025), Pub. L. No.119-10 (2025); S.J. Res. 28, 119th Cong. (2025), Pub. L. No.119-11 (2025); 90 Fed. Reg. 25874 (June 18, 2025); 90 Fed. Reg. 20084 (May 12, 2025).

*cites no case, from any court, holding that filing an APA suit a couple of months after a rule issues requires parties to suffer such irreparable harm for the entire case* (which will at least take many months, and likely years, with appeals). While CFPB asserts that there is "no credible evidence" that these costs "must be incurred before a final judgment," Opp.19, Plaintiff's undisputed declarations prove otherwise. Plaintiff's members must incur significant costs *now* to be "compliant [with] implementation" by March 1, 2026. Dkt.25, ¶ 10(d); *see* Mot.21–22. This is not "self-harm," as CFPB asserts, Opp.19, but unrecoverable expenditures that companies that need to comply with a regulation must take, Mot.20–23, which is irreparable under controlling law, *Ohio v. EPA*, 603 U.S. 279, 291–92 (2024).

Finally, CFPB's public-interest argument is deeply confused. Opp.19–20. Congress expressed its view of the public's interest in regulating PACE in Section 307. CFPB's subjective belief that the public would benefit from more extensive federal regulation is irrelevant because Congress does not share that view.

## CONCLUSION

This Court should preliminarily enjoin enforcement of the Final Rule.

Dated: July 15, 2025                    Respectfully submitted,

JOHN S. GIBBS III                       */s/ Misha Tseytlin*
Florida Bar No. 91102                   MISHA TSEYTLIN,* *Lead Counsel*
TROUTMAN PEPPER LOCKE LLP               TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street N.E., Suite 3000   111 South Wacker Dr., Suite 4100
Atlanta, Georgia 30308                  Chicago, Illinois 60606
(404) 885-3000                          (608) 999-1240 (MT)
evan.gibbs@troutman.com                 misha.tseytlin@troutman.com
**Admitted pro hac vice*                *Attorneys for Plaintiff*