# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

---

BUILDING RESILIENT INFRASTRUCTURE
& DEVELOPING GREATER EQUITY, INC.
          Plaintiff,

v.                                                  Case No. 8:25-cv-1367-TPB-NHA

CONSUMER FINANCIAL PROTECTION BUREAU
*and* RUSSELL VOUGHT, *in his official capacity as Acting
Director of the Consumer Financial Protection Bureau*,
          Defendants.

---

## Proposed Order

Pursuant to the Court's order following the December 16, 2025, hearing on the parties' cross-motions for summary judgment, *see* ECF No. 71, Defendants Consumer Financial Protection Bureau (CFPB) and Russell Vought, in his official capacity as Acting Director of the CFPB, respectfully submit the attached proposed order.


Dated: January 5, 2026                    Respectfully Submitted

                                          MARK PAOLETTA
                                          *Chief Legal Officer*
                                          DANIEL SHAPIRO
                                          *Deputy Chief Legal Officer*
                                          VICTORIA DORFMAN
                                          *Senior Legal Advisor*
                                          CHRISTOPHER DEAL
                                          *Deputy General Counsel for Litigation*
                                          ANDREA MATTHEWS
                                          *Assistant General Counsel for Litigation*

/s/ Joseph Frisone
Joseph Frisone (VA Bar No. 90728)
Derick Sohn (DC Bar No. 1003386)
*Senior Counsel*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Joseph.Frisone@cfpb.gov
Derick.Sohn@cfpb.gov
(202) 435-9287
(202) 435-7873

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

---

BUILDING RESILIENT INFRASTRUCTURE
& DEVELOPING GREATER EQUITY, INC.
       Plaintiff,

v.                                                  Case No. 8:25-cv-1367-TPB-NHA

CONSUMER FINANCIAL PROTECTION BUREAU
*and* RUSSELL VOUGHT, *in his official capacity as Acting
Director of the Consumer Financial Protection Bureau*,
       Defendants.

---

     This matter is before the Court on cross-motions for summary judgment.

Plaintiff, Building Resilient Infrastructure & Developing Greater Equity, Inc.

(BRIDGE), filed its motion for summary judgment on November 7 (Doc. 57).

Defendants, Consumer Financial Protection Bureau (CFPB or Bureau) and Russell

Vought, in his official capacity as Acting Director of the CFPB, filed a combined

cross-motion for summary judgment, opposition to Plaintiff's motion for summary

judgment, and motion to dismiss on November 21 (Doc. 62). Plaintiff filed its

combined opposition and reply on November 28 (Doc. 63), and Defendants filed their

reply on December 5 (Doc. 66). The parties jointly filed the portions of the

administrative record on which each relied on December 12 (Doc. 69). After

reviewing the motions, responses, replies, legal arguments, case file, and relevant

portions of the administrative record, the Court finds as follows:

## Background

This is an Administrative Procedure Act (APA) case in which Plaintiff challenges the CFPB's final rule titled Residential Property Assessed Clean Energy (PACE) Financing (Regulation Z), 90 Fed. Reg. 2434 (Jan. 10, 2025). The final rule addresses the application of the Truth in Lending Act (TILA) to a particular kind of financial transaction known as PACE financing. The Court begins by providing an overview of PACE financing, the relevant statutory and regulatory framework, and the portions of the final rule at issue here.

### A. PACE Financing

Congress defines PACE financing as "financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer." 15 U.S.C. § 1639c(b)(3)(C)(i). It is a government initiative that multiple states, including Florida, have adopted.[1] The program allows a homeowner to finance certain energy efficient and weather-hardening home-improvement projects through a voluntary assessment paid through the homeowner's regular property tax bill. Local governments typically partner with a private PACE company, like one of Plaintiff's members, to administer a PACE program. These PACE companies typically handle the day-to-day operations of the PACE program, including marketing PACE to consumers, training home improvement contractors to offer PACE loans as a

---

[1] Although at least 19 states and the District of Columbia have enabling legislation allowing residential PACE programs, only a few states—primarily California, Florida, and Missouri—have had active residential PACE programs. Most PACE programs exist in California and Florida.

financing option to consumers door-to-door, overseeing originations, performing underwriting, and making decisions about whether to approve PACE financing applications. 90 Fed. Reg. at 2435.

In a typical PACE financing agreement, the local government or third-party PACE company pays the contractor performing the work on the consumer's home. *See* Doc. 50 at 4. In return, the homeowner agrees to repay the costs of the improvement, with interest, through a tax assessment over a period of time—generally between five and thirty years. *See*, *e.g.*, Doc. 69-3 at 81 (sample PACE contract providing that the "Property Owner agrees to pay the Assessments levied under this Assessment Contract to pay for the cost of the Project"). PACE loans use the residence as collateral for the financing, and PACE liens typically have "super-priority" status under state law. 90 Fed. Reg. at 2435. This means that if the consumer's home is sold through foreclosure, sale proceeds will first go to amounts that are due on the PACE loan before they can be used to pay off any other mortgage debt, even if that debt preexisted the PACE loan. *Id*.

Further, when ownership of the property transfers to a new owner, the new owner becomes responsible for the remaining payment obligation on the PACE loan. *Id*. However, due in part to guidelines issued by Fannie Mae and Freddie Mac, mortgage lenders generally will not originate loans for prospective home buyers to purchase homes with an existing PACE lien. *Id*. at 2449 n.121. For this reason, PACE companies warn consumers in their PACE agreements that they may have to prepay their PACE loan in full in order to refinance or sell their home. *See* Doc. 50 at 5–6 n.6.

3

**B. Statutory and Regulatory Framework**

Congress enacted TILA in 1968 to "assure a meaningful disclosure of credit terms so that the consumer [would] be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." Pub. L. No. 90-321, 82 Stat. 146 (1968). As relevant here, TILA applies to "consumer credit." "Consumer" refers to a "natural person" to whom "credit" is offered or extended for primarily personal, family, or household purposes. "Credit," in turn, is defined as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f), (i). A "creditor" includes a "government or governmental subdivision or agency." *Id.* § 1602(d), (e), (g).

Prior to the creation of the CFPB, TILA provided the Federal Reserve Board of Governors (Federal Reserve Board or Board) with the authority to "prescribe regulations to carry out the purposes" of TILA. Pub. L. No.90-321, § 105; 15 U.S.C. § 1604 (1970). TILA also authorized the Board to make "adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate [TILA's] purposes[.]" *Id.* The regulation implementing TILA is known as Regulation Z.

Shortly after TILA's passage, the Board addressed the scope of TILA's definition of "credit" in a series of publicly issued staff letters. In one such letter from 1969, Board staff explained that involuntary sewer assessments were not covered by TILA because the Act's definition of "credit" applied only to "debt[s]" that arose "from a contractual relationship, voluntarily entered into, between the debtor and

4

creditor." Doc. 69-2 at 63. As the Board explained, "certain transactions," like "tax assessments," did not "involve the *right* to defer a debt," and thus were not "credit" under TILA. 90 Fed. Reg. at 2448 (quoting 46 Fed. Reg. 20848, 20851 (Apr. 7, 1981)) (emphasis added). Accordingly, in 1981, the Federal Reserve Board issued "official staff commentary" to Regulation Z stating that "tax assessments" are "not considered credit for purposes of the regulation." Doc. 69-2 at 7.

Fast forward to 2008. California became the first state to pass legislation authorizing PACE financing. 90 Fed. Reg. at 2437. Florida followed suit in 2010. *Id.* at 2437–38. But these PACE enabling statutes did not create statewide PACE programs. Doc. 50. at 2. Rather, each county or municipality that wishes to offer a PACE program must separately opt in through a resolution or other enabling legislation. *Id.* at 2–3 (citing California and Florida state law).

Also in 2010, Congress passed the Dodd-Frank Act, creating the CFPB and transferring to it much of the authority to regulate consumer financial products and services that had been vested in other federal agencies, including the authority to enforce and prescribe regulations implementing over a dozen laws, including TILA. *See* 12 U.S.C. §§ 5481(12) and (14), 5581. But that authority did not transfer to the Bureau until the "designated transfer date" a year later, on July 21, 2011. *See* 12 U.S.C. §§ 5581, 5582; 75 Fed. Reg. 57252 (Sept. 20, 2010).

With this transfer of authorities came significant regulatory responsibility. Congress required that the CFPB issue a host of rules—and fast. For instance, Congress required that the Bureau issue a rule governing remittance transfers (broadly

speaking, international money transfers) within 6 months of the designated transfer date, which the Bureau did. *See* 77 Fed. Reg. 6194 (Feb. 7, 2012). Congress required the Bureau to issue a rule defining larger non-depository participants in a market for consumer financial products or services within a year of the designated transfer date, which the Bureau did. 77 Fed. Reg. 42874 (July 20, 2012). And finally, Congress required the Bureau to issue a series of significant rules regulating mortgage lending within 18 months of the designated transfer date, or by January 21, 2013. Those included rules governing escrow accounts, 78 Fed. Reg. 4726 (Jan. 22, 2013), mortgage servicing, 78 Fed. Reg. 10696 (Feb. 14, 2013); 78 Fed. Reg. 10901 (Feb. 14, 2013); and appraisals, 78 Fed. Reg. 7216 (Jan. 31, 2013).[2]

Those 2013 mortgage lending rules also implemented TILA's ability-to-repay provision. Specifically, in response to the mortgage crisis that precipitated the Great Recession, Congress amended TILA to require that a creditor making "a residential mortgage loan" ensure that "the consumer has a reasonable ability to repay the loan[.]" 15 U.S.C. § 1639c(a). To effectuate this, Congress provided that "[i]n accordance with regulations prescribed by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan." *Id.*

---

[2] As with the final rule at issue here, there is a short delay between when the CFPB issues a rule and when it is published in the Federal Register. Notwithstanding their publication date in the Federal Register, these 2013 mortgage lending rules were issued prior to January 21, 2013.

§ 1639c(a)(1). The Bureau issued its "Ability-to-Repay Rule" on January 30, 2013. 78 Fed. Reg. 6408 (Jan. 30, 2013). Accordingly, before making a residential mortgage loan, a creditor generally must consider the consumer's (1) current or expected income or assets; (2) employment status; (3) monthly payment for the proposed credit; (4) monthly payment on any simultaneous loans the creditor should know about; (5) monthly payment for mortgage-related obligations; (6) debt obligations; (7) debt-to-income ratio; and (8) credit history. 12 C.F.R. § 1026.43(c)(2).

Up until 2013, PACE financing had "been relatively limited, with cumulative obligations of around $200 million." 90 Fed. Reg. at 2435 (citing public data from PACENation, a national association that advocates for PACE financing). In 2014, however, "PACE financing activity accelerated." *Id.* The CFPB took notice, and in 2015, the Bureau began engaging with "various private PACE industry stakeholders, including private PACE companies [and] a national trade association." *Id.* at 2439.

PACE financing also drew the attention of some in Congress. In April 2017, Representative Brad Sherman (D-CA) introduced a House bill to regulate PACE loans under TILA. Doc. 50 at 10. Senator Tom Cotton (R-AR) introduced a companion bill in the Senate. *Id.* Concerned that "PACE loan[s]" were not being provided with "Federal disclosure or underwriting," the Senate bill was meant to "clarify that [TILA] applies to PACE loans." *Id.* at 10–11. Neither bill was put to a vote in committee.

A year later, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act (EGRRCPA). Pub. L. No.115-174, 132 Stat. 1296 (May 24,

2018). Relevant here is Section 307, in which Congress amended TILA—and specifically a section of TILA governing mortgage credit—to address "underwriting requirements" for PACE financing. *See* 15 U.S.C. § 1639c(b)(3)(C). Congress provided that the Bureau "shall prescribe regulations that carry out the purposes of [TILA's ability-to-repay requirements] and apply [TILA's civil liability provisions] with respect to violations [of the ability-to-repay requirements] with respect to [PACE] financing, which shall account for the unique nature of [PACE] financing." *Id.* § 1639c(b)(3)(C)(ii). Congress also authorized the Bureau to "collect such information and data that the Bureau determines is necessary" to prescribe the regulations and directed the Bureau to "consult with State and local governments and bond-issuing authorities." *Id.* § 1639c(b)(3)(C)(iii).

Shortly thereafter, in March 2019, the Bureau issued an Advance Notice of Proposed Rulemaking soliciting information to better understand the PACE financing market and the unique nature of PACE financing. 84 Fed. Reg. 8479 (Mar. 8, 2019). The Bureau also solicited views on whether TILA and Regulation Z's provisions other than those listed in Section 307 should apply to PACE financing. *Id.* at 8482.

In October 2020, consistent with the EGRRCPA's authorization to collect information, the CFPB requested PACE financing data from all companies providing PACE financing at the time. 90 Fed. Reg. at 2440. The Bureau also contracted with one of the three nationwide consumer reporting agencies to obtain credit record data for the PACE consumers in the PACE transaction data received from the PACE companies. *Id.* In August 2022, the CFPB received de-identified PACE data and

matching deidentified credit record data for about 208,000 individual PACE consumers in California and Florida. *Id.* In total, the matched consumers submitted about 286,000 PACE applications and entered into approximately 100,000 PACE transactions. *Id.*

Using those data, the Bureau published a report in May 2023, titled PACE Financing and Consumer Financial Outcomes Report (PACE Report), in May 2023. *See* Doc. 69-1 at 117. The report analyzes the impact of PACE transactions on consumer financial outcomes, with a particular focus on mortgage delinquency, by comparing consumers who had taken out a PACE loan and those who had a PACE loan application approved but ultimately chose not to proceed with the PACE loan. Among other things, the report found that taking out a PACE loan increased a consumer's probability of mortgage delinquency by 2.5 percentage points, or by 35%. *Id.* at 144–45.

At the same time the Bureau published its report, it issued the proposed rule. 88 Fed. Reg. 30388 (May 11, 2023). The Bureau explained that the rule, if finalized, would not have a significant impact on a substantial number of small entities. *Id.* at 30428–29. Accordingly, the Bureau did not convene a small business review panel. *Id.*

**C. PACE Rule**

On December 17, 2024, the CFPB issued the final rule that is the subject of this case, which was published in the Federal Register on January 10, 2025. 90 Fed. Reg. at 2434. As relevant here, the rule does two things. First, using its general rulemaking authority under TILA, the Bureau explained that PACE loans meet TILA's definition

of "credit" and are therefore covered by the Act. In doing so, the CFPB clarified that the decades-old exception from Regulation Z's definition of credit for "tax assessments" applies only to *involuntary* tax assessments. *Id.* at 2443. The Bureau reasoned that the original rationale for this exception—that tax assessments do not involve a "contractual relationship, voluntarily entered into, between the debtor and creditor"—does not apply to voluntary tax assessments, which were not contemplated when the exception was created. *Id.* at 2448. The rule thus made clear that voluntary tax assessments, like PACE financing, could be TILA "credit" if they otherwise meet the term's definition.

The CFPB then concluded that PACE financing does indeed meet that definition because consumers voluntarily agree to incur a debt (to cover the cost of the home improvement financing contract, *i.e.*, the PACE loan) and obtain the right to repay that debt over time (through years of property assessments). *Id.* at 2447. And because PACE loans meet TILA's definition of credit and are secured by the consumer's home, TILA's other mortgage protections, like mandatory disclosures, will apply when the rule takes effect. So too will other federal statutes whose protections apply to certain TILA-covered mortgage credit, such as the Real Estate Settlement Procedures Act.

Second, the CFPB applied TILA's ability-to-repay requirements and civil liability provisions to PACE loans after accounting for PACE loans' unique characteristics, as required by Section 307 of the EGRRCPA. Specifically, the Bureau concluded that the existing ability-to-repay framework for other mortgage loans

10

should largely apply to PACE loans, with certain adjustments, including to the factors a PACE creditor has to consider when it knows that a consumer is repaying the PACE assessment via an escrow account for an existing mortgage. *Id.* at 2467. The Bureau likewise tailored the rule's application of TILA's civil liability provisions. Recognizing that TILA liability attaches to the "creditor," that the creditor for PACE loans is typically a local government, and that such entities are exempt from liability under TILA, *see* 15 U.S.C. § 1612(b), the Bureau concluded that in order to fulfill Congress's purpose of ensuring consumers are not left without recourse for violations of TILA's ability-to-repay provisions as applied to PACE transactions, liability should extend to PACE companies that are substantially involved in making the credit decision. 90 Fed. Reg. at 2473.

Further, as required by Section 1022(b)(2)(A) of the Consumer Financial Protection Act, the Bureau also conducted an analysis of the final rule's potential benefits, costs, and impacts. *Id.* at 2474–98. Throughout that analysis, the Bureau relied, among other things, on the PACE Report to quantify the impacts of the rule on consumers and covered persons. *Id.* at 2474–75; *see also id.* at 2482–98.

The Bureau also determined that the rule would not have a significant economic impact on a substantial number of small entities. *Id.* at 2498–2501. To reach that conclusion, the Bureau identified the industries potentially impacted by the rule, as defined by 6-digit industry codes in the North American Industry Classification

System (NAICS).[3] *Id.* The Bureau then calculated that small entities who participate in the PACE industry or PACE-financed home improvements represent only a small percentage of the small entities in any of the larger relevant industries. *Id.* The Bureau also calculated that the number of small government entities impacted by the rule represented only a small percentage of relevant small government entities, whether the latter was defined to include all small government entities in the country or only those in states with active PACE legislation. *Id.* Because it determined that the rule would not have a significant economic impact on a substantial number of small entities, the Bureau concluded that neither a regulatory flexibility analysis nor a small business review panel was required for the rule. *Id.* at 2501.

## **Procedural History**

On May 28, 2025, over five months after the Bureau issued the final rule, Plaintiff filed this action under the APA. Doc. 1. The complaint raises four claims. First, Plaintiff claims that the Bureau exceeded its statutory authority by: (1) applying to PACE financing more than just the TILA provisions listed in Section 307 of the EGRRCPA, and (2) failing to consider PACE financing's unique nature in implementing Section 307. *Id.* at 33–41. Second, Plaintiff claims that Section 307 and the final rule violate the Tenth Amendment by impermissibly infringing on states' taxing authority and commandeering states to enforce a federal program. *Id.* at 41–53.

---

[3] The NAICS system is produced by a partnership between the Office of Management and Budget and partner agencies in Canada and Mexico to provide a consistent framework for analyzing industry statistics. 90 Fed. Reg. at 2499 n.348.

Third, Plaintiff claims that the Bureau issued the final rule without convening a small

business review panel as required by the Regulatory Flexibility Act. *Id.* at 54–58.

Finally, Plaintiff claims that the rule is arbitrary and capricious by relying on a report

that Plaintiff alleges is flawed. *Id.* at 58–64.

On June 5, Plaintiff moved for a preliminary injunction on claims 1, 2, and 4.

After conducting two hearings and requesting additional briefing, the Court denied

Plaintiff's motion on November 3, finding that Plaintiff had failed to "establish a

substantial likelihood of success on the merits and irreparable injury." Doc. 56 at 3–4.

Over two weeks later, Plaintiff appealed and filed a time-sensitive motion for

preliminary injunction pending appeal, which the Court denied the next day. Docs.

58, 59, 60. Plaintiff thereafter moved for an injunction pending appeal in the Eleventh

Circuit. That motion, too, was denied.

Finally, following supplemental briefing, the Court concluded that it retained

jurisdiction to rule on the parties' cross-motions for summary judgment

notwithstanding the pending appeal from the denial of the preliminary injunction.

Doc. 70. On December 16, the Court held a summary judgment hearing. Doc. 71.

## Legal Standard

"In cases involving judicial review of agency action … summary judgment is

the mechanism for deciding whether as a matter of law the agency action is supported

by the administrative record and is otherwise consistent with the APA standard of

review." *Fishing Rts. All., Inc. v. Pritzker*, 247 F. Supp. 3d 1268, 1275 (M.D. Fla. 2017)

(cleaned up). In such cases, "the district court acts as an appellate tribunal and the

entire case on review is a question of law." *Id*. Under the APA, "an agency action will
be upheld unless it is arbitrary or capricious, an abuse of discretion, contrary to law, or
without observance of procedure required by law." *Id*. (citing 5 U.S.C. § 706(2)).

The relevant standards of review under the APA fall into two categories. First,
"a court reviews legal issues de novo, including by applying its 'independent
judgment' to statutory-interpretation questions." *Lopez-Martinez v. U.S. Attorney
General*, 149 F.4th 1202, 1207 (11th Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*,
603 U.S. 369, 391–92, 412 (2024)). Under this standard, courts use the traditional
methods of statutory interpretation to determine "the best reading" of a statute
without giving deference to the agency's interpretation of the statute. *Loper Bright*, 603
U.S. at 400. And "[w]hen the best reading of a statute is that it delegates discretionary
authority to an agency … the court fulfills [its] role [under the APA] by recognizing
constitutional delegations, fixing the boundaries of the delegated authority, and
ensuring the agency has engaged in 'reasoned decisionmaking' within those
boundaries." *Id*. at 395 (cleaned up).

Second, the court reviews an "agency's decision making process" under the
"deferential 'arbitrary and capricious' standard." *Lopez-Martinez*, 149 F.4th at 1207
(citations omitted). This standard "requires that agency action be reasonable and
reasonably explained." *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 134 F.4th 1282,
1286 (11th Cir. 2025). A court's review under this standard "ensures that an
administrative agency examined the relevant data and articulated a satisfactory
explanation for its action including a rational connection between the facts found and

the choice made." *Id.* (citing *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567

(2025)) (cleaned up).

Finally, if a court lacks subject-matter jurisdiction over a claim, that claim must

be dismissed. *See Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1314 (11th

Cir. 2016). When a defendant moves under Federal Civil Procedure 12(b)(1) to bring a

"facial attack[]" on subject-matter jurisdiction, the court takes the plaintiff's

allegations as true and determines whether the plaintiff has sufficiently alleged that

jurisdiction exists. *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).

## <u>Discussion</u>

### Count I – Statutory Authority

Plaintiff asserts that the CFPB exceeded its statutory authority in issuing the

PACE Rule in two ways: (1) by applying to PACE financing more of TILA's

mortgage credit protections than those listed in Section 307, and (2) by failing to

account for PACE financing's unique nature in implementing Congress's directive in

Section 307. The Court addresses each claim in turn, concluding that the CFPB acted

within its authority in issuing the final rule.

#### A. Application of TILA

Plaintiff's first claim boils down to a dispute about how much of TILA applies

to PACE financing. According to Plaintiff, the CFPB may only apply those TILA

provisions listed in Section 307 of the EGRRCPA—that is, TILA's ability-to-repay

and civil liability provisions. The Bureau, on the other hand, maintains that because

15

PACE financing is "consumer credit" under TILA, the Act's provisions concerning
residential mortgage loans generally should apply as well.

The parties agree that this is a question of statutory interpretation that the Court
reviews de novo using its independent judgment. *See* Doc. 50 at 14–15. Accordingly,
the Court "start[s], as always, with the text." *Fla. Agency for Health Care Admin. v.
Adm'r for Centers for Medicare & Medicaid Servs.*, --- F. 4th ---, 2025 WL 3496406, at *9
(11th Cir. Dec. 5, 2025). TILA defines credit as the "right granted by a creditor to a
debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C.
§ 1602(f). And a "consumer" credit transaction is "one in which the party to whom
credit is offered or extended is a natural person, and the money, property, or services
which are the subject of the transaction are primarily for personal, family, or
household purposes." *Id.* § 1602(i).

PACE loans are plainly consumer credit. PACE lenders offer consumers money
to pay for home improvement projects; if consumers accept the deal, they repay the
loan in installments over time through tax assessments placed on the property. In
other words, PACE creditors grant debtors (here, the homeowners) the right to incur
debt (the PACE loan) and defer its payment (repaid semi-annually or annually,
alongside property taxes, for years).

Plaintiff's primary counterargument is that the consumer is not the "debtor" for
purposes of TILA because the repayment mechanism for PACE loans—a PACE
assessment—attaches to and runs with the property. In Plaintiff's telling, this means
that PACE loans are neither "extended" to a natural person nor a debt "incurred by

the homeowner." Rather, it is, according to Plaintiff, the property that is the "debtor." Doc. 57 at 17–18. The Court disagrees. The consumer is the debtor in PACE transactions.

Start with the beginning of the transaction. The "party to whom credit is offered or extended" is in fact a "natural person," 15 U.S.C. § 1602(i), namely individual homeowners. PACE loans are frequently marketed "directly" to homeowners, "often door-to-door." 90 Fed. Reg. at 2435. The homeowners are offered the loans and sign the financing agreements. *See* Doc. 69-3 at 282 (example PACE contract providing that "This Assessment Contract … is by and between the California Statewide Communities Development Authority and … *the Property Owner*" (emphasis added)). The underlying real property, on the other hand, is not a legal entity that can enter into contracts.

Nor is the property the "debtor" in PACE transactions. "Debtor" is not defined in TILA, but it is commonly understood as "[s]omeone who owes an obligation to another" especially "an obligation to pay money." Debtor, Black's Law Dictionary (12th ed. 2024); *see also Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021) (Courts "interpret words that are not defined in a statute with their ordinary and plain meaning"). Plaintiff similarly defines "debtor" as "one who owes or is indebted to another." Doc. 57 at 17 (citing *Debtor*, 4 Oxford English Dictionary 316 (J.A. Simpson & E.S.C. Weiner, eds. 2d ed. 1989). That is the consumer in these transactions.

It is the homeowner—not the property—who has the obligation to pay the PACE loan each time the assessment comes due. *See* Doc. 69-3 at 84 (sample PACE contract stating that the "Property Owner will be responsible for payment of the Assessment"). Moreover, if the homeowner doesn't pay, the homeowner will suffer the consequences—namely, the risk of losing the home in a tax sale or a foreclosure. That PACE loans are nonrecourse, meaning that the remedy for nonpayment is only seizure of the house, does not change the fact that the homeowner is the one who actually owes the money and has the obligation to pay. Nor does it matter that the obligation to pay the assessment runs with title to the property. That just means that the obligation to repay passes to the future owners of the property. *See, e.g.*, *In re Rosenfeld*, 23 F.3d 833, 837 (4th Cir. 1994) (concluding that because an obligation to pay assessments was imposed by a "covenant running with the land," that obligation was "a function of owning the land with which the covenant runs" that bound the next owner).

Plaintiff attempts to dance around this by arguing that what matters is the "legal responsibility" to repay the PACE loan. But it is the consumer and not the property that has this legal responsibility. This is borne out by Plaintiff's members' contracts in the record, which expressly place the responsibility, *i.e.*, the obligation, to repay the PACE assessments on the homeowners. Those contracts state that the "Property Owner agrees to pay the Assessments levied under th[e] Assessment Contract to pay for the cost of the Project," Doc. 69-3 at 81, and the "rights and obligations"

established under the contract, "including the obligation to pay the Assessments," are the "rights and obligations of the Property Owner," *id*. at 83.

For this reason, the Court is not persuaded by Plaintiff's reliance on *In re Hero Loan Litig. (Hero)*, No. ED CV 1602478-AB (KKx), 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017). The court there made the same error Plaintiff does here: relying solely on the superficial fact that PACE assessments run with the property without analyzing what that actually means for the consumer. In doing so, the court and Plaintiff elevate form over substance, ignoring both the practical and legal realities of PACE transactions. *See Meyers v. Clearview Dodge Sales, Inc.*, 539 F.2d 511, 515 (5th Cir. 1976) (rejecting argument that "elevate[d] form over substance in an effort to avoid the realities of the credit transaction" under TILA);[4] *see also Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000) ("[C]ourts are to focus on the economic substance of the transaction in determining whether TILA has been violated."). Indeed, the "Supreme Court and many other courts … have applied the substance-over-form doctrine to consumer finance law." *Edwards v. Your Credit Inc.*, 148 F.3d 427, 436 (5th Cir. 1998) (concluding that the "substance-over-form doctrine provides the proper framework for analyzing [TILA]").

Here, the substance (and, as evidenced by the PACE contracts, the form) of PACE financing is "consumer credit." As detailed above, it is the homeowner that "incur[s]" the obligation to repay the PACE loan. The homeowner signs the

---

[4] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit held as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

agreement and expressly agrees to take responsibility for making the PACE loan payments. The homeowner then makes the payments and suffers the consequences if no payments are made. The Court thus concludes that PACE loans meet TILA's definition of "credit."

Normally, that would be the end of the matter, but Plaintiff claims that Section 307 reflects Congress's intent that, whether or not PACE loans are credit, the Bureau may apply only the TILA provisions listed in Section 307 to PACE financing. But the best indicator of legislative intent is the actual "words [that Congress] used." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). And here, there is nothing in Section 307 that suggests Congress intended to limit TILA's application to PACE financing to "only" those TILA provisions listed in Section 307. Had Congress wanted to so limit TILA's application, it easily could have said so, but it didn't. *See Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) (refusing to add the word "any" in a definition because Congress "knows how to use th[at] term" and did not).

Nor does Congress's definition of PACE financing support Plaintiff's reading. Plaintiff argues that Congress recognized that "PACE stood entirely outside of TILA's regime" as evidenced by Congress defining PACE as a "tax assessment." But neither is the case. In addressing "underwriting requirements for [PACE] financing," Congress plainly defined PACE as "*financing*" that "*results*" in a tax assessment. 15 U.S.C. § 1639c(b)(3)(C). (emphasis added). And far from placing PACE entirely outside TILA's regime, Congress placed Section 307 within TILA—in a section

dealing with mortgage credit. This, of course, makes sense as PACE loans are a form of mortgage credit.

In fact, Section 307's text supports the Court's conclusion that PACE financing is consumer credit because Section 307 presupposes that PACE financing is mortgage credit, which TILA defines as a form of consumer credit. *See id.* § 1602(dd)(5). Here's how: Section 307 required the CFPB to "prescribe regulations that … apply [TILA's civil liability provisions] with respect to violations under [TILA's ability-to-repay provision] with respect to [PACE] financing." *Id.* § 1639c(b)(3)(C)(ii). The key language here is "with respect to violations under" TILA's ability-to-repay provision. That's because the only way to violate the ability-to-repay provision is for a "creditor" to "make a *residential mortgage loan*" without "a reasonable and good faith determination … that … the consumer has a reasonable ability to repay the loan." *Id.* § 1639c(a)(1) (emphasis added). Thus, Congress instructed the Bureau to apply TILA's civil liability provisions to PACE financing with respect to violations under a section of TILA that applies only to residential mortgage loans. If PACE financing were not a residential mortgage loan, there could be no violations of the ability-to-repay provision. Section 307 thus reflects Congress's recognition of PACE financing for what it plainly is: mortgage credit.

Plaintiff's remaining arguments are unconvincing. To start, Section 307 does not control merely because it is the later-enacted, more specific statute. As the Eleventh Circuit has held, "there is no need to engage in a general/specific canon analysis" when there is no "conflict" between the relevant statutory provisions. *See In*

*re 2 Monkey Trading, LLC*, 142 F.4th 1323, 1334 (11th Cir. 2025). Here, there is no conflict between Section 307 and the commonsense conclusion that PACE financing is credit. Section 307 requires the CFPB to apply TILA's ability-to-repay and civil liability provisions to PACE loans, accounting for their unique characteristics. 15 U.S.C. § 1639c(b)(3)(C)(ii). The final rule does precisely that. To be sure, the final rule goes further and confirms that other TILA protections also apply to PACE financing. But the application of those additional protections in no way conflicts with Section 307.

Nor does recognizing that PACE financing is TILA "credit" render Section 307 superfluous or a nullity. Accordingly, BRIDGE's reliance on *Bilski v. Kappos*, 561 U.S. 593 (2010), a patent case that does not address agency rulemaking, is misplaced.

First, as the Supreme Court has recognized, it is not "redundant" for Congress to "*require*[]" an agency to issue a rule that it could have already issued under its general rulemaking authority. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 383 n.9 (1999). That is exactly what happened here. The fact that Section 307 *required* the Bureau to issue a rule applying TILA's ability-to-repay and civil liability provisions to PACE transactions does not mean that the Bureau was not already *authorized* to regulate PACE transactions as credit.

Second, by specifically requiring the Bureau issue such a rule (as opposed to generally authorizing it), Section 307 limited the Bureau's rulemaking options in another way. As part of the Bureau's preexisting rulemaking authority under TILA, the agency may "exempt, by regulation, from all or part of [TILA] all or any class of

transactions" 15 U.S.C. § 1604(f). Section 307, however, would preclude the Bureau
from exempting PACE from TILA's ability-to-repay and associated civil liability
provisions, as doing so would actually conflict with Section 307.

Third, just as in *AT&T*, Section 307 "gives the [CFPB] authority beyond that
conferred by" TILA's general rulemaking authority. 525 U.S. at 383 n.9. Section 307's
instruction to "account for [PACE] financing's unique nature" gave the Bureau the
authority to extend TILA's civil liability provision to PACE companies, even though
liability under TILA typically applies to only creditors, and the creditors in PACE
transactions are local government entities. *See* 90 Fed. Reg. at 2473. This is something
the Bureau could not do under its general rulemaking authority.

Finally, with no textual support, Plaintiff asks this Court to look beyond
Section 307's text to inquire why Congress passed Section 307. According to Plaintiff,
Congress would have had no reason to pass Section 307 if TILA already applied to
PACE financing. But "statutory interpretation cannot be overcome by judicial
speculation as to the subjective intent of various legislators in enacting [a] subsequent
provision." *Bilski*, 561 U.S. at 608. Indeed, "it is better to analyze a statute than it is to
psychoanalyze Congress." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1361–62 (11th Cir.
2020). And, as discussed above, the actual words Congress enacted in Section 307
show that Congress treated PACE financing as TILA "credit."

Regardless, Congress passing Section 307 is not inconsistent with the Court's
conclusion that the CFPB acted within its authority in concluding that PACE
financing meets TILA's definition of "credit." Before Congress passed Section 307

and the Bureau implemented it, there was "ambiguity" about TILA's application to
PACE transactions given Regulation Z's existing exception for "tax assessments"
from TILA's definition of "credit." 90 Fed. Reg. at 2450. Case in point: The one court
to consider whether PACE transactions are TILA "credit" prior to Section 307 held in
part that PACE was not covered under TILA based on Regulation Z's exception for
tax assessments. *See In re Hero*, 2017 WL 3038250, at *4. As explained above, this is
inconsistent with Section 307's text, as well as the plain meaning of TILA's definition
of "credit." The final rule accordingly clarified that the tax assessment exception
applies only to "involuntary tax assessments." *Id.*

This change makes sense, too, as it brought the exception in line with its
original rationale—that tax assessments do not involve a "contractual relationship,
voluntarily entered into, between the debtor and creditor," which is a predicate for
TILA "credit." *See* Doc. 69-2 at 63 (Federal Reserve Board staff letter). Indeed, it is
apparent that the Federal Reserve Board based that exception on involuntary tax
assessments, not voluntary ones. *See* 90 Fed. Reg. at 2448.

Moreover, it makes sense for Congress to compel an agency to act sooner in
addressing an issue that the agency was already empowered to address. *Cf. AT&T
Corp.*, 525 U.S. at 383 n.9 (not redundant for Congress to require an agency to act
where it was already authorized to do so). That very well could have been the case
here. *See* Doc. 50 at 10–11 (explaining that Senator Cotton introduced legislation to
"clarify that [TILA] applies to PACE loans" because he was concerned that "PACE
loan[s]" were not being provided with "Federal disclosure or underwriting").

Relatedly, there is nothing in the timeline that suggests that the CFPB's inaction reflected a view that the CFPB was not authorized to address PACE financing under TILA. PACE financing was created in 2008. Congress did not create the CFPB until 2010, and even then, the Bureau did not have authority to issue rules under TILA until 2011. As discussed above, the Bureau spent its first several years issuing a number of significant rules required by Congress on a prescribed timeline. *See supra* pp. 8–9. Further, PACE financing did not begin taking off until around 2014. *See* 90 Fed. Reg. at 2435 ("In 2014, PACE financing activity accelerated."). Only a year later, the CFPB began engaging with industry on PACE financing. *Id.* at 2438. Thus, even if the Court were to consider this extra-textual evidence, it would not support the inference that the CFPB acted as if it believed it did not have authority to address PACE financing.

Ultimately, why Congress acted when it did is largely beside the point. When "a statute is passed by Congress, it is the text of the statute … and certainly not someone's understanding of the circumstances which gave rise to the legislation" that matters. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001). Analyzing the text, the Court concludes that PACE financing meets TILA's definition of "credit." Accordingly, the CFPB did not exceed its statutory authority in issuing the final rule.

**B. Application of Section 307**

Plaintiff claims that the CFPB failed to account for PACE financing's unique nature in implementing Section 307's mandate, and that even if the Bureau did, it did not do so reasonably. The Court disagrees with both assertions.[5]

Section 307 requires the CFPB to issue a rule "carry[ing] out the purposes" of TILA's ability-to-repay provision and "apply[ing]" TILA's civil liability provisions "with respect to [PACE] financing, which shall account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii). Neither the EGRRCPA nor TILA defines what it means to "account for" PACE financing's unique nature. The Court accordingly looks to that phrase's "ordinary and plain meaning." *Catalyst Pharms., Inc.*, 14 F.4th at 1307; *see also Ruiz v. Wing*, 991 F.3d 1130, 1138 (11th Cir. 2021) ("While most words carry more than one dictionary definition, '[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.'" (quoting Antonin Scalia & Bryan A. Garner, Reading Law 70 (2012)). As used in this context, "account for" ordinarily means to "think about (something)" or to "take (something) into consideration. *See* Account for (something), Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/account%20for%20%28something%29; *cf. Bufkin v. Collins*, 604 U.S. 369, 379 (2025) (finding that "to 'take account of' something means to give it

---

[5] For this reason, the Court need not consider whether Plaintiff's challenge here is limited solely to 5 U.S.C. § 706(2)(C) (exceeding statutory authority), as stated in the Complaint, or whether it should also include a claim under 5 U.S.C. § 706(2)(A) (arbitrary and capricious). The final rule passes muster under both standards.

attention or consideration"). Accordingly, Section 307 requires the CFPB to apply TILA's ability-to-repay and civil liability provisions taking into consideration PACE financing's unique characteristics.

Further, as Plaintiff concedes, Section 307 "confer[s] broader discretionary authority on CFPB," and there are multiple "permissible ways for CFPB to 'account for' PACE's 'unique nature.'" *See* Doc. 63 at 10. The Court therefore agrees with the CFPB that Section 307 permits the CFPB to apply the existing ability-to-repay and civil liability framework for other mortgage loans to PACE financing while making adjustments where appropriate given PACE financing's unique characteristics. That is precisely what the final rule does.

Start with the civil liability provisions, which Plaintiff wholly ignores. The CFPB premised its application of the civil liability provisions to PACE lending on PACE's unique characteristic that the "creditor" in such transactions is typically the local government entity. While TILA provides a private right of action against "creditors," TILA also insulates local government entities from civil penalties. *See* 15 U.S.C. § 1612(b). Thus, applying TILA's civil liability provisions to PACE transactions without any adjustments would seem to leave consumers without any remedy for violations of TILA's ability-to-repay provision with respect to PACE transactions. To give effect then to Congress's directive to apply TILA liability to violations of the ability-to-repay requirements in the context of PACE financing, the rule extends liability to PACE companies that are substantially involved in making the credit decision. 90 Fed. Reg. at 2473.

Turning to the ability-to-repay provision, it's important here to bear in mind
what the existing framework actually is: a requirement that creditors first make a
"reasonable and good faith determination … that the consumer will have a reasonable
ability to repay the loan" before the creditor makes the loan. 12 C.F.R.
§ 1026.43(c)(1). In making that determination, creditors generally must consider the
consumer's (1) current or expected income or assets; (2) employment status; (3)
monthly payment for the proposed credit; (4) monthly payment on any simultaneous
loans the creditor should know about; (5) monthly payment for mortgage-related
obligations; (6) debt obligations; (7) debt-to-income ratio; and (8) credit history. *Id.*
§ 1026.43(c)(2). The CFPB considered PACE's unique characteristics and determined
that the existing ability-to-repay framework should largely apply with certain
adjustments. *See* 90 Fed. Reg. at 2464–66.

In particular, recognizing that PACE loans are repaid through an assessment
alongside property taxes and that many consumers will make such payments through
an escrow account for an existing mortgage, the rule directs PACE creditors to
consider the timing of a consumer's first PACE loan payment for these consumers. 90
Fed. Reg. at 2468. This is because the CFPB found that due to a potential lag in a
mortgage servicer accounting for the new PACE loan, by the time a consumer's first
PACE payment is due, there may be a (substantial) shortfall in the consumer's escrow
account, requiring the consumer to make a considerably higher mortgage payment to
make up the difference. *Id.* Given this situation that is unique to PACE lending, the

rule instructs PACE creditors to keep this in mind when considering the consumer's

ability to repay the PACE loan. *Id.*

In rebuttal, Plaintiff lists several factors that it claims the CFPB did not

reasonably consider. But Plaintiff does not explain why the factors it lists should alter

the general ability-to-repay framework discussed above. Take, for instance, the fact

that PACE loans are repaid through tax assessments, or that PACE loans further

public-policy goals, or that the creditor in a PACE loan is typically the local

government. *See* Doc. 57. at 11. Plaintiff does not explain and the Court sees no

reason why these factors mean that creditors should not check a consumer's monthly

income, employment status, or expected monthly payment before making the PACE

loan. The same is true of Plaintiff's conclusory assertion that the ability-to-repay

framework should be adjusted to account for the fact that some state and local

governments have already adopted some consumer protections, or that some PACE

companies voluntarily apply underwriting practices to ensure consumers can repay the

loan.

The CFPB expressly considered these characteristics in the final rule and

reasonably concluded that they do not militate against applying a uniform national

ability-to-repay requirement for all consumers. *See* 90 Fed. Reg. at 2465. After all, as

the CFPB explained in the final rule, not all states with PACE-enabling legislation

have comparable requirements, new states may enable PACE lending without

enacting such requirements, and future PACE companies that enter the market may

not voluntarily follow best practices not required by law. *See id.*

Plaintiff's final effort is to offer, without much evidence, that a rule faithful to Section 307 would have looked much different. For instance, Plaintiff proposes that creditors should consider a comparison between the value of the property to the size of the PACE debt. But as the CFPB points out, if creditors wish to consider that, they can. Regulation Z's ability-to-repay factors are not exhaustive. *See* 12 C.F.R. § 1026.43(c)(2). Regardless, that Plaintiff wishes to add a consideration does not mean it was unreasonable for the CFPB to require PACE creditors to consider the same basic factors, like a consumer's monthly income and employment status, that other mortgage lenders must consider before making a mortgage loan.

Plaintiff then regurgitates its claim that the CFPB's implementation of Section 307 was unreasonable because it applies TILA's other mortgage credit protections and portions of other consumer protection laws. But, as discussed above, this is a result of PACE financing meeting TILA's definition of credit, and not because of anything the Bureau did in implementing Section 307's directive to apply an ability-to-repay framework to PACE financing.

Ultimately, Plaintiff's true complaint is that, after considering PACE financing's unique nature, the CFPB concluded that it was appropriate to apply much of the existing ability-to-repay framework to PACE transactions—and that the adjustments the Bureau did make to those requirements were not to Plaintiff's liking. But that Plaintiff desires different adjustments than the ones the Bureau made does not mean that the Bureau failed to "account for the unique nature of [PACE] financing"

30

or that the Bureau's consideration of PACE financing's unique nature was unreasonable.

For these reasons, the Court finds that the CFPB did not exceed its statutory authority in issuing the PACE Rule. According, the Court enters summary judgment in favor on the CFPB on Count I.

## Count II – Tenth Amendment

Plaintiff asserts that Section 307 and the final rule violate the Tenth Amendment by abridging states' taxing power and impermissibly commandeering states into enforcing a federal program. However, fatal to both claims is that PACE financing is a credit transaction and not a tax.

"A tax is an impost levied by authority of government upon its citizens, or subjects, for the support of the State." *Lane Cnty. v. Oregon*, 74 U.S. 71, 80 (1868). It stands in stark contrast to the creation of "debt," which "originates in and is founded upon contracts." *Id.*; *see also Meriwether v. Garrett*, 102 U.S. 472, 513 (1880) (distinguishing between taxes, which are "imposts levied for the support of the government" and debts, which are "obligations for the payment of money founded upon contract").

PACE loans, as discussed above, are created voluntarily by contract with individual homeowners. They are not imposts levied on the general public for revenue-raising purposes. One of Plaintiff's members made this exact point in another federal case, explaining that PACE assessments "are not a state tax … because they are not used for general revenue …; [r]ather, PACE assessments are levied as a

repayment mechanism for the ... financing of energy efficiency and renewable energy [home] improvements." *Midland States Bank v. Ygrene Energy Fund Inc.*, 564 F. Supp. 3d 805, 813, 815 (E.D. Mo. 2021) (holding PACE assessments are not taxes under state law). It makes no difference that this other case, as Plaintiff argues, was brought under the Tax Injunction Act. The issue there was the same as it is here: whether PACE assessments are taxes. They are not.

Nor does it matter, as Plaintiff argues, that PACE assessments are "voluntarily incurred." That is beside the point. A consumer may voluntarily incur a sales tax by choosing to buy an item, but what makes the sales tax a tax is that it was unilaterally levied, *i.e.*, imposed, by the government for general revenue-raising purposes. PACE assessments, on the other hand, are imposed on the property only with the agreement of the homeowner. *See* Doc. 69-3 at 81 (sample PACE agreement providing that "the Property Owner agrees to the imposition ... of the Assessment in order to repay the costs incurred").

Even assuming that PACE financing *implicates* states' taxing authority because PACE assessments are collected alongside property taxes, the Court would still find that Section 307 and the final rule do not run afoul of the Tenth Amendment. That is because Congress has broad authority to preempt states' taxing power under the Commerce Clause. As the Eleventh Circuit succinctly put it: "the federal commerce power supersedes state tax authority." *Montgomery Cnty. Comm'n v. Fed. Hous. Fin. Agency*, 776 F.3d 1247, 1261 (11th Cir. 2015); *see also DeKalb Cnty. v. Fed. Hous. Fin.*

*Agency*, 741 F.3d 795, 801 (7th Cir. 2013) ("No provision of the Constitution insulates state taxes from federal powers granted by the Constitution.").

In fact, the Supreme Court has held that a federal statute can be "construed to invalidate" a state tax, given "the broad power of Congress to regulate interstate commerce." *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 150 (1979). And far from invalidating a state tax, the alleged infringement here is merely the reduction in assessments from the potential reduction in consummated PACE loans. Accordingly, any infringement would be entirely consistent with Congress's power under the Commerce Clause. *Cf. Montgomery Cnty. Comm'n*, 776 F.3d at 1258 (Commerce Clause authorized Congress to exempt certain federal entities from state transfer taxes).

Similarly, the Court would find no anticommandeering problem with Section 307 and the final rule if the Court construed PACE financing to implicate states' taxing power. The anticommandeering doctrine does not apply where, as here, Congress does not regulate "States in their sovereign capacity to regulate their own citizens," but rather as voluntary participants subject to a generally applicable regulatory scheme. *See Reno v. Condon*, 528 U.S. 141, 151 (2000). Further, it is well settled that the fact "[t]hat a State wishing to engage in a certain activity must take … action to comply with federal standards regulating that activity … presents no constitutional defect." *South Carolina v. Baker*, 485 U.S. 505, 514–15 (1988).

That is the case here. Section 307 and the final rule govern a commercial activity, imposing obligations on "creditors" engaged in offering and extending credit

as defined by TILA. They do not compel states to enforce a federal regulatory
program against their citizens, but rather require local governments to follow the
generally applicable federal requirements for consumer lending.

For these reasons, Section 307 and the final rule do not violate the Tenth
Amendment. Accordingly, summary judgment on Count II is granted in favor of the
Defendants.

## Count III – Regulatory Flexibility Act

Plaintiff claims that the final rule should be set aside because the CFPB failed to
submit the rule to a Small Business Review Panel as required by Section 609(b) of the
Regulatory Flexibility Act (RFA). That section provides, in relevant part, that when a
rule will have a "significant economic impact on a substantial number of small
entities," a "covered agency," which the RFA defines to include the CFPB, "shall
convene a review panel" to consider the impact of the rule on small entities. 5 U.S.C.
§ 609(b). The CFPB argues that this claim should be dismissed for lack of subject
matter jurisdiction because the RFA does not authorize judicial review of Section
609(b) claims. The Court agrees.

Section 611 of the RFA, titled Judicial Review, addresses the scope of courts'
review of claims alleging noncompliance with the RFA. Specifically, the RFA
provides that courts "shall have jurisdiction to review any claims of noncompliance
with sections 601, 604, 605(b), 608(b), and 610" as well as "compliance with sections
607 and 609(a)." *Id.* § 611(a). It further provides that compliance with the RFA "shall
be subject to judicial review only in accordance with" Section 611. *Id.* § 611(c).

Noticeably absent from Section 611's list of reviewable claims is a claim based on noncompliance with Section 609(b)'s requirement to convene a small business review panel.

The RFA provides a detailed list of sections that are judicially reviewable. Accordingly, this Court will not use the "judicial power … to supply words … that have been omitted." *See In re Cumbess*, 960 F.3d 1325, 1333 (11th Cir. 2020) (quoting Antonin Scalia & Bryan A. Garner, Reading Law 93–94 (2012)).

The D.C. Circuit Court of Appeals faced this exact issue and reached the same conclusion in *National Association of Home Builders v. EPA*, 682 F.3d 1032 (D.C. Cir. 2012). There, petitioners claimed that the Environmental Protection Agency (EPA) violated the RFA "by failing to convene a small business advocacy review panel to assess the impact" of an EPA rule. *Id*. at 1041. The court concluded that because Section 609(b) is "[c]onspicuously absent from the[] lists of reviewable claims," courts have "no jurisdiction to review challenges to an agency's compliance with that section." *Id*.

Plaintiff takes issue with the D.C. Circuit's so-called "flawed" decision, but tellingly, does not identify any particular flaw in this straightforward textual analysis. Instead, Plaintiff argues that the Court may nevertheless review an agency's compliance with Section 609(b) under the general rules that administrative action is "presumptively subject to review by the courts" and that a failure to follow required procedures can usually be challenged under the APA. The problem with this argument is that it, too, ignores Section 611 of the RFA. The RFA expressly provides that an

35

agency's "[c]ompliance…with the [RFA] shall be subject to judicial review *only* in accordance with [section 611]." 5 U.S.C. § 611(c) (emphasis added). Thus, as the D.C. Circuit recognized, "courts may not, under the guise of APA review, enforce compliance with a procedural requirement that the RFA clearly excludes from [courts'] purview." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1042.

Perhaps recognizing its error in alleging a non-reviewable claim, Plaintiff tries to assert a cause of action that it did not actually plead. Specifically, Plaintiff claims in its final brief that the real "issue here" is that the CFPB supposedly didn't comply with "Section 605(b)." That provision provides that an agency does not have to follow certain of the RFA's requirements if the agency certifies that a rule will not have a significant impact on a substantial number of small entities. 5 U.S.C. § 605(b).

But Section 605 is not the "issue" according to Plaintiff's complaint. In fact, Section 605 does not show up once in the Complaint. Nor does it show up in Plaintiff's opening summary judgment brief even though that brief acknowledges the contrary caselaw holding that Section 609(b) claims—like the one Plaintiff actually alleged—are unreviewable. A "plaintiff may not amend [its] complaint through argument in a brief" at the summary judgment stage. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Plaintiff is thus stuck with its claim based on noncompliance with Section 609(b). And because that claim is not judicially reviewable, the Court will dismiss it for lack of subject matter jurisdiction.

For the sake of completeness, the Court notes that even if Plaintiff had alleged a Section 605(b) claim, the Court would still find in favor of the CFPB. That is for two

Case 8:25-cv-01367-TPB-NHA    Document 73    Filed 01/05/26    Page 39 of 49 PageID 3196

reasons: (1) Plaintiff has not shown that it or its members are "small entities" entitled to sue under the RFA and (2) on the merits, the CFPB's finding that the rule would not have a significant impact on a substantial number of small entities was reasonable.

To start, in order to assert "an APA claim that invokes another statute," as Plaintiff does here, a plaintiff must show that it "fall[s] within the underlying statute's zone of protected interests." *California Cattlemen's Ass'n v. U.S. Fish and Wildlife Serv.*, 315 F. Supp. 3d 282, 287 (D.D.C. 2018). The underlying statute here is the RFA, which authorizes causes of action only for "a small entity that is adversely affected or aggrieved by final agency action." 5 U.S.C. § 611(a)(1); *see also State v. Ctrs. For Medicare & Medicaid Servs.*, No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090, at *8 (M.D. Ala. Mar. 30, 2010) ("Section 611(a)(1) … limits the type of plaintiff that can bring" an RFA claim to a "small entity."). Plaintiff has failed to show—indeed, it does not even assert—that it or its members are small entities.

As both parties acknowledge, the threshold for PACE companies to be considered small entities under the RFA is averaging less than $47 million in annual receipts over the past 5 years. *See* Doc. 1 at 54; 90 Fed. Reg. at 2500. Plaintiff does not dispute the CFPB's articulation in the final rule that annual receipts in this context means principal balance of PACE loans originated in a given year. *See id.*

Plaintiff does not assert that it or any of its members fall below this threshold. And the information it has put forward suggests the opposite. Specifically, one of Plaintiff's members stated in an affidavit submitted in support of Plaintiff's preliminary injunction motion that in 2024 alone, it financed over $215 million in

37

PACE loans. *See* Doc. 25 at 3. Unable to show that it or any of its members are small entities, Plaintiff instead only argues that it "work[s] with" small entities affected by the rule. Doc. 63 at 18 n.†; *see also* Compl. ¶¶ 253–70 (failing to allege that any of BRIDGE's members is a small entity). But the question isn't whether Plaintiff works with them but rather whether Plaintiff's members include "a small entity that is adversely affected or aggrieved by final agency action." 5 U.S.C. § 611(a)(1).

Plaintiff has not shown that to be the case, and so the Court would dismiss Count III for that reason as well.

Regardless, the Court finds that the CFPB did not violate Section 605(b). In reviewing claims under the RFA, the question is "whether [the Bureau] has made a 'reasonable, good-faith effort' to carry out the mandate of the RFA." *Alenco Communications, Inc. v. FCC*, 201 F.3d 608, 624–25 (5th Cir. 2000); *see also Cactus Corner, LLC v. U.S. Dep't of Agriculture*, 346 F. Supp. 2d 1075, 1115 (E.D. Cal. 2004) ("Courts have interpreted the RFA to require nothing more than a good faith effort to assess the impact of a regulation on small businesses."). The Bureau easily meets that standard.

In concluding that convening a small business panel was not required because the rule would not have a significant impact on a substantial number of small entities, the Bureau reasonably determined that PACE companies were not "small entities," and regardless, affected PACE companies and impacted home contractors did not represent a substantial number of entities in their respective markets. *See* 90 Fed. Reg. at 2499–2501.

It is on this latter point that Plaintiff challenges the CFPB's analysis, arguing that home improvement contractors performing work on PACE projects represent a "distinct market." Therefore, according to Plaintiff, the Bureau was unreasonable in using all home improvement contractors as the relevant market to determine whether affected PACE contractors made up a "substantial number" of small entities. But Plaintiff has not shown that PACE contractors are truly a distinct market. Indeed, the only support Plaintiff cites in the record for this point says nothing of the sort. *See* Doc. 69-3 at 458. Contrary to Plaintiff's assertion, the record does not say that PACE contractors "only compete" with other PACE contractors, *see* Doc. 57 at 26; rather, it merely says that only PACE contractors are subject to the rule, *see* Doc. 69-3 at 458.

To be sure, that is one part of the equation. But the other part is whether those affected PACE contractors make up a substantial number of the relevant market. And here the CFPB reasonably concluded that the market for financing home improvements through PACE transactions should be understood as part of the broader market for financing and completing home improvement projects. *See* 90 Fed. Reg. at 2499–2501. That makes sense because, with some adjustments, the rule extends to PACE companies the same requirements that already apply to their non-PACE competitors. *See* 90 Fed. Reg. at 2434.

Indeed, Plaintiff's argument below about the PACE Report and the proper control group reinforces that PACE contractors compete against other non-PACE home improvement contractors. In particular, Plaintiff argues that the CFPB should have compared consumers who took out a PACE loan with consumers who chose not

to take out a PACE loan and instead procured some other financing to complete their home improvement projects. Doc. 57 at 20–22. That consumers could opt to pursue other financing options and hire other home improvement contractors necessarily shows, as the CFPB reasonably concluded, that PACE financing and PACE contractors are competing in a broader market for financing and home improvement projects.

Thus, even if the Court were to modify Plaintiff's Section 609(b) claim under Count III and reach the merits of a Section 605(b) claim, it would find that the CFPB acted reasonably and enter summary judgment in the CFPB's favor.

## Count IV – PACE Report

In its final claim, Plaintiff asserts that the final rule is arbitrary and capricious because the CFPB relied on a report that Plaintiff alleges is flawed. The CFPB maintains that the PACE Report was not flawed; that the decisions the Bureau made in conducting the study were reasonable; and regardless the report did not factor into the two aspects of the rule that Plaintiff challenges here and thus any potential issues with the report are harmless. The Court agrees with the CFPB.

The Court starts by noting that this claim is governed by the APA's arbitrary-and-capricious standard, which "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Under this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Gray Television, Inc. v. FCC*, 130 F.4th 1201, 1216 (11th

Cir. 2025). This does not mean that an agency must have "perfect empirical or statistical data." *Prometheus Radio Project*, 592 U.S. at 427. Rather, the agency must make "reasonable … judgment[s] based on the evidence it ha[s]." *Id*. The CFPB has done that here.

Plaintiff says otherwise, taking issue with four aspects of the PACE Report. The Court addresses each, noting that Plaintiff relied principally on the first at the summary judgment hearing. In particular, Plaintiff argued that the CFPB used an improper control group when it compared consumers who obtained PACE loans to consumers who were approved to take out a PACE loan but chose not to. According to Plaintiff, the CFPB should have instead compared consumers who obtained a PACE loan to consumers who were approved for a PACE loan but chose a different financing option to complete their home improvement projects.

The Court is satisfied that the Bureau's choice of control group here was reasonable; indeed, it was superior to Plaintiff's preferred control group. As the final rule explains, the purpose of the study was to "identify the overall impact of PACE loans on consumer financial outcomes." 90 Fed. Reg. at 2481. The Bureau reasonably concluded that to quantify that impact, it needed to identify a group that would capture the "counterfactual," *i.e.*, "how outcomes would have changed for the treated group had they not been treated" (with the treated group being consumers who obtained a PACE loan). *Id*. The Bureau thus compared consumers who took out PACE loans to similarly situated consumers who were approved and could have taken out a PACE loan but chose not to. *Id*. And to make sure the Bureau selected a

reasonable control group, the Bureau included extensive analysis in the PACE Report "to substantiate the similarity" of the two groups, and "include[d] several robustness checks exploring alternative control groups, all of which [were] consistent with the results based on the main control group." 90 Fed. Reg. at 2477–78; *see also* Doc. 69-1 at 181–183 (PACE Report robustness checks).

The Bureau also considered Plaintiff's preferred control group and reasonably determined that it was not suited to measure the overall impact of PACE loans. For instance, an analysis that uses a control group of consumers who were approved for PACE financing but took out other financing instead does not measure the impact that PACE marketing had on "induc[ing] consumers into undertaking a home improvement project in the first place, or into financing a project that they might otherwise pay cash for." 90 Fed. Reg. at 2481.

The Bureau also reasonably determined that analyses employing Plaintiff's preferred control group were too flawed to be useful. Commenters presented two different analyses that purported to compare consumers who obtained a PACE loan to PACE-approved consumers who financed a different way. One such analysis used a control group that consisted of only 312 consumers—as opposed to the over 45,000 consumers in the Bureau's control group—and that was therefore "too small to have statistical power necessary to draw conclusions about the effect of PACE." *Id.* And the other such analysis used a control group that consisted of consumers who were materially different from consumers who obtained PACE financing, including because they had markedly higher credit scores and had, prior to applying for PACE financing,

experienced delinquency rates over *ten times* lower than consumers who obtained PACE financing. *Id.*

Accordingly, the Bureau acted reasonably in selecting the control group that it did.

Second, Plaintiff claims that the PACE Report relied on outdated data because most of the consumers in the study applied for and obtained PACE loans before certain state reforms took effect—namely, California's 2018 reforms. But the Bureau acknowledged the relevance of those state reforms and separately analyzed pre- and post-reform data to understand their impact. 90 Fed. Reg. at 2476–78. Indeed, it devoted an entire section of the PACE Report to the California reforms and their impact. *See* Doc. 69-1 at 163–69 ("Regulating PACE: Case study of California"). Tellingly, Plaintiff raises no quarrel with the substance of that analysis. Plaintiff instead argues the Bureau's post-reform data were limited and "not statistically precise." But the fact that an agency lacks "perfect empirical or statistical data" does not render its conclusions arbitrary or capricious. *Prometheus Radio Project*, 592 U.S. at 427. Rather, it is sufficient for the Bureau to "acknowledge[] the gaps in the data," rely on the "data it ha[s]," and make a reasonable decision. *Id.* at 425. The Bureau did that here.

Third, Plaintiff argues that the PACE Report's conclusion that PACE loans increased mortgage delinquency rates by 2.5 percentage points, or by 35%, is too small to justify the final rule. To start, as the Court will discuss in a moment, this finding had no effect on the portions of the rule that Plaintiff challenges. And Plaintiff's

43

conclusory assertion that increasing delinquency rates by over a third is insignificant is dubious at best. Regardless, whether a 35% increase in delinquency rates is significant or important enough is the kind of line drawing exercise left for an agency to make, and under the APA's "deferential and narrow standard, [a court] will not substitute [its] judgment for that of the agency." *See Gray Television, Inc.*, 130 F.4th at 1212 (cleaned up).

Fourth, Plaintiff claims that the PACE Report is undermined by the Bureau omitting from its analysis 22% of PACE applicants who could not be matched to credit histories. Plaintiff asserts without evidence that the omitted consumers were less creditworthy than their matched counterparts. But even if that's true, Plaintiff does not explain, nor does the Court see, how omitting these consumers from both the control group and the treated group impacted the PACE Report. And, as the Bureau explained, it is more likely that these consumers were not matched because of data issues. 90 Fed. Reg. at 2479. The data that the Bureau received from PACE companies allowed the Bureau to match consumers to their credit histories only by name and address. *Id*. And that limitation on matching consumers was caused by PACE companies' choice not to share other identifying information that would have increased the likelihood of matching consumers, like social security numbers. *Id*. While that choice may have been reasonable, the CFPB had to work with the data that it had. Moreover, considering that PACE loans are available only for homeowners and most home purchases are funded by mortgages, it's more likely that the unmatched consumers did indeed have credit histories and were not matched

because of data issues. *See id.* and *id.* n.253. Ultimately, that the Bureau omitted these
consumers from its study does not show that the Bureau failed to "examine the
relevant data." *Gray Television, Inc.*, 130 F.4th at 1216.

For these reasons, the Court finds that the PACE Report was not flawed and
that the Bureau acted reasonably in making the decisions it made in the report.

However, even assuming that the PACE Report was flawed in one of the ways
Plaintiff describes, that would not provide a basis to set aside the final rule. The APA
instructs courts to take "due account … of the rule of prejudicial error" when
reviewing agency decisions. *Bidi Vapor LLC v. Food & Drug Admin.*, 47 F.4th 1191,
1205 (11th Cir. 2022) (citing 5 U.S.C. § 706). This is known as the harmless error rule
and it means that agency action will not be disturbed where the "the agency's error
had no bearing on the procedure used or the substance of the decision reached." *Food
& Drug Admin. v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 590 (2025) (cleaned
up); *see also United States v. Schwarzbaum*, 24 F.4th 1355, 1366 (11th Cir. 2022) (same).
The CFPB has shown that is the case here with respect to Plaintiff's alleged flaws in
the PACE Report.

Recall that Plaintiff challenges the final rule's application of many of TILA's
mortgage credit provisions (and portions of other consumer protection laws) to PACE
financing as well as the CFPB's implementation of Congress's directive in Section
307. The PACE Report did not play a role in either decision. As discussed above,
application of TILA to PACE financing is based on whether PACE financing meets
TILA's definition of "credit." That is a legal determination—one that is not affected

45

by any issues (real or perceived) concerning the empirical analysis done in the PACE Report. Indeed, the Court assessed that question above without reference at all to the PACE Report. And in Section 307, the CFPB was required to apply TILA's ability-to-repay and civil liability provisions, whether it issued the PACE Report or not. *Cf. Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629–30 (2023) ("Where the agency was required to take a particular action, we have observed, that it provided a different rationale for the necessary result is no cause for upsetting its ruling." (cleaned up)).

Plaintiff points to the fact that the CFPB relied on the PACE Report in assessing the final rules costs, benefits, and impacts. To be sure, the Bureau did rely on the report in addressing the Dodd-Frank Act's requirement that the Bureau consider a rule's costs, benefits, and impacts. *See* 12 U.S.C. § 5512(b)(2)(A). But the relevant issue is whether the alleged errors Plaintiff cites affected the "substance" of the decisions the Bureau reached that Plaintiff challenges here. And the Court agrees that the Report did not factor into the Bureau's decisions that "TILA applies regardless of the current level of risk in any specific credit market," 90 Fed. Reg. at 2450, and that TILA's "existing ability-to-repay framework … effectively carries out the purposes of TILA's ability-to-repay provisions and is generally appropriate for PACE transactions," *id.* at 2464.

Accordingly, the Court finds that any potential flaws in the PACE Report are "harmless" and thus not a basis for set aside the final rule. *See Schwarzbaum*, 24 F.4th at 1366.

Accordingly, it is hereby

**ORDERED, ADJUDGED, and DECREED:**

(1) Defendants' Motion for Summary Judgment is **GRANTED** as to Counts I, II, and IV.

(2) Defendants' Motion to Dismiss Count III is **GRANTED.**

(3) Plaintiff's Motion for Summary Judgment is **DENIED**.