# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BUILDING RESILIENT
INFRASTRUCTURE &
DEVELOPING GREATER
EQUITY, INC.,

      Plaintiff,

v.                               Case No. 8:25-cv-1367-TPB-NHA

CONSUMER FINANCIAL PRO-
TECTION BUREAU, et al.,

      Defendants.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case presents a challenge to a final agency rule under the

Administrative Procedure Act ("APA") and comes before the Court on cross-motions

for summary judgment.  On November 7, 2025, Plaintiff Building Resilient

Infrastructure & Developing Greater Equity, Inc. ("BRIDGE" or "Plaintiff") filed

"Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law."

(Doc. 57).  On November 21, 2025, Defendants Consumer Financial Protection

Bureau and Russell Vought in his official capacity (together the "CFPB" or the

"Bureau") filed "Defendants' Combined Cross-Motion for Summary Judgment,

Opposition to Plaintiff's Motion for Summary Judgment and Motion to Dismiss."

(Doc. 62).  Plaintiff filed a combined reply memorandum in support of its motion for

summary judgment and response in opposition to the Bureau's motion on November

28, 2025. (Doc. 63). The Bureau filed a reply in support of its motion for summary judgment and to dismiss on December 5, 2025. (Doc. 66). The Court held a hearing on the parties' respective motions on December 16, 2025. (Doc. 71; 72). At the Court's direction, the parties submitted proposed orders on January 5, 2026. (Docs. 73; 74).[1]

Based on the motions, responses, replies, argument of counsel, the court file, and the record, the Court finds as follows:

## Background

### *Introduction*

Residential Property Assessed Clean Energy ("PACE") financing is a government initiative that allows a homeowner to borrow money to finance certain energy efficient and weather-hardening home improvement projects and the homeowner's loan is repaid through a voluntary assessment appearing on the homeowner's property tax bill. Multiple states – including Florida – have adopted

---

[1] Plaintiff initially filed a motion for preliminary injunction. (Doc. 23). After hearings on the matter on September 17, 2025, and October 8, 2025, the Court denied the motion for preliminary injunction and directed the parties to present their arguments in the form of cross-motions for summary judgment. *See* (Docs. 46; 51; 52; 56). Plaintiff appealed the denial order to the Eleventh Circuit Court of Appeals. (Doc. 58). At the Court's direction, the parties submitted legal memoranda addressing whether the pendency of the appeal deprived the Court of jurisdiction to rule on motions for summary judgment. *See* (Docs. 64; 67; 68). Both sides argued that it did not. The Court, having reviewed the parties' memoranda and conducted its own research, concludes that it has jurisdiction. *See, e.g., Alabama v. EPA*, 871 F.2d 1548, 1553-54 (11th Cir. 1989) ("The district court had jurisdiction to grant summary judgment and to dismiss the suit despite the pending interlocutory appeal."); *Johnson v. USDA*, 734 F.2d 774, 789 n.13 (11th Cir. 1984) ("When an appeal is taken from the denial or granting of a preliminary injunction, the district court retains full authority and jurisdiction to proceed toward a judgment on the merits.")

PACE programs by statute. In 2018, Congress passed the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA"), which required the CFPB to promulgate a rule applying the purposes of the "ability-to-repay" and related civil liability provisions of the Truth in Lending Act ("TILA") to PACE financing.

When the Bureau promulgated regulations, however, it went further. The Bureau issued a final rule amending the regulation implementing TILA, known as Regulation Z, to apply essentially all TILA provisions as well as portions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.*, and the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 ("SAFE Act"), 12 U.S.C. § 5101 *et seq.*, to PACE financing transactions. *See* 90 Fed. Reg. 2434 (Jan. 10, 2025) (the "PACE Rule"). Plaintiff BRIDGE is a PACE trade organization and alleges that its mission is to promote and advocate on behalf of the residential PACE industry and to support residential PACE companies. (Doc. 1, at ¶ 17).[2] BRIDGE filed this suit seeking to prevent enforcement of the rule under the APA, alleging that the rule is unlawful and that BRIDGE and its members, who are subject to regulation under the Rule, will be harmed by its operation. *See* (Doc. 1, at ¶¶ 9, 11-12, 16-17).

---

[2] The parties' cross-motions do not address Plaintiff's standing to pursue this action, which appears to be undisputed. The Court finds that Plaintiff's allegations regarding standing based on the impact of the PACE Rule on Plaintiff association and on its members confer standing on Plaintiff. *See* (Doc. 1, at ¶¶ 16-33).

***PACE Financing***[3]

Congress defined "[PACE] financing" to mean "financing to cover the costs of home improvements that results in a tax assessment on the real property of the consumer." 15 U.S.C. § 1639c(b)(3)(C)(i). The type of improvements that PACE financing can be used to fund vary based on the jurisdiction authorizing the improvement but are generally limited to improvements for energy-efficiency, resilience, and disaster recovery, based on a state legislature's policy objectives. *See, e.g.*, § 163.08(4), *F.S.*; Cal. Sts. & Hwys. Code § 5898.20(b). Typical PACE projects include solar panels, insulation and energy-efficient roofs, modern HVAC equipment, seawalls, and impact windows and doors.

At least nineteen states and the District of Columbia have enabling legislation allowing residential PACE programs. *See* 90 Fed. Reg. at 2435. However, at this point only a few states, principally California and Florida, have active residential PACE programs. *Id.* California first passed legislation authorizing PACE in 2008. *Id.* at 2437. For California and Florida, the PACE enabling statutes do not create statewide PACE programs. Rather, each county or municipality that wishes to offer PACE must separately opt-in through a resolution or other enabling legislation. *See* § 163.083(1), *F.S.*; Cal. Sts. & Hwys. Code § 5898.20.

---

[3] The background information set forth below is based largely on the parties' agreed submission of background information. (Doc. 50). The basic facts relating to PACE programs, the history of TILA, and the development of the PACE Rule are undisputed.

PACE agreements are voluntarily entered into between homeowners and local governments. *See* 90 Fed. Reg. at 2435. The local government may be a county, a municipality, or a separate government entity operating with the authority of several local governments and offering PACE in multiple jurisdictions within the state. *See id.* & n.3. The agreements may, but do not always, also include a private company – sometimes referred to as a PACE administrator – an agent for the local government. Some local governments administer PACE programs directly, but many local governments contract with these private companies to act as third-party administrators of PACE programs. 90 Fed. Reg. at 2435.

In the PACE financing agreements, the local government or PACE administrator will agree to arrange financing for the home improvement project (*i.e.*, pay the contractor performing the work on behalf of the homeowner). *See id.* Typically, the third-party PACE administrator may directly advance funds to the contractor. *See id.* The homeowner in return agrees to repay the cost of the home improvement through a tax assessment over a period of time, generally between five and thirty years. *Id.* The advanced funds are repaid by homeowners through assessments that are collected along with the homeowner's property tax and assessment obligations, typically semi-annually or annually. *Id.*; 90 Fed. Reg. at 2472.

PACE financing is typically secured by a super-priority lien on the real property, as typical with property tax and assessment liens. 90 Fed. Reg. at 2435.

These liens have priority under state law over mortgage liens on the property, including preexisting mortgage liens. *Id.* The obligation to pay the assessment runs with the property, in the sense that, unless the PACE loan is paid off at or prior to closing, the lien remains on the property when ownership transfers, and the new owner must continue to pay the assessments or risk losing the property. *See id.*

In 2018, California significantly enhanced its residential PACE program, requiring additional disclosures and an ability-to-repay assessment. *See* 90 Fed. Reg. at 2437. Florida, too, has implemented its own disclosure and ability-to-repay regimes for its PACE programs. *Id.* Both Florida and California regulate the origination of residential PACE financing and provide numerous homeowner protections. *See id*; *see also, e.g.*, §§ 163.081(3), (4), *F.S.* (among other things, requiring written disclosures of the estimated amount to be financed, the term of the financing agreement, the interest charged, and estimated annual percentage rate); Cal. Sts. & Hwys. Code §§ 5898.16, 5898.17 (among other things, imposing a right to cancel and a maximum financing-to-property-value ratio, requiring disclosures, and ability-to-repay requirements).

### *Federal Statutory and Regulatory History*

<u>TILA and Its Implementing Regulation Z</u>

Congress enacted TILA in 1968 to "assure a meaningful disclosure of credit terms so that the consumer [would] be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." *See* Pub. L.

No. 90-321, § 102, 82 Stat. 146 (1968); 15 U.S.C. § 1601(a). TILA only applies to "consumer credit," where "consumer" refers to a "natural person" to whom credit is offered or extended and "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." *See* 15 U.S.C. §§ 1602(f), (g), (i). Prior to the creation of the CFPB, TILA provided the Federal Reserve Board of Governors (the "Federal Reserve Board") with the authority to "prescribe regulations to carry out the purposes" of TILA. Pub. L. No. 90-321, § 105; 15 U.S.C. § 1604 (1970). TILA also authorized the Board to make "adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate [TILA's] purposes[.]" *Id*. The regulation implementing TILA is known as Regulation Z.

In 1981, the Federal Reserve Board exercised its authority under TILA to issue "official staff commentary to Regulation Z" that "applie[d] and interpret[ed]" the regulation. *See* 46 Fed. Reg. 50288, 50288 (Oct. 9, 1981). Comment 2(a)(14)-1 explains that "tax liens" and "tax assessments" are "not considered credit for purposes the regulation." *Id*. at 50292. As with many other portions of the official staff commentary, comment 2(a)(14)-1's discussion of tax liens "adopted" existing staff opinion letters regarding Regulation Z. *See id*. at 50288. In those letters, Federal Reserve Board staff concluded that tax assessments were not "credit" under TILA because TILA's definition of "credit" necessarily "assumes the right to avoid incurring debt," that is, the "debt must arise from a contractual relationship, voluntarily entered into, between the debtor and creditor." *See*, *e.g*., Fed. Rsrv. Bd.,

Pub. Information Letter No. 153 (1969) (concluding mandatory sewer assessments were not TILA credit) (Doc. 69-2, at 64).

<u>The Dodd-Frank Act of 2010 and Resulting Regulations</u>

In 2010, Congress enacted the Dodd-Frank Act, which created the Bureau and transferred primary rulemaking and interpretive authority for TILA from the Federal Reserve Board to the Bureau. *See* Pub. L. No. 111-203, § 1061, 124 Stat. 1376 (2010); 12 U.S.C. § 5512(a), (b)(1), (4); 15 U.S.C. §§ 1604(a), 1640(f). In addition, the Dodd-Frank Act, in response to the mortgage crisis in the 2008 recession, imposed additional substantive conduct requirements relating to mortgage loans. Thus, TILA today requires a creditor entering "a residential mortgage loan" to ensure that "the consumer has a reasonable ability to repay the loan . . .." 15 U.S.C. § 1639c(a)(1). More specifically, the ability-to-repay provision requires that "[i]n accordance with regulations prescribed by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." *Id*. The Bureau issued its "Ability-to-Repay" rule implementing this provision on January 30, 2013. *See* 78 Fed. Reg. 6408 (Jan. 30, 2013).

In July 2011, the Bureau issued a notice stating that "the official commentary, guidance, and policy statements issued prior to July 21, 2011, by [the

Federal Reserve Board] will be applied by the CFPB pending further CFPB action." *See* 76 Fed. Reg. 43569, 43570 (July 21, 2011). And on December 22, 2011, the Bureau republished Regulation Z and its official commentary without material change. *See* 76 Fed. Reg. 79768, 79918 (Dec. 22, 2011). Thus, the official commentary's exclusion of "tax liens" and "tax assessments" from the definition of consumer "credit" remained in effect.

EGRRCPA

In May 2018, Congress enacted the Economic Growth, Regulatory Relief, and Consumer Protection Act ("EGRRCPA"). *See* Pub. L. No. §115-174, 132 Stat. 1296 (2018). Relevant here is § 307, in which Congress added the following directive to the section of TILA addressing ability-to-repay requirements:

> The Bureau shall prescribe regulations that carry out the purposes of [TILA's ability-to-repay provision] and apply [TILA's civil liability provisions] with respect to violations [of the ability-to-repay provision] with respect to Property Assessed Clean Energy financing, which shall account for the unique nature of Property Assessed Clean Energy financing.

*Id.*; 15 U.S.C. § 1639c(b)(3)(C)(ii). In prescribing these regulations, Congress authorized the Bureau to "collect such information and data that the Bureau determines is necessary" and directed the Bureau to "consult with State and local governments and bond-issuing authorities." *Id.* § 1639c(b)(3)(C)(iii).

The PACE Rule

In response to EGRRCPA, the Bureau issued an Advance Notice of Proposed Rulemaking in March 2019. In that announcement, the Bureau stated it was

considering a proposed rule and solicited information to better understand the PACE financing market and the unique nature of PACE financing. *See* 90 Fed. Reg. at 2440. In May 2023, about four years later, the Bureau issued a proposed rule and at the same time published a report, "PACE Financing and Consumer Financial Outcomes" (the "PACE Report") analyzing PACE transaction data that the Bureau had received from PACE companies and other sources. *Id*.

On January 10, 2025, the CFPB published the PACE Rule that is the subject of Plaintiff's challenge in the Federal Register. The PACE Rule changed Regulation Z's official commentary to clarify that tax liens and tax assessments were excluded from the scope of "credit" only when involuntary. *See* 90 Fed. Reg. at 2443-49. With that clarification, the CFPB concluded that PACE financing meets the definition of "credit," meaning that virtually all TILA's provisions, not only the ability-to-repay and related civil liability provisions addressed in § 307, apply to PACE transactions. *See id*. at 2443. In addition, by construing PACE transactions as consumer credit under TILA, the PACE Rule applies certain provisions of RESPA (including the so-called "TILA-RESPA Integrated Disclosure" regulations) and explains that PACE financing is also subject to the SAFE Act. *Id*. at 2442, 2445-53, 2492, 2494-96.

The TILA-RESPA disclosure regulations require, for example, the provision of a "Loan Estimate" form and a "Closing Disclosure," with information to help consumers understand the key features, costs, and risks of the financing for which they are applying. The Loan Estimate must include, among other things, "identifying information for the borrower, the seller, where applicable, and the

lender," including "the name of any PACE [administrator] involved in the transaction," *id.* at 2459; financial information about the costs, terms, and payments for the transaction, including "the total periodic payment, as well as an itemization of the periodic payment's constituent parts," *id.*; and various qualitative disclosures to help the consumer understand the transaction. *Id.* at 2460; *see also id.* at 2459-61 (providing additional required disclosures). The PACE Rule also applies the "TILA-RESPA waiting period" to PACE transactions. *Id.* at 2454-55. And the Rule made a number of adjustments to the requirements for the Loan Estimate form (and Closing Disclosure) specific to PACE transactions, including eliminating certain fields relating to escrow account information. *Id.* at 2454-56.

In addition to the foregoing, the Bureau determined that the SAFE Act mandates that States require testing and licensing of all individuals deemed to be "loan originators" of PACE transactions. *Id.* at 2495.

On May 28, 2025, Plaintiff filed this suit to prevent implementation of the PACE Rule. Plaintiff alleges that the Rule (1) exceeds the Bureau's statutory authority because it applies essentially all TILA provisions to PACE financing, and in applying TILA's ability-to-repay provisions, fails to take into account the unique nature of PACE financing, (2) is arbitrary and capricious because it relies on the PACE Report, which Plaintiff contends is flawed, (3) was issued by the Bureau without complying with certain provisions of the Regulatory Flexibility Act, and (4) violates the Tenth Amendment by abridging States' sovereign taxing authority and

by "commandeering" state and local governments into implementing a federal regulatory program.

## Legal Standard

Ordinarily, Rule 56 of the Federal Rules of Civil Procedure governs the Court's review of a motion for summary judgment. However, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Thus, in such a case, the substantive standard in Rule 56 – whether there is a genuine dispute as to any material fact – does not apply. *CS–360, LLC v. U.S. Dep't of Veterans Affairs*, 101 F. Supp. 3d 29, 32 (D.D.C. 2015). Instead, "[s]ummary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.* (internal alterations and quotation marks omitted).

Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reaching its determination, "a court reviews legal issues de novo, including by applying its 'independent judgment' to statutory-interpretation questions." *Id.* at 1207 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92, 412 (2024)). Courts are to use the traditional methods of statutory interpretation to determine "the best reading" of a statute. *Loper Bright*, 603 U.S. at 400. While an agency's

interpretation of the statute may be especially informative where it rests on factual premises within the agency's expertise, generally courts do not give deference to the agency's interpretation of the statute. *See id.* at 400-402.

The other APA standard applicable here looks to whether agency action was arbitrary or capricious. "The arbitrary and capricious standard is exceedingly deferential." *Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013) (internal quotation marks omitted). A reviewing court's role is to "ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Id.* (internal quotation marks omitted). "In determining whether the agency acted arbitrarily and capriciously, [a court asks] whether the agency examined the relevant data and articulated a satisfactory explanation for its action." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1288 (11th Cir. 2015) (internal quotation marks omitted). The agency's action will be upheld as long as the agency has "acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, the arbitrary or capricious standard "provides the reviewing court with limited discretion to reverse an agency's decision." *City of N. Miami v. Fed. Aviation*

*Admin.*, 47 F.4th 1257, 1266 (11th Cir. 2022) (quoting *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009)).[4]

<h2 align="center"><u>Analysis</u></h2>

As stated above, Plaintiff raises four challenges to the PACE Rule.  The Court addresses these contentions in turn below.

### *CFPB's Statutory Authority to Promulgate the PACE Rule*

In § 307 of the EGRRCPA, Congress directed the Bureau to apply the purposes of TILA's ability-to-repay and related civil liability provisions to PACE financing.  In doing so, the agency was directed to "account for the unique nature" of PACE financing.  Plaintiff argues that the Bureau's PACE Rule exceeded this statutory authority in two ways: first, by applying TILA provisions other than the ability-to-repay and related civil liability provisions to PACE financing; and second, by failing to account for the unique nature of PACE financing.

#### <u>Application of TILA to PACE Financing Generally</u>

It is undisputed that the PACE Rule goes beyond the specific directive of § 307 because it applies provisions of TILA to PACE financing in addition to those addressed in § 307.  The Bureau contends, however, that PACE financing involves "consumer credit," which is within the scope of TILA, and therefore the PACE

---

[4] A "third APA-based standard of review," applies to agency findings of fact made in a "formal" proceeding, *i.e.*, one in which the agency conducted a hearing.  *See Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1207 (11th Cir. 2025) (citing 5 U.S.C. § 706(2)(E)). The parties agree that this standard does not apply to Plaintiff's challenge to the Bureau's PACE Rule.

Rule's application of other aspects of TILA was authorized by TILA's general grant of rulemaking authority to the Bureau.

*PACE Financing is "Credit."*

Whether the Bureau's rulemaking authority allowed broad regulation of PACE transactions under TILA therefore turns on whether PACE financing involves consumer credit. This is a question of statutory interpretation to be determined by the Court *de novo*.

TILA defines "credit" as the "right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). And a "consumer" credit transaction is "one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." *Id.* § 1602(i).

PACE loans are consumer credit under these provisions. PACE lenders offer consumers money to pay for home improvement projects; if consumers accept the deal, they repay the loan in installments over time through tax assessments placed on the property. In other words, PACE creditors grant debtors (here, the homeowners) the right to incur debt (the PACE loan) and defer its payment (repaid semi-annually or annually, alongside property taxes), for years.

Plaintiff argues that the consumer is not a "debtor" for purposes of TILA primarily because *the repayment mechanism* for PACE loans – a PACE assessment – attaches to and runs with the property, and the obligation cannot be enforced

against the consumer personally. As a result, Plaintiff argues, a PACE loan is neither extended to a natural person nor is it a debt "incurred by the homeowner."

"Debtor" is not defined in TILA, but it is commonly understood as "[s]omeone who owes an obligation to another" especially "an obligation to pay money." *Debtor*, Black's Law Dictionary (12th ed. 2024). Contrary to Plaintiff's argument, in PACE transactions, it is the homeowner who has the obligation to make a payment on the PACE loan each time the assessment comes due. PACE financing companies' contracts expressly place the responsibility, *i.e.*, the obligation, to repay the PACE assessments on the homeowners. *See e.g.,* (Doc. 69-3, at 81, 83). Moreover, if the homeowner fails to pay, he or she will suffer consequences, including the potential loss of his or her home in a tax sale or a foreclosure. That PACE loans are nonrecourse, meaning that the remedy for nonpayment is limited to seizure of the property rather than a money judgment, does not change the fact that the homeowner is the one who has the obligation to pay. Moreover, if the consumer sells the property, the PACE obligation will have to be taken into account one way or the other. If the buyer finances the purchase, the buyer's mortgage lender will likely require payoff of the PACE loan, because otherwise that lender's mortgage lien would be subordinate to that of the PACE super-priority lien. The PACE borrower would therefore be required to pay off the PACE obligation from the sale proceeds. In the event the buyer pays cash, the existence of the PACE lien would likely reduce the amount the buyer is willing to pay to the seller for the property.

In support if its argument, Plaintiff cites California federal district court decisions, principally *In re Hero Loan Litig.*, No. ED CV 1602478-AB (KKx), 2017 WL 3038250, at *3 (C.D. Cal. July 17, 2017), holding that PACE financing does not constitute consumer debt within the scope of TILA.[5] In *Hero*, the court offered two rationales for excluding PACE transactions from the definition of "credit" under TILA. One was deference to the Bureau's then-existing position excluding tax liens and assessments from the meaning of "credit," on the ground that the agency's position was not "demonstrably irrational." *Id.* (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)). Such deference to the agency on a legal issue would no longer be proper under *Loper Bright* and would not support Plaintiff here in any event because the Bureau has now clarified that PACE – a form of financing which did not exist at the time of the commentary cited by the *Hero* court – involves an extension of credit and is therefore subject to regulation under TILA.[6]

---

[5] *See also Burke v. Renew Fin. Grp., Inc.*, No. 2:21-cv-02938-RGK-PD, 2021 WL 5177776, *3 (C.D. Cal. Aug. 13, 2021) (citing *Hero, supra*).

[6] In supporting its conclusion that the Bureau's exclusion of tax liens and assessments from the definition of "debt" was not "demonstrably irrational," the *Hero* court rejected the plaintiffs' arguments that "debt" was by its nature voluntary while a tax was involuntary. *Hero*, 2017 WL 3038250, at *3. The court pointed to other, very different types of voluntary transactions that the Bureau's commentary excluded from the meaning of "credit" under TILA. But the fact that other types of voluntary transactions are excluded from TILA does not invalidate the voluntary/involuntary distinction as fundamental to differentiating between a tax and a debt, nor does it dictate that PACE financing is an instance of the former rather than the latter. Similarly unpersuasive is Plaintiff's pointing to special assessment districts which the taxpayers in a geographic area may impose on themselves by majority vote. Taxes imposed by a such a special district are not voluntary in the direct way that PACE transactions are voluntary, and, of course, they are not "voluntary" at all for those who voted against the district.

Second, to the extent the *Hero* court offered its own rationale, it simply opined that PACE transactions are imposed on property, not on the borrower, and are collected in the same manner and at the same time as general taxes. *Id.* As the Bureau correctly notes, however, to posit that the "property" incurs an obligation and that none is imposed on the consumer ignores the financing arrangement from which the PACE assessment arises as well as the implications for the consumer. As discussed above, the "property" does not make the agreed-upon payments, and it is the consumer who must do so or risk losing his or her property. Respectfully, the *Hero* court's reasoning elevates form over substance by ignoring the practical and legal realities of PACE transactions.

> *PACE Financing is Not a "Tax."*

Plaintiff repeatedly insists that PACE cannot be "credit" under TILA because "PACE is a tax assessment," and claims that Congress itself in § 307 defined PACE as a "tax assessment." This is incorrect. Congress did not define PACE as a "tax assessment;" it described PACE as *financing* that *results in* a tax assessment. This is not a mere semantic distinction. To assert that "PACE" *is* a "tax" or a "tax assessment" myopically focuses on one isolated aspect of PACE, the collection mechanism, and ignores the entire context in which that mechanism is used, which is the financing of a consumer purchase.

Plaintiff's argument also ignores the longstanding understanding of what a "tax" is. As the Supreme Court observed more than one hundred fifty years ago, "[a] tax is an impost levied by authority of government upon its citizens, or subjects, for

the support of the State." *Lane Cty. v. Oregon*, 74 U.S. 71, 80 (1868). Equally fundamental is that a tax "operate[s] *in invitum*," that is, against an unwilling party. *See Meriwether v. Garrett*, 102 U.S. 472, 513 (1880). PACE transactions do not share these characteristics. State and local government involvement in PACE is aimed at facilitating loans to encourage purchase of certain home improvements rather than raising revenue for the support of the government generally. Indeed, Plaintiff has pointed to no evidence suggesting that any monies collected through PACE property tax assessments anywhere in the country went into a public treasury for general governmental use. Instead, it appears that all monies collected through PACE property tax assessments received by local governments are used to recoup disbursements on PACE loans.

Furthermore, it is clear that PACE transactions are not unilateral impositions by the government on unwilling citizens. Instead, a PACE assessment arises from a voluntary contractual arrangement, which is the antithesis of a tax. *See id.* (distinguishing between taxes and debts, which are "obligations for the payment of money founded upon contract"); *Lane*, 74 U.S. at 80 (noting that, in contrast to a tax, a debt "originates in and is founded upon contracts"). That the borrower's repayments are made through the mechanism of a charge on his or her property tax bill as opposed to using some other collection mechanism does not transform the financing arrangement into a tax.

Holding that PACE financing is not a tax but a debt subject to TILA also makes sense in light of one of the key purposes of TILA, which is to "assure a

meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . .." 15 U.S.C. § 1601(a). This goal contemplates transactions in which the consumer has a choice and therefore a decision to make as to whether and on what terms to finance a purchase. That concept does not apply to taxation but applies fully to PACE transactions.[7]

Although Plaintiff argues that existing state law protections for consumers render regulation by the Bureau under TILA unnecessary, a point discussed below, the Court finds the fact that these statutes require analyses and disclosures similar to TILA further confirms that PACE financing involves the creation of consumer debt appropriate for regulation under TILA. For example, Florida's statute requires the program administrator (the local government or a third party to whom the government has delegated responsibility) to make findings on the assessment-to-value ratio, the property owner's creditworthiness, and the owners' ability to repay.

---

[7] Plaintiff correctly notes that the 1981 official commentary on Regulation Z by the Federal Reserve Board, adopted by the Bureau after it assumed enforcement of TILA, stated that tax liens and tax assessments were not within TILA's definition of "credit." *See* 46 Fed. Reg. at 50292 (official commentary 2(a)(14)-1). This official comment made sense as applied to taxation in general, which as discussed herein involves a unilateral imposition by the government, as opposed to a voluntary transaction. In fact, a staff letter issued long before the official comment had expressly opined that deferring payment on a tax assessment does not constitute the extension of credit subject to TILA precisely because it did not involve a "contractual relationship, voluntarily entered into, between the debtor and creditor." *See* (Doc. 69-2, at 64). PACE financing, which combines a voluntary financing transaction with a collection mechanism involving the use of the homeowner's property tax bill, did not exist when the official commentary was issued. After PACE financing was created beginning in 2008, the need arose to clarify the Bureau's official comment, which the Bureau did in the PACE Rule.

*See* § 163.081(3), *F.S.*  The statute requires disclosures to the homeowner that include the total cost including fees and interest, the right to cancel within three business days, and the absence of a prepayment penalty.  *See* § 163.081(4)(a)(1)-(10), *F.S.*  It also requires disclosure that, if the owner sells the property or refinances his mortgage, the refinancing lender or the buyer's lender may require payoff of the amount owed under the PACE financing, and that a failure to pay may result in penalties, fees, issuance of a tax certificate that could result in losing the property and a judgment against the property owner and may affect the owner's credit rating.  § 163.081(4), *F.S.*  Finally, and tellingly, those advertising or soliciting homeowner participation in the program are prohibited from suggesting or implying to the homeowner that the financing "does not require repayment of the financial obligation."  § 163.085(1)(a)(3), *F.S.*  California's PACE statutes include similar protections.  *See* Cal. Sts. & Hwys. Code §§ 5898.16, 5898.17.

> *§ 307 of EGRRCPA is Fully Consistent with the Bureau's Preexisting Authority to Regulate PACE Financing.*

Plaintiff argues that even if a court might otherwise conclude based on TILA's definition of credit and the plain meaning of "debtor" that PACE financing is covered, those definitions must be read together with § 307 of the EGRRCPA.  The latter provision, Plaintiff argues, by directing the Bureau to apply TILA's ability-to-repay provisions but remaining silent on other TILA provisions, reflects Congress's contrary intent that PACE transactions do not involve consumer credit.  Therefore,

Plaintiff argues, the Bureau may apply to PACE financing only the TILA provisions specifically listed in § 307.

The Court disagrees. Section 307 does not by its terms limit TILA's application to PACE financing to those TILA provisions specifically mentioned there. Had Congress wanted to so limit TILA's application in general, it easily could have said so expressly, but it did not. Moreover, Congress placed § 307's directive in TILA itself and, as noted above, defined PACE transactions not as a tax, but as "*financing*" that "*results*" in a tax assessment. *See* 15 U.S.C. § 1639c(b)(3)(C)(i). (emphasis added). The terms of § 307 are perfectly consistent with the proposition that PACE financing involves consumer credit that is subject to TILA.

Plaintiff argues that if PACE financing constituted consumer credit within the reach of TILA then § 307 would be rendered a "nonsensical nullity." But it is not "nonsensical" or redundant for Congress to *require* an agency to issue a rule relating to a specific activity that the agency *could have* already issued under its general rulemaking authority but had not.

Recognizing the Bureau's preexisting authority to apply TILA to PACE financing does not render § 307 superfluous for another reason as well. Under § 1604 of TILA, regulations issued by the Bureau may exempt "from all or part of this subchapter all or any class of transactions," with certain exceptions. *See* 15 U.S.C. § 1604(f)(1); *see also* 15 U.S.C. § 1604(a) (authorizing the Bureau to "provide for such adjustments and exceptions for all or any class of transactions," as the Bureau

determines are appropriate to effectuate TILA's purposes). Thus, even if the Bureau already had authority to apply to TILA to PACE financing, § 307 would still serve to limit the Bureau's discretionary authority to exempt PACE transactions from TILA's reach.

Plaintiff's reliance on *Bilski v. Kappos*, 561 U.S. 593 (2010), a patent case, to argue that the Bureau's reading of its preexisting rulemaking authority would render § 307 a nullity is misplaced. In *Bilski*, the Court addressed whether business methods were patentable under § 101 of the Patent Act, under which patents may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof . . .." *Id.* at 601 (quoting 35 U.S.C. § 101). A later-enacted provision of the Patent Act provided for a defense of prior use to claims of infringement of a business method patent. *Id.* at 607. If § 101 were interpreted as excluding the existence of such a claim, the later statute creating a defense to that claim would be truly useless, contrary to the "canon against interpreting any statutory provision in a manner that would render another provision superfluous." *Id.* Here, in contrast, for the reasons set forth above, reading the definition of "credit" as reaching PACE transactions does not render § 307 superfluous.

Plaintiff points to various items of extrinsic evidence it contends show that "Congress recognized that, under the existing legal landscape, PACE stood entirely outside of TILA's regime." (Doc. 57, at 14). This evidence includes (1) the fact that, even though PACE programs were created beginning in 2008, neither the Federal

Reserve Board nor the Bureau had taken action to regulate PACE programs prior to the enactment of § 307 in 2018, (2) the existence of decisions such as *Hero*, *supra*, holding that TILA did not apply to PACE, and (3) unsuccessful attempts to pass broader grants of authority for the Bureau to regulate PACE.  *See* (*Id.* at 13-14).

Whatever inferences one might draw from this evidence about Congressional understanding of the "legal landscape," the proper inquiry is to determine Congressional intent based on the terms of the statute, considering their plain meaning and the usual rules of construction, rather the speculating about what Congress collectively "recognized" or understood based on extrinsic evidence of a supposed "uniform understanding that TILA was inapplicable to PACE."  *See, e.g.*, *Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1361-62 (11th Cir. 2020) (noting that "it is better to analyze a statute than it is to psychoanalyze Congress.") (citing *United States v. Pub. Utils. Comm'n*, 345 U.S. 295, 319 (1953) (Jackson, J., concurring)).

Ultimately, the reason Congress acted the way it did is impossible to determine and largely beside the point.  When "a statute is passed by Congress, it is the text of the statute . . . and certainly not someone's understanding of the circumstances which gave rise to the legislation" that matters.  *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001).  Analyzing the text, the Court concludes that PACE financing meets TILA's definition of "credit," and § 307 of the EGRRCPA does not change that.  Accordingly, since PACE financing is within the definition of credit under TILA, the CFPB did not exceed its

statutory authority in issuing the PACE Rule that applied TILA provisions going beyond those specifically mentioned in § 307.

<u>The Bureau's Application of TILA's Ability-to-Repay Provisions</u>

Plaintiff argues that the PACE Rule exceeds § 307's grant of regulatory authority in another way. Specifically, Plaintiff argues that the PACE Rule, in its specific provisions applying the ability-to-repay requirements to PACE, fails to "account for" the unique nature of PACE financing as directed by § 307.

Section 307 expressly directs the CFPB to issue a rule "carry[ing] out the purposes" of TILA's ability-to-repay provision and "apply[ing]" TILA's civil liability provisions "with respect to [PACE] financing, which shall account for the unique nature of [PACE] financing." 15 U.S.C. § 1639c(b)(3)(C)(ii). Neither the EGRRCPA nor TILA defines or explains what it means to "account for" PACE financing's unique nature or limits the Bureau's determination in that regard. The online Merriam-Webster Dictionary offers several definitions of "account for," the one applicable in this context being "to think about (something) before doing something" or to "take (something) into consideration."[8] Accordingly, § 307 requires the CFPB to apply TILA's ability-to-repay and civil liability provisions taking into consideration PACE financing's characteristics.

---

[8] *See account for (something)*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/account%20for%20%28something%29; *see also Bufkin v. Collins*, 604 U.S. 369, 379 (2025) (finding that "to 'take account of' something means to give it attention or consideration[.]").

Upon review of the PACE Rule, the Court finds that the Bureau complied with this provision by considering various of PACE's unique characteristics and determining that the existing ability-to-repay framework should largely apply with certain adjustments. *See* 90 Fed. Reg. at 2464-66. For example, one of PACE's unique characteristics is that the "creditor" in such transactions will typically be a local government entity. TILA provides a private right of action against "creditors," but insulates local government entities from civil penalties. *See* 15 U.S.C. § 1612(b). In order to provide consumers in PACE transactions with sufficient remedies for violations of TILA's ability-to-repay provision as applied to PACE transactions, the PACE Rule extended liability to PACE companies that are substantially involved in making the credit decision. *See* 90 Fed. Reg. at 2473.

As for the ability-to-repay requirements, the Bureau considered, for example, that PACE loans are repaid through assessments on the consumer's property tax bill and many consumers will make such payments through an escrow account for an existing mortgage. The Bureau found that potential delays in the mortgage servicer's accounting for the new PACE loan might result in a situation where, by the time of a consumer's first PACE payment, there is a substantial shortfall in the consumer's escrow account, requiring the consumer to make a considerably higher mortgage payment to make up the difference. The PACE Rule accordingly directs PACE creditors to consider the timing of a consumer's first PACE loan payment for these consumers. *See id.* at 2468.

Plaintiff points to several factors that it claims the CFPB did not reasonably consider. Plaintiff notes that PACE assessments are not (in Plaintiff's view) debt obligations of individuals, that local government entities will be "creditors," and that PACE is only available on certain projects that further the State's policy goals. But Plaintiff offers no explanation why these factors demonstrate that the agency failed to account for the unique nature of PACE in the specific regulations it issued. In fact, Plaintiff appears to complain not so much that the Bureau failed to account for the nature of PACE financing in the specific regulatory provisions it issued, but that it applied TILA's ability-to-repay provisions to PACE financing at all.

Plaintiff argues that the Bureau should have adjusted the ability-to-repay framework to account for the fact that some state and local governments have already adopted some consumer protections and that some PACE companies voluntarily apply underwriting practices to ensure consumers can repay the loan. But the Bureau expressly considered these points in the PACE Rule and reasonably concluded that they do not militate against applying a uniform national ability-to-repay requirement for all consumers. *See id*. at 2465. As the Bureau explained in the PACE Rule, not all States with PACE-enabling legislation have comparable requirements, new States may enable PACE lending without enacting such requirements, and PACE companies that enter the market in the future may not voluntarily follow best practices not required by law. *See id.*

Ultimately, Plaintiff's complaint about the Bureau's application of TILA's ability-to-repay provisions to PACE financing is that the Bureau did not make

adjustments to TILA's requirements that reflect Plaintiff's concerns and preferences. That does not mean the Bureau failed to "account for the unique nature of [PACE] financing" or that the Bureau's consideration of PACE financing's unique nature was unreasonable. For these reasons, the Court finds that Plaintiff has not carried its burden to show that the CFPB exceeded its statutory authority in issuing the PACE Rule.

### Reliance on the PACE Report

The Bureau published the PACE Report, which analyzed the impact of PACE transactions on consumer financial outcomes, along with its Notice of Proposed Rulemaking, on May 1, 2023, and ultimately relied on the data and conclusions in the Report in various ways in the PACE Rule. Plaintiff alleges that the PACE Report is flawed, the Bureau's reliance on the Report's analysis was therefore arbitrary and capricious, and the Rule is unlawful and should be set aside.

As discussed above, the APA's arbitrary and capricious standard is highly deferential. The Court's role here is not to perform its own analysis or substitute its judgment for that of the agency but simply to "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. The Court is satisfied the Bureau's use of the data and conclusions in the PACE Report meets this standard of basic rationality. In fact, the Bureau's PACE Rule itself addresses Plaintiff's criticisms and offers a reasonable explanation for its disagreement with Plaintiff's points.

The Report compared financial outcomes over a period of time between two subsets of a sample of similar consumers who applied for and were approved for PACE loans. One subset, termed the "Originated" consumers, actually went forward with PACE financing. The other was a control group called "Application Only" consumers, consisting of individuals who applied for and were approved for a PACE loan but did not take out the loan. *See* (Doc. 69-1, PACE Report, at 9). The report concluded that the Originated consumers had, for example, a rate of mortgage delinquency that was 2.5 percentage points higher than Application Only consumer group. Against a baseline rate of 7.1 percent, this represented a 35% higher rate of delinquency. (*Id*. at 3).

Plaintiff argues the agency used the wrong control group because the Bureau's Application Only control group itself can be divided two different subgroups of individuals. One of these consists of those who did not obtain financing other than PACE financing to undertake the contemplated home improvement project (either because they paid cash or because they chose not to undertake the project). The other subgroup consists of those who undertook the project using some form of financing other than a PACE loan. Plaintiff contends only the latter subgroup should have been compared to the Originated group and, if that had been done, the Originated group would have performed better in comparison. Plaintiff argues that including in the control group individuals who did not incur any additional debt at all, whether via PACE or some other type of financing, necessarily would increase the likelihood of a comparatively negative

outcome for the Originated group.  Therefore, Plaintiff argues, the study does not shed light on the extent to which particular features of PACE financing, as opposed to incurring debt for a home improvement project in general, increase negative outcomes.

The Court is satisfied that the Bureau's choice of control group here was reasonable.  The PACE Rule itself explains the Bureau's reasoning.  The Bureau's approach was to examine the overall impact of PACE loans on consumers, including not only the impact of specific aspects of PACE lending, but also impact of consumers taking on additional debt for home improvement:

> The CFPB acknowledges that the estimates in the PACE Report evaluating the impact of a PACE loan include the impact of additional debt in general, as well as the specific features of PACE loans that differ from other forms of credit.  However, the CFPB views this as the correct way to evaluate the costs of PACE loans for consumers and thus the potential benefits of the rule in preventing such loans.  PACE loans have a variety of features that are relevant to whether consumers can repay, including but not limited to the structure of the obligations, the way they are marketed by home improvement contractors and PACE companies, the potential that consumers would take on a home improvement contract that might not otherwise occur, and the infrequent payment cycle relative to non-PACE mortgages, as well as imposing additional debt on the consumer.  But for the purposes of this rule, to determine whether consumers have difficulties affording PACE loans, the CFPB must determine the impact of all of these features collectively. . . . The overall impact of PACE loans on consumers is the relevant quantity for this analysis.

90 Fed. Reg at 2477.

While an argument can be made that using Plaintiff's preferred control group would have been a reasonable alternative approach as well, the Court finds the Bureau's approach lies within the zone of reasonableness.  The same is true of the

Bureau's reasons for concluding that proposed alternate analyses using Plaintiff's preferred control group would not be useful. One analysis used a control group that consisted of only 312 consumers (as to 45,000 in the Bureau's control group). The Bureau reasonably concluded this group would be "too small to have statistical power necessary to draw conclusions about the effect of PACE on consumer financial outcomes . . .." *Id.* at 2481. The Bureau reasoned that another suggested analysis used a control group that consisted of consumers who were materially different from consumers who obtained PACE financing. *Id.* In short, the Bureau acted reasonably in selecting the control group that it did.

Second, Plaintiff claims that the PACE Report relied on outdated data because most of the consumers in the study applied for and obtained PACE loans before certain state reforms took effect, including specifically California's 2018 reforms. But the Bureau acknowledged the relevance of those state reforms and separately analyzed pre- and post-reform data to understand their impact. *See id.* at 2476-78; (Doc. 69-1, at 163-69, "Regulating PACE: Case study of California"). Moreover, once again, the Bureau in the PACE Rule considered this point and offered a reasonable explanation for rejecting it – the possibility that other States might adopt PACE programs without needed regulation:

> Many commenters stated that the proposal was premised on outdated concerns, and that the CFPB should have relied more heavily on more recent trends and information. Some commenters, including PACE companies, a State agency, and a government sponsor, stated that evidence, including evidence from the PACE Report and California DFPI reports, for example, demonstrates that consumer outcomes

improved after California's and Missouri's consumer-protection
legislation took effect . . .

* * *

Recent efforts by States and PACE industry stakeholders to enhance
consumer protections do not make TILA requirements less meaningful
for PACE consumers.  Further, as the PACE industry continues to
grow, some States may not impose consumer protection requirements
similar to those under TILA, and new private participants may enter
the industry that do not share the same commitment to consumer
protections as current industry stakeholders have shown in recent
years.

90 Fed. Reg. at 2446, 2449.

Third, Plaintiff argues that the PACE Report's conclusion that PACE loans

increased mortgage delinquency rates by 2.5 percentage points, or by 35%, is too

small to justify the final rule.  But whether a 35% increase in delinquency rates is

significant or important enough is the kind of line drawing exercise left for an

agency to make, and under the APA's deferential arbitrary and capricious standard,

a court is not to "substitute its own judgment for the administrative agency's

decision." *See Defenders of Wildlife,* 733 F.3d at 1115.

Fourth, and finally, Plaintiff claims that the PACE Report is undermined by

the Bureau omitting from its analysis 22% of PACE applicants who could not be

matched to credit histories.  Plaintiff, however, has not demonstrated that the

omitted consumers were less creditworthy than the consumers included in the study

or demonstrated how the omission of these individuals from the Originated group

and the Application Only group impacted the PACE Report.  *See* 90 Fed. Reg at

2479.  That an agency lacks "perfect empirical or statistical data" does not render

its conclusions arbitrary or capricious. *Prometheus Radio Project*, 592 U.S. at 427.

Rather, it was sufficient for the Bureau to "acknowledge[] the gaps in the data," rely

on the "data it had," and make a reasonable decision. *See id*. at 425.

The Bureau did that here, expressly acknowledging the limitations of the

PACE Report. As the PACE Rule explained:

> The CFPB acknowledges several important limitations that prevent a
> full determination of benefits, costs, and impacts. The CFPB relies on
> the PACE Report for many parts of this discussion, but as discussed in
> the PACE Report itself, the data underlying the Report have
> limitations. The data used in the Report to evaluate consumer impacts
> are restricted primarily to consumers with a credit record. Further,
> the comparison groups used in the difference-in-differences
> analysis are reasonable but imperfect.

90 Fed. Reg. at 2476 (footnote omitted).

In sum, the Bureau reasonably used the study in the PACE Report to

illustrate, not the impact of specific aspects of PACE financing, but "the broader

effect that PACE loans have on consumers' finances . . .." *Id*. at 2470. Moreover,

the Bureau's PACE Rule relied not only on the Report, but on multiple sources of

information and evidence, including information presented in comments from

consumers and consumer advocates, state and local governments and PACE

financing companies, as well as the agency's own expertise and observations

regarding the specific features of PACE financing. For the foregoing reasons, the

Court concludes that the Bureau's reliance on the PACE Report was not arbitrary

or capricious.

*Failure to Convene a Small Business Review Panel*

 Plaintiff alleges that Bureau issued the PACE Rule "without observance of procedure required by law" in violation of the APA because the agency did not convene a "small business review panel" to consider the proposed rule as required under the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq*. ("RFA"). The Bureau argues that the RFA's provisions render the Bureau's alleged noncompliance with this requirement non-reviewable. Plaintiff, not surprisingly, disagrees. The question of this Court's jurisdiction to rule on the Bureau's failure to convene the small business review panel presents an issue of statutory construction subject to *de novo* review.

 The RFA requires that an agency, prior to promulgating a rule that will have a significant impact on a substantial number of small business entities, engage in an analysis of the impact of the proposed rule. Section 603 of the RFA requires that the agency conduct an initial regulatory flexibility analysis and § 604 requires that the agency conduct a final regulatory flexibility analysis. Section 609(b) requires the use of a small business review panel as part of the procedure for gathering information prior to publication of the initial regulatory flexibility analysis. Under § 605(b), the agency need not engage in either of these analyses if the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."

 Here, the CFPB did not do an initial or a final flexibility analysis and certified in the PACE Rule that there would not be a significant impact on a

substantial number of small entities. Plaintiff alleges that the agency's determination as to the lack of a significant impact was wrong because it improperly evaluated whether the impact would be "substantial" in terms of the number of small entities affected in comparison to the nationwide universe of home improvement contractors. Plaintiff argues that the Bureau instead should have used as its denominator the narrower universe of PACE-certified contractors in areas that have PACE programs. Accordingly, Plaintiff alleges, "the CFPB has no justification [for] not submitting the Final Rule to the Small Business Review Panel." (Doc. 1 at 57, ¶ 269).

As the Bureau argues, however, the Court of Appeals for the District of Columbia Circuit analyzed the RFA's scheme for judicial review and concluded that "the RFA renders this kind of claim unreviewable." *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1041 (D.C. Cir. 2012). The Court finds the reasoning of the D.C. Circuit persuasive and adopts it here.

Section 611 of the RFA provides that its provisions offer the only mechanism for judicial review. *See* 5 U.S.C. § 611(5)(c) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review *only* in accordance with this section.") (emphasis added). The same section of the RFA expressly provides for judicial review of agency compliance with the requirements of §§ 601, 604, 605(b), and 610. 5 U.S.C. § 611(a)(1). As the D.C. Circuit noted, "[c]onspicuously absent from [the] lists of reviewable claims is a claim alleging noncompliance with section 609(b) – the provision that requires the convening of

small business advocacy review panels." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1041. In addition, § 603, the provision requiring an initial flexibility analysis, thereby triggering the need for a small business review panel, is not listed as one of the sections that can be the basis for judicial review. Accordingly, the Court concludes that the Bureau's failure to convene a small business review panel is not reviewable.

Plaintiff tries to avoid this conclusion by pointing to the fact that § 611 provides for judicial review of the agency's certification as to the rule's impact on small businesses under § 605(b). Such a certification would allow the agency to dispense with an initial flexibility analysis, and therefore with the small business review panel. Plaintiff contends that the agency acted arbitrarily and capriciously when it certified that the requisite impact was absent. However, even if that were correct, it would not change the result. Under the clear statutory scheme, judicial review would be precluded even if the Bureau had made no certification whatsoever. Plaintiff offers no explanation or authority supporting the proposition that the Bureau's making a certification, but doing so incorrectly, somehow renders the failure to convene a small business review panel reviewable when the statute clearly precludes it.

Because the Bureau's alleged noncompliance with § 603 and § 609(b) is non-reviewable, the Court does not reach Plaintiff's arguments that the Bureau was

required to convene a small business panel and that its stated reasons for not doing so were inadequate.[9]

## *Violation of the Tenth Amendment*

Plaintiff alleges that § 307 and the PACE Rule violate the Tenth Amendment by (1) abridging an exercise of the States' taxing power in the form of PACE programs, and (2) impermissibly commandeering States into implementing a federal regulatory program. This issue of constitutional law presents a legal question to be considered by the Court *de novo*.

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U.S. Const. amend. X. Plaintiff argues that PACE programs represent an exercise of state power to levy taxes, and that the power to tax has been recognized as an essential government function and central to state sovereignty. *See Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 345 (1994); *Lane Cty.*, 74 U.S. at 80. Section 307 and the PACE rule, Plaintiff argues, treat local governments participating in PACE as creditors subject to TILA regulation and thereby abridges the States' power of taxation in violation of the Tenth Amendment. The Court finds no Tenth Amendment violation, for two reasons.

---

[9] While the Bureau requests dismissal of this Count rather than summary judgment, the Court believes the better approach is to grant summary judgment on Plaintiff's case as a whole. *See Nat'l Ass'n of Homebuilders*, 682 F.3d at 1034 (denying petition for review of final rule based in part on lack of jurisdiction to entertain the petitioner's challenge to EPA's failure to convene a small business review panel).

First, for all the reasons discussed above in connection with extending TILA to cover PACE financing, the latter does not involve taxation as traditionally understood, which is a levy by the government imposed on citizens regardless of their consent in order to obtain funds to support the government. *See Lane Cty.*, 74 U.S. at 80; *Meriwether*, 102 U.S. at 513. In addition, § 307 and the PACE Rule do not purport to directly regulate the assessment itself, which is merely the collection mechanism, but instead regulate the voluntary consumer credit transaction out of which the assessment arises.

Second, and more fundamentally, even if PACE programs involved the States' taxing power, the Tenth Amendment does not carve out particular state activities such as taxation as essential governmental activities or incidents of sovereignty that are completely free from federal regulation under the commerce clause or other powers the Constitution grants to the federal government. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546-48 (1988) (holding that the Tenth Amendment does not exempt state functions from federal regulation under the commerce clause simply because those functions can be classified as "traditional" government functions, or "important" or "integral" or "necessary" or "intrinsic parts of state sovereignty").[10]

---

[10] *See also Montgomery Cty. Comm'n v. Fed. Housing Fin. Agency,* 776 F.3d 1247, 1261 (11th Cir. 2015) (holding that federal statutory exemptions from state sales taxes on transfers by Freddie Mac did not violate Tenth Amendment, noting that under the supremacy clause Congress may enact statutes under the commerce clause that "supercede state tax law"); *N. Alabama Exp., Inc. v. I.C.C.*, 971 F.2d 661, 666 n.10 (11th Cir. 1992), *amended on reh'g*, 996 F.2d 1072 (11th Cir. 1993); *State of Alabama v. Lyng*, 811 F.2d 567, 570 (11th Cir. 1987) (holding that amendment to Food Stamp Act that conditioned state

It has long been held that the enactment of TILA was a valid exercise of Congressional power under the commerce clause. *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 377 (1973) (holding that TILA's "statutory scheme is within the power granted to Congress under the Commerce Clause."). Plaintiff does not argue to the contrary with respect to TILA in general or § 307 in particular and, as discussed above, the PACE Rule does not exceed the Bureau's statutory authority.

Plaintiff's argument that the Tenth Amendment is nevertheless violated appears to be based on the notion of "spheres of unregulable state activity," which was rejected by the Supreme Court in *Garcia* when it overruled *Nat'l League of Cities v. Usery*, 426 U.S. 823 (1976). *See N. Alabama Exp., Inc. v. I.C.C.*, 971 F.2d 661, 666 n.10 (11th Cir. 1992) (explaining that, under *Garcia*, "States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity.") (quoting *South Carolina v. Baker,* 485 U.S. 505, 512 (1988) (plurality opinion)), *amended on reh'g*, 996 F.2d 1072 (11th Cir. 1993). The Court therefore rejects Plaintiff's argument based on abridgement of state power to tax.

---

participation on compliance with prohibition on collecting state or local sales taxes did not violate the Tenth Amendment simply because it "affect[ed] a state's taxing power"); *Montgomery Cty., Md. v. Fed. Nat. Mortg. Ass'n*, 740 F.3d 914, 925-26 (4th Cir. 2014) ("[B]ecause we hold today that Congress acted within its Commerce Clause power in granting Fannie Mae and Freddie Mac statutory tax exemptions, the Tenth Amendment is inapplicable.").

Plaintiff additionally alleges that § 307 and the PACE Rule violate the Tenth Amendment's prohibition on federal laws that "compel the States to enact or administer a federal regulatory program." *See New York v. United States*, 505 U.S. 144, 188 (1992). Plaintiff argues that the "anticommandeering" principle is violated because the local government sponsor is the "creditor" responsible for compliance with TILA, and the directives of § 307 and the PACE Rule therefore "directly 'compel the States to implement . . . [a] federal regulatory program[.]'" (Doc. 1, at ¶ 248) (quoting *Printz v. United States*, 521 U.S. 898, 925 (1997)).

The Court finds no anticommandeering problem with § 307 or the PACE Rule. The anticommandeering doctrine does not apply unless Congress attempts to require "States in their sovereign capacity to regulate their own citizens;" it does not apply where the federal government regulates the activities of States and local governments "as voluntary participants subject to a generally applicable regulatory scheme." *See Reno v. Condon*, 528 U.S. 141, 151 (2000). "That a State wishing to engage in certain activity must take . . . action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Baker*, 485 U.S. at 514-15.

That is the case here. Section 307 and the PACE Rule do not purport to compel States to enforce a federal regulatory program to govern the conduct of their citizens. They require local governments to the extent they act as creditors in consumer lending transactions to follow the generally applicable federal

requirements for consumer lending.  For these reasons, § 307 and the PACE Rule do not violate the Tenth Amendment.

## Conclusion

For all the foregoing reasons, the PACE Rule does not exceed the Bureau's statutory authority, is not arbitrary or capricious, and does not violate the Tenth Amendment.  The Bureau's failure to convene a small business review panel is not reviewable.  Plaintiff's motion for summary judgment is therefore denied and the Bureau's motion for summary judgment is granted.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)  "Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law" (Doc. 57) is **DENIED**.

(2)  Defendants' cross-motion for summary judgment (Doc. 62) is **GRANTED**.

(3)  The Clerk is directed to enter final judgment in favor of Defendants.

(4)  Following the entry of judgment, the Clerk is directed to terminate

any pending motions and deadlines and thereafter close this case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 12th day of February, 2026.

TOM BARBER
UNITED STATES DISTRICT JUDGE